IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOAN GALE FRANK, JON A. BELL, SAMUEL BUKRINSKY, JAIME ALEXIS ARROYO BORNSTEIN, PEGGY ROIF ROTSTAIN, JUAN C. OLANO, and JOHN WADE in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan, on behalf of themselves and all others similarly situated, | §<br>§<br>§<br>§<br>§<br>§ | |
| | § | Civil Action No. |
| Plaintiffs, | §<br>§ | |
| v. | § | |
| | § | |
| THE COMMONWEALTH OF ANTIGUA AND BARBUDA, | §<br>§<br>§ | |
| | § | **JURY TRIAL** |
| Defendant. | §<br>§ | **DEMANDED** |
| | § | |

# CLASS ACTION COMPLAINT

Plaintiffs Joan Gale Frank, Jon A. Bell, Samuel Bukrinsky, Jaime Alexis Arroyo Bornstein, Peggy Roif Rotstain, Juan C. Olano, and John Wade in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their class action complaint against the Defendant, the Commonwealth of Antigua and Barbuda ("Antigua"), allege as follows:

# NATURE OF THE ACTION

1.      This is an action to recover billions of dollars of losses suffered by innocent and unsuspecting customers from around the world who entrusted their money to R. Allen Stanford's Stanford International Bank, Ltd. ("SIBL"), part of the Stanford

Financial Group ("SFG"), which has now been exposed as one of the most notorious, fraudulent, corrupt, and criminal enterprises in history.

2.      R. Allen Stanford ("Allen Stanford"), the various commercial entities that he controlled (the "Stanford Entities," and, together with Allen Stanford, "Stanford"), and certain of his employees engaged in a multi-year, multi-billion dollar "Ponzi" scheme of international scope.

3.      Antigua is sovereign, but not above the law.  It became a full partner in Stanford's fraud, and reaped enormous financial benefits from the scheme.  Stanford stuffed Antigua's coffers – and its officials' pockets – with money stolen from unsuspecting customers throughout the United States, Canada, Central America, South America, and elsewhere.  Antigua worked tirelessly to protect and nurture Stanford's criminal enterprise and, in return, eagerly accepted its share of criminally-procured funds.

4.      As described more fully below, Stanford's massive fraud would not have been possible without the active, knowing, and essential assistance of Antigua.  Antigua: (i) provided a safe haven for Stanford to operate; (ii) provided essential assistance in Stanford's efforts to portray itself to Plaintiffs and other members of the Class as a legitimate provider of financial services; (iii) participated with Stanford in a variety of commercial activities in Antigua that provided a pretext for the transfer of criminal proceeds from Stanford to Antigua; (iv) provided false and fraudulent information to the Securities and Exchange Commission ("SEC") and other regulators in order to thwart the SEC's investigations into Stanford; and (v) shared in the criminal proceeds of the

conspiracy, all or substantially all of which were stolen from the Plaintiffs and other members of the Class.

5.      Stanford's customers are devastated as a result of Stanford's and Antigua's fraudulent conduct, and those customers, including Plaintiffs and other members of the Class, are likely to recover only a *fraction* of the full amount owed to them through the pending court-ordered liquidation of the Stanford Entities.  The victims' losses are staggering, and the Plaintiffs and other members of the Class have a right to recoup their losses from Antigua, which was Stanford's full partner in crime.

## PARTIES

6.      At all relevant times, Plaintiff Joan Gale Frank is and was a citizen of the United States residing in Oregon.

7.      At all relevant times, Plaintiff Jon A. Bell is and was a citizen of the United States residing in Oregon.

8.      At all relevant times, Plaintiff Samuel Bukrinsky is and was a citizen of Mexico residing in Mexico.

9.      At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.

10.      At all relevant times, Plaintiff Peggy Roif Rotstain is and was a citizen of Peru residing in Peru.

11.      At all relevant times, Plaintiff Juan C. Olano was a citizen of Colombia and the United States residing in Florida.

12.     At all relevant times, Plaintiff John Wade was a trustee of the Microchip ID Systems, Inc. Retirement Plan.

13.     As of February 16, 2009, Plaintiffs were customers of SIBL, had money on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the Class, as defined below.

14.     Antigua is an independent state within the British Commonwealth of Nations.  On November 15, 2000, the United Nations Convention against Transnational Organized Crime (the "Convention") was adopted by resolution A/RES/55/25 at the fifty-fifth session of the General Assembly of the United Nations.  The United States signed the Convention on December 12, 2000, and ratified the Convention on December 13, 2000.  Antigua signed the Convention on September 26, 2001, and ratified the Convention on July 24, 2002.

## RELEVANT NON-PARTIES

15.     At all relevant times, SFG was the parent company of SIBL and a web of other affiliated financial services entities.  SFG maintained its headquarters in Houston, Texas, and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida.  Upon information and belief, the activities of SFG and all of the Stanford Entities were directed from SFG's Houston, Texas, headquarters.

16.     At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua and elsewhere.  SIBL was organized in Montserrat, originally under the name of Guardian International Bank.  In or about 1989, SIBL's principal banking location was moved to Antigua.

17.     From 2001 to 2008, SIBL marketed its primary investment product, Certificates of Deposit ("CDs"), and promised higher rates of return on those CDs than were generally offered at banks in the United States.  In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets.  In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

18.     At all relevant times, Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995.  SGC was registered with the SEC as a broker-dealer and investment advisor.  SGC also was a member of the Securities Investor Protection Corporation, and the Financial Industry Regulatory Agency (formerly, the National Association of Securities Dealers).  SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States.  According to the Court-appointed receiver[1] for the Stanford Entities, "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL."  Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

19.     Allen Stanford founded and owned SFG and its affiliated companies, including, through a holding company, SIBL.  Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

---

[1] On February 16, 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud."  By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver").

20.     James M. Davis ("Davis") was the Chief Financial Officer of SFG and SIBL, and served as a member of SIBL's Investment Committee.

21.     Laura Pendergest-Holt ("Pendergest-Holt") was the Chief Investment Officer of SFG.  In or about December 2005, Pendergest-Holt was appointed by SIBL's Board of Directors to be a member of SIBL's Investment Committee.  Gilberto Lopez ("Lopez"), a U.S. citizen and resident of Spring, Texas, worked in SFG's Houston, Texas, office, as the chief accounting officer of SFG and its affiliate, Stanford Financial Group Global Management, LLC ("SFGGM").  In this capacity, he provided accounting services to many entities under Stanford's control, including SIBL, SFG, and SFGGM.

22.     Mark Kuhrt ("Kuhrt"), a U.S. citizen and resident of Christiansted, St. Croix, U.S. Virgin Islands, was the global controller for SFGGM.  In this capacity, he provided accounting services to many entities under Stanford's control, including SIBL, SFG, and SFGGM.  Kuhrt reported at various times to Lopez and Davis, but also directly to Stanford.  Kuhrt is not a Certified Public Accountant.  (Allen Stanford, Davis, Pendergest-Holt, Lopez, and Kuhrt are referred to collectively herein as the "Stanford Co-Conspirators.")

23.     The Financial Services Regulatory Commission of Antigua ("FSRC") was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act (the "IBC Act").  FSRC is an agency and/or instrumentality of Antigua.

24.     During certain relevant times described below, Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things,

was supposedly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's

investment portfolio, including the review of SIBL's financial reports, and the response

to requests by foreign regulators, including the SEC, for information and documents

regarding SIBL's operations.  As the SEC alleged in its Second Amended Complaint in

the SEC Action, however, King "facilitated the Ponzi scheme by ensuring that the FSRC

'looked the other way' and conducted sham audits and examinations of [SIBL's] books

and records.  In exchange for bribes paid to him over a period of several years, King

made sure that the FSRC did not examine [SIBL's] investment portfolio.  King also

provided Stanford with access to the FSRC's confidential regulatory files."  [SEC Second

Amended Complaint at p. 3]

### The RICO Enterprises

25.     The "SFG Enterprise" consists of Stanford Financial Group and its

subsidiaries and formal affiliates, including but not limited to SIBL and SGC.  At all

relevant times, the SFG Enterprise was an "enterprise" within the meaning of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4).

26.     At all relevant times, the SFG Enterprise was "a global network of

privately held, wholly owned affiliated financial service companies. Although

independent, the affiliated companies together provide[d] coordinated wealth

management through international private banking, asset management, investment

advisory services, trust administration, commercial banking and insurance for clients

worldwide." [SIBL 2006 Annual Report]  Upon information and belief,  SFG had more

than 50,000 clients from more than 100 countries on six continents.  [SIBL 2007 Annual Report]

27.     At all relevant times, the SFG Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity alleged herein.

28.     The "SIBL Enterprise" consists of SIBL.  At all relevant times the SIBL Enterprise was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

29.     At all relevant times, SIBL was a banking institution chartered by Antigua.

30.     At all relevant times, the SIBL Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity alleged herein.

31.     The SFG Enterprise and the SIBL Enterprise are referred to collectively herein as the "Stanford Enterprises."

## JURISDICTION AND VENUE

32.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1605(a)(1), 1605(a)(2), and 1605(a)(3) in that this is an action against a foreign state; 28 U.S.C. § 1331 in that this case presents federal questions; and supplemental jurisdiction under 28 U.S.C. § 1367.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) on the ground that jurisdiction is not based solely upon diversity of citizenship and a substantial part of the events or omissions giving rise to the claim occurred in this District.

34.     Venue also is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) on the ground that it is an action against a foreign state as defined in 28 U.S.C. § 1603(a),

and that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

35.     The class of persons that Plaintiffs seek to represent (the "Class") is comprised of all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL.

36.     *Numerosity*.   A class action is appropriate in this case because the Class is so numerous that joinder of all members is impracticable.   While the precise number of Class members and their addresses are unknown to the Plaintiffs, their identities can be determined from SIBL's records.   Upon information and belief, Class members number in the tens of thousands.

37.     *Commonality.*   A class action is appropriate in this case because there are questions of law and fact common to the Class, including but not limited to:

(a)  whether Antigua received funds from the criminal proceeds of the Stanford Enterprises;

(b)  whether Antigua deceived the SEC for the purpose of perpetuating the Stanford Enterprises and enriching itself;

(c)  whether Antigua knew, or should have known, that the Stanford Co-Conspirators were using the Stanford Enterprises to perpetrate a massive "Ponzi" scheme;

(d)  whether Antigua committed wire fraud and mail fraud as part of the scheme;

(e)   whether Antigua's alleged acts of wire fraud and mail fraud had an effect upon interstate or foreign commerce;

(f)   whether Antigua conducted or participated, directly or indirectly, in the conduct of the Stanford Enterprises' affairs through a "pattern of racketeering activity" within the meaning of RICO;

(g)   whether Antigua conspired with the Stanford Co-Conspirators to perpetrate the fraud;

(h)   whether Antigua aided and abetted the fraud committed by the Stanford Co-Conspirators;

(i)   whether Antigua is liable to SIBL's depositors for their participation in the scheme;

(j)   the existence and the amount of damages suffered by members of the Class; and

(k)   whether Antigua misappropriated assets belonging to the Stanford Entities and, in so doing, deprived the Class of assets that should be available to satisfy their claims against the Stanford Entities.

38.   The questions of law and fact common to the Class predominate over any questions affecting only individual members.

39.   *Typicality.*  The claims of the representative Plaintiffs are typical of the claims of the Class.

40.   *Adequacy.*  The representative Plaintiffs will fairly and adequately protect the interests of the Class.

41.     In the absence of class certification, there is a risk that adjudications in thousands of separate cases with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

42.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Fraud[2]

43.     Stanford's business was a massive fraud in which the Stanford Co-Conspirators, through the Stanford Enterprises and with the knowing provision of substantial assistance by Antigua, misappropriated billions of dollars, falsified SIBL's financial statements, and concealed their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere.

44.     SIBL represented to the Plaintiffs and the Class that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) SIBL had averaged double-digits returns on its investments for over 15 years; (iii) Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by

---

[2] The allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex) (Second Amended Complaint), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, and other public materials and media reports.

a team of SFG analysts in Memphis, Tennessee; (v) SIBL, in early 2009, was stronger than at any time in its history; and (vi) SIBL did not have exposure to losses from investments in the fraudulent "Ponzi" scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme").  More fundamentally, Stanford and Antigua represented that SIBC was a legitimate banking institution, which made money by investing assets and generating investment returns.  These representations were false.

45.     Plaintiffs and other members of the Class reasonably relied upon these representations when making their decisions to invest in and with the Stanford Entities.

46.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that SIBL's representations were false; (b) intentionally and substantially assisted Stanford by concealing SIBL's false statements from customers (including Plaintiffs and other members of the Class) and other nations' regulators; and (c) affirmatively represented to Plaintiffs and the Class that the FSRC undertook audits that it did not actually perform.

47.     Contrary to SIBL's public statements, by February 2009, the Stanford Co-Conspirators, together with Antigua, had misappropriated billions of dollars from Plaintiffs and the Class, and "invested" an undetermined amount of those funds in speculative, unprofitable private businesses controlled by Allen Stanford.  Contrary to SIBL's representations regarding the liquidity and safety of its portfolio, the Plaintiffs' and the Class's funds were not invested in a "well-diversified portfolio of highly marketable securities."  Instead, SIBL internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

48.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that Stanford had misappropriated a significant portion of SIBL's investment portfolio; and (b) intentionally and substantially assisted Stanford's scheme for the purpose of sharing in the proceeds that Stanford had misappropriated from Plaintiffs and other members of the Class.

49.     According to the SEC, the Stanford Co-Conspirators fabricated SIBL's financial statements.  Using a predetermined return on investment number, the Stanford Co-Conspirators reverse-engineered SIBL's financial statements to report investment income that SIBL had not actually earned.  As a result, information in SIBL's financial statements and annual reports bore no relationship to the actual performance of SIBL's investments.

50.     Plaintiffs and other members of the Class reasonably relied upon SIBL's fabricated financial statements when making their decisions to entrust their money to the Stanford Entities.

51.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that the Stanford Co-Conspirators had fabricated SIBL's financial statements; and (b) intentionally and substantially assisted Stanford's scheme by falsely representing to Plaintiffs and other members of the Class that SIBL's financial statements were subject to, and approved only after, substantive review and scrutiny by the FSRC.

52.     In selling the CDs, SIBL touted, among other things, the CDs' safety, security, and liquidity.  SIBL told Plaintiffs and the Class that SIBL aggregated customer deposits, and then reinvested those funds in a "globally diversified portfolio" of assets.

SIBL also represented to the Plaintiffs and the Class that Stanford employed a sizeable team of analysts to monitor SIBL's portfolio.  These representations were false.

53.     Plaintiffs and other members of the Class reasonably relied upon SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio.

54.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio were false; and (b) intentionally and substantially assisted Stanford's scheme for the purpose of sharing in the proceeds that Stanford had misappropriated from Plaintiffs and other members of the Class.

55.     SIBL's annual reports also represented that "SIBL does not expose its clients to the risks associated with commercial loans...the Bank's only lending is on a cash secured basis."  Contrary to SIBL's representations, however, SIBL exposed Plaintiffs and the Class to the risks associated with more than $1.6 billion in undisclosed and unsecured personal "loans" to Allen Stanford.  To conceal the theft, some of these "loans" were evidenced by promissory notes from Allen Stanford.

56.     These promissory notes were typically created after Davis had, at Allen Stanford's direction, fraudulently wired out billions dollars of SIBL investor funds to Allen Stanford or his designees.  Allen Stanford made few, if any, payments required by the terms of the promissory notes, and the outstanding loan balances and interest owed by him to SIBL were rolled into new, larger, promissory notes.

57.     The personal "loans" to Allen Stanford were inconsistent with representations that had been made to Plaintiffs and members of the Class:  despite the fact that SIBL's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related-party transactions entered into by SIBL, SIBL's "loans" to Allen Stanford were not disclosed in the "Related-Party Transactions" section of SIBL's annual reports from 2004 through 2008.

58.     Allen Stanford used the money that he "borrowed" from SIBL to, among other things, fund his personal ventures and private pursuits, including more than $400 million to fund personal real estate deals and more than $36 million to subsidize "Stanford 20/20", an annual cricket tournament that boasted a $20 million purse.

59.     Plaintiffs and other members of the Class reasonably relied upon SIBL's misrepresentations regarding SIBL's bogus "loans" to Allen Stanford.

60.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding SIBL's bogus "loans" to Allen Stanford, and the omission and/or mischaracterization of those "loans" in SIBL's Annual Reports; and (b) intentionally and substantially assisted Stanford in concealing SIBL's false statements regarding those bogus "loans" from Plaintiffs, other members of the Class, and other regulators.

61.     Allen Stanford's misappropriation of the Plaintiffs' and the Class's assets (and the poor performance of SIBL's investment portfolio) created a giant hole in SIBL's balance sheet.  To conceal their fraudulent conduct and thereby ensure that Plaintiffs and the Class continued to entrust their money to SIBL, the Stanford Co-Conspirators

fabricated the growth, composition, and performance of SIBL's investment portfolio to give the appearance that SIBL's investments were highly profitable.

62.     In its training materials for the SGC advisers, SIBL represented that it had earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years.  SIBL marketed the CDs using these purported returns on investment.  Likewise, SIBL's Annual Reports stated that the bank earned from its "diversified" investments approximately $642 million in 2007 (11 %), and $479 million in 2006 (12%).

63.     SIBL claimed that its high returns on investment allowed it to offer higher rates on the CD than those offered by U.S. banks.  For example, SIBL offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed-rate CD based upon an investment of $100,000.   On November 28, 2008, SIBL quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid less than 3.2%.

64.     None of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio was true.  Instead, through their actions, the Stanford Co-Conspirators caused SIBL to report investment income that the bank did not actually earn and, thereby, greatly inflate the value of its investment portfolio.  Specifically, the Stanford Co-Conspirators prepared and reviewed SIBL's financial statements, including the annual reports that were provided to customers and posted on the bank's website.

65.     Plaintiffs and other members of the Class reasonably relied upon the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio.

66.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding the false and fraudulent nature of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio; and (b) intentionally and substantially assisted Stanford's scheme by falsely representing to Plaintiffs and other members of the Class that SIBL's financial statements were subject to, and approved only after, substantive FSRC review and scrutiny.

67.     As world financial markets experienced substantial declines in 2008, it became apparent to Allen Stanford and Davis that SIBL could not credibly report investment profits in the 11 % to 15% range (as it had done in previous years). Allen Stanford and Davis thus agreed that SIBL would for the first time show a "modest" loss to avoid raising too many "red flags" to customers and other nations' regulators. In other words, they opted to tell a "more believable lie" in order to conceal their many previous years of fraudulent conduct.

68.     SIBL touted a purported $541 million capital infusion from Allen Stanford in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

69.     The purported capital infusions by Allen Stanford were backdated, fictitious, and engineered to give the appearance that SIBL had achieved "desired" levels of capital.

70.     In December 2008, well after Allen Stanford had purportedly infused the $541 million in additional capital into SIBL, Allen Stanford, Davis, Kuhrt, and Lopez approved and implemented a scheme wherein they "papered" a series of fraudulent round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by SIBL in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

71.     To give the appearance that the above-referenced capital infusions actually occurred, Allen Stanford, Davis, Kuhrt, and Lopez falsified accounting records by recording bogus transactions:

- SIBL sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIBL the $63.5 million);

- the Stanford-controlled entities, at Allen Stanford's and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Allen Stanford's personal debt to SIBL, Allen Stanford contributed to SIBL $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation); and

- Allen Stanford then contributed to SIBL additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

72.     These transactions did not infuse real capital into SIBL. In fact, the entire process was fabricated after the reported capital contributions allegedly occurred.

Moreover, the purported inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles. SIBL did not secure an appraisal and had no other reasonable support for such a drastic increase in value.  The transactions among Stanford-controlled entities simply were not the kind of arm's-length transactions required to justify a 5000% increase in value. Nevertheless, on a mere promise from Allen Stanford that the land would appraise for over $3 billion, Stanford, Davis, Kuhrt, and Lopez used $63.5 million of Antiguan real estate to simultaneously plug a multi-billion dollar hole in SIBL's balance sheet and eliminate a significant portion of Allen Stanford's personal debt to SIBL.

73.     Following the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate.  Yet, SIBL did not disclose the transactions in its December 2008 newsletter, which touted Allen Stanford's purported capital infusion.  Moreover, Stanford's real estate investments were wholly inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate.

74.     Plaintiffs and other members of the Class reasonably relied upon the information regarding Allen Stanford's purported capital infusion to SIBL.

75.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding the fraudulent nature of both Allen Stanford's purported capital infusion to SIBL and the Stanford Co-Conspirators' inflated appraisal of Antiguan real estate; and (b) intentionally and substantially assisted Stanford in concealing SIBL's

fraudulent real estate machinations from Plaintiffs, other members of the Class, and other nations' regulators.

## Misrepresentations Regarding Management
## of SIBL's Investment Portfolio

76.     Prior to making decisions to entrust their money to SIBL, prospective customers routinely asked how SIBL safeguarded and monitored its assets.  They also frequently inquired whether Stanford could "run off with the money."

77.     In response to these questions, at least during 2006 and much of 2007, Pendergest-Holt trained SIBL's senior investment officer ("SIO") to tell customers and prospective customers that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.  The SIO followed Pendergest-Holt's instructions, telling customers and prospective customers that SIBL's entire investment portfolio was managed by a global network of money managers and monitored by a team of more than twenty analysts.

78.     Neither Pendergest-Holt nor the SIO disclosed to customers that SIBL segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3").  As of December 2008, Tier 1 represented merely approximately 9% ($800 million) of SIBL's purported portfolio.  Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximate1y 10% of

SIBL's portfolio.  Tier 3, the undisclosed assets managed by Allen Stanford and Davis, thus represented *approximately 80%* of SIBL's investment portfolio in December, 2008.

79.     Neither Pendergest-Holt nor SIBL's SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Allen Stanford and Davis. Likewise, they did not disclose that Allen Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIBL's assets.

80.     Neither Pendergest-Holt nor the SIO disclosed to the Plaintiffs or the Class that the "global network" of money managers and the team of analysts did not manage any of SIBL's Tier 3 investments and, in reality, only monitored approximately 10% of SIBL's portfolio.  In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIBL's portfolio because that information "wouldn't leave an investor with a lot of confidence."  Likewise, Davis instructed the SIO to "steer" potential customers away from information about SIBL's portfolio.

81.     Plaintiffs and other members of the Class reasonably relied upon the information disseminated by SIBL's SIO when making their decisions to invest in and with the Stanford Entities.

82.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding the fact that, as of December, 2008, undisclosed Tier 3 investments represented approximately 80% of SIBL's portfolio; and (b) intentionally and substantially assisted Stanford in concealing SIBL's method of segregating its investment

portfolio into three "tiers" from Plaintiffs, other members of the Class, and other nations' regulators.

## Misrepresentation That SIBL Was "Stronger" Than Ever Before

83.     On January 10, 2009, Allen Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performers Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

84.     During that meeting, Davis stated that SIBL was "stronger" than at any time in its history.  Allen Stanford, Davis, and Pendergest-Holt represented that SIBL was secure and built upon a strong foundation, and that its financial condition was shored up by Allen Stanford's capital infusions.  Davis, however, failed to disclose that he had been informed only days earlier by the head of SIBL's treasury that, despite SIBL's best efforts to liquidate Tier 2 assets, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million.

85.     Allen Stanford and Davis also failed to disclose to the SGC sales force that: (i) Allen Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIBL's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIBL customers' funds had been invested in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity; and (iv) the purported 2008 capital infusions by Allen Stanford were a fiction.

86.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered

questions about SIBL's investment portfolio.  In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIBL's entire investment portfolio and, instead, only monitored approximately 10% of the bank's investments. She also failed to disclose that SIBL had invested SIBL's funds in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity.

87.     Allen Stanford, Davis and Pendergest-Holt also failed to disclose that, on or about December 12, 2008, Pershing, LLC (SGC's clearing broker-dealer) had informed SGC that it would no longer process wire transfers from SGC to SIBL for the purchase of the CDs, citing suspicions about SIBL' s investment returns and its inability to get from the bank "a reasonable leve1 of transparency" into its investment portfolio.

88.     Allen Stanford, Davis and Pendergest-Holt knew that SGC advisers would rely upon the information provided to them during the Top Performers Club meeting to sell CDs.  Plaintiffs and other members of the Class reasonably relied upon that information.

89.     Upon information and belief, Antigua, through the FSRC had actual knowledge regarding the facts that: (i) in the second half of 2008, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million; and (ii) Pershing, LLC, had discontinued its role as SGC's clearing broker-dealer due to its suspicions regarding SIBL.

**Exposure to Losses From Madoff-related Investments**

90.     In the December 2008 Monthly Report, SIBL told its customers that it "had no direct or indirect exposure to any of [Bernard] Madoff s investments."

91.     Contrary to this statement, Allen Stanford, Davis and Pendergest-Holt knew, prior to the release of the December 2008 Monthly Report, that SIBL had exposure to losses from the Madoff Scheme.

92.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIBL had invested, detailing SIBL's exposure to losses from the Madoff Scheme.

93.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIBL had exposure to losses from the Madoff Scheme in two additional funds through which SIBL had invested.  That same day, Davis, Pendergest-Holt, and others consulted with Allen Stanford regarding the bank's exposure to losses from the Madoff Scheme.

94.     Allen Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

95.     Plaintiffs and other members of the Class reasonably relied upon the information regarding SIBL's purported lack of exposure to losses from the Madoff Scheme.

96.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding SIBL's exposure to losses from the Madoff Scheme; and (b) intentionally and substantially assisted Stanford in concealing SIBL's exposure to losses

from the Madoff Scheme from SIBL's customers (including Plaintiffs and other members of the Class) and other nations' regulators.

### Antigua's Participation in the Fraud

97.     Tourism accounts for more than half of Antigua's gross domestic product. After a series of violent hurricanes devastated Antigua's tourism infrastructure in 1995, Antigua experienced a sharp decline in tourist arrivals and revenue; this decline was exacerbated by the recent global economic downturn.  As a result of this decline in its primary source of income, Antigua experienced severe fiscal difficulties.

98.     Partly as a result of the decline in tourist revenues, Antigua has, for many years, had difficulties in engaging in routine commercial activities such as securing loans from legitimate sources.  At the time, "most [banks] balk[ed] at lending to a bloated and revenue-strapped government with a record of mismanagement and corruption."

[P. Fritsch, *Antigua, Island of Sun, Is Also in the Shadow of R. Allen Stanford*, WALL ST. JOURNAL, Mar. 5, 2002, pg A1 (the "2002 WSJ Article")]

99.     Antigua therefore entered into a corrupt and illegal commercial partnership with the Stanford Co-Conspirators, in which Antigua became an integral part of, and beneficiary of, Stanford's multi-billion dollar international fraudulent conspiracy.

### Antigua's Commercial Lending Relationship With Stanford

100.    Despite Antigua's lack of creditworthiness with legitimate lending institutions, Stanford provided Antigua with vast sums of money from the Stanford Enterprises – funds stolen from Plaintiffs and other members of the Class – and entered

into a series of commercial business transactions with Antigua, all with the purpose and effect of prolonging, and making Antigua a full partner in, Stanford's criminal enterprise.

101.    According to a March 11, 2009, report on Bloomberg News's website [*Stanford's Island Empire Implodes As Antigua Grabs Properties*, by Alison Fitzgerald and Thomas Black (the "2009 Bloomberg Article")] Stanford has "loaned" at least $85 million to Antigua.   It now is apparent that the money that Stanford "loaned" to Antigua was stolen from members of the Class, including Plaintiffs.

102.    For example, in May, 1995, Stanford "loaned" roughly $11 million to Antigua, which Antigua used to pay salaries of public employees and contributions to those employees' pension fund.  Upon information and belief, the "loan" was a transfer from the Stanford Entities to Antigua using proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and other members of the Class.

103.    Upon information and belief, all or substantially all of Stanford's loans to Antigua have not been repaid.

### Antigua's Commercial Partnership with Stanford in the Development and Operation of V.C. Bird International Airport

104.    In May, 1993, on the same day that Stanford made its first significant loan (approximately $3.7 million) to Antigua, Stanford and Antigua entered into a "trust" agreement that gave Stanford near-total control over the V.C. Bird International Airport in Antigua.

105.    Stanford and Antigua worked together on many improvements to the airport between 1993 and 2009.  Indeed, according to the Judicial Committee of the United Kingdom's Privy Council (the final Court of Appeal for Commonwealth countries

who have chosen to retain it), by 2002, Stanford "was in the process of preparing a plan, *on the instructions of the government*, of the expansion and redevelopment of the airport and its surroundings" (emphasis added).   This plan for the commercial development of the airport by Stanford, under the instructions of Antigua, was known as the "Master Plan."

106.    The Master Plan resulted in a commercial partnership between Antigua and Stanford in the development and operation of the airport and its surrounding facilities.

107.    At Antigua's direction, and with its express approval, Stanford developed the area around the airport to include SIBL's (and the Bank of Antigua's) offices, a cricket stadium, and two restaurants.

### Antigua's Commercial Partnership with Stanford in Real Estate Sales and Development

108.    Antigua has, on several occasions, sold land to Stanford at what former Prime Minister Lester Bird called "cut-rate prices."  [2009 Bloomberg Article]

109.    Upon information and belief, Stanford facilitated at least some of these sales by making payments to public officials.  For example, in 2003, when Allen Stanford was seeking to swap land owned by his Bank of Antigua for other land that he wished to develop, Allen Stanford gave separate $74,000 checks to Antigua's Tourism Minister and Planning Minister.  Upon information and belief, each of those payments was made with proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

110.     In 2003, Antigua sold Maiden Island, a 23-acre property, to Stanford. Upon information and belief, that purchase was made using proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

111.     In 1997, Antigua, acting in furtherance of Stanford's commercial interests, pressured the American owner of the 110-acre Half Moon Bay beach resort to sell that property to Allen Stanford.  When the American hotel owner refused to accede to Antigua's demand to sell, Antigua moved to expropriate the property by eminent domain. The hotel owner litigated the matter for more than a decade until, in late 2007, the Privy Council ruled that Antigua had the right to nationalize the land.  Prior to Allen Stanford's arrest, Antigua had convened an "Assessment Board" to set the value that the new owner to be selected by Antigua – presumably, Allen Stanford – would need to pay the former owner for the confiscated property

### Caribbean Star Airlines

112.     In January, 2000, Stanford incorporated "Caribbean Star Airlines", a for-profit airline company.

113.     From its inception, Caribbean Star Airlines was an integral part of the Stanford Enterprises.

114.     Upon information and belief, Caribbean Star Airlines was established, funded, and maintained using proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

115.     In 2007, Leeward Islands Air Transport Services ("LIAT"), an airline owned in large part by Antigua, purchased Caribbean Star Airlines, and several airplanes belonging to Caribbean Star, from Stanford, on favorable terms.

116.     Upon information and belief, Antigua, through LIAT, would not have had the financial ability to purchase Caribbean Star Airlines but for the fact that funding was made available to it by the Stanford Enterprises.

### Antigua's Commercial Partnership with Stanford In the Development of Mount St. John Medical Centre

117.     In the late 1990s and early 2000s, Antigua partnered with Stanford and others in the construction of Antigua's new Mount St. John Medical Centre.

118.     As part of the partnership, Antigua sought, and received, a $30 million loan from Stanford for the hospital's construction costs.  Upon information and belief, the funds that Stanford made available to Antigua for construction of the hospital were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

119.     Stanford was appointed as the Chairman of the Board of the hospital. Subsequently, an independent commission tasked with investigating allegations of corruption in the building of the hospital determined that Antigua had promised to repay the $30 million loan to Stanford with funds that were taken directly from Antigua's social security system.

120.     Thus, the purported "loan" agreement was actually a fraudulent scheme between Antigua and Stanford designed to use $30 million of proceeds from the Stanford Enterprises to enable Antigua to loot its own social security system.

121.     As a result of the commission's report, Allen Stanford resigned from the hospital's Board of Directors.

## Stanford's Transfer
## Of Additional Crime Proceeds to Antigua

122.     At roughly the same time, Stanford also underwrote the construction of new executive offices for the government of Antigua.

123.     Upon information and belief, the funds that Stanford made available to Antigua for construction of the executive offices were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

124.     In 2001, Allen Stanford announced that he would forgive a $5 million loan that he personally had made to Antigua, and provide an additional loan to pay Antigua's back salaries and meet other obligations.  Upon information and belief, the funds loaned to Antigua were stolen from Plaintiffs and other members of the Class, then transferred to Antigua.

125.     A U.S. official responded to Allen Stanford's decision to forgive the loan by stating that "[w]e've made clear to the [Antiguan] government that this does not at all look good" when juxtaposed with Antigua's then-pending (and eventually-successful) effort to confiscate the Half Moon Bay hotel.   [2002 WSJ Article]

126.     Upon information and belief, the funds that Stanford made available to Antigua through both the loan forgiveness and the additional loan were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

127.    In 2004, Antigua's Finance Minister disclosed that Stanford had: (a) agreed to write off roughly $18 million of Antigua's debt; (b) "donated" money needed to build a national library; and (c) "donated" $9 million for a higher education complex for Antigua.  Upon information and belief, the funds that Stanford made available to Antigua for loan forgiveness, to pay for the national library, and to pay for the higher education complex were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

128.    In return for the transfer of funds from the Stanford Enterprises to Antigua, Antigua allowed Allen Stanford to acquire yet another island, Guiana Island. Upon information and belief, the funds that Stanford used to purchase that island were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

129.    Antigua also partnered with Stanford to create the "Empowerment for Ownership Initiative."  According to Antigua's Minister of Finance and Economy, this initiative represented a "far-reaching and historic alliance between the Stanford Group and the Government of Antigua."  [2005 Budget Statement, Hon. L. Errol Cort, MP, Nov. 30, 2004, "2005 Budget Statement"]  According to a 2007 Antigua and Barbuda Budget Presentation, the "initiative represent[ed] a collaborative undertaking of the Government, the Stanford Group of Companies and the [Antigua Barbuda Development] Bank." Upon announcing the initiative, the Minister of Finance and Economy stated that "[t]he Government of Antigua and Barbuda looks forward to an enduring and productive partnership with the Stanford Group."  [2005 Budget Statement]

130.    The "collaborative undertaking" between Antigua and Stanford was created with "a $10 million fund endowed by the Stanford Group of Companies." *Id.* Upon information and belief, the funds that Stanford used to fund the endowment were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

131.    Antigua also has entered into a commercial venture with Stanford in the promotion of the sport of cricket.  At relevant times, Stanford bankrolled Antigua's national professional cricket team, and built the large "Stanford Cricket Ground" near the V.C. Bird International Airport.  Upon information and belief, the funds used to support these joint Antigua-Stanford commercial ventures were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

132.    Stanford and Antigua also collaborated on the funding, construction, and improvement of Antigua's infrastructure prior to Antigua's hosting in 2006 of the initial "Stanford 20/20" cricket tournament at the St. John's "ground."  The "20/20" tournament was also held in St. John's in 2007 and 2008, and was a substantial source of revenue for Antigua's suffering tourist industry.  Upon information and belief, the funds used to support this joint Antigua-Stanford commercial venture were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

### Antigua's Actions to Protect the Stanford Enterprises

133.    In light of the many lucrative commercial activities undertaken by the Antigua-Stanford collaboration, Antigua had an extremely strong financial incentive to

ensure the continuity of the Stanford Enterprises, from which Antigua had profited so handsomely.

134.    Upon information and belief, Antigua and the FSRC undertook a comprehensive effort to ensure the continuous flow of money and commercial activity between itself and the Stanford Enterprises by insulating the Stanford Enterprises from scrutiny by customers and other nations' regulators.

135.    In the late 1990s and early 2000s, Antigua took several self-serving steps to protect the Stanford Enterprises from any such scrutiny, and to perpetuate the scheme.

136.    In or about 1996, the Prime Minister of Antigua appointed Allen Stanford to spearhead a revision of Antigua's offshore banking regulations.  Allen Stanford successfully urged the Prime Minister to also name Allen Stanford's attorney (and two other members of that attorney's firm) to the "special advisory board."  At Antigua's request, Bank of Antigua – an entity that was part of the SFG Enterprise – loaned Antigua the money to pay for the "special advisory board" project.

137.    In November, 1998, Antigua's Parliament passed several laws that were recommended by the "special advisory board" led by Allen Stanford.  Among the new laws passed was one that criminalized the release, by any bank employee or Antiguan regulator, of information about any Antiguan bank customer without a court order.  This statute provided the Stanford Enterprises with a significant shield against any investigation into their fraudulent financial schemes.

138.    Another part of the 1998 reforms created the International Financial Sector Authority ("IFSA"), an Antiguan entity meant to regulate offshore banks.  Allen

Stanford, owner of SIBL, the largest offshore bank located in Antigua, was named to be

the Chairman of the Board of Directors of the IFSA, whose mandate purportedly was to

regulate banks such SIBL.

139.    As a result of Antigua's decision to allow Allen Stanford to regulate (or,

more accurately, fail to regulate) his own bank via the IFSA, in 1999, the United States

Department of State sent a cable from the U.S. Embassy in Antigua that stated that "the

Antiguan government has effectively ceded oversight of its offshore sector to an offshore

banker and his minions." According to the 2009 Bloomberg Article, Jonathan Winer, a

deputy assistant secretary of state during the relevant period, acknowledged that the

"offshore banker" referenced in the State Department cable was, in fact, Allen Stanford.

In that same article, Mr. Winer is quoted as saying that Allen Stanford's role as a

regulator of his own assets was "unprecedented, bizarre, inappropriate, [and an] obvious

conflict of interest."

140.    At roughly the same time, the U.S. Treasury Department listed Antigua as

a money laundering risk, only the second time that it had issued such a warning against

an entire nation.

141.    Shortly thereafter, the IFSA, of which Allen Stanford was still a board

member, sought to obtain Antigua's records related to its offshore banks. An Antiguan

governmental official, Althea Crick, refused to turn the documents over to Allen Stanford

and the IFSA, apparently because she feared that the IFSA would conceal any

wrongdoing found in the documents. After a two-day standoff, the IFSA seized the

documents from Ms. Crick. In a letter written by James Johnson, then the U.S. Treasury

Department's undersecretary of enforcement, to Antigua's Prime Minister, Mr. Johnson wrote that the IFSA's seizure of the bank documents "raises substantial questions as to Antigua and Barbuda's commitment to provide effective supervision of its offshore sector."  In that same letter, Mr. Johnson complained that Antigua had softened its laws against money laundering and had created an obvious conflict of interest by allowing Allen Stanford to sit on the IFSA board.  Allen Stanford eventually stepped down from the IFSA board.

<u>**Antigua Was an Integral Part of the Scheme**</u>

142.    Upon information and belief, the Stanford Enterprises repeatedly paid bribes to Antigua and Antiguan officials.  The purpose and effect of those bribes was to integrate Antigua into the scheme, and to give it a stake in the Stanford Enterprises.

143.    The 2002 WSJ Article quoted Baldwin Spencer, then the leader of the government opposition party, as saying that Allen Stanford "has a lien on our whole country."  According to the 2009 Bloomberg Article, in 2003, Mr. Spencer also criticized the Antigua-Stanford land swap and Antigua's sale of Maiden Island to Allen Stanford as "surrendering the people's patrimony."

144.    As The Observer (a United Kingdom newspaper) reported on March 2, 2008 (in *We Have Lift-off*, by Andy Bull), "[t]he power that [Allen Stanford's] wealth provides when exercised in a country as small as Antigua is difficult to comprehend.  He owns the national bank, runs the airline, paid for the hospital, and built the hotels.  The island is, to a degree, his fiefdom; the government awarded him a knighthood, presented by Prince Edward, in 2006."

145.    According to a 2009 article in GQ Magazine (*Did This Man Pull Off The Most Brazen Swindle Of All?*, by Aram Roston), money-laundering expert Jack Blum has bluntly stated that Allen Stanford "bought the [Antiguan] Prime Minister."

146.    Upon information and belief, sums that the Stanford Enterprises paid as bribes to Antiguan officials, and the monies that the Stanford Enterprises invested in (and loaned to Antigua in connection with) the various commercial ventures upon which Stanford and Antigua worked together, were taken directly from the billions of dollars that the Stanford Enterprises stole from their customers, including Plaintiffs and other members of the Class, by means of the massive "Ponzi" scheme for which Allen Stanford and others have now been indicted.

147.    In the course of the commercial activities in which they participated with the Stanford Enterprises, Antigua corruptly traded, or promised to trade, to Allen Stanford and/or the Stanford Enterprises items of value such as commercial real estate, at least two islands (Maiden and Guiana Islands), the Half Moon Bay luxury resort hotel, positions on the boards of corporations and agencies, a variety of development rights, and the rights to conduct various services (and impose or collect certain fees and/or taxes) at the V.C. Bird International Airport.  In return for using these, and other, items of value as consideration in connection with the various commercial activities in which Antigua engaged with the Stanford Enterprises, Antigua received millions of dollars in investments and loans (many of which subsequently were forgiven by the Stanford Enterprises, thus transforming those purported "loans" into direct cash payments) from

the Stanford Enterprises, all of which were funded by money that the Stanford Enterprises stole from depositors, including Plaintiffs and other members of the Class.

148.    As part of its efforts to maintain and facilitate the corrupt commercial activities from which they were profiting at Plaintiffs' and the Class's expense, Antigua shielded the Stanford Enterprises' "Ponzi" scheme from any person or entity (including, specifically, other nations' regulatory bodies) that might have endangered the vitality of the Stanford Enterprises' scheme, and the ability of the Stanford Enterprises to continue to funnel proceeds of that scheme to Antigua.

149.    For many years, Antigua's corrupt efforts to shield the Stanford Enterprises from regulatory and private scrutiny were successful, thus allowing the Stanford Enterprises to continue to steal money from depositors and pay part of the stolen amounts to Antigua in return for Antigua's continued protection of the Stanford Enterprises.

150.    In or about 2005, however, the SEC commenced an investigation into Stanford, and began to make official inquiries to the FSRC regarding the substance and worth of the investments that SIBL claimed that it had made on behalf of its customers, including Plaintiffs.

151.    The FSRC was established by a 2002 amendment to the IBC Act, which was initially passed in 1982 by Antigua's Parliament.  Pursuant to the IBC Act, the FSRC was, at all relevant times, managed by a Board of Directors comprised of four members appointed by Antigua's Minster of Finance and approved by Antigua's Cabinet.  One of the four FSRC members, as appointed by Antigua's Minister of Finance and confirmed

by Antigua's Cabinet, held the title of Administrator and Chief Executive Officer of the FSRC.

152.    Pursuant to the IBC Act, the FSRC is, and at all relevant times was, tasked with conducting annual on-site investigations of Antigua's offshore banks, including SIBL.  The statutory purpose of the FSRC's mandatory annual investigations is to ascertain the banks' compliance with applicable laws, regulations, and international standards.

153.    Antigua, through the FSRC, falsely represented that its annual investigations of its regulated entities including, at relevant times, SIBL, to included at least nine components:

(a)    A determination of the entity's solvency, including the quality of its investments and loan portfolio;

(b)    A review of the policies and procedures that govern the entity's operations;

(c)    A review of the entity's internal control systems, including its money-laundering prevention control systems;

(d)    The verification of the entity's compliance with proper customer account management guidelines;

(e)    The verification of the entity's compliance with internationally-recognized prudential standards;

(f)    An assessment of the quality of the entity's management;

     (g)     The verification of the accuracy of the returns that the entity submitted to the FSRC;

     (h)     The enforcement of Antigua's due diligence requirements; and

     (i)     A determination of whether the entity maintains detailed records of transactions and customer files.

154.     In addition to the annual investigations, the FSRC represented to customers and prospective customers of Antigua-based financial institutions, including SIBL, that the FSRC undertook continuous off-site supervision of those entities, in the form of analyses of quarterly returns and annual audited financial statements.

## Antigua, through the FSRC, Shielded Stanford

155.     It was essential to the conspiracy that Stanford in general, and SIBL in particular, be able to represent to their clients, prospective clients, and foreign regulators that SIBL was closely supervised by Antigua, through the FSRC.

156.     SIBL's marketing materials regularly highlighted Antigua and FSRC's purported regulation and inspection of SIBL's financial condition and operation.

157.     For example, in its 2003 Annual Report, SIBL stated that:

> In 2003, Antigua assumed the chairmanship of the Caribbean Financial Action Task Force (CFATF). This is another testament to the high level of compliance in the country. Moreover, Antigua enhanced its already stringent regulations in due diligence and compliance through the yearly on-site examination conducted by the Financial Sector Regulatory Commission.

158.     In its 2005, 2006, and 2007 Annual Reports, SIBL stated that:

> The Bank is registered under the International Business Corporation Act No. 28 of 1982 as amended ("the Act").

The Bank's activities are governed by the Act and by every other act currently in force concerning international business corporations and affecting the corporation in Antigua and Barbuda. The Bank is also regulated by the Financial Services Regulatory Commission (FSRC). International banks are subject to annual audits, regulatory inspections and licensing requirements by this body. The supervisory authority for money laundering and other financial crimes is the Office of the National Drug Control and Money Laundering Policy (ONDCP). The FSRC and ONDCP, although independent, work closely together.

159.    In its 2007 Annual Report, SIBL also stated that:

The Bank is registered under the International Business Corporation Act No. 28 of 1982 as amended ("the Act"). The Bank's activities are governed by the Act and by every other act currently in force concerning international business corporations and affecting the corporation in Antigua and Barbuda. The Bank is also regulated by the Financial Services Regulatory Commission (FSRC). International banks are subject to annual audits, regulatory inspections and licensing requirements by this body. The supervisory authority for money laundering and other financial crimes is the Office of the National Drug Control and Money Laundering Policy (ONDCP). The FSRC and ONDCP, although independent, work closely together….

Capital adequacy and the use of regulatory capital are monitored routinely by the Bank's management, employing techniques based on the guidelines developed by the Basel Committee, as implemented by the FSRC for supervisory purposes. The required information is filed with the Regulatory Authority on a quarterly basis.

The Authority requires each bank to: (1) hold all the minimum level of the regulatory capital, and (2) maintain a capital ratio to assets at or above the minimum of 5 percent.

160.    It was a part of the conspiracy that Stanford would make regular secret

payments of thousands of dollars in cash to King, the Administrator and CEO of the

FSRC, to ensure that, among other things:

(a)     The FSRC would not exercise its true regulatory functions in verifying the

existence and value of SIBL's investments;

(b)     King corruptly would provide to Stanford, Davis, and others information

about official inquiries that the FSRC had received from United States

regulators who had requested information from the FSRC regarding

"possible fraud perpetrated upon investors" by SIBL; and

(c)     King would make false representations in response to official inquiries of

regulators, including U.S. regulators, and would seek and receive the

assistance of Stanford, Davis, and others, in preparing false responses to

such inquiries.

161.    The FSRC actively touted and vouched for the safety and security of

SIBL.

162.    The FSRC also is the Antiguan entity that is responsible for receiving and

responding to requests by foreign regulators, including the SEC, for information

regarding the entities regulated by the FSRC.

163.    FSRC and King made false and misleading representations to the SEC and

others regarding the nature and extent of FSRC's oversight of SIBL, and the FSRC's

knowledge of SIBL's financial condition and operation including, but not limited to,

representations that SIBL's operations and financial state were being scrutinized by

FSRC, and that SIBL was subject to annual audits and regulatory inspections by FSRC.

In fact, however, due to Antigua's desire to maintain the cash flow that it was receiving

from the Stanford Enterprises, FSRC failed to accurately audit SIBL, verify the existence

or value of SIBL's assets, or take any of the other regulatory measures that the FSRC was required under the IBC Act to take with respect to SIBL.

164.    Moreover, according to documents obtained by the Receiver, in 2006 Antigua, through the FSRC, gave Stanford and/or certain of his employees advance notice of – and, in at least one case, the opportunity to significantly redraft – the FSRC's replies to inquiries from the Eastern Caribbean Central Bank ("ECCB") regarding SIBL.

165.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the Stanford Enterprises' fraudulent scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua aided and abetted the Stanford Enterprises by providing the Stanford Enterprises with information about the SEC's and the ECCB's inquiries regarding SIBL and SIBL's fraudulent activities.

166.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua, through FSRC and King, also unlawfully made false and misleading representations to the SEC regarding the solvency of SIBL, and sought and received the assistance of Stanford in preparing the false and misleading responses to such inquiries.

167.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the Stanford Enterprises' fraudulent scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua, through FSRC and King, took additional steps to protect the Stanford

Enterprises.  Specifically, in or about May, 2003, King removed from an examination of a SIBL affiliate a FSRC employee who, according to the SEC's Second Amended Complaint in the SEC Action, "got too close to the fire."

### Bribes Paid by the Stanford Enterprises to King

168.    During the relevant period, Stanford provided to King, in addition to the specific corrupt payments set forth below, use of the Stanford Enterprises' corporate airplanes, and use of a corporate car.

169.    King, as head of FSRC, received direct cash payments and other items of value from the Stanford Enterprises in exchange for his aid and assistance to, and participation in, the Stanford Enterprises.   Each of those cash payments and items of value were proceeds, or were paid for with the proceeds, from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

170.    On or about February 1, 2004, Allen Stanford provided two tickets to King to the 2004 Super Bowl, which, upon information and belief, were purchased by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

171.    On or about February 7, 2005, King deposited in a U.S. financial institution approximately $15,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

172.    On or about February 25, 2005, King deposited in a U.S. financial institution approximately $9,000 that was, upon information and belief, paid to him by

the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

173.    On or about March 24, 2005, King deposited in a U.S. financial institution approximately $9,700 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

174.    In June, 2005, the SEC requested the assistance of Antigua, through FSRC and King, in determining whether SIBL and SFG were defrauding their customers.

175.    On or about June 21, 2005, Antigua, through FSRC and King, falsely represented in a letter to the SEC that FSRC's examination of SIBL had not detected any evidence of SIBL's operation of a "Ponzi" scheme.  In that letter, Antigua, through FSRC and King, wrote that "any further investigation of 'possible' fraudulent activities of [SIBL] was unwarranted," and that "it is the opinion of the FSRC that [SIBL] has conducted its banking business to date in a manner the FSRC considers to be fully compliant."

176.    In fact, however, due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, FSRC had failed to accurately audit SIBL, verify the existence or value of SIBL's assets, or take any of the other measures that the FSRC was required under the IBC Act to take with respect to SIBL.

177.    On or about December 30, 2005, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by

the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

178.    On or about March 10, 2006, King deposited in a U.S. financial institution approximately $9,800 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

179.    On or about March 14, 2006, King deposited in a U.S. financial institution approximately $7,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

180.    On or about March 20, 2006, King deposited in a U.S. financial institution approximately $8,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

181.    On or about March 27, 2006, King deposited in a U.S. financial institution approximately $5,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

182.    On or about August 31, 2006, King deposited in a U.S. financial institution approximately $2,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

183.    In September, 2006, the SEC requested from Antigua, through FSRC and King, copies of FSRC's investigative reports regarding SIBL.

184.    On or about September 18, 2006, King deposited in a U.S. financial institution approximately $5,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

185.    On or about September 21, 2006, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

186.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about September 25, 2006, Antigua, through FSRC and King, unlawfully provided to Stanford the SEC's September, 2006, request to FSRC and King for copies of FSRC's investigative reports regarding SIBL.  Antigua, through FSRC and King, also discussed with Stanford how Antigua, through FSRC and King, should and would respond to the SEC's request.

187.    On or about September 28, 2006, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

188.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about October 10, 2006,

Antigua, through FSRC and King, provided to the SEC an official, false, and misleading response to the SEC's September, 2006, information request. The false and misleading letter written by Antigua, through FSRC and King, contained text that was not written by Antigua, FSRC, or King; but, instead, was written by Stanford and others. In that letter, Antigua, through FSRC and King (and using text unlawfully written by Stanford and others) , falsely and misleadingly represented that "the FSRC's most recent onsite examination just five months ago confirmed [SIBL's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations. The FSRC has further confirmed through its continuous visits and supervision of [SIBL] that there are no other issues or matters of concern with [SIBL]."

189.    On or about October 23, 2006, King deposited in a U.S. financial institution approximately $8,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

190.    On or about January 31, 2007, King deposited in a U.S. financial institution approximately $4,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

191.    On or about March 19, 2007, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

192.    On or about April 16, 2007, King deposited in a U.S. financial institution approximately $9,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

193.    On or about September 14, 2007, King deposited in a U.S. financial institution approximately $5,500 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

194.    On or about December 24, 2007, King deposited in a U.S. financial institution approximately $4,470 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

195.    On or about January 23, 2008, King withdrew approximately $15,000 from a U.S. bank account and deposited the money into a U.S. investment account. Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

196.    On or about January 30, 2008, King deposited in a U.S. financial institution approximately $9,500 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

197.    On or about April 23, 2008, King deposited in a U.S. financial institution approximately $9,600 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

198.    On or about June 30, 2008, King deposited in a U.S. financial institution approximately $7,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

199.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, in or about the fall of 2008, Antigua, through FSRC and King, caused false and misleading reports to be issued to Stanford's customers, including Plaintiffs, that misrepresented the value of SIBL's investments, and that set forth wildly inflated values for real estate that SIBL purportedly owned.

200.    On or about December 8, 2008, King deposited in a U.S. financial institution approximately $6,800 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

201.    On or about December 24, 2008, King deposited in a U.S. financial institution approximately $4,200 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

202.    On or about February 23, 2009, King transferred approximately $150,000 from a U.S. investment account to an Antiguan bank account.  Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

203.    On or about February 26, 2009, the SEC sent a letter to Antigua, through FSRC and King, in which the SEC sought to determine the amount of investor funds (including Plaintiffs' funds) that remained in SIBL accounts, and to identify persons who had committed fraud in connection with, or been victimized by, the Stanford Enterprises.

204.    On or about March 2, 2009, King transferred approximately $410,000 from a U.S. investment account to an Antiguan bank account.  Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

205.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about March 3, 2009, Antigua, through FSRC and King, sent a letter to the SEC that denied the SEC's February 26, 2009, information request.  In their March 3, 2009, letter, Antigua, through FSRC and King, stated that the FSRC had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to [the SEC's] request."  The "law" to which Antigua, through FSRC and King, referred was, naturally, the 1998 law that criminalized the release, by any Antiguan regulator, of information about a bank customer without a

court order, which had been passed by Antigua's Parliament upon the recommendation of the "special advisory board" that Allen Stanford had led, and for which Stanford's Bank of Antigua had loaned the money to Antigua to operate.

206.     On June 18, 2009, the United States Department of Justice ("DOJ") filed a twenty-one count criminal indictment in the United States District Court for the Southern District of Texas (the "DOJ Action") against King, Allen Stanford, and various Stanford Entities and employees, alleging mail fraud; wire fraud; obstruction of a SEC investigation; conspiracy to commit mail, wire, and securities fraud; conspiracy to obstruct a SEC investigation; and conspiracy to commit money laundering.

207.     On or about June 24, 2009, King was arrested by Antigua, in an apparent effort to shift the blame for Antigua's participation in Stanford's fraudulent scheme from Antigua – where that blame truly belongs – to King.

**Commercial Activity Having a
Direct Effect in the United States**

208.     As set forth in the pleadings in the SEC Action and DOJ Action, and in various news reports, the Stanford Enterprises' "Ponzi" scheme is responsible for the theft of at least $8 billion dollars from Stanford's customers, including Plaintiffs and other members of the Class.

209.     Antigua's actions described above, taken in furtherance of the Stanford Enterprises' fraudulent scheme, were performed: (1) outside of the United States; and (2) in connection with the desire to maintain the cash flow from the commercial activities in Antigua that were integral parts of Stanford's fraudulent scheme.

210.    Antigua's actions described above, taken in furtherance of the Stanford Enterprises' fraudulent scheme, had many direct effects in the United States, in large part because the Stanford Enterprises were based in the United States, and inextricably linked to the financial system of the United States.  For example, according to a June 9, 2009, Declaration of Karyl Van Tassel ("Van Tassel Dec."), a forensic accountant with FTI Consulting, Inc., which has been retained by the Receiver in the SEC Action, submitted in the SEC Action:

(a)    SIBL "was controlled and managed…from various places within the U.S.  Most core functions such as managing investments, directing fund flows, devising investment strategy, and managing legal and information technology were directed from - and for the most part, performed in - the U.S. It also appears that major cash transfers were directed and controlled from within the U.S. by [Allen] Stanford, Davis and, in some instances, Holt."  Van Tassel Dec. at ¶ 9.

(b)    "SIB[L]'s two principal business activities - selling CDs and investing (or otherwise directing) the proceeds of sale - were both controlled from the United States, with no meaningful management input from Antigua."  *Id.* at ¶ 12.

(c)    "CDs were sold to people from all over the world, although in terms of dollar amount, there were more sales to U.S. citizens (37% based on most recent statement mailing address) than to

citizens of any other country. Moreover, Stanford brokers located in the U.S. accounted for 42%-44% of al CD sales in 2007 and 48% of sales in 2008." *Id.* at ¶ 14.

(d)  "Misinformation regarding SIB[L]'s financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from…the United States." *Id.* at ¶ 15.

(e)  "SIB[L]'s principal operating accounts were maintained in Houston, Texas, at the Bank of Houston and Trustmark National Bank.  Only a small amount of SIB[L] funds were kept on deposit in Antigua, and these funds were kept at the Bank of Antigua, another Stanford Entity." *Id.* at ¶ 15.

211.  Moreover, the actions described above had a direct effect in the United States, in that:

(a)  As a result of the conduct alleged herein, and related conduct, SFG, SIBL, Allen Stanford, Pendergest-Holt, Davis, and others are now the subject of the SEC Action, which is pending in the Northern District of Texas;

(b)  As a result of the conduct alleged herein, and related conduct, criminal proceedings have been instituted, in the form of the DOJ Action, against Allen Stanford, Pendergest-Holt, King, and others in the Southern District of Texas;

(c)     The United States Internal Revenue Service has a multi-million dollar claim for taxes and penalties owed to the United States in whole or in part due to the commercial activities described herein;

(d)     A substantial number of Stanford's customers, including the Plaintiffs and members of the Class, were based in the United States, and the economic effects of those persons' tragic and substantial losses are being felt in the United States; and

(e)     Antigua's unlawful actions led to the collapse of SFG, which was based in Houston, Texas.

212.    Likewise, in connection with each allegation set forth above in which Plaintiffs allege that money was paid (or otherwise provided) to Antigua using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class, each such act had a direct effect in the United States because the money at issue was being funneled to Antigua from defrauded customers in the United States, and elsewhere, through SFG's operations in the United States, at the direction of the Stanford Enterprises in the United States.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF RICO – 18 U.S.C. §1962(c)

### (STANFORD ENTERPRISES)

213.    Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

214.    Plaintiffs and the Class are "persons injured in [their] business or property" within the meaning of 18 U.S.C. §1964(c).

215.    At all relevant times, the Stanford Enterprises were engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

216.    Antigua is a "person" within the meaning of 18 U.S.C. §§1961(3).

217.    At all relevant times, Antigua conducted or participated, directly or indirectly, in the conduct of the Stanford Enterprises' affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

218.    Specifically, at all relevant times, Antigua repeatedly committed the above criminal acts for the purpose of enriching itself, both financially and politically, and to otherwise further the ends of the Stanford Enterprises.

219.    Antigua conducted and participated in the affairs of the Stanford Enterprises in at least the following ways:

(a) Directing and/or otherwise causing the Stanford Enterprises to make commercial loans to Antigua, using the proceeds of the fraud;

(b) Directing, approving, and/or otherwise participating in the Stanford Enterprises' commercial development of the V.C. Bird International Airport, using the proceeds of the fraud;

(c) Directing, approving, and/or otherwise participating in the Stanford Enterprises' commercial development of SIBL's and the Bank of

Antigua's offices, cricket stadium, and restaurants, using the proceeds

of the fraud;

(d) Directing, approving, and/or otherwise participating in the sale of real

estate to the Stanford Enterprises for the purpose of transferring a

portion of the proceeds of the fraud from the Stanford Enterprises to

Antigua;

(e)  Directing, approving, and/or otherwise causing the Stanford

Enterprises to pay bribes to King and others, using proceeds of the

fraud;

(f)  Directing, approving, and/or otherwise causing the Stanford

Enterprises to sell Caribbean Star Airlines (which the Stanford

Enterprises had established using the proceeds of the fraud) to LIAT,

which was the financial beneficiary of Antigua's participation in the

fraud;

(g) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' development of the Mount St. John Medical

Centre, using the proceeds of the fraud;

(h) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' funding of the construction of new executive

offices for the government of Antigua, using the proceeds of the fraud;

(i)  Directing, approving, and/or otherwise causing Allen Stanford to

forgive a $5 million personal loan to Antigua, and provide an

additional loan to pay Antigua's back salaries and meet other obligations, using proceeds of the fraud;

(j)  Directing, approving, causing, and or otherwise participating in the Stanford Enterprises' write off of roughly $18 million of Antigua's debt, using proceeds of the fraud;

(k)  Directing, approving, causing, and or otherwise participating in the Stanford Enterprises' "donation" to Antigua of money needed to build a national library, using proceeds of the fraud;

(l)  Directing, approving, causing, and or otherwise participating in the Stanford Enterprises' "donation" of $9 million to construct a higher education complex for Antigua, using proceeds of the fraud;

(m) Directing, approving, causing, and or otherwise participating in the Stanford Enterprises' funding of the "Empowerment Ownership Initiative," using proceeds of the fraud;

(n)  Directing, approving, causing, and/or otherwise participating in the Stanford Enterprises' massive funding of the sport of cricket, using proceeds of the fraud;

(o)  Directing, approving, causing, and/or otherwise participating in the Stanford Enterprises' efforts to deceive depositors and prospective depositors in SIBL, including Plaintiffs and members of the Class, by intentionally disseminating misleading information concerning: Antigua's purported oversight of SIBL and the legitimacy and

solvency of SIBL, upon which Plaintiffs and members of the Class

reasonably relied; and

(p) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' efforts to deceive the SEC concerning the

solvency and legitimacy of SIBL's banking operations.

220. The acts described above were related to one another as part of a common

scheme or plan, namely a scheme to defraud the Plaintiffs and the Class, and to ensure

that the Stanford Enterprises would continue to be able to defraud the Plaintiffs and the

Class, for the financial benefit of the Stanford Enterprises, the Stanford Co-Conspirators,

and Antigua.

221. The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail

fraud) and 18 U.S.C. § 1343 (wire fraud) because Antigua, the Stanford Co-Conspirators,

and the Stanford Enterprises each knowingly and intentionally used interstate and/or

international wires and mails for the purpose of obtaining money and/or property by

means of false and fraudulent pretenses, including, among other things:

(a) disseminating false and fraudulent information to Plaintiffs and the Class,

upon which Plaintiffs and the Class reasonably relied, using interstate and/or

international telephone, the Internet, and interstate or international mails;

(b) deceiving the SEC concerning the legitimacy and solvency of SIBL, using

wire and/or mail communications between Antigua and the United States;

(c) effectuating the receipt of deposits from Plaintiffs and the Class, located throughout the United States and around the world, using electronic funds transfers and interstate and/or international mail;

(d) transferring such deposits to SIBL in Antigua, using electronic funds transfers and interstate and/or international mail; and

(e) disbursing the proceeds of the fraud to the participants, including Antigua, King, and the Stanford Co-Conspirators, using electronic funds transfers and interstate and/or international mail.

222.    Antigua committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

223.    Such unlawful conduct constituted a continuous pattern of racketeering activity spanning many years, more than 100 countries, tens of thousands of victims, and innumerable acts of wire and mail fraud.

224.    The acts of racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

225.    The acts alleged were related to each other by virtue of common participants, common victims (Plaintiffs and other members of the Class), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and the other members of the class out of, collectively, billions of dollars.

226.    At all relevant times, Antigua engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above.

227.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs and the Class have been injured in their business and property.  Among other things:

(a) Plaintiffs and the Class were damaged by each of the predicate acts that effectuated the transfer of proceeds of the fraud from the Stanford Enterprises to Antigua, thereby depriving the Plaintiffs and the Class of their property;

(b) Plaintiffs and the Class also were damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was transmitted by use of the wires and/or mails in interstate or foreign commerce for the purpose of executing the fraudulent scheme alleged herein, upon which information Plaintiffs and the Class reasonably relied, and which had the purpose and effect of inducing the Plaintiffs and the Class to deposit funds at SIBL, thereby depriving the Plaintiffs and the Class of their property; and

(c) Plaintiffs and the Class were also damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was transmitted by use of the wires and/or mails in interstate or foreign commerce with the purpose and effect of deceiving the SEC and/or other regulators concerning the legitimacy and solvency of SIBL, thereby prolonging the scheme, and depriving the Plaintiffs and the Class of their property.

228.    Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18

U.S.C. § 1962(c).  As a result of Antigua's and the Stanford Co-Conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

229.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## SECOND CLAIM FOR RELIEF: VIOLATION OF RICO – 18 U.S.C. §1962(c)

### (ASSOCIATION-IN-FACT ENTERPRISE)

230.    The Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

231.    At all relevant times, Antigua and SFG formed, and operated as, an association-in-fact (the "Antigua-Stanford Enterprise") for the purpose of defrauding the Plaintiffs and the Class.  The Antigua-Stanford Enterprise constituted an "enterprise" under RICO, as defined in 18 U.S.C. § 1961(4).

232.    At all relevant times, the Antigua-Stanford Enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

233.    At all relevant times, Antigua conducted or participated, directly or indirectly, in the conduct of the Antigua-Stanford Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

234.    Specifically, at all relevant times, Antigua repeatedly committed the above criminal acts in furtherance of and for the purpose of enriching itself, both financially and politically, and to otherwise further the ends of the Stanford Enterprises.

235.    Antigua conducted and participated in the affairs of the Antigua-Stanford Enterprise in at least the following ways:

(a)     Directing, approving, and/or otherwise participating in the Antigua-Stanford Enterprise's commercial development of the V.C. Bird International Airport, using the proceeds of the fraud;

(b)     Directing, approving, and/or otherwise participating in the Antigua-Stanford Enterprise's commercial development of SIBL's and the Bank of Antigua's offices, cricket stadium, and restaurants, using the proceeds of the fraud;

(c)     Directing, approving, and/or otherwise participating in the sale of real estate transactions between the members of the Antigua-Stanford Enterprise, for the purpose of transferring a portion of the proceeds of the fraud to Antigua;

(d)     Directing, approving, and/or otherwise causing the Antigua-Stanford Enterprise to pay bribes to King and others, using proceeds of the fraud;

(e)     Directing, approving, and/or otherwise causing the sale of Caribbean Star Airlines to LIAT;

(f)     Directing, approving, causing, and/or otherwise participating in the Antigua-Stanford Enterprise's development of the Mount St. John Medical Centre, using the proceeds of the fraud;

(g)     Directing, approving, causing, and/or otherwise participating in the Antigua-Stanford Enterprise's funding of the construction of new executive offices for the government of Antigua, using the proceeds of the fraud;

(h)     Directing, approving, causing, and or otherwise participating in the write off of roughly $18 million of Antigua's debt, using proceeds of the fraud;

(i)     Directing, approving, causing, and or otherwise participating in the "donation" to Antigua of money needed to build a national library, using proceeds of the fraud;

(j)     Directing, approving, causing, and or otherwise participating in the "donation" of $9 million to construct a higher education complex for Antigua, using proceeds of the fraud;

(k)     Directing, approving, causing, and or otherwise participating in the Antigua-Stanford Enterprise's funding of the "Empowerment Ownership Initiative," using proceeds of the fraud;

(l)     Directing, approving, causing, and/or otherwise participating in the Antigua-Stanford Enterprise's massive funding of the sport of cricket, using proceeds of the fraud;

(m)     Directing, approving, causing, and/or otherwise participating in the
Antigua-Stanford Enterprise's efforts to deceive depositors and
prospective depositors in SIBL, including Plaintiffs and members of the
Class by intentionally disseminating misleading financial information
upon which Plaintiffs and members of the Class reasonably relied;

(n)     Directing, approving, causing, and/or otherwise participating in the
Antigua-Stanford Enterprise's efforts to deceive Plaintiffs, the class, and
potential customers of SIBL into believing that the FSRC was exercising
actual oversight over SIBL by intentionally disseminating misleading
regulatory information upon which Plaintiffs and members of the Class
reasonably relied; and

(o)     Directing, approving, causing, and/or otherwise participating in the
Antigua-Stanford Enterprise's efforts to deceive the SEC concerning the
solvency and legitimacy of SIBL's banking operations.

236.     The acts described above were related to one another as part of a common
scheme or plan, namely a scheme to defraud the Plaintiffs and the Class, and to ensure
that the Antigua-Stanford Enterprise would continue to be able to defraud the Plaintiffs
and the Class, for the financial benefit of the Stanford Enterprises, the Stanford Co-
conspirators, and Antigua.

237.     The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail
fraud) and 18 U.S.C. § 1343 (wire fraud) because Antigua, the Stanford Co-Conspirators,
and the Antigua-Stanford Enterprise knowingly and intentionally used interstate and/or

international wires and mails for the purpose of obtaining money and/or property by

means of false and fraudulent pretenses in order to, among other things:

(a)     to disseminate false and fraudulent information to Plaintiffs and the Class,
upon which Plaintiffs and the Class reasonably relied, using interstate
and/or international telephone, the Internet, and interstate or international
mails;

(b)     to deceive the SEC, using wire and/or mail communications between
Antigua and the United States;

(c)     to effectuate the receipt of deposits from Plaintiffs and the Class, located
throughout the United States and around the world, using electronic funds
transfers and interstate and/or international mail;

(d)     to transfer such deposits to SIBL in Antigua, using electronic funds
transfers and interstate and/or international mail; and

(e)     to disburse the proceeds of the fraud to the participants, including Antigua,
King, and the Stanford Co-Conspirators, using electronic funds transfers
and interstate and/or international mail.

238.     Antigua committed and/or aided and abetted the commission of two or

more of these acts of racketeering activity.

239.     Such unlawful conduct constituted a continuous pattern of racketeering

activity spanning many years, more than 100 countries, tens of thousands of victims, and

innumerable acts of wire and mail fraud.  The acts of racketeering activity constituted a

"pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts

alleged were related to each other by virtue of common participants, common victims (Plaintiffs and other members of the Class), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and the other members of the class out of, collectively, billions of dollars.

240.    At all relevant times, Antigua engaged in "racketeering activity" within the meaning of 18 U.S.C. 1961(1) by engaging in the acts set forth above.

241.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs and the Class have been injured in their business and property.   Among other things:

(a)    Plaintiffs and the Class were damaged by each of the predicate acts that effectuated the transfer of proceeds of the fraud to Antigua, thereby depriving the Plaintiffs and the Class of their property;

(b)    Plaintiffs and the Class also were damaged by each of the predicate acts, in which false and fraudulent information concerning SIBL and/or SFG, upon which Plaintiffs and the Class reasonably relied, was transmitted by use of the wires and/or mails in interstate or foreign commerce for the purpose of executing the fraudulent scheme alleged herein, and with the intent to, and effect of, inducing the Plaintiffs and the Class to deposit funds at SIBL, thereby depriving the Plaintiffs and the Class of their property; and

(c)    Plaintiffs and the Class were also damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was

transmitted by use of the wires and/or mails in interstate or foreign

commerce with the purpose and effect of deceiving the SEC and/or other

regulators concerning the legitimacy and solvency of SIBL, thereby

prolonging the scheme, and depriving the Plaintiffs and the Class of their

property.

242.    Antigua's racketeering activities were the proximate cause of the

Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries

were a foreseeable consequence of Antigua's racketeering activities and violations of 18

U.S.C. § 1962(c).  As a result of Antigua's and the Stanford Co-conspirators' violations

of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in

amount to be determined at trial, but believed to be in excess of $8 billion.

243.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are

entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## THIRD CLAIM FOR RELIEF:
## VIOLATION OF RICO – 18 U.S.C. §1962(a)

244.    Plaintiffs repeat, reiterate, and reallege each of the allegations set forth

above.

245.    Antigua is a "person" within the meaning of 18 U.S.C. § 1962(a)

246.    As set forth above, Antigua received income derived, directly and

indirectly, from a pattern of racketeering activity.

247.    Antigua invested, directly and indirectly, part of such income, and/or the proceeds from such income, in the acquisition of an interest in, and the establishment and operation of, the Antigua-Stanford Enterprise.

248.    In particular, Antigua reinvested part of the proceeds of such income in the purchase of Caribbean Star Airlines, an integral part of the Stanford Enterprises. Plaintiffs and the Class were damaged by that reinvestment of income because: (a) the reinvestment provided additional funds for the Stanford Enterprises to operate their scheme to defraud the Plaintiffs and the Class; and (b) the reinvestment deprived Plaintiffs and the Class of hard assets (the airline and aircraft) that would otherwise be available to satisfy their claims.

249.    Antigua also invested part of the proceeds from the Stanford Enterprises in the establishment and operation of FSRC, which became an integral part of the Antigua-Stanford Enterprise, and essential to the scheme to defraud the Plaintiffs and the Class.

250.    Plaintiffs and the Class were injured by Antigua's investment of the proceeds of such income in the establishment and operation of FSRC because Antigua, through FSRC and its head, King, deceived Plaintiffs, the Class, and the SEC concerning the legitimacy and solvency of SIBL.

251.    The injuries suffered by the Plaintiffs and the Class from Antigua's investment of racketeering income in the FSRC are separate and distinct from the injuries suffered by the Plaintiffs and the Class as a result of the predicate acts involving the earlier transfers of money from the Plaintiffs and the Class, to SFG and Antigua.

252.     As set forth above, the Antigua-Stanford Enterprise affected interstate and foreign commerce.

253.     Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18 U.S.C. § 1962(c).  As a result of Antigua's and the Stanford Co-Conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

254.     Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## FOURTH CLAIM FOR RELIEF: VIOLATION OF RICO – 18 U.S.C. §1962(d)

255.     Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

256.     As described above, Antigua, in violation of 18 U.S.C. § 1962(d), did agree and conspire with the Stanford Co-Conspirators, and those acting in concert with the Stanford Co-Conspirators, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above.

257.     In furtherance of that agreement, and in violation of RICO, Antigua knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above, with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering activity.

258.     As a direct and proximate cause of the above-described conspiracy in violation of 18 U.S.C. § 1962(d), the Plaintiffs and the Class have been injured in their property.  Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18 U.S.C. § 1962(d).

259.     As a result of Antigua's and the other Stanford Co-conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

260.     Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## FIFTH CLAIM FOR RELIEF:
## AIDING AND ABETTING FRAUD

261.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

262.     At all relevant times, Antigua had actual knowledge of the Stanford's fraudulent activities.

263.     By reason of the foregoing, Antigua knowingly provided substantial assistance to SFG, SIBL, and the Stanford Co-Conspirators in their successful efforts to perpetrate a fraud upon Plaintiffs and other members of the Class.  As set forth above, Antigua's substantial assistance variously took the forms of affirmative acts in

furtherance of the fraud, concealment of the fraud, and failures and/or refusals to act against the fraud when Antigua had the duty to do so.

264.    Antigua's active participation in aiding and abetting the fraud was the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.

265.    As a result of Antigua's active participation in aiding and abetting the fraud, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

## SIXTH CLAIM FOR RELIEF:
## <u>AVOIDANCE OF FRAUDULENT TRANSFERS</u>

266.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

267.    Plaintiffs and the Class are creditors of Allen Stanford, SIBL, and/or SFG, by reason of their tort claims against them, and because they deposited funds at SIBL which have not, and will not, be returned to them in accordance with their rights as depositors.

268.    In or about February, 2009, Antigua seized more than 250 acres of land owned by SFG (the "Seized Properties").

269.    Upon information and belief, the Seized Properties were commercial in nature, and the development of those properties, and their seizure by Antigua, had a direct effect in the United States in that it deprived Houston-based SFG, and Houston-

managed SIBL, of substantial value, and thereby deprived American creditors of Allen

Stanford, SFG, and SIBL of substantial value to satisfy their claims.

270.    Antigua's seizure of such property effectuated the transfer of assets from

Allen Stanford, SIBL, and/or SFG for less than fair value, and with the purpose and intent

of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including Plaintiffs and

the Class.

271.    As described above, Stanford made numerous "loans" to Antigua,

believed to be in excess of $85 million, some or all of which have never been repaid.  In

addition, Stanford made numerous outright transfers of funds to Antigua or its designees.

272.    The unpaid loans and transfer of such funds effectuated the transfer of

assets from Allen Stanford, SIBL, and/or SFG for less than fair value, and with the

purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors,

including Plaintiffs and the Class.

273.    By reason of the foregoing, the transfers described above are ineffective as

against Plaintiffs and members of the Class.

274.    By reason of the foregoing, pursuant to the Uniform Fraudulent Transfers

Act, and common law, Plaintiffs and the Class are entitled to avoidance of the transfers.

## **JURY DEMAND**

275.    Plaintiffs demand a jury trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(i)     certify the Class;

(ii)    enter judgment in favor of the Class and against Antigua:
(a) awarding all damages proven at trial, in an amount not less than $8 billion;

(b) awarding treble damages, as permitted by law pursuant to RICO;

(c) ordering the avoidance of the fraudulent transfers described herein;

(d) awarding attorney fees, and costs as permitted by law; and

(e) granting such other and further relief as the Court may deem just and appropriate.

Dated: July 13, 2009

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

LACKEY HERSHMAN, L.L.P.

By:    /s/ Paul B. Lackey
       Paul B. Lackey
       State Bar Number 00791061
       Jamie R. Welton
       State Bar Number 24013732
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys for Plaintiffs*

≈JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS JOAN GALE FRANK, JON A. BELL, SAMUEL BURRINSKY, JAIME ALEXIS ARROYO BORNSTEIN, PEGGY ROIF ROTSTAIN, JUAN C. OLANO, and JOHN WADE in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan, on behalf of themselves and all others similarly situated | DEFENDANTS THE COMMONWEALTH OF ANTIGUA AND BARBUDA |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff    State of Oregon (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) SEE ATTACHMENT 1 | Attorneys (If Known) |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. § 1962

Brief description of cause:
Class action alleging violations of the Racketeer Influenced and Corrupt Organizations Act

| VII. REQUESTED IN COMPLAINT: | ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 24 billion | CHECK YES only if demanded in complaint: JURY DEMAND: ☑ Yes  ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instructions): | SEE ATTACHMENT 2 |
|---|---|---|
| | JUDGE | DOCKET NUMBER |

DATE
07/13/2009

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Attachment 1 to Civil Cover Sheet

Plaintiffs' Attorneys:

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
Morgenstern & Blue, LLC
885 Third Avenue
New York, NY 10022
Telephone:  (212) 750-6776

Paul B. Lackey
Jamie R.Welton
Lackey Hershman, L.L.P.
3102 Oak Lawn Ave
Suite 777
Dallas, TX 75219
Telephone: (214) 560-2201

Attachment 2 to Civil Cover Sheet

Related Cases:

Criminal Action No. 4:09-cr-00342-1; U.S. District Court for the Southern District of Texas (Houston); Assigned to Judge David Hittner

Civil Action No. 3:09-cv-00298-N; U.S. District Court for the Northern District of Texas (Dallas); Assigned to Judge David C. Godbey