**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JOAN GALE FRANK, *et al.* on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No.: 3:09-CV-02165-N |
| THE COMMONWEALTH OF ANTIGUA AND BARBUDA, *et al.*, | § § § | |
| Defendant. | § | |
| | | |
| STEVEN QUEYROUZE, *et al.* on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No.: 3:10-CV-00304-N |
| BANK OF ANTIGUA, *et al.*, | § § | |
| Defendants. | § § § | |

---

**PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION
TO DEFENDANT'S MOTIONS TO DISMISS**

---

**BUTZEL LONG,** a professional corporation
Peter D. Morgenstern (*admitted pro hac vice*)
380 Madison Avenue
New York, New York  10017
Telephone: (212) 818-1110
Facsimile: (212) 818-0494
morgenstern@butzel.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

INTRODUCTION ........................................................................................................... 1

FACTS ............................................................................................................................. 5

      Plaintiffs.................................................................................................................6

      Defendant..............................................................................................................6

      Antigua's Participation in the Fraud ....................................................................6

      (a)     Quid Pro Quo Commercial Transactions Between Antigua and Stanford........................................................................................................ 6

      (b)     Antigua's Actions to Protect Stanford's Scheme.................................. 10

      (c)     Payments to Antigua and Antiguan Officials ...................................... 14

      Criminal Proceedings.........................................................................................15

      The Testimony of James Davis...........................................................................16

      Findings in the Chapter 15 Case ........................................................................16

      Antigua's Conversion of Bank of Antigua's Assets in Violation of the Receivership Order .............................................................................................................18

      Plaintiffs' Standing to Recover Bank of Antigua's Assets.................................19

      Antigua's Waiver of Sovereign Immunity........................................................20

ARGUMENTS & AUTHORITIES ............................................................................... 23

      I.     Standard on Motion to Dismiss................................................................ 23

      II.     THE FSIA DOES NOT DEPRIVE THIS COURT OF JURISDICTION ............... 24

            1.     Plaintiff's Burden to Show an Exception to the FSIA is "Rather Small".... 25

            2.     Antigua Explicitly Waived Immunity under the FSIA ............................... 26

      3.        The Commercial Activity Exception Applies ................................................ 27

      4.        The Expropriation Exception Applies .......................................................... 32

  III.   THE COMPLAINTS STATE VALID CLAIMS FOR RELIEF .............................. 33

      1.        The Fraudulent Transfer Claims .................................................................. 34

           (A)     The Act of State Doctrine Does Not Apply to the TUFTA
                  Claims ........................................................................................... 34

           (B)     Plaintiffs Have Standing to Pursue the TUFTA Claims ............... 37

           (C)     Antigua Does Not Otherwise Oppose the TUFTA Claims............ 38

      2.        Aiding and Abetting Fraud .......................................................................... 40

CONCLUSION........................................................................................................... 42

# TABLE OF AUTHORITIES

## CASES

*Adler v. Federal Republic of Nigeria*,
    219 F.3d 869 (9th Cir. 2000) ........................................................................ 30, 31

*Agudas Chasidei Chabad of U.S. v. Russian Federation*,
    729 F. Supp. 2d 141 (D. D.C. 2010) .................................................................. 32

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
    425 U.S. 682 (1976) ............................................................................................ 35

*Amerada Hess Shipping Corp. v. Argentine Republic*,
    638 F. Supp. 73 (S.D.N.Y. 1986) ....................................................................... 29

*Arriba Ltd. v. Petroleos Mexicanos*,
    962 F.2d 528 (5th Cir. 1992) .............................................................................. 25

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (5th Cir. 1988) .............................................................................. 42

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ............................................................................................ 36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 24

*Braka v. Multibanco Comermex*, S.A.,
    589 F. Supp. 802 (S.D.N.Y.) .............................................................................. 31

*Crimson Semiconductor, Inc. v. Electronum*,
    629 F. Supp. 903 (S.D.N.Y. 1986)) .................................................................... 29

*Daventree Ltd. v. Republic of Azerbaijan*,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004) ............................................................... 35

*de Sanchez v. Banco Central De Nicaragua*,
    770 F.2d 1385 (5th Cir.1985) ............................................................................. 36

*Embassy of the Arab Republic of Egypt v. Lasheen*,
    603 F.3d 1166 (9th Cir. 2010) ............................................................................ 28

*Great Plains Trust Co., et al v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305 (5th Cir. 2002) .............................................................................. 42

*Griggs v. Hinds Junior College*,
    563 F.2d 179 (5th Cir. 1977) .............................................................................. 42

*Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*,
   649 F. Supp. 688 (S.D.N.Y. 1986) ........................................................ 30

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*,
   916 F.2d 528 (9th Cir. 1990) ............................................................... 39

*Janvey v. Alguire*,
   628 F.3d 164 (5th Cir. 2010) ........................................................ 39, 40

*Janvey v. Democratic Senatorial Campaign Committee*,
   793 F. Supp. 2d 825 (N.D. Tex. 2011) ................................................. 31

*Kirk v. Fed. Prop. Mgmt. Corp.*,
   22 F.3d 135 (7th Cir.1994) .................................................................. 25

*Libra Bank Ltd. v. Banco Nacional de Costa Rica, S. A.*,
   676 F.2d 47 (2d Cir. 1982) ................................................................. 26

*Lowrey v. Tex. A & M Univ. Sys.*,
   117 F.3d 242 (5th Cir. 1997) ............................................................... 24

*Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*,
   02 Civ. 0795, 2003 WL 21878798 (S.D.N.Y. Aug. 8, 2003) ............................ 35, 36

*Mann v. Hanil Bank*,
   900 F. Supp. 1077 (E.D. Wis. 1995) ................................................ 25, 30

*Marlowe v. Argentine Naval Comm'n.*,
   604 F. Supp. 703 (D. D.C. 1985) ......................................................... 27

*Martin K. Eby Constr. Co., v. Dallas Area Rapid Transit*,
   369 F.3d 464 (5th Cir. 2004) ............................................................... 24

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*
   651 F.3d 268 (2d. Cir. 2011) ................................................................. 5

*Morgan Guaranty Trust Co. v. Republic of Palau*,
   657 F. Supp. 1475 (S.D.N.Y. 1987) .................................................... 30

*Nocando Mem Holdings, Ltd. v. Credit Commer. de Fr., S.A.*,
   No. SA-01-CA-1194-XR, 2004 WL 2603739 (W.D. Tex. Oct. 6, 2004) ............... 26

*Priester v. Lowndes County*,
   354 F.3d 414 (5th Cir. 2004) ............................................................... 24

*Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*,
   760 F.2d 390 (2d Cir. 1985) ................................................................. 26

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992)............................................................................................ 28, 29

*Republic of Australia v. Altmann*,
   541 U.S. 677 (2004)................................................................................................ 34

*Resource Dynamics Int'l, Ltd. v. Gen. People's Comm.*,
   593 F. Supp. 572 (N.D. Ga. 1984)......................................................................... 27

*Rosner v. Bank of China*,
   528 F. Supp. 2d 419 (S.D.N.Y. 2007) .................................................................. 31

*Sage Int'l v. Cadillac Gage Co.*,
   534 F. Supp. 896 (E.D. Mich. 1981)...................................................................... 40

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) .................................................................................. 31

*SEC v. Res. Dev. Int'l, LLC*,
   487 F.3d 295 (5th Cir. 2007) ................................................................................ 38

*SEC v. Reynolds*,
   No. 3-08-CV-0384-B, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) .................... 24

*Shapiro v. Republic of Bolivia*,
   930 F.2d 1013 (2nd Cir. 1991) ............................................................................. 29

*SR Int'l Bus. Ins. Co. v. Energy Future Holdings Corp.*,
   539 F. Supp. 2d 871 (N.D. Tex. 2008) ................................................................. 24

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)............................................................................................... 25

*Texas Dept. of Cmty. Affairs v. Burdine*,
   450 U.S. 248 (1981)............................................................................................... 25

*Transcor Astra Group S.A. v. Petroleo Brasileiro S.A.-Petrobras*,
   409 Fed. Appx. 787 (5th Cir. 2011)................................................................. 24, 25

*U.S. v. Giffen*,
   326 F. Supp. 2d 497 (S.D.N.Y. 2004) .................................................................. 40

*Voest-Alpine Trading USA Corp. v. Bank of China*,
   142 F.3d 887 (5th Cir. 1998) ..................................................................... 29, 30, 31

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*,
   493 U.S. 400 (1990)............................................................................................... 41

*Walk Haydel & Assocs. v. Coastal Power Prod. Co.*,
   517 F.3d 235 (5th Cir. 2008) ............................................................. 26

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
   965 F.2d 1375 (5th Cir. 1992) ........................................................... 36

*Warfield v. Byron*,
   436 F.3d (5th Cir. 2006) .................................................................... 38

*Willard v. Humana Health Plan of Texas, Inc.*,
   336 F.3d 375 (5th Cir. 2003 .............................................................. 42


## STATUTES

18 U.S.C. § 1964(c) ............................................................................... 5

22 U.S.C. § 2370(e)(2)......................................................................... 36

28 U.S.C. § 1603(d) ............................................................................ 28

28 U.S.C. § 1605(a)(1).................................................................. 24, 26

28 U.S.C. § 1605(a)(2)............................................................. 24, 27, 28

28 U.S.C. § 1605(a)(3)................................................................. 24, 32

Texas Uniform Fraudulent Transfer Act
   § 24.005(a)(1) ............................................................................ 37, 38

Texas Uniform Fraudulent Transfer Act
   § 24.005(a)(2) ................................................................................ 40

Texas Uniform Fraudulent Transfer Act
   § 24.006(a) ............................................................................... 37, 40

## RULES

Fed. R. Civ. P. 12(b)(6)................................................................ 23, 24, 42

Fed. R. Civ. P. 15(a) ........................................................................ 42

## PRELIMINARY STATEMENT

Plaintiffs in the above-captioned actions, on behalf of themselves and a putative class of all others similarly situated (collectively, the "Plaintiffs"), respectfully submit this response and memorandum of law in opposition to the motions to dismiss filed by Defendant Antigua and Barbuda ("Antigua") in these actions.

## INTRODUCTION

These actions arise out of the fraud perpetrated by R. Allen Stanford ("Stanford") and certain accomplices, with the active and continuous support of the government of Antigua and its elected and other officials, who were literally Stanford's "partners in crime." Antigua was also Stanford's business partner in numerous commercial ventures outside the scope of its governmental functions, as set forth in the pleadings and herein. As the Court presiding over the Stanford Receivership and all Stanford-related litigation, the Court is well aware of the facts related to Stanford's scheme, the magnitude of his corruption, and the devastating impact of the multi-billion dollar Stanford fraud on thousands of innocent victims from around the world. Stanford and the entities he owned and controlled (collectively, the "Stanford Entities") purported to sell certificates of deposit ("CDs") issued by Stanford International Bank, Ltd. ("SIBL"), which was organized in Antigua, but operated out of Houston, Texas. Stanford marketed these phony CDs through a network of companies often known collectively as the Stanford Financial Group ("SFG"). Although the Stanford Entities represented the CDs to be safe, high-yielding investments, SIBL and the other Stanford Entities were in fact a massive fraudulent operation. Stanford and his associates stole customer deposits, misrepresented the business and financial results to CD purchasers, and used the proceeds for undisclosed and illegal purposes. Stanford paid redeeming investors with incoming funds, all the while looting SIBL and the Stanford Entities and evading U.S. banking and securities regulators. Financial

investigators and U.S. authorities estimate that Stanford stole as much as $7 billion from unsuspecting CD-investors worldwide, orchestrating one of the largest financial frauds in history.

Plaintiffs – investors in the SIBL CDs – seek recoveries from Antigua, which became a "blood brother" to Stanford, and an integral component of Stanford's fraudulent enterprise. Indeed, Stanford could not have conducted his fraud without the knowing, necessary, and pervasive assistance of Antigua and its government officials.  Stanford's influence and reach within Antigua was unprecedented and penetrated as far as the Prime Minister's office, and to every aspect of Antigua's business and governmental communities.  As just a few examples, Stanford secretly paid for Antiguan Prime Minister Lester Bird's medical care and made illicit payments to the country's Tourism Minister and Planning Minister, all using CD investor's funds.  Stanford received land transfers for arguably below market prices with government assistance, operated Antigua's airport, built the national library, sponsored the country's cricket tournament, and improperly "loaned" the government tens of millions of dollars of the CD investors' money for innumerable commercial enterprises.  Stanford became particularly close with Leroy King ("King"), the chief administrator and chief executive officer of Antigua's Financial Services Regulatory Commission ("FSRC"), the government body charged with regulating the country's banks, and with Errol Cort, who while acting as Stanford's personal attorney also served as Antigua's Finance Minster and in other high government positions.  As alleged by the Securities and Exchange Commission ("SEC") in the main Receivership case and demonstrated in Stanford's criminal trial, King, on behalf of the Antiguan government, entered into a "blood oath" with Stanford, committing himself, his country, and the agency he controlled to shielding and protecting Stanford's fraudulent dealings.  Stanford thereafter made regular

payments to King, and entered into various "sweetheart" deals with the Antiguan government. King conducted sham audits of SIBL and Bank of Antigua, another Antiguan bank owned by Stanford and controlled from Texas. Perhaps most devastating to Stanford's CD investors, King obstructed several SEC investigations of SIBL, forwarding confidential SEC correspondence to Stanford, providing responses to SEC inquiries which were actually drafted by Stanford or his employees and professionals, and misleading the SEC concerning the nature and extent of the FSRC's oversight of SIBL. King, although notably not charged with any crime in Antigua, has been indicted on numerous criminal charges in the United States, and is awaiting extradition to face those charges in an American court of law. Not surprisingly, Antigua has refused to deliver King to the U.S. authorities, and to this day King continues to walk the streets of Antigua as a free man. Perhaps even more significantly, more than three years after his fraud was exposed, even Stanford has never been charged with committing any criminal acts in Antigua under Antiguan law, notwithstanding his conviction and sentence of 110 years for his crimes by the U.S. Court. Stanford's enterprise was clearly part of the basic fabric of Antigua's business and political culture.

Antigua assisted Stanford in perpetrating his scheme for a simple reason: Antigua lacked creditworthiness, could not borrow funds from international monetary agencies or other lending institutions, and desperately needed Stanford's money to remain solvent and function. Thus, while assisting Stanford's criminal enterprise with one hand, Antigua took with the other hand tens of millions of dollars in "loans" – fraudulent transfers under applicable law – from Stanford and the Houston-based entities he operated. All of the funds purportedly "loaned" to Antigua by the Stanford Entities were actually CD customer funds which were stolen and diverted by

Stanford.  Significantly, Plaintiffs have uncovered over $85 million of transfers made to Antigua for purely commercial purposes,[1] including:

- $40 million to pay salaries and for other discretionary purposes;

- $31 million to pay for the construction of a hospital;

- $10 million to seed a fund dedicated to sponsoring local businesses;

- $10 million to build a library; and

- $9 million to construct an education complex, among other examples.

The Stanford Entities transferred these funds to Antigua and documented the transfers in a manner typical of commercial loans.  But the Stanford Entities were an insolvent Ponzi scheme when they made these loans, and received no consideration for these transfers other than Antigua's continuing support of Stanford's criminal enterprise.  Indeed, many of the loans were subsequently and purportedly "forgiven" by Stanford to ensure Antigua's material support for his fraudulent operations.   The "forgiveness" of such indebtedness for no consideration was itself fraudulent and is avoidable under applicable law, as discussed below.

In sum, Stanford and Antigua provided critical assistance to each other in furtherance of the Ponzi scheme, and their relationship as "blood brothers."   Stanford used Antigua as a regulatory haven from which to steal customer funds, and Antigua sustained its struggling economy with Stanford's ill-gotten largesse.   Indeed, even after the Ponzi scheme was uncovered, Antigua brazenly continued its theft of Stanford investors' property.   After the Receiver was appointed, Antigua seized the Stanford-owned Bank of Antigua and converted its assets, in clear violation of this Court's Receivership Order.   In addition, Antigua began the

---

[1]     The total amount of these transfers to Antigua remains unknown to Plaintiffs pending discovery.

process of expropriating Stanford's vast land holdings in Antigua, all approved by, and at the direction of, the Antiguan Government and leadership.

Antigua's conduct, as described in the Complaints, has caused significant damage to Plaintiffs, who were at all relevant times investors in Stanford CDs and creditors of the Stanford Entities, including the Bank of Antigua. Since the filing of these actions, Plaintiffs' allegations have been confirmed, both in Stanford's criminal trial and by this Court, and in testimony and findings in the Chapter 15 case submitted by the foreign liquidators of Stanford's Antigua-based assets appointed by the Antigua courts. Indeed, even at this early stage of the proceedings, and without the benefit of any discovery or the testimony of King, the evidence leads to one conclusion: Antigua knowingly provided necessary assistance to Stanford's $7 billion Ponzi scheme, and in exchange received millions of dollars in fraudulent transfers. Accordingly, by these actions, Plaintiffs seek recoveries of the fraudulent transfers they have already identified and those expected to be disclosed during discovery, damages for aiding and abetting fraud, and recovery of Bank of Antigua's illegally seized assets under theories of conversion and unjust enrichment.[2]

## FACTS

The facts of these cases are stated in the complaints filed on the dockets at Case No.: 3:09-CV-02165-N [Doc. 1] ("Complaint 1") and Case No.: 3:10-CV-00304-N [Doc. 1] ("Complaint 2").[3]

---

[2]  Plaintiffs are withdrawing their RICO-based claims in light of the so-called 'RICO amendment' set forth in the Private Securities Litigation Reform Act ("PSLRA") and case law decided subsequent to the filing of these actions. *See* 18 U.S.C. § 1964(c); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268 (2d. Cir. 2011) (dismissing RICO claims on the ground that the 'RICO amendment' to the PSLRA bars civil RICO claims relating to conduct undertaken to perpetuate a Ponzi scheme).

[3]  Complaint 1 and Complaint 2 (together, the "Complaints") are annexed to the accompanying Declaration of Peter D. Morgenstern in Support of Plaintiffs' Response and Brief in Opposition to Defendants' Motions to Dismiss ("Morgenstern Decl.") as Exhibit A and Exhibit B, respectively.

**Plaintiffs**

Plaintiffs seek to represent a putative class of individuals and entities that, as of February 16, 2009, were customers of SIBL, had money on deposit at SIBL, and/or held CDs issued by SIBL. Complaint 1 ¶¶ 13, 35. All the Plaintiffs are creditors of Stanford, SIBL, Bank of Antigua and other Stanford Entities affiliated with SFG. Plaintiffs are citizens of countries worldwide, including the United States, Mexico, and Peru. *Id.* ¶¶ 6-11.

**Defendant**

Antigua is an independent state within the British Commonwealth of Nations. Complaint 1 ¶ 14. Although purportedly independent, Antigua was dominated, influenced, and controlled by Stanford during the time period relevant to the Complaints. Antigua and Stanford became organically linked and developed a commercial symbiotic relationship, based on furthering Stanford's fraudulent activities and benefiting Antigua, as described in greater detail below.

**Antigua's Participation in the Fraud**

      (a)    *Quid Pro Quo Commercial Transactions Between Antigua and Stanford*

The Complaints state detailed factual allegations showing how Antigua became an integral part and beneficiary of Stanford's multi-billion dollar international fraudulent enterprise. Stanford became a crucial supporter of Antigua's struggling economy, and in exchange Antigua and its government employees shielded his scheme from regulatory scrutiny and legal enforcement.

Antigua is a poor country, with a history of official corruption, whose problems intensified in 1995 when its tourism industry collapsed following a series of devastating hurricanes. Complaint 1 ¶ 97. As a result of a precipitous decline in Antigua's tourism revenues – which historically has accounted for more than half of Antigua's gross domestic product – "most [banks] balk[ed] at lending to a bloated and revenue-strapped government with a record of

mismanagement and corruption." *Id.* ¶ 98 (quoting P. Fritsch, *Antigua, Island of Sun, Is Also in the Shadow of R. Allen Stanford*, WALL ST. JOURNAL, Mar. 5, 2002, p. A1 (the "2002 WSJ Article"), annexed to Morgenstern Decl. as Exhibit L).

Antigua's lack of creditworthiness ultimately led it to enter into its commercial partnership with Stanford and the entities he operated out of Houston. *Id.* ¶ 99.  In exchange, Stanford "loaned" at least $85 million to Antigua, all of which was stolen from members of the Class, including Plaintiffs. *Id.* ¶ 101 (citing *Stanford's Island Empire Implodes As Antigua Grabs Properties*, by Alison Fitzgerald and Thomas Black (the "2009 Bloomberg Article"), annexed to Morgenstern Decl. as Exhibit M).

Stanford's commercial business dealings with Antigua became extensive and soon dominated Antigua's economy.[4]  Indeed, in May, 1993 – on the same day the Stanford Entities made their first significant loan to Antigua of approximately $3.7 million – Stanford and Antigua entered into a "trust" agreement, giving Stanford near-total control over the V.C. Bird International Airport. *Id.* ¶ 104.  Between 1993 and 2009, Stanford and Antigua worked on improving the airport (*id.* ¶ 105) and entered into what became known as the "Master Plan" to develop the airport and its surrounding facilities. *Id.* ¶¶ 105-106.  The nominal offices of SIBL and Bank of Antigua were housed at the Master Plan development (although controlled and operated from Texas), as was Antigua's cricket stadium and two restaurants. *Id.* ¶ 107.

Antigua later sold land to Stanford at what former Prime Minister Bird openly called "cut-rate prices." *Id.* ¶ 108 (citing Morgenstern Decl. Exh. M, the 2009 Bloomberg Article).  To facilitate certain below-market land deals, Stanford gave Antigua's Tourism Minister and Planning Minister each a separate $74,000 check in 2003, paid for with funds fraudulently stolen

---

[4]     Notably, Stanford's financial support and commercial dealings with Antigua were not disclosed to CD investors in offering documents or otherwise.

from Plaintiffs and the Class.  *Id.* ¶ 109.  Also in 2003, Antigua sold Maiden Island, a 23-acre property, to Stanford.  *Id.* ¶ 110.  Antigua also exerted significant and undue pressure on the American owners of the 110-acre Half Moon Bay beach resort to coerce them to sell the property to Stanford.  When the owners refused, Antigua nationalized the land with the intent to "sell" it to Stanford.  *Id.*  Antigua continues to defy numerous court orders requiring it to pay compensation to the American owners of that property

In January 2000, Stanford incorporated Caribbean Star Airlines, a for-profit airline company that was established, funded, and maintained using funds fraudulently stolen from Plaintiffs and the Class.  *Id.* ¶¶ 112-114.  In 2007, Leeward Island Air Transport Services, an airline owned in large part by Antigua, "purchased" Caribbean Star Airlines and several of Caribbean Star Airlines' airplanes from Stanford on unusually favorable terms and with funding made available by Stanford and his enterprises.  *Id.* ¶¶ 115-116.

In the late 1990s and early 2000s, Antigua partnered with Stanford in the construction of Mount St. John Medical Centre.  *Id.* ¶ 117.  Antigua received a $31 million "loan" from Stanford on a 30-year term for the hospital's construction costs, which funds were CD proceeds stolen from the Plaintiffs and the Class.  *Id.* ¶ 118.  At approximately the same time, Stanford underwrote the construction of new executive offices for the Government of Antigua, once again with stolen CD customer funds.  *Id.* ¶¶ 122-23.

In 2001, Stanford announced that he would forgive a $5 million loan made to Antigua and would provide Antigua with a $40 million additional loan.  *Id.* ¶ 124.  Notably, the U.S. government "made clear to the [Antiguan] government that [forgiving the loan] does not at all look good" when juxtaposed with Antigua's then-pending effort to exercise its eminent domain

over the Half Moon Bay hotel, which Stanford was interested in purchasing for development.  *Id.*
¶ 125 (citing Morgenstern Decl. Exh. L, the 2002 WSJ Article).

In 2004, Stanford again funneled money into Antigua's infrastructure.  *Id.* ¶ 127.  As
Antigua's Finance Minister later disclosed, Stanford (i) agreed to write off approximately $18
million of Antigua's debt, (ii) donated money needed to build a national library, and (iii) donated
$9 million for a higher education complex.  *Id.*  The funds used by Stanford in these transactions
were proceeds from the Stanford enterprises operated out of Texas, including funds fraudulently
stolen from the Plaintiffs and the Class.  *Id.*  In exchange for these transactions, Antigua allowed
Stanford to acquire yet another island, Guiana Island.  *Id.* ¶ 128.

Antigua and Stanford together created the "Empowerment for Ownership Initiative,"
which represented a "far-reaching and historic alliance between the Stanford Group and the
Government of Antigua."  *Id.* ¶ 129 (quoting 2005 Budget Statement, Hon. L. Errol Cort, MP,
Nov. 30, 2004 (the "2005 Budget Statement")).  According to a 2007 Antigua budget
presentation, the "initiative represent[ed] a collaborative undertaking of the Government, the
Stanford Group of Companies and the [Antigua Barbuda Development] Bank."  *Id.* (quoting the
2005 Budget Statement).  In addition, upon announcing the initiative, the Minister of Finance
and Economy stated that, "[t]he Government of Antigua and Barbuda looks forward to an
enduring and productive partnership with the Stanford Group."  *Id.* (quoting the 2005 Budget
Statement).  This "collaborative undertaking" between Antigua and Stanford was created with "a
$10 million fund endowed by the Stanford Group of Companies," *id.* (quoting the 2005 Budget
Statement), which was funded with proceeds from the Stanford enterprises operated out of
Texas, including funds fraudulently stolen from the Plaintiffs and the Class.  *Id.*

Antigua and Stanford also entered into a commercial venture to promote the sport of cricket. In particular, Stanford bankrolled Antigua's national professional cricket team and built the large "Stanford Cricket Ground" near the V.C. Bird International Airport. *Id.* ¶ 131. Stanford and Antigua also collaborated on the funding, construction, and improvement of Antigua's infrastructure prior to Antigua's hosting the initial "Stanford 20/20" cricket tournament at St. John's in 2006 (and then again in 2007 and 2008). *Id.* ¶ 132.

In sum, Stanford's business presence in and commercial relationship with Antigua was pervasive. Stanford's commercial activity with Antigua reached almost every aspect of Antiguan life: medical care, sports, business development, office construction, real-estate, tourism, air travel, and infrastructure. Stanford and his Texas-based entities engaged in significant commerce with Antigua – and Antigua returned the favor.

     **(b)**    ***Antigua's Actions to Protect Stanford's Scheme***

Because Antigua's economy was so dependent on Stanford as a source of funding, Antigua knowingly and purposefully agreed to protect Stanford and his entities from scrutiny by customers and other nations' regulators. *Id.* ¶¶ 134, 149.

Significantly, in or about 1996, the Prime Minister of Antigua appointed Stanford to spearhead a revision of Antigua's offshore banking regulations and also appointed Stanford's attorney and two members of that attorney's firm to the "special advisory board." *Id.* ¶ 136. Incredibly, Stanford's Bank of Antigua loaned Antigua the money to pay for the "special advisory board" project at the request of Antigua. *Id.* The "special advisory board" recommended that new laws be passed that criminalized the release of information about any Antiguan bank customer without a court order. *Id.* ¶ 137. Antigua's Parliament enacted these

proposed statutes in November 1998, thus shielding Stanford from legal and regulatory investigation. *Id.*

In 1998, the International Financial Sector Authority ("IFSA") was created by the Antiguan Parliament to regulate offshore banks, *id.* ¶ 138, and Stanford, who owned SIBL, the largest offshore bank located in Antigua, was actually appointed Chairman of the IFSA's board. *Id.* This appointment allowed Stanford to regulate his *own* banks, a conflict of interest that alarmed the United States Department of State which sent a cable from the U.S. Embassy in Antigua stating that "the Antiguan government has effectively ceded oversight of its offshore sector to an offshore banker and his minions." *Id.* ¶ 139. According to the 2009 Bloomberg Article, Jonathan Winer, a deputy assistant Secretary of State during the relevant period, acknowledged that the "offshore banker" referenced in the cable was, in fact, Stanford. Mr. Winer was also quoted as saying that Stanford's role as a regulator of his own bank was "unprecedented, bizarre, inappropriate, [and an] obvious conflict of interest." *Id.* (quoting Morgenstern Decl. Exh. M, the 2009 Bloomberg Article). During this time, the U.S. Treasury Department listed Antigua as a money laundering risk, marking the second time that it had issued such a warning against an entire nation. *Id.* ¶ 140.

Shortly thereafter, the IFSA, sought to obtain Antigua's records related to its offshore banks. *Id.* ¶ 141. When an Antiguan governmental official, Althea Crick, refused to turn over the documents (because she feared the IFSA would conceal any evidence of wrongdoing) the IFSA seized them from Ms. Crick. *Id.* In a letter written by James Johnson, then the U.S. Treasury Department's undersecretary of enforcement to Antigua's Prime Minister, Mr. Johnson wrote that the IFSA's seizure of the bank documents "raises substantial questions as to Antigua and Barbuda's commitment to provide effective supervision of its offshore sector." *Id.* Mr.

Johnson also complained that Antigua had softened its laws against money laundering and had created an obvious conflict of interest by allowing Stanford to sit on the IFSA board.  *Id.*

Antigua also shielded Stanford's activities though the FSRC.  The FSRC was established by a 2002 amendment to the International Business Corporations Act ("IBC Act"), which was initially passed in 1982 by Antigua's Parliament.  *Id.* ¶ 151.  Pursuant to the IBC Act, the FSRC is tasked with conducting annual on-site investigations of Antigua's offshore banks, including SIBL.  The statutory purpose of the FSRC's mandatory annual investigations was to ascertain the banks' compliance with applicable laws, regulations, and international standards.  *Id.* ¶ 152.  The FSRC was managed by a Board of Directors comprised of four members appointed directly by Antigua's Minister of Finance and approved by Antigua's Cabinet.  *Id.* ¶ 151.  Leroy King, as noted above, headed the FSRC during the relevant period.

Stanford and King entered into a "blood oath" to ensure that Antigua would shield Stanford and his operations from regulatory scrutiny.  *See* Morgenstern Decl. Exh. C, Testimony of James Davis at 2808:23, 2809-15.  They agreed, among other things, that: (a) the FSRC would not exercise its regulatory functions in verifying the existence and value of SIBL's investments; (b) King would provide Stanford with information about official inquiries the FSRC received from foreign regulators; and (c) King would make false representations in response to official inquiries of regulators, including U.S. regulators, and would seek and receive the assistance of Stanford and others in preparing false responses to such inquiries.  *Id.* ¶ 160.

Indeed, in or about 2005, the SEC commenced an investigation into Stanford, and began to make official inquiries to Antigua and the FSRC regarding the substance and worth of the investments that SIBL claimed that it had made on behalf of its customers, including Plaintiffs. *Id.* ¶¶ 150, 174.  The SEC was seeking to determine whether SIBL and SFG were defrauding

their customers. *Id.* ¶ 174. Antigua, through the FSRC and King, represented in a letter to the SEC that FSRC's examination of SIBL had not detected any evidence of impropriety or misconduct. *Id.* ¶ 175. King, wrote that "any further investigation of 'possible' fraudulent activities of [SIBL] was unwarranted," and that "it is the opinion of the FSRC that [SIBL] has conducted its banking business to date in a manner the FSRC considers to be fully compliant." *Id.*

Of course, this was false. The FSRC, in fact, failed to accurately audit SIBL, verify the existence or value of SIBL's assets, or take any of the other regulatory measures that the FSRC was required to perform under the IBC Act. *Id.* ¶ 176. Antigua also made false and misleading representations to the SEC regarding the solvency of SIBL and sought and received the assistance of Stanford in preparing false and misleading responses to the SEC's inquiries. *Id.* ¶ 166. In fact, in response to the SEC's September 2006 information request, King (using text actually written by Stanford and others), represented that "the FSRC's most recent onsite examination just five months ago confirmed [SIBL's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations. The FSRC has further confirmed through its continuous visits and supervision of [SIBL] that there are no other issues or matters of concern with [SIBL]." *Id.* ¶ 188. Antigua also gave Stanford and/or certain of his employees advance notice of – and, in at least one case, the opportunity to significantly redraft – the FSRC's replies to inquiries from the Eastern Caribbean Central Bank ("ECCB") regarding SIBL. *Id.* ¶ 164. Antigua also provided Stanford with information about the SEC's and the ECCB's inquiries into SIBL, including its fraudulent activities. *Id.* ¶ 165.

In or about the fall of 2008, Antigua, FSRC and King, caused false and misleading reports to be issued to Stanford's customers, including Plaintiffs, that misrepresented the value of

SIBL's investments, and that set forth wildly inflated values for real estate SIBL purportedly owned. *Id.* ¶ 199.  On or about February 26, 2009, the SEC sent a letter to Antigua, through FSRC and King, seeking to determine the amount of investor funds (including Plaintiffs' funds) that remained in SIBL accounts and to identify persons who had committed fraud in connection with, or been victimized by, Stanford. *Id.* ¶ 203.  On or about March 3, 2009, King sent a letter to the SEC that denied the SEC's February 2009 information request. *Id.* ¶ 205.  King stated that the FSRC had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to [the SEC's] request." *Id.*   In a bitter twist of irony, the "law" to which King referred was the 1998 Antigua law criminalizing the release of information about a bank customer without a court order, passed by Antigua's Parliament upon the recommendation of the "special advisory board" Stanford himself led and for which Stanford's Bank of Antigua "loaned" money to operate. *Id.* ¶ 205.

(c)    ***Payments to Antigua and Antiguan Officials***

Aside from the commercial transactions described above, Antigua and Antiguan officials received numerous payments from Stanford. *Id.* ¶ 142.  The monies used in the commercial ventures and for these illicit payments were taken directly from the billions of dollars that Stanford stole from members of the Class and Plaintiffs as part of his massive Ponzi scheme.

The 2002 WSJ Article quotes Baldwin Spencer, then the leader of the government opposition party, as saying that Stanford "has a lien on our whole country."  According to the 2009 Bloomberg Article, in 2003, Mr. Spencer criticized the Antigua-Stanford land swap and Antigua's sale of Maiden Island to Stanford as "surrendering the people's patrimony." *Id.* ¶ 143.  As THE OBSERVER (the British newspaper) reported on March 1, 2008 (in *We Have Lift-off*, by Andy Bull, annexed to Morgenstern Decl. as Exhibit N), "[t]he power that [Allen Stanford's]

wealth provides when exercised in a country as small as Antigua is difficult to comprehend.  He owns the national bank, runs the airline, paid for the hospital, and built the hotels.  The island is, to a degree, his fiefdom; the government awarded him a knighthood, presented by Prince Edward, in 2006." *Id.*

According to a 2009 article in GQ MAGAZINE (*Did This Man Pull Off The Most Brazen Swindle of All?*, by Aram Roston, annexed to Morgenstern Decl. as Exhibit P), money-laundering expert Jack Blum stated succinctly that Stanford "bought the [Antiguan] Prime Minister." *Id.* ¶ 145.

From 2004 to 2009, Stanford provided King with several cash payments, use of Stanford's private airplanes, use of a corporate car, and two tickets to the 2004 Super Bowl.  *Id.* ¶¶ 168, 170.  King deposited the funds given to him by Stanford in U.S. financial institutions. *Id.* ¶¶ 171-173, 177-185, 187, 189-198, 200-201.  Such funds totaled approximately $162,570.

## Criminal Proceedings

On June 18, 2009, the United States Department of Justice ("DOJ") filed a 21-count criminal indictment in the United States District Court for the Southern District of Texas against King, Stanford, and various Stanford entities and employees.  The DOJ in its action alleged mail fraud, wire fraud, obstruction of a SEC investigation, conspiracy to commit mail, wire, and securities fraud, conspiracy to obstruct a SEC investigation, and conspiracy to commit money laundering. *Id.* ¶ 206.

On June 18, 2009, a federal grand jury in Houston, Texas returned a 21-count indictment against Stanford.  On March 6, 2012, Stanford was convicted after a six-week jury trial of 13 counts of wire fraud, conspiracy to commit wire fraud, mail fraud, obstruction of an SEC

proceeding, conspiracy to obstruct an SEC proceeding, and conspiracy to commit money laundering.   On June 14, 2012, Stanford was sentenced to serve over 110 years in prison.

After more than three years since the Stanford fraud was uncovered, King continues to contest attempts by U.S. authorities to extradite him from Antigua to face trial in an American court of law.  Antigua has failed to cooperate in the extradition and has actively interfered with the Receivership.  Tellingly, King has not been charged with any crime in Antigua.

**The Testimony of James Davis**

During Stanford's criminal trial, James Davis ("Davis") – Stanford's criminal accomplice and Chief Financial Officer of SIBL and the Stanford Entities – corroborated many of the allegations made by Plaintiffs.  Testifying as a government witness, after pleading guilty to charges relating to his own role in the fraud, Davis confirmed that: Stanford had an unusually close relationship with Antigua's Prime Minister and cabinet members during the relevant period; Stanford used CD customer funds to purchase and shore up Bank of Antigua as a favor to the Antiguan government; Stanford used CD customer funds to funnel donations to Antiguan politicians; Stanford used his influence with the Antiguan government to have Althea Crick terminated from her position with the FSRC; and Stanford entered into a "blood oath" with King whereby King and his associates committed to shield SIBL from regulatory scrutiny.  *See* Morgenstern Decl. Exh. C, Testimony of James Davis, at 2803:1 – 2825:25.

**Findings in the Chapter 15 Case**

This Court reached many of the same conclusions for purposes of the Chapter 15 case filed by the foreign Joint Liquidators of Stanford's Antiguan assets.  In this Court's Order, which followed an extensive evidentiary hearing and submissions by numerous parties, the Court determined that:

Stanford used CD proceeds to influence Antiguan Prime Minister Lester Bird and his government for several years. Later, when the United Progressive Party came to power in 2004, Stanford immediately sought to foster close relations with the Party's members through favorable deals with the new government - for example, Stanford paid the government $1 million for the construction of an Antiguan national library, $10 million for an Antiguan entrepreneurial fund, and $25 million for the construction of a higher education complex. He also agreed to write off $50 million in debt that Antigua owed to the Stanford Entities. Concurrent with these payments, the Antiguan government ratified Stanford's acquisition of a piece of real estate in Antigua.

Additionally, Stanford had an extremely close personal relationship with Leroy King, the former administrator and chief executive officer of the FSRC (SIB's purported Antiguan regulator), where, in addition to cash payments amounting to hundreds of thousands of dollars, Stanford provided King with the use of his fleet of private jets to travel throughout the United States and Caribbean and the use of a SIB corporate car. In exchange, King facilitated Stanford's fraud by obstructing the SEC investigation and abdicating FSRC's oversight responsibilities. The Receiver specifically outlines King's actions in his direct testimony, which included providing confidential SEC communications to Stanford, falsely telling the SEC that the FSRC had investigated SIB and that any further investigation was unwarranted, replying to SEC communications as dictated by Stanford, Davis, and SFG's general counsel, and posting on the FSRC's website that the FSRC performed continuous off-site supervision of SIB in the form of analyses of quarterly returns and annual audited financial statements.

The Court also notes that the Receiver has presented evidence that Stanford had illicit dealings with and undue influence over the government of Antigua and Barbuda. For example, (a) SFGC and the Bank of Antigua, two Stanford Entities, loaned the Antiguan government more than $90 million that remains unpaid, (b) the Antiguan Offshore Financial Sector Planning Committee, with Stanford as the chairman, successfully influenced Antigua to remove the offenses of "false accounting," "fraud," and "illegal deposit-taking" from its Money Laundering Prevention Act, causing the U.S. Department of Treasury Financial Crimes Enforcement Network to issue an advisory requiring financial institutions to give enhanced scrutiny to all transactions involving Antiguan offshore banks; and (c) King, the former administrator and chief executive officer of the FSRC, received monetary and

nonmonetary benefits from Stanford in apparent exchange for obstructing the SEC's investigation of the Stanford Entities and abdicating the FSRC's oversight responsibilities.

Case No. 3:09-cv-00721-N ("Chapter 15 Case"), Order [Doc. 176] n. 59 & 62 ("Chapter 15 Order" – annexed to Morgenstern Decl. as Exhibit D) (citations to the record in the Chapter 15 case omitted).

### Antigua's Conversion of Bank of Antigua's Assets in Violation of the Receivership Order

Antigua's actions as described in Plaintiffs' Complaints have also been alleged by the SEC in the main Receivership case.  *See* Second Amended Complaint, Case No. 3-09-CV-0298-N (the "SEC Action") [Doc. 952] at ¶¶ 6, 13, 16, 21, 25, 55, 62, 63, 84, 85, 91, and 92, annexed to Morgenstern Decl. as Exhibit E.  Indeed, Antigua took illegal steps even after the SEC initiated its action, in blanket violation of this Court's Receivership Order.

On February 16, 2009, the SEC commenced its action against Stanford, Davis, Laura Pendergest-Holt, and three of Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC, alleging that Stanford and various Stanford-related entities perpetrated a multi-billion-dollar Ponzi scheme.  *See* Morgenstern Decl. Exh. E , SEC Action, Sec. Am. Compl. ¶¶ 1- 8 [Doc. 952].  On February 17, 2009, the Court entered an order appointing Ralph S. Janvey receiver over all the assets of Stanford and all the entities he owned or controlled.  SEC Action, Order Appointing Receiver (the "Receivership Order") [Doc. 10] ¶ 2, annexed to Morgenstern Decl. as Exhibit F.  As part of that litigation, the Court assumed "exclusive jurisdiction and t[ook] possession" of the Receivership Assets.  *See* Morgenstern Decl. Exh. F, Receivership Order ¶ 1.  Bank of Antigua is an asset owned by Stanford and is subject to the Receivership Order.  *See* Chapter 15 Case, Order [Doc. 176], p. 52.

Despite the Receivership Order, and shortly after it was entered, Antigua, in conjunction with the Eastern Caribbean Central Bank ("ECCB") seized Bank of Antigua and misappropriated all of its assets.  Complaint 2 ¶¶ 4-7, 43-49.  The seizure was engineered by Errol Cort ("Cort"), Antigua's Minister of Finance during the relevant period.  *Id.* ¶¶ 45-46.  Cort orchestrated the seizure of these assets in order to extinguish Antigua's loan obligations to Stanford.  *Id.* ¶ 44. According to the 2005 Budget Statement delivered by Cort to the Antiguan Parliament, Antigua's debt to Stanford and the Bank of Antigua at that time was at least $230 million – and much of this debt remains outstanding.  *Id.* ¶ 45.[5]  Cort, who also chaired the ECCB's Monetary Council, orchestrated the takeover of Bank of Antigua to transform Antigua from being a major multi-million dollar obligor to the Bank of Antigua to being its largest shareholder.  *Id.* ¶ 46. Incredibly, after Antigua illegally seized Bank of Antigua and other properties, Antigua's Prime Minister, Baldwin Spencer, admitted that the seizure was simply a negotiating tactic.  Baldwin told the Antigua House of Representatives: "We have to give ourselves a bargaining chip, so when the receivers come they have to deal with the government of Antigua and Barbuda."  *Id.* ¶ 7.

**Plaintiffs' Standing to Recover Bank of Antigua's Assets**

Plaintiffs then filed these actions, in part, to recover Bank of Antigua's assets – which actions are now part of a larger effort to recover Stanford-related property for the benefit of investors and the Receivership Estate.  Although Antigua has challenged Plaintiffs' standing to maintain these actions, there can be no question that Plaintiffs can properly seek recovery of Bank of Antigua assets.

---

[5]  The total amount of indebtedness owed by Antigua to the Stanford Entities is unknown at this time and requires discovery.

Indeed, as creditors of the Stanford Entities, Plaintiffs are entitled to maintain fraudulent transfer claims under applicable law against Bank of Antigua – which was owned and operated by Stanford – and transferees of its assets, such as Antigua. Moreover, at the MDL Status Conference held before the Court on September 23, 2010, the Receiver's attorneys, the SEC, and the Court-appointed Examiner all stated that it was their view that Plaintiffs' class-actions against Antigua should be pursued for the benefit of the Receivership. *See* Morgenstern Decl. Exh. G, Transcript of Status Conference, 8:24-9:5 (attorney for Receiver stating: "Our view, Your Honor, is that the cases where a Receivership entity or SEC defendants or financial advisors are defendants, that those cases ought to remain stayed …. That then leaves a collection of other cases, of cases against banks … <u>cases against the government of Antigua</u> …  the Receiver's view is those should not be stayed per the litigation injunction, they should go forward on – on their own processing, on merits without respect to the litigation injunction") (emphasis added); *id.* at 11:16-20 (SEC concurring with Receiver's assessment of status of non-Receivership cases); *id.* at 15:11-17 (Examiner stating that "if third party investor plaintiffs are already suing banks … there's no great reason for the Receiver to go and start his own lawsuit"). The Receiver and the Court recognized at the hearing that the Receiver and Committee would eventually intervene at a later stage to ensure that payments by the third-party Defendants, including Antigua, would inure to the benefit of the Receivership Estate. *Id.* at 15:18-23. Thus, with the imprimatur of the Receivership, Plaintiffs continue to vigorously prosecute these actions against Antigua with the aim of achieving recoveries for the Receivership Estate.

## Antigua's Waiver of Sovereign Immunity

The facts stated in the Complaints are well-grounded and plausible, and remain undisputed at this stage of the proceedings. Antigua seeks to escape liability for its conduct

solely by asserting legal defenses based on principles of sovereign immunity.[6]   But as argued more fully below, these defenses have no merit as a matter of law and fact. Indeed, Plaintiffs' pleadings, documentary evidence already in Plaintiffs' possession, and this Court's recent findings of fact in the Chapter 15 Case mandate the conclusion that Antigua either waived any defense based on sovereign immunity, or that Plaintiffs' claims arise out of significant commercial dealings with the United States such that the sovereign immunity defense is not applicable.

Thus, Plaintiffs have obtained the agreement governing the $40 million commercial loan to Antigua – which remains outstanding as of the date of this submission and is a fraudulent transfer under applicable law.   *See* "Loan Agreement", annexed to Morgenstern Decl. as Exhibit H.   The $40 million loan agreement provides clear waivers of the sovereign immunity defense and act of state doctrine in the broadest possible terms:

> 10.16   **Waiver of Immunity**. …. Borrower [i.e., Antigua] hereby irrevocably and unconditionally waives any and all defenses it may possess based in whole or in part upon the doctrine of sovereign immunity with respect to the Loan, the Note, this Loan Agreement and the agreements, instruments and transactions contemplated thereby.
>
> 10.17   **Act of State Doctrine**.   Borrower hereby expressly and irrevocably waives any defense or claim it may have to delay, hinder or stop the enforcement of the Loan Documents based directly or indirectly upon the Act of State doctrine.

Morgenstern Decl. Exh. H, Loan Agreement, §§ 10.16, 10.17.   The $40 million loan – which matures fully on August 29, 2016, and under which Antigua continues to be in material breach – was made to Antigua from Stanford Financial Group Company, "a corporation duly incorporated

---

[6]   Plaintiffs moved this Court for leave to conduct jurisdictional discovery to counter Antigua's sovereign immunity defense, (Case No.: 3:09-CV-02165-N [Doc. 31] and Case No.: 3:10-CV-00304-N [Doc. 10]), which motion was denied on February 7, 2012.   *See* Case No.: 3:09-CV-02165-N [Doc. 45] and Case No.: 3:10-CV-00304-N [Doc. 24], (citing presumption under Fifth Circuit jurisprudence against permitting pre-answer discovery solely to determine availability of sovereign immunity).

under the Laws of the State of Florida, United States of America." *Id.*, Loan Agreement, Recitals, p. 2. Repayment of the loan was to be made in U.S. dollars directly to "Lender," presumably in Miami or Houston where "Lender" is located. *Id.*, Loan Agreement, §§ 2.4, 6.1 & 10.4.

Antigua also expressly waived any defense based on sovereign immunity in respect of the $31 million loan made from the Stanford Entities to Antigua on a 30-year term for construction of the Mount St. John's Hospital. The Act of Parliament approving the loan expressly provided that Antigua broadly "waive[d] any claim or right to immunity the Borrower or its property may now or hereafter enjoy." *See* Morgenstern Decl. Exh. I, Act No. 8 of 1998, AN ACT TO MAKE PROVISIONS FOR THE BORROWING OF MONEY FOR THE PURPOSES OF CONSTRUCTING AND EQUIPPING A NEW HOSPITAL AT MOUNT ST. JOHN'S, ("Act No. 8"), Schedule II § 12.

The Act of Parliament further states that, (i) the lender for $2 million of the total amount was "Bank of Antigua," and the lender for the other $29 million was "Stanford Financial Group Ltd., and its Affiliated Companies and Syndicated Participants" (*id.*, Schedule I); (ii) the loan was made in U.S. dollars (*id.*, Schedule II § 2A); and (iii) repayment was to be made "in such currency and in the United States....." (*id.*, Schedule II § 14) (underscore supplied).

In addition to these instances of explicit waiver, Antigua's ongoing and commercial dealings with the U.S.-based Stanford Entities are also a basis to disregard Antigua's invocation of sovereign immunity under applicable law. Significantly, this Court found in its recent Order in the Chapter 15 Case that the center of main interest of Stanford, his entities (including Bank of Antigua), and their activities during the relevant period was the United States, under applicable law. *See* Morgenstern Decl. Exh. D, Chapter 15 Order at p. 59. The Court made this finding after considering, among other things, evidence that: Stanford was the sole owner of SIBL, Bank

of Antigua, and 130 other entities; Stanford used these entities to conduct his fraud; Stanford commingled the assets of these entities; and Stanford generally disregarded corporate formalities. *See id.* at pp. 26-36.   The Court further concluded that the U.S. was the center of Stanford's combined business operations because: Stanford and Davis lived and worked in the U.S.; Stanford managed and operated his conglomerate out of Houston; and Stanford's sale of CDs largely bypassed Antigua, among other factors.   *See id.* at pp. 40-50.   Indeed, "[e]ven the Antiguan government stated that Stanford ran SIB from Houston, Texas – referring to Antigua as a mere transit point."   *Id.* at p. 49; *see also* Morgenstern Decl. Exh. J, Antigua Official Government Statement ("the business of [SIBL] was run from Houston, Texas, and its books maintained in Memphis, Tennessee").   Thus, Antigua's *quid-pro-quo* with Stanford as alleged in the Complaints (i.e., abetting Stanford's Ponzi scheme in exchange for commercial loans) had a direct effect on the U.S. such that Antigua's claim of sovereign immunity should be disregarded.

Indeed, the foregoing agreements and evidentiary findings confirm Plaintiffs' detailed and plausible allegations stated in the Complaints that (i) Stanford's operations were based in Texas; and (ii) Antigua's ongoing and extensive commercial dealings with these Texas-based entities had a significant commercial effect on the U.S.   Complaint 1 ¶¶ 15, 18, 102, 104-107, 109-120, 146-148, 208-212, 269; Complaint 2 ¶¶ 13, 21, 24, 41-42, 50-54, 59, 66.   Accordingly, and as argued below, Antigua should not be permitted to escape liability by invoking principles of sovereign immunity.   The motions to dismiss should be denied, and the cases should proceed to discovery.

## ARGUMENTS & AUTHORITIES

### I.    STANDARD ON MOTION TO DISMISS

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded allegations as true and view them in the light most favorable to the plaintiff.   *Martin K.*

*Eby Constr. Co., Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *SEC v. Reynolds*, No. 3-08-CV-0384-B, 2008 WL 3850550, at *3 (N.D. Tex. Aug. 19, 2008). Motions to dismiss are viewed with disfavor and rarely granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004); *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *SR Int'l Bus. Ins. Co., Ltd. v. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008). A motion under Rule 12(b)(6) should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id.* at 545 (internal citations omitted).

## II.  THE FSIA DOES NOT DEPRIVE THIS COURT OF JURISDICTION

Contrary to Antigua's claims, the Foreign Sovereign Immunity Act ("FSIA") does not deprive this Court of subject matter jurisdiction. Plaintiffs acknowledge that Antigua is a sovereign state and presumptively within the ambit of the FSIA's protections. *See Transcor Astra Group S.A. v. Petroleo Brasileiro S.A.-Petrobras*, 409 Fed. Appx. 787, 789 (5th Cir. 2011) ("Under the FSIA, a foreign state is presumptively immune from jurisdiction of the United States courts.") (citations omitted). But that, of course, does not end the matter. The FSIA provides for clear exceptions to sovereign immunity, including the "waiver exception," the "commercial activity exception," and the "expropriation exception." *See* 28 U.S.C. § 1605(a)(1) (waiver exception); 28 U.S.C. § 1605(a)(2) (commercial activity exception); 28 U.S.C. § 1605(a)(3) (expropriation exception). As discussed in greater detail below, each of these exceptions apply.

1.      __Plaintiff's Burden to Show an Exception to the FSIA is "Rather Small"__

In responding to a motion to dismiss based on the FSIA, a plaintiff's burden of proof is "rather small" and it must show only "some facts" demonstrating an exception, while the sovereign state "retains the ultimate burden of proof on immunity." *Transcor*, 409 Fed. Appx. at 790 (quoting *Arriba Ltd. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992)); *see also id.* at 789 ("The district court ruled that Transcor met its burden of alleging 'some facts' that Petrobras Brazil carried on commercial activity having substantial contact with the United States."); *id.* at 791 ("Because these activities are sufficient to sustain Transcor's burden of producing 'some facts' to show that its claim is based upon Petrobras Brazil's commercial activity either carried out in the United States or having a direct effect here …. We hold that the district court has subject matter jurisdiction over this suit under the commercial activity exception to the Foreign Sovereign Immunities Act, and we therefore AFFIRM the district court's order denying the motion to dismiss."); *Mann v. Hanil Bank*, 900 F. Supp. 1077, 1087 n.3 (E.D. Wis. 1995) ("Because the burden of persuasion remains on the defendant, the responsibility 'shifted' to the plaintiff is rather small, as he or she must simply produce some evidence to support his or her claim that a statutory [FSIA] exception applies.") (underscore supplied) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) (discussing the burden-shifting approach used in Title VII cases)); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981); *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994).

Further, when courts rule on motions to dismiss for lack of jurisdiction without holding an evidentiary hearing – as is the case here – the plaintiffs only need to make a prima facie showing of jurisdiction, and "the court must accept as true the [plaintiffs'] uncontroverted allegations and resolve all factual disputes in its favor." *Nocando Mem Holdings, Ltd. v. Credit Commer. de Fr., S.A.*, No. SA-01-CA-1194-XR, 2004 WL 2603739, at *10 (W.D. Tex. Oct. 6,

2004) (internal citation omitted).  And even if the court receives some evidentiary materials, as is also the case here, "unless there is a full and fair hearing, it should not act as a fact finder and <u>must construe all disputed facts in the plaintiff's favor</u> and consider them along with the undisputed facts."  *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (underscore supplied).

Plaintiffs easily meet their burden of showing "some facts" that the exceptions to the FSIA apply.  And because Antigua failed to put forth any evidence in support of its claims of immunity, the Court should accept the facts and evidence presented by Plaintiffs herein and construe such evidence in Plaintiffs' favor.

### 2.  <u>Antigua Explicitly Waived Immunity under the FSIA</u>

Pursuant to the FSIA, "a foreign state shall not be immune from the jurisdiction of the courts of the United States ... in any case ... in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).

Courts have found that foreign sovereign defendants have waived immunities under the FSIA based on explicit waiver language found in a contract or agreement at the crux of the dispute.  *See, e.g.*, *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 393, 396 (2d Cir. 1985) (finding an explicit waiver of FSIA immunity by a Venezuela bank pursuant to a Loan Agreement entered into by the parties); *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47 (2d Cir. 1982) (finding that defendant bank, which as an instrumentality of a foreign government, was a "foreign state" within the meaning of the FSIA, and which had "explicitly" waived its immunity from prejudgment attachment).

Here, Antigua explicitly and unequivocally waived its immunity under the FSIA and the act of state doctrine in disputes arising out of the $40 million and $31 million transfers made

from the Stanford Entities to Antigua.  *See* Morgenstern Decl. Exh. H, Loan Agreement, §§ 10.16, 10.17; *id.*, Exh. I, Act No. 8, Schedule II § 12.

Plaintiffs also note that implied waiver of FSIA immunity has been found in the inclusion of choice of law provisions in loan or transactional documentation.  *See, e.g.*, *Resource Dynamics Int'l, Ltd. v. Gen. People's Comm.*, 593 F. Supp. 572, 575 (N.D. Ga. 1984); *Marlowe v. Argentine Naval Comm'n.*, 604 F. Supp. 703, 708 (D. D.C. 1985).  The documents governing the $40 million and $31 million transfers each contain choice of law provisions.  *See* Morgenstern Decl. Exh. H, Loan Agreement, § 10.5; *see* Morgenstern Decl. Exh. I, Act No. 8, Schedule II § 12.  And to the extent the documents governing the other transactions implicated in this case contain choice of law provisions, Antigua has similarly waived immunity.  Indeed, it appears that the course of conduct between the parties was such that Antigua typically waived immunity in its dealings with Stanford, and at the very least consented to be sued and bound by any judgment rendered either in Antigua or in "any other territory" at Stanford's discretion.  *See* Morgenstern Decl. Exh. K, Identical Guarantees Governing Various Loans (the "Guarantees"), Part III § 15(a)(2) ("The Guarantor [i.e., Antigua] agrees that any legal suit, action arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) ANTIGUA AND BARBUDA and in (2) ANY OTHER TERRITORIES at the option of the Bank and the Guarantor … irrevocably agrees to be bound by any judgment thereof …").  Antigua likely had no other choice, as it had no other source of funding and had to accede to favorable lending terms requested by the Stanford Entities.

### 3.    The Commercial Activity Exception Applies

Quite aside from the "waiver" exception to the FSIA, the "commercial activity" exception applies.  Under the "commercial activity" exception of the FSIA, a foreign state is not immune from suit in any case,

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605 (a)(2).  Thus, Plaintiffs must plead some facts demonstrating that the transfers they seek to avoid were the result of "commercial activity" on the part of Antigua which had a "direct effect in the United States."

> The FSIA defines "commercial activity" to mean:

>> [E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).  The Supreme Court has concluded that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).  By way of example, the Supreme Court instructs that "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id.* at 614-15 (citations omitted).  Accordingly, Plaintiffs herein must allege commercial activity akin to a Sovereign's contract for "army boots" or "bullets." *See also Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010) (Egyptian defendants did not act with

powers peculiar to a sovereign, but as private players in the market when contracting with a company to manage a health benefits plan).

Plaintiffs must also allege a "direct effect" on the United States. Significantly, there is no requirement that such "direct effect" be "substantial" or "foreseeable." *Weltover*, 504 U.S. at 618. Instead, an effect is "direct" if it simply follows "as an immediate consequence of the defendant's … activity." *Id.* (citation and quotation omitted). Indeed the "direct effect" requirement has been described as "breathtakingly broad." *Amerada Hess Shipping Corp. v. Argentine Republic*, 638 F. Supp. 73, 75 (S.D.N.Y. 1986) (citing *Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903 (S.D.N.Y. 1986)).

It is well-settled that a foreign sovereign's failure to pay on a loan or bond payable in the U.S. is "commercial activity" with a "direct effect" in the United States. *Weltover,* 504 U.S. at 620 ("Argentina's issuance of the Bonods [i.e., bonds] was a 'commercial activity' under the FSIA [and] its rescheduling of the maturity dates on those instruments was taken in connection with that commercial activity and had a 'direct effect' in the United States…."); *see also Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 894, 896 (5th Cir. 1998) (Fifth Circuit ruling that Bank of China's failure to pay on a letter of credit constituted an immediate effect in the United States, even though there was no provision in the letter of credit identifying a location in the United States as the place of payment because, but for the refusal of payment on the letter of credit, Bank of China "would have wired the money directly to Voest-Alpine's Texas bank account."); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2nd Cir. 1991) ("We know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA.") (citation omitted); *Morgan Guaranty Trust Co. v. Republic of*

*Palau*, 657 F. Supp. 1475 (S.D.N.Y. 1987) (Republic of Palau's repudiation of commercial debt was "commercial activity" under FSIA); *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*, 649 F. Supp. 688 (S.D.N.Y. 1986) (Nigerian government-owned bank not immune from suit under FSIA, where bank was involved in commercial activity that had direct effect in United States, which was breach of contract negotiated and payable in United States).

Here, the Act of Parliament governing the $31 million loan between the Stanford Entities and Antigua called for payment to be made in U.S. dollars and "in the United States."  *See* Morgenstern Decl. Exh. I, Act No. 8, Schedule II § 14.  And although the agreement governing the $40 million loan between Stanford Financial Group Company and Antigua does not explicitly require payment to be made in the U.S., because the loan was in U.S. dollars and was extended by an entity organized under Florida law with offices in Houston and Miami, it must be assumed that repayment was to be directed to the U.S.  *See, e.g.*, *Voest-Alpine Trading*, *supra* (letter of credit not stating place of payment).

Accordingly, the fraudulent transfers at issue in the subject actions constitute "commercial activity" with a "direct effect" in the U.S. such that the defense of sovereign immunity is inapplicable.  *See Mann v. Hanil Bank*, 900 F. Supp. at 1092 (finding "commercial activity" exception to FSIA in action to recover fraudulent transfers and examining underlying contracts and documentation).

The "commercial activity" exception is also applicable to Plaintiffs' claim for aiding and abetting fraud.  When tortious conduct is part and parcel of a program of commercial activity with direct effects in the U.S., the FSIA's commercial activity exception will be applied.  *See, e.g.*, *Adler v. Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir. 2000) ("commercial activity" exception to FSIA applied in action by U.S. citizen against Nigeria and Nigerian banks for fraud

relating to money paid to further illegal contract – what the Court described as an "enterprise for mutual advantage"); *Rosner v. Bank of China*, 528 F. Supp. 2d 419 (S.D.N.Y. 2007) ("commercial activity" exception applied to receiver's claim for aiding and abetting fraud relating to improper transactions in currency futures contracts); *Braka v. Multibanco Comermex, S.A.*, 589 F. Supp. 802, 804 (S.D.N.Y.) ("Plaintiffs' claims of securities law violations [ ] did arise directly out of defendant's commercial activity and thereby fall within the 'commercial activity' exception to the FSIA.").[7] This is true even if the acts which form the basis of liability occurred solely outside the U.S. *Voest-Alpine Trading*, 142 F.3d at 894 ("the only act that must be legally significant-that is, give rise to or form the basis of the cause of action-is the act outside the United States.").

Here, and as alleged in the Complaints, Antigua's conduct of aiding and abetting fraud and converting Receivership assets were part of a commercial *quid-pro-quo* involving significant economic activity with direct effects in the U.S. Thus, Antigua was permitted to "borrow" money from the U.S.-based Stanford Entities and in exchange agreed to thwart efforts by U.S. regulators and others to uncover Stanford's Ponzi scheme. Complaint 1 ¶¶ 3-4, 43, 46, 48, 51, 54-60, 66, 70-75, 82, 89, 97-207, 219, 262-265, 267-272; Complaint 2 ¶¶ 5, 6, 41-42, 56-60. Antigua at <u>all</u> levels of government engaged in significant misconduct in exchange for badly-needed funds to be applied for commercial projects. The effects of this activity were felt by the

---

[7]   In each of these cases, the courts found that the fraudulent conduct fell within the "commercial activities" exception, but dismissed the cases based on discrete facts that are not present in the subject actions. In *Adler*, the court subsequently found that the plaintiff's unclean hands barred recovery. Here, there is no allegation that Plaintiffs engaged in any misconduct. Nor can the doctrine of unclean hands be applied to the Receivership Estate, which is the beneficiary of these lawsuits. *See, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 753-54 (7th Cir. 1995) (doctrine of *in pari delicto* did not bar receiver's claim to recover assets fraudulently transferred in a Ponzi scheme). In *Rosner*, the court found that the fraud claims were not pleaded with particularity. But here, the fraud and Antigua's role therein is stated in meticulous detail and is not challenged by Antigua. And while the court in *Braka* dismissed the claims on statute of limitations grounds, Antigua has made no such challenge in its briefs, nor can it. *See Janvey v. Democratic Senatorial Campaign Committee*, 793 F. Supp. 2d 825 (N.D. Tex. 2011) (giving Receiver significant latitude on application of statute of limitations in Stanford-related actions).

U.S.-based Stanford Entities and its U.S. and other investors who were harmed thereby. Accordingly, the defense of sovereign immunity is not applicable to shield Antigua from its aiding and abetting Stanford's fraud.

### 4.       The Expropriation Exception Applies

Finally, the "expropriation exception" to the FSIA applies to Antigua's illegal conversion of Bank of Antigua's assets.   Pursuant to U.S.C. § 1605(a)(3), the court will be found to have subject matter jurisdiction in cases,

> in which rights in property taken in violation of international law are in issue and …. that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

In order for the FSIA's "expropriations exception" to apply, four conditions must be met: (i) "plaintiff must bring forth evidence that rights in property are at issue;" (ii) "plaintiff must prove that defendant took the property in violation of international law" – *i.e.*, the taking is "not for a public purpose, is discriminatory, or does not provide for just compensation;" (iii) a "plaintiff must prove that agencies or instrumentalities of [the foreign sovereign] are in possession of plaintiff's unlawfully expropriated property;" and (iv) "the agency or instrumentality in possession of the illegally expropriated property must be engaged in commercial activity in the Unites States" – i.e., "in either a regular course of commercial activity or a particular commercial transaction or act."  *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 729 F. Supp. 2d 141, 144-48 (D. D.C. 2010) (citations and quotations omitted).

Here, all four factors are met.  First, it cannot be disputed that Plaintiffs are creditors of Bank of Antigua.  Plaintiffs became creditors when the Court entered its Receivership Order on February 17, 2009, *before* Bank of Antigua's assets were seized by Cort and Antiguan authorities.  Moreover, Plaintiffs' funds were clearly funneled illegally through Bank of Antigua,

as they were through all of Stanford's fraudulent enterprise.  <u>Second</u>, Antigua clearly took the

assets in violation of international law.  Only days before the seizure, Antigua stated publicly

that Bank of Antigua was well capitalized.  Complaint 2 ¶ 44.  Then, following the seizure,

Antigua's Prime Minister revealed publicly that the taking was *not* a regulatory act, but rather a

negotiating tactic meant to keep the Receiver at bay.  In addition, neither Plaintiffs nor the

Receivership Estate received any compensation for the taking, which violates not only

international law, but the ECCB's own governing statute.  Complaint 2 ¶ 49.  <u>Third</u>, Antigua is

in possession of the Bank of Antigua assets.  Complaint 2 ¶ 43.  And <u>Fourth</u>, and as

demonstrated in great detail above, Antigua was engaged in significant commercial activity with

the U.S.-based Stanford Entities, and its taking of Bank of Antigua's assets was an extension of

that conduct.  Complaint 2 ¶¶ 50-54.  Antigua converted these assets to offset and otherwise

reduce its financial obligations to the Stanford Entities – a purely commercial act.  *Id.*

Accordingly, the defense of sovereign immunity is inapplicable to Antigua's conversion of Bank

of Antigua's assets.

## III.　　<u>THE COMPLAINTS STATE VALID CLAIMS FOR RELIEF</u>

In addition to challenging the validity of the Complaints on FSIA/subject-matter-

jurisdiction grounds, Antigua argues that the Complaints should be dismissed for "failure to state

a claim" in light of the supposed application of the act of state doctrine to these actions.  *See*

Case No.: 3:09-CV-02165-N [Doc. 43] ("Motion to Dismiss 1") at p. 28-29 and Case No.: 3:10-

CV-00304-N [Doc. 6] ("Motion to Dismiss 2") at p. 20-21.  This argument and other related and

ancillary objections raised by Antigua are addressed below.

1.      **The Fraudulent Transfer Claims**

Plaintiffs have alleged in great detail an array of multi-million dollar fraudulent transfers made from Stanford and Stanford-related companies to Antigua in violation of the Texas Fraudulent Uniform Transfer Act ("TUFTA").  Complaint 1 ¶¶ 97-132, 266-274; Complaint 2 ¶¶ 41-42, 55-69.

Significantly, Antigua challenges the claims related to <u>only</u> a subset of these transfers, namely Antigua's seizure of (i) certain real property owned by the Receivership Estate and (ii) assets owned by the Bank of Antigua.  *See* Motion to Dismiss 1 at p. 28. (Antigua arguing that "[t]he Court must dismiss Plaintiffs claim of avoidance because Antigua and Barbuda's acquisition of lands in Antigua and Barbuda constituted a non-judicable Act of State."); Motion to Dismiss 2 at p. 20 (Antigua arguing that "[t]he Act of State Doctrine precludes this Court from adjudicating Plaintiffs' claims against Antigua and Barbuda arising out of the ECCB's intervention in, management of, and subsequent transfer of the Bank of Antigua.").

Antigua does <u>not</u> challenge the TUFTA claims as they relate to the significant commercial loan activity detailed in the Complaints.  Thus, even if the Court determines that the act of state doctrine applies to Plaintiffs' claims for avoidance of Antigua's seizure of land and Bank of Antigua's assets, the avoidance claims relating to the loan activity must survive Antigua's motion.  Moreover, and as detailed below, the act of state doctrine does not bar Plaintiffs' avoidance claims in any respect.

(A)      **The Act of State Doctrine Does Not Apply to the TUFTA Claims**

As an initial matter, Plaintiffs note that the act of state doctrine is a "substantive defense" to liability, in contrast to an FSIA-related defense which is jurisdictional in nature.  *Republic of Australia v. Altmann*, 541 U.S. 677, 699 (2004).  "As a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment

than in a motion to dismiss." *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004) (*citing Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 02 Civ. 0795, 2003 WL 21878798, at *4-8 (S.D.N.Y. Aug. 8, 2003)). Indeed, Antigua bears "the burden of establishing [its] act of state defense," *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976), and Plaintiffs cannot determine how Antigua can possibly meet its evidentiary burden without any evidentiary showing. Nevertheless, the evidence even at this early stage of the proceedings requires the conclusion that the act of state doctrine cannot be invoked to defeat the TUFTA claims.

### i.    Antigua Waived Application of the Doctrine

<u>First</u>, Antigua explicitly waived any defense relating to sovereign immunity and the act of state doctrine for many, if not all of the monetary transfers implicated in this case. *See* Morgenstern Decl. Exh. H, Loan Agreement, §§ 10.16, 10.17; *see* Morgenstern Decl. Exh. I, Act No. 8, Schedule II § 12; *see* Morgenstern Decl. Exh. K, Guarantees, Part III § 15(a)(2).

### ii.    The Commercial Activity Exception Applies

<u>Second</u>, as seen in the commercial activity exception to the FSIA, the act of state defense is <u>not</u> available for "acts committed by foreign sovereigns in the course of their purely commercial operations." *Alfred Dunhill*, 425 U.S. at 706; *see also id.* at 698-99 ("Repudiation of a commercial debt cannot, consistent with this restrictive approach to sovereign immunity, be treated as an act of state; for if it were, foreign governments, by merely repudiating the debt before or after its adjudication, would enjoy an immunity which our Government would not extend them under prevailing sovereign immuni[ty] principles in this country. This would undermine the policy supporting the restrictive view of immunity, which is to assure those engaging in commercial transactions with foreign sovereignties that their rights will be determined in the courts whenever possible."); *Walter Fuller Aircraft Sales, Inc. v. Republic of*

*Philippines*, 965 F.2d 1375, 1388 (5th Cir. 1992) ("Although public acts lurk in the background, the act of state doctrine 'does not preclude judicial resolution of all commercial consequences stemming from the occurrence of ... public acts'") (citation omitted); *Lyondell–Citgo,* 2003 WL 21878798, at *8–9 (declining to apply the act of state doctrine where parties' contract made transactions commercial, as opposed to governmental).

As discussed in great detail above (Section II § 3, *infra*), Antigua's loan activity with the Stanford Entities was purely commercial in nature, such that the act of state doctrine cannot possibly apply.

### iii.      The Hickenlooper Exception Applies

<u>Third</u>, the Hickenlooper exception precludes Antigua from challenging its conversion of Bank of Antigua's assets.  Passed by Congress in response to the Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) (holding that the act of state doctrine bars U.S. courts from invalidating official acts of expropriation by a sovereign state within the sovereign's territory), the "Hickenlooper Amendment" provides that the act of state doctrine shall not apply to claims concerning expropriations "in violation of principles of international law," "including principles of compensation."   22 U.S.C. § 2370(e)(2).   The Hickenlooper Amendment is "congruent" with jurisprudence relating to the "expropriation exception" of the FSIA.  *See de Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985) ("Section 1605(a)(3) of the FSIA ... parallels the so-called 'Hickenlooper Exception' to the act of state doctrine . . . Like the Hickenlooper Exception, Section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state.") (quotations and citations omitted).  Thus, for the same reason the

expropriation exception bars Antigua from invoking the FSIA (Section II § 4, *infra*), the Hickenlooper exception precludes Antigua from relying on the act of state doctrine.

### (B)   Plaintiffs Have Standing to Pursue the TUFTA Claims

Antigua also argues that Plaintiffs lack standing to sue under TUFTA for the land transfers and bank-asset seizures because such an action somehow violates "article 5E of the Schedule to the ECCB Act," an Antigua and Barbuda statute. *See* Motion to Dismiss 2, p. 21 & n.17. But this argument – for which Antigua cites no U.S. case law or authority whatsoever – ignores the obvious reality that Plaintiffs herein are in no way bound by foreign law, much less the "ECCB Act."

Antigua also claims that Plaintiffs lack standing to sue because they are not "creditors" of Bank of Antigua within the meaning of TUFTA. *See* Motion to Dismiss 2, p. 22. But this argument is misdirected. Bank of Antigua is a Stanford-related entity whose assets were put into Receivership by this Court, and which was one of the many entities wholly owned by Stanford and used by him to conduct his Ponzi scheme. *See* Morgenstern Decl. Exh. E, SEC Action, Sec. Am. Compl. ¶ 85, (stating that Bank of Antigua was owned and controlled by Stanford); *see also* Second Amended Receivership Order, SEC Action, Dkt. No. 1130 at ¶¶ 1, 5 (providing the Receiver jurisdiction over all assets owned or controlled by the Stanford Entities, and empowering the Receiver to collect all assets traceable to the Stanford Entities controlled by the Receiver); *see also* Morgenstern Decl. Exh. D, Chapter 15 Order, pp. 43 & n. 47, 50 (Court identifying Bank of Antigua as a Stanford entity subject to the Receivership). As statutory "creditors" of the Stanford Entities under TUFTA, Plaintiffs' legal standing cannot possibly be questioned. *See* Tex. Bus. & Com. Code Ann. § 24.005 & 24.006 (Vernon 2009). Indeed, the evidence in the Chapter 15 case, the main Receivership case, and the criminal action against Allen Stanford demonstrate that CD-customer funds flowed into Bank of Antigua, much like

they did to the many other Stanford Entities.  In the same way that Plaintiffs are creditors of

Allen Stanford, SIBL, and SFG, they are creditors of the many other Stanford-related entities

implicated in the Receivership case, which were all controlled and dominated by Stanford out of

Texas, including Bank of Antigua.  Accordingly, Plaintiffs clearly have standing to recover Bank

of Antigua's assets and the other transfers made to Antigua for the benefit of the Receivership

Estate.

### (C)   Antigua Does Not Otherwise Oppose the TUFTA Claims

Antigua does not oppose the TUFTA claims on any other grounds.  And indeed, the

TUFTA claims are well-pled and valid.

To state a valid claim for a fraudulent transfer under § 24.005(a)(1) of TUFTA, Plaintiffs

must allege plausibly that a debtor made a transfer  "with actual intent to hinder, delay, or

defraud any creditor of the debtor."   Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Vernon

2009).

Significantly, the appropriate inquiry under this section is the intent of the transferor

rather than the transferee.  *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)

("'[T]he transferees' knowing participation is irrelevant under the statute' for purposes of

establishing the premise of (as opposed to liability for) a fraudulent transfer.") (citing *Warfield v.*

*Byron,* 436 F.3d 551, 559 (5th Cir. 2006)).  And Plaintiffs, in alleging that the Stanford Entities

operated a "Ponzi scheme," have adequately alleged the fraudulent intent of the Stanford Entities

in making the transfers to Antigua under applicable law.  *See SEC*, 487 F.3d at 301 ("In this

circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind

the transfers it made."); *Warfield*, 436 F.3d at 558 ("The Receiver's proof that RDI operated as a

Ponzi scheme established the fraudulent intent behind transfers made by RDI."); s*ee also Hayes*

*v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 535–

36 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme.").

Indeed, the Complaints plead in great detail that the Stanford Entities conducted an immense fraud, which was a Ponzi scheme from its inception and which made transfers of CD customer funds to Antigua without receiving value in return. Complaint 1 ¶¶ 1-5, 43-207, 266-274; Complaint 2 ¶¶ 1-8, 38-46, 55-78.

And both this Court and the Fifth Circuit Court of Appeals have found that the Stanford fraud was a "Ponzi scheme" as a matter of law. *See Janvey v. Alguire*, 628 F.3d 164, 168, 176-178, 180, 183-185 (5th Cir. 2010), *withdrawn and superseded on other grounds*, 647 F.3d 585 (5th Cir. 2011). This Court held that: "[t]he Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors"; "the Receiver present[ed] ample evidence that the Stanford scheme . . . was a Ponzi scheme"; and "[t]he Court finds that the Stanford enterprise operated as a Ponzi scheme . . . ." *Janvey v. Alguire*, No. 3:09-00724-N (N.D. Tex. June 10, 2010) (Order Granting Receiver a Preliminary Injunction Under TUFTA) at pp. 2, 11, 13. In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings. *See Alguire*, 628 F.3d at 168, 185. In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
>        *       *       *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . [The Davis Plea] reflects a classic Ponzi scheme . . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.

*     *     *

The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .

*     *     *

Here, the Receiver provided evidence of a massive Ponzi scheme . . . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at 176-178, 180.

Thus, because of the presumptions that arise when the transferor was a Ponzi scheme, Plaintiffs have addressed <u>each</u> element of their actual fraudulent-transfer claims under TUFTA.[8]

## 2.     <u>Aiding and Abetting Fraud</u>

Finally, Antigua does not challenge Plaintiffs' claim for aiding and abetting fraud on act of state grounds. Nor can it do so in light of the commercial activities exception applicable in these actions. *See, e.g.*, *U.S. v. Giffen*, 326 F. Supp. 2d 497, 503 (S.D.N.Y. 2004) ("The indictment alleges deposits of monies into foreign banks, which were then used by Giffen to fund offshore entities for the personal benefit of the senior Kazakh officials. These actions were commercial – not governmental, and are not immune under the act of state doctrine.") (citations omitted); *Sage Int'l v. Cadillac Gage Co.*, 534 F. Supp. 896 (E.D. Mich. 1981) (applying commercial activity exception to act of state doctrine in holding defendant liable for conducting "sham litigation" in violation of antitrust law). As argued above (Section II § 3, *infra*; Section

---

[8]     Further, the transfers were constructively fraudulent under applicable law. Pursuant to TUFTA § 24.005(a)(2), Plaintiffs must allege plausibly that a debtor made a transfer "without receiving reasonably equivalent value in exchange for the transfer, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id.* § 24.005(a)(2). And under Section 24.006(a), Plaintiffs must allege plausibly that a debtor made a transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." *Id.* § 24.006(a). Given that many of the "loans" made by Stanford to Antigua remain outstanding, the Stanford entities clearly did not receive value in exchange.

III § 1(A)(ii), *infra*), Antigua's decision to assist Stanford's fraudulent scheme was made for purely commercial purposes, and involved a web of significant commercial activity.  The effect of this commercial activity was felt directly in the U.S. by Stanford's defrauded CD investors and by the Stanford Entities, which as the Court found conclusively in the Chapter 15 Order, were controlled by Stanford and operated out of Houston, Texas.

Instead, Antigua seeks to escape liability by distancing itself from the acts of Leroy King, saying he was a lone actor and that his misconduct was *ultra vires* under applicable law.  Motion to Dismiss 1 at p. 14.  Quite the contrary was true.  King did not act alone, or even in violation of Antiguan law or policy.  As alleged in the Complaints, Antigua's assistance to Stanford and his fraud was pervasive, comprehensive, and part of a deliberate effort to secure badly needed funds for Antigua from its only available source: Allen Stanford and his entities.  Indeed, Stanford was appointed to important bank regulatory posts, granted land holdings for below-market prices, advanced payments to the Prime Minister and other government officials, and influenced and controlled the tiny island of Antigua at all conceivable levels.  Stanford's "blood oath" with King was merely a minor manifestation of a much larger *quid pro quo* between Antigua and the criminal it determined to harbor and shield from prosecution for so many years.  King, who has not been arrested or even charged with <u>any</u> crime by Antigua, was one of many officials who carried out Antigua's overt commercial policies and objectives in respect of Stanford and his entities.   Accordingly, and as stated in great detail in the Complaints, Antigua cannot place the blame for its shameful and illicit conduct solely with Leroy King.  *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) ("The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments …").

King's actions in furtherance of the fraud are <u>fact</u> issues that should be the subject of discovery and trial – not motions to dismiss.  If the Court is inclined to dismiss Plaintiffs' claims as they relate to King – or any other cause of action stated in the Complaints – Plaintiffs, at the very least, respectfully request leave to amend the Complaints under Rule 15(a) of the Federal Rules of Civil Procedure, so that Plaintiffs can correct any pleading deficiencies specifically identified by the Court.  *See Great Plains Trust Co., et al v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[O]ur cases support the premise that 'granting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim.'") (citing *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (per curiam) (addressing Rule 12(b)(6) dismissal)); *Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (Rule 15(a) applies where plaintiffs expressly request to amend even though the request is "not contained in a properly captioned motion paper") (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (5th Cir. 1988)).

## <u>CONCLUSION</u>

At this early stage of the proceedings, Plaintiffs have stated factual, plausible and compelling claims against Antigua.  Plaintiffs have also demonstrated that Antigua's legal defenses based upon sovereign immunity do not apply to the allegations made in the Complaints.  Significantly, Plaintiffs note that Leroy King, one of the main players in the fraud, has not yet been extradited to the U.S. to stand trial.  Plaintiffs expect to learn a great deal more about Antigua's knowing and material participation in Stanford's Ponzi scheme, and its receipt of millions of dollars in fraudulent transfers, when King is brought to justice.  Plaintiffs respectfully submit that they have nevertheless met their burden at this stage of the proceedings and that Antigua's motions to dismiss the Complaints should be denied in their entirety.

Dated:  August 20, 2012                    Respectfully submitted,


                                            **BUTZEL LONG,** a professional corporation

                                            By:_____/s/ *Peter D. Morgenstern*_____
                                                   Peter D. Morgenstern (*admitted pro hac vice*)
                                            380 Madison Avenue, 22nd Floor
                                            New York, NY 10017
                                            Telephone: (212) 818-1110
                                            Facsimile: (212) 818-0494
                                            morgenstern@butzel.com

                                            *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of August, 2012, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Peter D. Morgenstern*
Peter D. Morgenstern