# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| JOAN GALE FRANK, *at al.*<br>on behalf of themselves and all others<br>similarly situated, | § § § § | |
| Plaintiffs, | § § | Case No. 3:09-cv-02165 |
| v. | § § | |
| THE COMMONWEALTH OF ANTIGUA<br>AND BARBUDA, | § § § | |
| Defendant. | § § § § | |

| | | |
|---|---|---|
| STEVEN QUEYROUZE, *at al.*,<br>on behalf of themselves and all others<br>similarly situated, | § § § § | |
| Plaintiffs, | § § | Case No. 3:10-cv-00304 |
| v. | § § | |
| BANK OF ANTIGUA, *et al.* | § § | |
| Defendants. | § § § | |

---

## DECLARATION OF PETER D. MORGENSTERN IN SUPPORT OF PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

PETER D. MORGENSTERN, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.      My name is Peter D. Morgenstern and I am an attorney admitted to practice law in New York. I have been admitted to practice *pro hac vice* in the State of Texas in connection with this case since 2009. I am a shareholder at Butzel Long, PC, counsel to Plaintiffs in this action. I have practiced in the area of civil litigation for 28 years. I have handled numerous cases as lead counsel in state and federal courts throughout the United States.

2.      I respectfully submit this declaration in support of Plaintiffs' Response and Brief in Opposition to Defendants' Motions to Dismiss.

3.      Attached hereto as <u>Exhibit A</u> is the Complaint filed against The Commonwealth of Antigua and Barbuda by the plaintiffs, Joan Gale Frank, *et al.*, on behalf of themselves and all others similarly situated, in the United States District Court for the Northern District of Texas ("District Court"). Case No. 3-09-CV-02165-N, Docket No. 1.

4.      Attached hereto as <u>Exhibit B</u> is the Complaint filed against Bank of Antigua, *et al.*, by the plaintiffs, Steven Queyrouze, *et al.*, on behalf of themselves and all others similarly situated, in the District Court. Case No. 3-10-CV-00304-N, Docket No. 1.

5.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of excerpts from the transcript of the testimony of James Davis from the criminal trial of R. Allen Stanford in the United States District Court for the Southern District of Texas. Cr. No. H-09-342 (Hittner, D.J.).

6.      Attached hereto as <u>Exhibit D</u> is the Order of the District Court (Godbey, D.J.), entered on July 30, 2012 in *In re Stanford International Bank, Ltd.,* Case No. 3-09-CV-00721-N, Docket No. 176, (DCG) (N.D. Tex.).

7.      Attached hereto as <u>Exhibit E</u> is the Second Amended Complaint filed against Stanford International Bank, *et al.*, by plaintiff, the Securities and Exchange Commission, in the District Court.  Case No. 3-09-CV-00298-N, Docket No. 952.

8.      Attached hereto as <u>Exhibit F</u> is the Order of the District Court (Godbey, D.J.), entered on February 16, 2009 in *Securities and Exchange Commission v. Stanford International Bank, Ltd, et al.,* Case No. 3-09-CV-00298-N, Docket No. 10, (DCG) (N.D. Tex.), appointing Ralph S. Janvey as receiver over all the assets and records of R. Allen Stanford, Stanford International Bank, and all the associated companies and entities they own or control.

9.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of excerpts from the transcript of the Status Conference held on September 23, 2010 in *In re Stanford Entities Litigation,* Case No. 3-09-MD-02099-N, (DCG) (N.D. Tex.).

10.     Attached hereto as <u>Exhibit H</u> is a true and correct copy of the agreement, effective as of August 30, 2001, governing a $40 million loan facility between Stanford Financial Group Company and the Government of Antigua and Barbuda.

11.     Attached hereto as <u>Exhibit I</u> is a true and correct copy of an Antigua and Barbuda Act of Parliament, dated July 17, 1998 and titled Act No. 8 of 1998, AN ACT TO MAKE PROVISIONS FOR THE BORROWING OF MONEY FOR THE PURPOSES OF CONSTRUCTING AND EQUIPPING A NEW HOSPITAL AT MOUNT ST. JOHN'S, approving a $31 million loan facility between Stanford Financial Group, Ltd. and Bank of Antigua and the Government of Antigua and Barbuda and the Medical Benefits Board of Control, effective as of July 30, 1998.

12.     Attached hereto as <u>Exhibit J</u> is a true and correct copy of the "STATEMENT OF THE GOVERNMENT OF ANTIGUA & BARBUDA ON THE STANFORD VICTIMS COALITION CLAIMS

MARCH 19TH, 2010" posted on March 22, 2010 and available at

http://www.antigua.gov.ag/article_details.php?id=463&category=38.

13.     Attached hereto as Exhibit K is a true and correct copy of several identical

guarantees governing various loans entered into by the Government of Antigua and Barbuda

related to the Stanford entities.

14.     Attached hereto as Exhibit L is a true and correct copy of a March 5, 2002

article from the WALL ST. JOURNAL titled "*Antigua, Island of Sun, Is Also in the Shadow of R.

Allen Stanford*" by Peter Fritsch.

15.     Attached hereto as Exhibit M is a true and correct copy of a March 11,

2009 article from BLOOMBERG titled "*Stanford's Island Empire Implodes As Antigua Grabs

Properties*" by Alison Fitzgerald and Thomas Black.

16.     Attached hereto as Exhibit N is a true and correct copy of a March 1, 2008

article from THE OBSERVER titled "*We Have Lift-off*" by Andy Bull.

17.     Attached hereto as Exhibit O is a true and correct copy of a June 2009

article from GQ MAGAZINE titled "*Did This Man Pull Off The Most Brazen Swindle of All?*" by

Aram Roston.

Dated:  August 20, 2012                        Respectfully submitted,


                                               By:    /s/ Peter D. Morgenstern
                                                      Peter D. Morgenstern

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOAN GALE FRANK, JON A. BELL, SAMUEL BUKRINSKY, JAIME ALEXIS ARROYO BORNSTEIN, PEGGY ROIF ROTSTAIN, JUAN C. OLANO, and JOHN WADE in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan, on behalf of themselves and all others similarly situated, | § § § § § § § | Civil Action No. |
| Plaintiffs, | § § | |
| v. | § § | |
| THE COMMONWEALTH OF ANTIGUA AND BARBUDA, | § § § | |
| Defendant. | § § § | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Joan Gale Frank, Jon A. Bell, Samuel Bukrinsky, Jaime Alexis Arroyo Bornstein, Peggy Roif Rotstain, Juan C. Olano, and John Wade in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their class action complaint against the Defendant, the Commonwealth of Antigua and Barbuda ("Antigua"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action to recover billions of dollars of losses suffered by innocent and unsuspecting customers from around the world who entrusted their money to R. Allen Stanford's Stanford International Bank, Ltd. ("SIBL"), part of the Stanford

Financial Group ("SFG"), which has now been exposed as one of the most notorious, fraudulent, corrupt, and criminal enterprises in history.

2.      R. Allen Stanford ("Allen Stanford"), the various commercial entities that he controlled (the "Stanford Entities," and, together with Allen Stanford, "Stanford"), and certain of his employees engaged in a multi-year, multi-billion dollar "Ponzi" scheme of international scope.

3.      Antigua is sovereign, but not above the law.  It became a full partner in Stanford's fraud, and reaped enormous financial benefits from the scheme.  Stanford stuffed Antigua's coffers – and its officials' pockets – with money stolen from unsuspecting customers throughout the United States, Canada, Central America, South America, and elsewhere.  Antigua worked tirelessly to protect and nurture Stanford's criminal enterprise and, in return, eagerly accepted its share of criminally-procured funds.

4.      As described more fully below, Stanford's massive fraud would not have been possible without the active, knowing, and essential assistance of Antigua.  Antigua: (i) provided a safe haven for Stanford to operate; (ii) provided essential assistance in Stanford's efforts to portray itself to Plaintiffs and other members of the Class as a legitimate provider of financial services; (iii) participated with Stanford in a variety of commercial activities in Antigua that provided a pretext for the transfer of criminal proceeds from Stanford to Antigua; (iv) provided false and fraudulent information to the Securities and Exchange Commission ("SEC") and other regulators in order to thwart the SEC's investigations into Stanford; and (v) shared in the criminal proceeds of the

conspiracy, all or substantially all of which were stolen from the Plaintiffs and other members of the Class.

5.     Stanford's customers are devastated as a result of Stanford's and Antigua's fraudulent conduct, and those customers, including Plaintiffs and other members of the Class, are likely to recover only a *fraction* of the full amount owed to them through the pending court-ordered liquidation of the Stanford Entities. The victims' losses are staggering, and the Plaintiffs and other members of the Class have a right to recoup their losses from Antigua, which was Stanford's full partner in crime.

## PARTIES

6.     At all relevant times, Plaintiff Joan Gale Frank is and was a citizen of the United States residing in Oregon.

7.     At all relevant times, Plaintiff Jon A. Bell is and was a citizen of the United States residing in Oregon.

8.     At all relevant times, Plaintiff Samuel Bukrinsky is and was a citizen of Mexico residing in Mexico.

9.     At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.

10.     At all relevant times, Plaintiff Peggy Roif Rotstain is and was a citizen of Peru residing in Peru.

11.     At all relevant times, Plaintiff Juan C. Olano was a citizen of Colombia and the United States residing in Florida.

12.     At all relevant times, Plaintiff John Wade was a trustee of the Microchip ID Systems, Inc. Retirement Plan.

13.     As of February 16, 2009, Plaintiffs were customers of SIBL, had money on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the Class, as defined below.

14.     Antigua is an independent state within the British Commonwealth of Nations.  On November 15, 2000, the United Nations Convention against Transnational Organized Crime (the "Convention") was adopted by resolution A/RES/55/25 at the fifty-fifth session of the General Assembly of the United Nations.  The United States signed the Convention on December 12, 2000, and ratified the Convention on December 13, 2000.  Antigua signed the Convention on September 26, 2001, and ratified the Convention on July 24, 2002.

## RELEVANT NON-PARTIES

15.     At all relevant times, SFG was the parent company of SIBL and a web of other affiliated financial services entities.  SFG maintained its headquarters in Houston, Texas, and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida.  Upon information and belief, the activities of SFG and all of the Stanford Entities were directed from SFG's Houston, Texas, headquarters.

16.     At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua and elsewhere.  SIBL was organized in Montserrat, originally under the name of Guardian International Bank.  In or about 1989, SIBL's principal banking location was moved to Antigua.

17.     From 2001 to 2008, SIBL marketed its primary investment product, Certificates of Deposit ("CDs"), and promised higher rates of return on those CDs than were generally offered at banks in the United States. In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets. In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

18.     At all relevant times, Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995. SGC was registered with the SEC as a broker-dealer and investment advisor. SGC also was a member of the Securities Investor Protection Corporation, and the Financial Industry Regulatory Agency (formerly, the National Association of Securities Dealers). SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States. According to the Court-appointed receiver[1] for the Stanford Entities, "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL." Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

19.     Allen Stanford founded and owned SFG and its affiliated companies, including, through a holding company, SIBL. Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

---

[1] On February 16, 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud." By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver").

20.     James M. Davis ("Davis") was the Chief Financial Officer of SFG and

SIBL, and served as a member of SIBL's Investment Committee.

21.     Laura Pendergest-Holt ("Pendergest-Holt") was the Chief Investment

Officer of SFG.  In or about December 2005, Pendergest-Holt was appointed by SIBL's

Board of Directors to be a member of SIBL's Investment Committee.  Gilberto Lopez

("Lopez"), a U.S. citizen and resident of Spring, Texas, worked in SFG's Houston,

Texas, office, as the chief accounting officer of SFG and its affiliate, Stanford Financial

Group Global Management, LLC ("SFGGM").  In this capacity, he provided accounting

services to many entities under Stanford's control, including SIBL, SFG, and SFGGM.

22.     Mark Kuhrt ("Kuhrt"), a U.S. citizen and resident of Christiansted, St.

Croix, U.S. Virgin Islands, was the global controller for SFGGM.  In this capacity, he

provided accounting services to many entities under Stanford's control, including SIBL,

SFG, and SFGGM.  Kuhrt reported at various times to Lopez and Davis, but also directly

to Stanford.  Kuhrt is not a Certified Public Accountant.  (Allen Stanford, Davis,

Pendergest-Holt, Lopez, and Kuhrt are referred to collectively herein as the "Stanford

Co-Conspirators.")

23.     The Financial Services Regulatory Commission of Antigua ("FSRC") was

created by and, at all relevant times, existed under the authority of, Antigua's

International Business Corporations Act (the "IBC Act").  FSRC is an agency and/or

instrumentality of Antigua.

24.     During certain relevant times described below, Leroy King ("King") was

the Administrator and Chief Executive Officer for the FSRC.  King, among other things,

was supposedly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations. As the SEC alleged in its Second Amended Complaint in the SEC Action, however, King "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records. In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine [SIBL's] investment portfolio. King also provided Stanford with access to the FSRC's confidential regulatory files." [SEC Second Amended Complaint at p. 3]

## The RICO Enterprises

25.     The "SFG Enterprise" consists of Stanford Financial Group and its subsidiaries and formal affiliates, including but not limited to SIBL and SGC. At all relevant times, the SFG Enterprise was an "enterprise" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4).

26.     At all relevant times, the SFG Enterprise was "a global network of privately held, wholly owned affiliated financial service companies. Although independent, the affiliated companies together provide[d] coordinated wealth management through international private banking, asset management, investment advisory services, trust administration, commercial banking and insurance for clients worldwide." [SIBL 2006 Annual Report] Upon information and belief, SFG had more

than 50,000 clients from more than 100 countries on six continents.  [SIBL 2007 Annual Report]

27.     At all relevant times, the SFG Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity alleged herein.

28.     The "SIBL Enterprise" consists of SIBL.  At all relevant times the SIBL Enterprise was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

29.     At all relevant times, SIBL was a banking institution chartered by Antigua.

30.     At all relevant times, the SIBL Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity alleged herein.

31.     The SFG Enterprise and the SIBL Enterprise are referred to collectively herein as the "Stanford Enterprises."

## JURISDICTION AND VENUE

32.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1605(a)(1), 1605(a)(2), and 1605(a)(3) in that this is an action against a foreign state; 28 U.S.C. § 1331 in that this case presents federal questions; and supplemental jurisdiction under 28 U.S.C. § 1367.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) on the ground that jurisdiction is not based solely upon diversity of citizenship and a substantial part of the events or omissions giving rise to the claim occurred in this District.

34.     Venue also is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) on the ground that it is an action against a foreign state as defined in 28 U.S.C. § 1603(a),

and that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

35.     The class of persons that Plaintiffs seek to represent (the "Class") is comprised of all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL.

36.     *Numerosity.*  A class action is appropriate in this case because the Class is so numerous that joinder of all members is impracticable.  While the precise number of Class members and their addresses are unknown to the Plaintiffs, their identities can be determined from SIBL's records.  Upon information and belief, Class members number in the tens of thousands.

37.     *Commonality.*  A class action is appropriate in this case because there are questions of law and fact common to the Class, including but not limited to:

(a)  whether Antigua received funds from the criminal proceeds of the Stanford Enterprises;

(b)  whether Antigua deceived the SEC for the purpose of perpetuating the Stanford Enterprises and enriching itself;

(c)  whether Antigua knew, or should have known, that the Stanford Co-Conspirators were using the Stanford Enterprises to perpetrate a massive "Ponzi" scheme;

(d)  whether Antigua committed wire fraud and mail fraud as part of the scheme;

(e) whether Antigua's alleged acts of wire fraud and mail fraud had an effect upon interstate or foreign commerce;

(f) whether Antigua conducted or participated, directly or indirectly, in the conduct of the Stanford Enterprises' affairs through a "pattern of racketeering activity" within the meaning of RICO;

(g) whether Antigua conspired with the Stanford Co-Conspirators to perpetrate the fraud;

(h) whether Antigua aided and abetted the fraud committed by the Stanford Co-Conspirators;

(i) whether Antigua is liable to SIBL's depositors for their participation in the scheme;

(j) the existence and the amount of damages suffered by members of the Class; and

(k) whether Antigua misappropriated assets belonging to the Stanford Entities and, in so doing, deprived the Class of assets that should be available to satisfy their claims against the Stanford Entities.

38.     The questions of law and fact common to the Class predominate over any questions affecting only individual members.

39.     *Typicality.* The claims of the representative Plaintiffs are typical of the claims of the Class.

40.     *Adequacy.* The representative Plaintiffs will fairly and adequately protect the interests of the Class.

41.     In the absence of class certification, there is a risk that adjudications in thousands of separate cases with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

42.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Fraud[2]

43.     Stanford's business was a massive fraud in which the Stanford Co-Conspirators, through the Stanford Enterprises and with the knowing provision of substantial assistance by Antigua, misappropriated billions of dollars, falsified SIBL's financial statements, and concealed their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere.

44.     SIBL represented to the Plaintiffs and the Class that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) SIBL had averaged double-digits returns on its investments for over 15 years; (iii) Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by

---

[2] The allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex) (Second Amended Complaint), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, and other public materials and media reports.

a team of SFG analysts in Memphis, Tennessee; (v) SIBL, in early 2009, was stronger than at any time in its history; and (vi) SIBL did not have exposure to losses from investments in the fraudulent "Ponzi" scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme"). More fundamentally, Stanford and Antigua represented that SIBC was a legitimate banking institution, which made money by investing assets and generating investment returns. These representations were false.

45.     Plaintiffs and other members of the Class reasonably relied upon these representations when making their decisions to invest in and with the Stanford Entities.

46.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that SIBL's representations were false; (b) intentionally and substantially assisted Stanford by concealing SIBL's false statements from customers (including Plaintiffs and other members of the Class) and other nations' regulators; and (c) affirmatively represented to Plaintiffs and the Class that the FSRC undertook audits that it did not actually perform.

47.     Contrary to SIBL's public statements, by February 2009, the Stanford Co-Conspirators, together with Antigua, had misappropriated billions of dollars from Plaintiffs and the Class, and "invested" an undetermined amount of those funds in speculative, unprofitable private businesses controlled by Allen Stanford. Contrary to SIBL's representations regarding the liquidity and safety of its portfolio, the Plaintiffs' and the Class's funds were not invested in a "well-diversified portfolio of highly marketable securities." Instead, SIBL internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

48.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that Stanford had misappropriated a significant portion of SIBL's investment portfolio; and (b) intentionally and substantially assisted Stanford's scheme for the purpose of sharing in the proceeds that Stanford had misappropriated from Plaintiffs and other members of the Class.

49.     According to the SEC, the Stanford Co-Conspirators fabricated SIBL's financial statements.  Using a predetermined return on investment number, the Stanford Co-Conspirators reverse-engineered SIBL's financial statements to report investment income that SIBL had not actually earned.  As a result, information in SIBL's financial statements and annual reports bore no relationship to the actual performance of SIBL's investments.

50.     Plaintiffs and other members of the Class reasonably relied upon SIBL's fabricated financial statements when making their decisions to entrust their money to the Stanford Entities.

51.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that the Stanford Co-Conspirators had fabricated SIBL's financial statements; and (b) intentionally and substantially assisted Stanford's scheme by falsely representing to Plaintiffs and other members of the Class that SIBL's financial statements were subject to, and approved only after, substantive review and scrutiny by the FSRC.

52.     In selling the CDs, SIBL touted, among other things, the CDs' safety, security, and liquidity.  SIBL told Plaintiffs and the Class that SIBL aggregated customer deposits, and then reinvested those funds in a "globally diversified portfolio" of assets.

SIBL also represented to the Plaintiffs and the Class that Stanford employed a sizeable team of analysts to monitor SIBL's portfolio. These representations were false.

53.     Plaintiffs and other members of the Class reasonably relied upon SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio.

54.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge that SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio were false; and (b) intentionally and substantially assisted Stanford's scheme for the purpose of sharing in the proceeds that Stanford had misappropriated from Plaintiffs and other members of the Class.

55.     SIBL's annual reports also represented that "SIBL does not expose its clients to the risks associated with commercial loans...the Bank's only lending is on a cash secured basis." Contrary to SIBL's representations, however, SIBL exposed Plaintiffs and the Class to the risks associated with more than $1.6 billion in undisclosed and unsecured personal "loans" to Allen Stanford. To conceal the theft, some of these "loans" were evidenced by promissory notes from Allen Stanford.

56.     These promissory notes were typically created after Davis had, at Allen Stanford's direction, fraudulently wired out billions dollars of SIBL investor funds to Allen Stanford or his designees. Allen Stanford made few, if any, payments required by the terms of the promissory notes, and the outstanding loan balances and interest owed by him to SIBL were rolled into new, larger, promissory notes.

57.     The personal "loans" to Allen Stanford were inconsistent with representations that had been made to Plaintiffs and members of the Class: despite the fact that SIBL's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related-party transactions entered into by SIBL, SIBL's "loans" to Allen Stanford were not disclosed in the "Related-Party Transactions" section of SIBL's annual reports from 2004 through 2008.

58.     Allen Stanford used the money that he "borrowed" from SIBL to, among other things, fund his personal ventures and private pursuits, including more than $400 million to fund personal real estate deals and more than $36 million to subsidize "Stanford 20/20", an annual cricket tournament that boasted a $20 million purse.

59.     Plaintiffs and other members of the Class reasonably relied upon SIBL's misrepresentations regarding SIBL's bogus "loans" to Allen Stanford.

60.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding SIBL's bogus "loans" to Allen Stanford, and the omission and/or mischaracterization of those "loans" in SIBL's Annual Reports; and (b) intentionally and substantially assisted Stanford in concealing SIBL's false statements regarding those bogus "loans" from Plaintiffs, other members of the Class, and other regulators.

61.     Allen Stanford's misappropriation of the Plaintiffs' and the Class's assets (and the poor performance of SIBL's investment portfolio) created a giant hole in SIBL's balance sheet. To conceal their fraudulent conduct and thereby ensure that Plaintiffs and the Class continued to entrust their money to SIBL, the Stanford Co-Conspirators

fabricated the growth, composition, and performance of SIBL's investment portfolio to give the appearance that SIBL's investments were highly profitable.

62.     In its training materials for the SGC advisers, SIBL represented that it had earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years. SIBL marketed the CDs using these purported returns on investment. Likewise, SIBL's Annual Reports stated that the bank earned from its "diversified" investments approximately $642 million in 2007 (11 %), and $479 million in 2006 (12%).

63.     SIBL claimed that its high returns on investment allowed it to offer higher rates on the CD than those offered by U.S. banks. For example, SIBL offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed-rate CD based upon an investment of $100,000. On November 28, 2008, SIBL quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid less than 3.2%.

64.     None of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio was true. Instead, through their actions, the Stanford Co-Conspirators caused SIBL to report investment income that the bank did not actually earn and, thereby, greatly inflate the value of its investment portfolio. Specifically, the Stanford Co-Conspirators prepared and reviewed SIBL's financial statements, including the annual reports that were provided to customers and posted on the bank's website.

65.     Plaintiffs and other members of the Class reasonably relied upon the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio.

66.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding the false and fraudulent nature of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio; and (b) intentionally and substantially assisted Stanford's scheme by falsely representing to Plaintiffs and other members of the Class that SIBL's financial statements were subject to, and approved only after, substantive FSRC review and scrutiny.

67.     As world financial markets experienced substantial declines in 2008, it became apparent to Allen Stanford and Davis that SIBL could not credibly report investment profits in the 11 % to 15% range (as it had done in previous years). Allen Stanford and Davis thus agreed that SIBL would for the first time show a "modest" loss to avoid raising too many "red flags" to customers and other nations' regulators. In other words, they opted to tell a "more believable lie" in order to conceal their many previous years of fraudulent conduct.

68.     SIBL touted a purported $541 million capital infusion from Allen Stanford in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

69.     The purported capital infusions by Allen Stanford were backdated,

fictitious, and engineered to give the appearance that SIBL had achieved "desired" levels

of capital.

70.     In December 2008, well after Allen Stanford had purportedly infused the

$541 million in additional capital into SIBL, Allen Stanford, Davis, Kuhrt, and Lopez

approved and implemented a scheme wherein they "papered" a series of fraudulent

round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by

SIBL in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

71.     To give the appearance that the above-referenced capital infusions actually

occurred, Allen Stanford, Davis, Kuhrt, and Lopez falsified accounting records by

recording bogus transactions:

- SIBL sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIBL the $63.5 million);

- the Stanford-controlled entities, at Allen Stanford's and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Allen Stanford's personal debt to SIBL, Allen Stanford contributed to SIBL $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation); and

- Allen Stanford then contributed to SIBL additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

72.     These transactions did not infuse real capital into SIBL. In fact, the entire

process was fabricated after the reported capital contributions allegedly occurred.

Moreover, the purported inflation in value of the real estate from $40,000 to $2 million

per acre was not justifiable under applicable U.S. or international accounting principles.

SIBL did not secure an appraisal and had no other reasonable support for such a drastic

increase in value. The transactions among Stanford-controlled entities simply were not

the kind of arm's-length transactions required to justify a 5000% increase in value.

Nevertheless, on a mere promise from Allen Stanford that the land would appraise for

over $3 billion, Stanford, Davis, Kuhrt, and Lopez used $63.5 million of Antiguan real

estate to simultaneously plug a multi-billion dollar hole in SIBL's balance sheet and

eliminate a significant portion of Allen Stanford's personal debt to SIBL.

73.     Following the fraudulent capital infusions, the largest segment of the

bank's investment portfolio would have been $3.2 billion in over-valued real estate. Yet,

SIBL did not disclose the transactions in its December 2008 newsletter, which touted

Allen Stanford's purported capital infusion. Moreover, Stanford's real estate investments

were wholly inconsistent with SIBL's representations to customers that SIBL's

investment portfolio was composed of marketable securities, and not real estate.

74.     Plaintiffs and other members of the Class reasonably relied upon the

information regarding Allen Stanford's purported capital infusion to SIBL.

75.     Upon information and belief, Antigua, through the FSRC: (a) had actual

knowledge regarding the fraudulent nature of both Allen Stanford's purported capital

infusion to SIBL and the Stanford Co-Conspirators' inflated appraisal of Antiguan real

estate; and (b) intentionally and substantially assisted Stanford in concealing SIBL's

fraudulent real estate machinations from Plaintiffs, other members of the Class, and other nations' regulators.

## Misrepresentations Regarding Management
## of SIBL's Investment Portfolio

76.     Prior to making decisions to entrust their money to SIBL, prospective customers routinely asked how SIBL safeguarded and monitored its assets. They also frequently inquired whether Stanford could "run off with the money."

77.     In response to these questions, at least during 2006 and much of 2007, Pendergest-Holt trained SIBL's senior investment officer ("SIO") to tell customers and prospective customers that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee. The SIO followed Pendergest-Holt's instructions, telling customers and prospective customers that SIBL's entire investment portfolio was managed by a global network of money managers and monitored by a team of more than twenty analysts.

78.     Neither Pendergest-Holt nor the SIO disclosed to customers that SIBL segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1 represented merely approximately 9% ($800 million) of SIBL's purported portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of

SIBL's portfolio. Tier 3, the undisclosed assets managed by Allen Stanford and Davis, thus represented *approximately 80%* of SIBL's investment portfolio in December, 2008.

79.     Neither Pendergest-Holt nor SIBL's SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Allen Stanford and Davis. Likewise, they did not disclose that Allen Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIBL's assets.

80.     Neither Pendergest-Holt nor the SIO disclosed to the Plaintiffs or the Class that the "global network" of money managers and the team of analysts did not manage any of SIBL's Tier 3 investments and, in reality, only monitored approximately 10% of SIBL's portfolio. In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIBL's portfolio because that information "wouldn't leave an investor with a lot of confidence." Likewise, Davis instructed the SIO to "steer" potential customers away from information about SIBL's portfolio.

81.     Plaintiffs and other members of the Class reasonably relied upon the information disseminated by SIBL's SIO when making their decisions to invest in and with the Stanford Entities.

82.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding the fact that, as of December, 2008, undisclosed Tier 3 investments represented approximately 80% of SIBL's portfolio; and (b) intentionally and substantially assisted Stanford in concealing SIBL's method of segregating its investment

portfolio into three "tiers" from Plaintiffs, other members of the Class, and other nations' regulators.

### Misrepresentation That SIBL Was "Stronger" Than Ever Before

83.    On January 10, 2009, Allen Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performers Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

84.    During that meeting, Davis stated that SIBL was "stronger" than at any time in its history. Allen Stanford, Davis, and Pendergest-Holt represented that SIBL was secure and built upon a strong foundation, and that its financial condition was shored up by Allen Stanford's capital infusions. Davis, however, failed to disclose that he had been informed only days earlier by the head of SIBL's treasury that, despite SIBL's best efforts to liquidate Tier 2 assets, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million.

85.    Allen Stanford and Davis also failed to disclose to the SGC sales force that: (i) Allen Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIBL's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIBL customers' funds had been invested in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity; and (iv) the purported 2008 capital infusions by Allen Stanford were a fiction.

86.    During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered

questions about SIBL's investment portfolio.  In so doing, she failed to disclose to

attendees that she and her team of analysts did not manage SIBL's entire investment

portfolio and, instead, only monitored approximately 10% of the bank's investments.

She also failed to disclose that SIBL had invested SIBL's funds in a manner inconsistent

with SIBL's representations to customers that SIBL's investment portfolio was composed

of marketable securities, and not real estate and/or private equity.

     87.    Allen Stanford, Davis and Pendergest-Holt also failed to disclose that, on

or about December 12, 2008, Pershing, LLC (SGC's clearing broker-dealer) had

informed SGC that it would no longer process wire transfers from SGC to SIBL for the

purchase of the CDs, citing suspicions about SIBL' s investment returns and its inability

to get from the bank "a reasonable level of transparency" into its investment portfolio.

     88.    Allen Stanford, Davis and Pendergest-Holt knew that SGC advisers would

rely upon the information provided to them during the Top Performers Club meeting to

sell CDs.  Plaintiffs and other members of the Class reasonably relied upon that

information.

     89.    Upon information and belief, Antigua, through the FSRC had actual

knowledge regarding the facts that: (i) in the second half of 2008, SIBL's cash position

had fallen from the June 30, 2008, reported balance of $779 million to less than $28

million; and (ii) Pershing, LLC, had discontinued its role as SGC's clearing broker-dealer

due to its suspicions regarding SIBL.

### Exposure to Losses From Madoff-related Investments

90.     In the December 2008 Monthly Report, SIBL told its customers that it "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

91.     Contrary to this statement, Allen Stanford, Davis and Pendergest-Holt knew, prior to the release of the December 2008 Monthly Report, that SIBL had exposure to losses from the Madoff Scheme.

92.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIBL had invested, detailing SIBL's exposure to losses from the Madoff Scheme.

93.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIBL had exposure to losses from the Madoff Scheme in two additional funds through which SIBL had invested.  That same day, Davis, Pendergest-Holt, and others consulted with Allen Stanford regarding the bank's exposure to losses from the Madoff Scheme.

94.     Allen Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

95.     Plaintiffs and other members of the Class reasonably relied upon the information regarding SIBL's purported lack of exposure to losses from the Madoff Scheme.

96.     Upon information and belief, Antigua, through the FSRC: (a) had actual knowledge regarding SIBL's exposure to losses from the Madoff Scheme; and (b) intentionally and substantially assisted Stanford in concealing SIBL's exposure to losses

from the Madoff Scheme from SIBL's customers (including Plaintiffs and other members
of the Class) and other nations' regulators.

### Antigua's Participation in the Fraud

97.     Tourism accounts for more than half of Antigua's gross domestic product.
After a series of violent hurricanes devastated Antigua's tourism infrastructure in 1995,
Antigua experienced a sharp decline in tourist arrivals and revenue; this decline was
exacerbated by the recent global economic downturn.  As a result of this decline in its
primary source of income, Antigua experienced severe fiscal difficulties.

98.     Partly as a result of the decline in tourist revenues, Antigua has, for many
years, had difficulties in engaging in routine commercial activities such as securing loans
from legitimate sources.  At the time, "most [banks] balk[ed] at lending to a bloated and
revenue-strapped government with a record of mismanagement and corruption."
[P. Fritsch, *Antigua, Island of Sun, Is Also in the Shadow of R. Allen Stanford*, WALL ST.
JOURNAL, Mar. 5, 2002, pg A1 (the "2002 WSJ Article")]

99.     Antigua therefore entered into a corrupt and illegal commercial
partnership with the Stanford Co-Conspirators, in which Antigua became an integral part
of, and beneficiary of, Stanford's multi-billion dollar international fraudulent conspiracy.

### Antigua's Commercial Lending Relationship With Stanford

100.     Despite Antigua's lack of creditworthiness with legitimate lending
institutions, Stanford provided Antigua with vast sums of money from the Stanford
Enterprises – funds stolen from Plaintiffs and other members of the Class – and entered

into a series of commercial business transactions with Antigua, all with the purpose and

effect of prolonging, and making Antigua a full partner in, Stanford's criminal enterprise.

101.    According to a March 11, 2009, report on Bloomberg News's website

[*Stanford's Island Empire Implodes As Antigua Grabs Properties*, by Alison Fitzgerald

and Thomas Black (the "2009 Bloomberg Article")] Stanford has "loaned" at least $85

million to Antigua.   It now is apparent that the money that Stanford "loaned" to Antigua

was stolen from members of the Class, including Plaintiffs.

102.    For example, in May, 1995, Stanford "loaned" roughly $11 million to

Antigua, which Antigua used to pay salaries of public employees and contributions to

those employees' pension fund.   Upon information and belief, the "loan" was a transfer

from the Stanford Entities to Antigua using proceeds from the Stanford Enterprises,

including funds fraudulently stolen from the Plaintiffs and other members of the Class.

103.    Upon information and belief, all or substantially all of Stanford's loans to

Antigua have not been repaid.

### Antigua's Commercial Partnership with Stanford<br>in the Development and Operation of V.C. Bird International Airport

104.    In May, 1993, on the same day that Stanford made its first significant loan

(approximately $3.7 million) to Antigua, Stanford and Antigua entered into a "trust"

agreement that gave Stanford near-total control over the V.C. Bird International Airport

in Antigua.

105.    Stanford and Antigua worked together on many improvements to the

airport between 1993 and 2009.   Indeed, according to the Judicial Committee of the

United Kingdom's Privy Council (the final Court of Appeal for Commonwealth countries

who have chosen to retain it), by 2002, Stanford "was in the process of preparing a plan, *on the instructions of the government*, of the expansion and redevelopment of the airport and its surroundings" (emphasis added). This plan for the commercial development of the airport by Stanford, under the instructions of Antigua, was known as the "Master Plan."

106.   The Master Plan resulted in a commercial partnership between Antigua and Stanford in the development and operation of the airport and its surrounding facilities.

107.   At Antigua's direction, and with its express approval, Stanford developed the area around the airport to include SIBL's (and the Bank of Antigua's) offices, a cricket stadium, and two restaurants.

### Antigua's Commercial Partnership with Stanford in Real Estate Sales and Development

108.   Antigua has, on several occasions, sold land to Stanford at what former Prime Minister Lester Bird called "cut-rate prices." [2009 Bloomberg Article]

109.   Upon information and belief, Stanford facilitated at least some of these sales by making payments to public officials. For example, in 2003, when Allen Stanford was seeking to swap land owned by his Bank of Antigua for other land that he wished to develop, Allen Stanford gave separate $74,000 checks to Antigua's Tourism Minister and Planning Minister. Upon information and belief, each of those payments was made with proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

110.    In 2003, Antigua sold Maiden Island, a 23-acre property, to Stanford.
Upon information and belief, that purchase was made using proceeds from the Stanford
Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

111.    In 1997, Antigua, acting in furtherance of Stanford's commercial interests,
pressured the American owner of the 110-acre Half Moon Bay beach resort to sell that
property to Allen Stanford.  When the American hotel owner refused to accede to
Antigua's demand to sell, Antigua moved to expropriate the property by eminent domain.
The hotel owner litigated the matter for more than a decade until, in late 2007, the Privy
Council ruled that Antigua had the right to nationalize the land.  Prior to Allen Stanford's
arrest, Antigua had convened an "Assessment Board" to set the value that the new owner
to be selected by Antigua – presumably, Allen Stanford – would need to pay the former
owner for the confiscated property

### Caribbean Star Airlines

112.    In January, 2000, Stanford incorporated "Caribbean Star Airlines", a for-
profit airline company.

113.    From its inception, Caribbean Star Airlines was an integral part of the
Stanford Enterprises.

114.    Upon information and belief, Caribbean Star Airlines was established,
funded, and maintained using proceeds from the Stanford Enterprises, including funds
fraudulently stolen from the Plaintiffs and the Class.

115.    In 2007, Leeward Islands Air Transport Services ("LIAT"), an airline owned in large part by Antigua, purchased Caribbean Star Airlines, and several airplanes belonging to Caribbean Star, from Stanford, on favorable terms.

116.    Upon information and belief, Antigua, through LIAT, would not have had the financial ability to purchase Caribbean Star Airlines but for the fact that funding was made available to it by the Stanford Enterprises.

### Antigua's Commercial Partnership with Stanford In the Development of Mount St. John Medical Centre

117.    In the late 1990s and early 2000s, Antigua partnered with Stanford and others in the construction of Antigua's new Mount St. John Medical Centre.

118.    As part of the partnership, Antigua sought, and received, a $30 million loan from Stanford for the hospital's construction costs.  Upon information and belief, the funds that Stanford made available to Antigua for construction of the hospital were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

119.    Stanford was appointed as the Chairman of the Board of the hospital. Subsequently, an independent commission tasked with investigating allegations of corruption in the building of the hospital determined that Antigua had promised to repay the $30 million loan to Stanford with funds that were taken directly from Antigua's social security system.

120.    Thus, the purported "loan" agreement was actually a fraudulent scheme between Antigua and Stanford designed to use $30 million of proceeds from the Stanford Enterprises to enable Antigua to loot its own social security system.

121.    As a result of the commission's report, Allen Stanford resigned from the
hospital's Board of Directors.

### Stanford's Transfer
### Of Additional Crime Proceeds to Antigua

122.    At roughly the same time, Stanford also underwrote the construction of
new executive offices for the government of Antigua.

123.    Upon information and belief, the funds that Stanford made available to
Antigua for construction of the executive offices were proceeds from the Stanford
Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

124.    In 2001, Allen Stanford announced that he would forgive a $5 million loan
that he personally had made to Antigua, and provide an additional loan to pay Antigua's
back salaries and meet other obligations.  Upon information and belief, the funds loaned
to Antigua were stolen from Plaintiffs and other members of the Class, then transferred to
Antigua.

125.    A U.S. official responded to Allen Stanford's decision to forgive the loan
by stating that "[w]e've made clear to the [Antiguan] government that this does not at all
look good" when juxtaposed with Antigua's then-pending (and eventually-successful)
effort to confiscate the Half Moon Bay hotel.  [2002 WSJ Article]

126.    Upon information and belief, the funds that Stanford made available to
Antigua through both the loan forgiveness and the additional loan were proceeds from the
Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the
Class.

127.    In 2004, Antigua's Finance Minister disclosed that Stanford had: (a) agreed to write off roughly $18 million of Antigua's debt; (b) "donated" money needed to build a national library; and (c) "donated" $9 million for a higher education complex for Antigua.  Upon information and belief, the funds that Stanford made available to Antigua for loan forgiveness, to pay for the national library, and to pay for the higher education complex were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

128.    In return for the transfer of funds from the Stanford Enterprises to Antigua, Antigua allowed Allen Stanford to acquire yet another island, Guiana Island.  Upon information and belief, the funds that Stanford used to purchase that island were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

129.    Antigua also partnered with Stanford to create the "Empowerment for Ownership Initiative."  According to Antigua's Minister of Finance and Economy, this initiative represented a "far-reaching and historic alliance between the Stanford Group and the Government of Antigua."  [2005 Budget Statement, Hon. L. Errol Cort, MP, Nov. 30, 2004, "2005 Budget Statement"]  According to a 2007 Antigua and Barbuda Budget Presentation, the "initiative represent[ed] a collaborative undertaking of the Government, the Stanford Group of Companies and the [Antigua Barbuda Development] Bank."  Upon announcing the initiative, the Minister of Finance and Economy stated that "[t]he Government of Antigua and Barbuda looks forward to an enduring and productive partnership with the Stanford Group."  [2005 Budget Statement]

130.   The "collaborative undertaking" between Antigua and Stanford was created with "a $10 million fund endowed by the Stanford Group of Companies." *Id.* Upon information and belief, the funds that Stanford used to fund the endowment were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

131.   Antigua also has entered into a commercial venture with Stanford in the promotion of the sport of cricket. At relevant times, Stanford bankrolled Antigua's national professional cricket team, and built the large "Stanford Cricket Ground" near the V.C. Bird International Airport. Upon information and belief, the funds used to support these joint Antigua-Stanford commercial ventures were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

132.   Stanford and Antigua also collaborated on the funding, construction, and improvement of Antigua's infrastructure prior to Antigua's hosting in 2006 of the initial "Stanford 20/20" cricket tournament at the St. John's "ground." The "20/20" tournament was also held in St. John's in 2007 and 2008, and was a substantial source of revenue for Antigua's suffering tourist industry. Upon information and belief, the funds used to support this joint Antigua-Stanford commercial venture were proceeds from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

### Antigua's Actions to Protect the Stanford Enterprises

133.   In light of the many lucrative commercial activities undertaken by the Antigua-Stanford collaboration, Antigua had an extremely strong financial incentive to

ensure the continuity of the Stanford Enterprises, from which Antigua had profited so handsomely.

134.    Upon information and belief, Antigua and the FSRC undertook a comprehensive effort to ensure the continuous flow of money and commercial activity between itself and the Stanford Enterprises by insulating the Stanford Enterprises from scrutiny by customers and other nations' regulators.

135.    In the late 1990s and early 2000s, Antigua took several self-serving steps to protect the Stanford Enterprises from any such scrutiny, and to perpetuate the scheme.

136.    In or about 1996, the Prime Minister of Antigua appointed Allen Stanford to spearhead a revision of Antigua's offshore banking regulations.  Allen Stanford successfully urged the Prime Minister to also name Allen Stanford's attorney (and two other members of that attorney's firm) to the "special advisory board."  At Antigua's request, Bank of Antigua – an entity that was part of the SFG Enterprise – loaned Antigua the money to pay for the "special advisory board" project.

137.    In November, 1998, Antigua's Parliament passed several laws that were recommended by the "special advisory board" led by Allen Stanford.  Among the new laws passed was one that criminalized the release, by any bank employee or Antiguan regulator, of information about any Antiguan bank customer without a court order.  This statute provided the Stanford Enterprises with a significant shield against any investigation into their fraudulent financial schemes.

138.    Another part of the 1998 reforms created the International Financial Sector Authority ("IFSA"), an Antiguan entity meant to regulate offshore banks.  Allen

Stanford, owner of SIBL, the largest offshore bank located in Antigua, was named to be

the Chairman of the Board of Directors of the IFSA, whose mandate purportedly was to

regulate banks such SIBL.

139.    As a result of Antigua's decision to allow Allen Stanford to regulate (or,

more accurately, fail to regulate) his own bank via the IFSA, in 1999, the United States

Department of State sent a cable from the U.S. Embassy in Antigua that stated that "the

Antiguan government has effectively ceded oversight of its offshore sector to an offshore

banker and his minions." According to the 2009 Bloomberg Article, Jonathan Winer, a

deputy assistant secretary of state during the relevant period, acknowledged that the

"offshore banker" referenced in the State Department cable was, in fact, Allen Stanford.

In that same article, Mr. Winer is quoted as saying that Allen Stanford's role as a

regulator of his own assets was "unprecedented, bizarre, inappropriate, [and an] obvious

conflict of interest."

140.    At roughly the same time, the U.S. Treasury Department listed Antigua as

a money laundering risk, only the second time that it had issued such a warning against

an entire nation.

141.    Shortly thereafter, the IFSA, of which Allen Stanford was still a board

member, sought to obtain Antigua's records related to its offshore banks. An Antiguan

governmental official, Althea Crick, refused to turn the documents over to Allen Stanford

and the IFSA, apparently because she feared that the IFSA would conceal any

wrongdoing found in the documents. After a two-day standoff, the IFSA seized the

documents from Ms. Crick. In a letter written by James Johnson, then the U.S. Treasury

Department's undersecretary of enforcement, to Antigua's Prime Minister, Mr. Johnson wrote that the IFSA's seizure of the bank documents "raises substantial questions as to Antigua and Barbuda's commitment to provide effective supervision of its offshore sector." In that same letter, Mr. Johnson complained that Antigua had softened its laws against money laundering and had created an obvious conflict of interest by allowing Allen Stanford to sit on the IFSA board. Allen Stanford eventually stepped down from the IFSA board.

### Antigua Was an Integral Part of the Scheme

142.    Upon information and belief, the Stanford Enterprises repeatedly paid bribes to Antigua and Antiguan officials. The purpose and effect of those bribes was to integrate Antigua into the scheme, and to give it a stake in the Stanford Enterprises.

143.    The 2002 WSJ Article quoted Baldwin Spencer, then the leader of the government opposition party, as saying that Allen Stanford "has a lien on our whole country." According to the 2009 Bloomberg Article, in 2003, Mr. Spencer also criticized the Antigua-Stanford land swap and Antigua's sale of Maiden Island to Allen Stanford as "surrendering the people's patrimony."

144.    As The Observer (a United Kingdom newspaper) reported on March 2, 2008 (in *We Have Lift-off*, by Andy Bull), "[t]he power that [Allen Stanford's] wealth provides when exercised in a country as small as Antigua is difficult to comprehend. He owns the national bank, runs the airline, paid for the hospital, and built the hotels. The island is, to a degree, his fiefdom; the government awarded him a knighthood, presented by Prince Edward, in 2006."

145.    According to a 2009 article in GQ Magazine (*Did This Man Pull Off The Most Brazen Swindle Of All?*, by Aram Roston), money-laundering expert Jack Blum has bluntly stated that Allen Stanford "bought the [Antiguan] Prime Minister."

146.    Upon information and belief, sums that the Stanford Enterprises paid as bribes to Antiguan officials, and the monies that the Stanford Enterprises invested in (and loaned to Antigua in connection with) the various commercial ventures upon which Stanford and Antigua worked together, were taken directly from the billions of dollars that the Stanford Enterprises stole from their customers, including Plaintiffs and other members of the Class, by means of the massive "Ponzi" scheme for which Allen Stanford and others have now been indicted.

147.    In the course of the commercial activities in which they participated with the Stanford Enterprises, Antigua corruptly traded, or promised to trade, to Allen Stanford and/or the Stanford Enterprises items of value such as commercial real estate, at least two islands (Maiden and Guiana Islands), the Half Moon Bay luxury resort hotel, positions on the boards of corporations and agencies, a variety of development rights, and the rights to conduct various services (and impose or collect certain fees and/or taxes) at the V.C. Bird International Airport.  In return for using these, and other, items of value as consideration in connection with the various commercial activities in which Antigua engaged with the Stanford Enterprises, Antigua received millions of dollars in investments and loans (many of which subsequently were forgiven by the Stanford Enterprises, thus transforming those purported "loans" into direct cash payments) from

the Stanford Enterprises, all of which were funded by money that the Stanford

Enterprises stole from depositors, including Plaintiffs and other members of the Class.

148.    As part of its efforts to maintain and facilitate the corrupt commercial

activities from which they were profiting at Plaintiffs' and the Class's expense, Antigua

shielded the Stanford Enterprises' "Ponzi" scheme from any person or entity (including,

specifically, other nations' regulatory bodies) that might have endangered the vitality of

the Stanford Enterprises' scheme, and the ability of the Stanford Enterprises to continue

to funnel proceeds of that scheme to Antigua.

149.    For many years, Antigua's corrupt efforts to shield the Stanford

Enterprises from regulatory and private scrutiny were successful, thus allowing the

Stanford Enterprises to continue to steal money from depositors and pay part of the stolen

amounts to Antigua in return for Antigua's continued protection of the Stanford

Enterprises.

150.    In or about 2005, however, the SEC commenced an investigation into

Stanford, and began to make official inquiries to the FSRC regarding the substance and

worth of the investments that SIBL claimed that it had made on behalf of its customers,

including Plaintiffs.

151.    The FSRC was established by a 2002 amendment to the IBC Act, which

was initially passed in 1982 by Antigua's Parliament.  Pursuant to the IBC Act, the FSRC

was, at all relevant times, managed by a Board of Directors comprised of four members

appointed by Antigua's Minster of Finance and approved by Antigua's Cabinet.  One of

the four FSRC members, as appointed by Antigua's Minister of Finance and confirmed

by Antigua's Cabinet, held the title of Administrator and Chief Executive Officer of the FSRC.

152.    Pursuant to the IBC Act, the FSRC is, and at all relevant times was, tasked with conducting annual on-site investigations of Antigua's offshore banks, including SIBL. The statutory purpose of the FSRC's mandatory annual investigations is to ascertain the banks' compliance with applicable laws, regulations, and international standards.

153.    Antigua, through the FSRC, falsely represented that its annual investigations of its regulated entities including, at relevant times, SIBL, to included at least nine components:

(a)    A determination of the entity's solvency, including the quality of its investments and loan portfolio;

(b)    A review of the policies and procedures that govern the entity's operations;

(c)    A review of the entity's internal control systems, including its money-laundering prevention control systems;

(d)    The verification of the entity's compliance with proper customer account management guidelines;

(e)    The verification of the entity's compliance with internationally-recognized prudential standards;

(f)    An assessment of the quality of the entity's management;

(g)     The verification of the accuracy of the returns that the entity submitted to

the FSRC;

(h)     The enforcement of Antigua's due diligence requirements; and

(i)     A determination of whether the entity maintains detailed records of

transactions and customer files.

154.    In addition to the annual investigations, the FSRC represented to

customers and prospective customers of Antigua-based financial institutions, including

SIBL, that the FSRC undertook continuous off-site supervision of those entities, in the

form of analyses of quarterly returns and annual audited financial statements.

### Antigua, through the FSRC, Shielded Stanford

155.    It was essential to the conspiracy that Stanford in general, and SIBL in

particular, be able to represent to their clients, prospective clients, and foreign regulators

that SIBL was closely supervised by Antigua, through the FSRC.

156.    SIBL's marketing materials regularly highlighted Antigua and FSRC's

purported regulation and inspection of SIBL's financial condition and operation.

157.    For example, in its 2003 Annual Report, SIBL stated that:

> In 2003, Antigua assumed the chairmanship of the
> Caribbean Financial Action Task Force (CFATF). This is
> another testament to the high level of compliance in the
> country. Moreover, Antigua enhanced its already stringent
> regulations in due diligence and compliance through the
> yearly on-site examination conducted by the Financial
> Sector Regulatory Commission.

158.    In its 2005, 2006, and 2007 Annual Reports, SIBL stated that:

> The Bank is registered under the International Business
> Corporation Act No. 28 of 1982 as amended ("the Act").

The Bank's activities are governed by the Act and by every other act currently in force concerning international business corporations and affecting the corporation in Antigua and Barbuda. The Bank is also regulated by the Financial Services Regulatory Commission (FSRC). International banks are subject to annual audits, regulatory inspections and licensing requirements by this body. The supervisory authority for money laundering and other financial crimes is the Office of the National Drug Control and Money Laundering Policy (ONDCP). The FSRC and ONDCP, although independent, work closely together.

159.    In its 2007 Annual Report, SIBL also stated that:

The Bank is registered under the International Business Corporation Act No. 28 of 1982 as amended ("the Act"). The Bank's activities are governed by the Act and by every other act currently in force concerning international business corporations and affecting the corporation in Antigua and Barbuda. The Bank is also regulated by the Financial Services Regulatory Commission (FSRC). International banks are subject to annual audits, regulatory inspections and licensing requirements by this body. The supervisory authority for money laundering and other financial crimes is the Office of the National Drug Control and Money Laundering Policy (ONDCP). The FSRC and ONDCP, although independent, work closely together....

Capital adequacy and the use of regulatory capital are monitored routinely by the Bank's management, employing techniques based on the guidelines developed by the Basel Committee, as implemented by the FSRC for supervisory purposes. The required information is filed with the Regulatory Authority on a quarterly basis.

The Authority requires each bank to: (1) hold all the minimum level of the regulatory capital, and (2) maintain a capital ratio to assets at or above the minimum of 5 percent.

160.    It was a part of the conspiracy that Stanford would make regular secret payments of thousands of dollars in cash to King, the Administrator and CEO of the FSRC, to ensure that, among other things:

    (a)    The FSRC would not exercise its true regulatory functions in verifying the existence and value of SIBL's investments;

    (b)    King corruptly would provide to Stanford, Davis, and others information about official inquiries that the FSRC had received from United States regulators who had requested information from the FSRC regarding "possible fraud perpetrated upon investors" by SIBL; and

    (c)    King would make false representations in response to official inquiries of regulators, including U.S. regulators, and would seek and receive the assistance of Stanford, Davis, and others, in preparing false responses to such inquiries.

161.    The FSRC actively touted and vouched for the safety and security of SIBL.

162.    The FSRC also is the Antiguan entity that is responsible for receiving and responding to requests by foreign regulators, including the SEC, for information regarding the entities regulated by the FSRC.

163.    FSRC and King made false and misleading representations to the SEC and others regarding the nature and extent of FSRC's oversight of SIBL, and the FSRC's knowledge of SIBL's financial condition and operation including, but not limited to, representations that SIBL's operations and financial state were being scrutinized by FSRC, and that SIBL was subject to annual audits and regulatory inspections by FSRC. In fact, however, due to Antigua's desire to maintain the cash flow that it was receiving from the Stanford Enterprises, FSRC failed to accurately audit SIBL, verify the existence

or value of SIBL's assets, or take any of the other regulatory measures that the FSRC was required under the IBC Act to take with respect to SIBL.

164.    Moreover, according to documents obtained by the Receiver, in 2006 Antigua, through the FSRC, gave Stanford and/or certain of his employees advance notice of – and, in at least one case, the opportunity to significantly redraft – the FSRC's replies to inquiries from the Eastern Caribbean Central Bank ("ECCB") regarding SIBL.

165.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the Stanford Enterprises' fraudulent scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua aided and abetted the Stanford Enterprises by providing the Stanford Enterprises with information about the SEC's and the ECCB's inquiries regarding SIBL and SIBL's fraudulent activities.

166.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua, through FSRC and King, also unlawfully made false and misleading representations to the SEC regarding the solvency of SIBL, and sought and received the assistance of Stanford in preparing the false and misleading responses to such inquiries.

167.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of the Stanford Enterprises' fraudulent scheme, including Antigua's receipt of proceeds from the Stanford Enterprises, and King's receipt of cash bribes, Antigua, through FSRC and King, took additional steps to protect the Stanford

Enterprises. Specifically, in or about May, 2003, King removed from an examination of a SIBL affiliate a FSRC employee who, according to the SEC's Second Amended Complaint in the SEC Action, "got too close to the fire."

### Bribes Paid by the Stanford Enterprises to King

168.    During the relevant period, Stanford provided to King, in addition to the specific corrupt payments set forth below, use of the Stanford Enterprises' corporate airplanes, and use of a corporate car.

169.    King, as head of FSRC, received direct cash payments and other items of value from the Stanford Enterprises in exchange for his aid and assistance to, and participation in, the Stanford Enterprises. Each of those cash payments and items of value were proceeds, or were paid for with the proceeds, from the Stanford Enterprises, including funds fraudulently stolen from the Plaintiffs and the Class.

170.    On or about February 1, 2004, Allen Stanford provided two tickets to King to the 2004 Super Bowl, which, upon information and belief, were purchased by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

171.    On or about February 7, 2005, King deposited in a U.S. financial institution approximately $15,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

172.    On or about February 25, 2005, King deposited in a U.S. financial institution approximately $9,000 that was, upon information and belief, paid to him by

the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

173.    On or about March 24, 2005, King deposited in a U.S. financial institution approximately $9,700 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

174.    In June, 2005, the SEC requested the assistance of Antigua, through FSRC and King, in determining whether SIBL and SFG were defrauding their customers.

175.    On or about June 21, 2005, Antigua, through FSRC and King, falsely represented in a letter to the SEC that FSRC's examination of SIBL had not detected any evidence of SIBL's operation of a "Ponzi" scheme. In that letter, Antigua, through FSRC and King, wrote that "any further investigation of 'possible' fraudulent activities of [SIBL] was unwarranted," and that "it is the opinion of the FSRC that [SIBL] has conducted its banking business to date in a manner the FSRC considers to be fully compliant."

176.    In fact, however, due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, FSRC had failed to accurately audit SIBL, verify the existence or value of SIBL's assets, or take any of the other measures that the FSRC was required under the IBC Act to take with respect to SIBL.

177.    On or about December 30, 2005, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by

the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

178.     On or about March 10, 2006, King deposited in a U.S. financial institution approximately $9,800 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

179.     On or about March 14, 2006, King deposited in a U.S. financial institution approximately $7,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

180.     On or about March 20, 2006, King deposited in a U.S. financial institution approximately $8,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

181.     On or about March 27, 2006, King deposited in a U.S. financial institution approximately $5,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

182.     On or about August 31, 2006, King deposited in a U.S. financial institution approximately $2,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

183.    In September, 2006, the SEC requested from Antigua, through FSRC and King, copies of FSRC's investigative reports regarding SIBL.

184.    On or about September 18, 2006, King deposited in a U.S. financial institution approximately $5,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

185.    On or about September 21, 2006, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

186.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about September 25, 2006, Antigua, through FSRC and King, unlawfully provided to Stanford the SEC's September, 2006, request to FSRC and King for copies of FSRC's investigative reports regarding SIBL. Antigua, through FSRC and King, also discussed with Stanford how Antigua, through FSRC and King, should and would respond to the SEC's request.

187.    On or about September 28, 2006, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

188.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about October 10, 2006,

Antigua, through FSRC and King, provided to the SEC an official, false, and misleading response to the SEC's September, 2006, information request. The false and misleading letter written by Antigua, through FSRC and King, contained text that was not written by Antigua, FSRC, or King; but, instead, was written by Stanford and others. In that letter, Antigua, through FSRC and King (and using text unlawfully written by Stanford and others) , falsely and misleadingly represented that "the FSRC's most recent onsite examination just five months ago confirmed [SIBL's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations. The FSRC has further confirmed through its continuous visits and supervision of [SIBL] that there are no other issues or matters of concern with [SIBL]."

189.    On or about October 23, 2006, King deposited in a U.S. financial institution approximately $8,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

190.    On or about January 31, 2007, King deposited in a U.S. financial institution approximately $4,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

191.    On or about March 19, 2007, King deposited in a U.S. financial institution approximately $6,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

192.     On or about April 16, 2007, King deposited in a U.S. financial institution approximately $9,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

193.     On or about September 14, 2007, King deposited in a U.S. financial institution approximately $5,500 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

194.     On or about December 24, 2007, King deposited in a U.S. financial institution approximately $4,470 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

195.     On or about January 23, 2008, King withdrew approximately $15,000 from a U.S. bank account and deposited the money into a U.S. investment account. Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

196.     On or about January 30, 2008, King deposited in a U.S. financial institution approximately $9,500 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

197.    On or about April 23, 2008, King deposited in a U.S. financial institution approximately $9,600 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

198.    On or about June 30, 2008, King deposited in a U.S. financial institution approximately $7,000 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

199.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, in or about the fall of 2008, Antigua, through FSRC and King, caused false and misleading reports to be issued to Stanford's customers, including Plaintiffs, that misrepresented the value of SIBL's investments, and that set forth wildly inflated values for real estate that SIBL purportedly owned.

200.    On or about December 8, 2008, King deposited in a U.S. financial institution approximately $6,800 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

201.    On or about December 24, 2008, King deposited in a U.S. financial institution approximately $4,200 that was, upon information and belief, paid to him by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

202.    On or about February 23, 2009, King transferred approximately $150,000 from a U.S. investment account to an Antiguan bank account. Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

203.    On or about February 26, 2009, the SEC sent a letter to Antigua, through FSRC and King, in which the SEC sought to determine the amount of investor funds (including Plaintiffs' funds) that remained in SIBL accounts, and to identify persons who had committed fraud in connection with, or been victimized by, the Stanford Enterprises.

204.    On or about March 2, 2009, King transferred approximately $410,000 from a U.S. investment account to an Antiguan bank account. Upon information and belief, those funds previously had been paid to King by the Stanford Enterprises using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class.

205.    Due to Antigua's desire to maintain the cash flow from the commercial activities that were part of Stanford's fraudulent scheme, on or about March 3, 2009, Antigua, through FSRC and King, sent a letter to the SEC that denied the SEC's February 26, 2009, information request. In their March 3, 2009, letter, Antigua, through FSRC and King, stated that the FSRC had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to [the SEC's] request." The "law" to which Antigua, through FSRC and King, referred was, naturally, the 1998 law that criminalized the release, by any Antiguan regulator, of information about a bank customer without a

court order, which had been passed by Antigua's Parliament upon the recommendation of the "special advisory board" that Allen Stanford had led, and for which Stanford's Bank of Antigua had loaned the money to Antigua to operate.

206.    On June 18, 2009, the United States Department of Justice ("DOJ") filed a twenty-one count criminal indictment in the United States District Court for the Southern District of Texas (the "DOJ Action") against King, Allen Stanford, and various Stanford Entities and employees, alleging mail fraud; wire fraud; obstruction of a SEC investigation; conspiracy to commit mail, wire, and securities fraud; conspiracy to obstruct a SEC investigation; and conspiracy to commit money laundering.

207.    On or about June 24, 2009, King was arrested by Antigua, in an apparent effort to shift the blame for Antigua's participation in Stanford's fraudulent scheme from Antigua – where that blame truly belongs – to King.

### Commercial Activity Having a
### Direct Effect in the United States

208.    As set forth in the pleadings in the SEC Action and DOJ Action, and in various news reports, the Stanford Enterprises' "Ponzi" scheme is responsible for the theft of at least $8 billion dollars from Stanford's customers, including Plaintiffs and other members of the Class.

209.    Antigua's actions described above, taken in furtherance of the Stanford Enterprises' fraudulent scheme, were performed: (1) outside of the United States; and (2) in connection with the desire to maintain the cash flow from the commercial activities in Antigua that were integral parts of Stanford's fraudulent scheme.

210.    Antigua's actions described above, taken in furtherance of the Stanford

Enterprises' fraudulent scheme, had many direct effects in the United States, in large part

because the Stanford Enterprises were based in the United States, and inextricably linked

to the financial system of the United States.  For example, according to a June 9, 2009,

Declaration of Karyl Van Tassel ("Van Tassel Dec."), a forensic accountant with FTI

Consulting, Inc., which has been retained by the Receiver in the SEC Action, submitted

in the SEC Action:

(a)    SIBL "was controlled and managed...from various places within

the U.S.  Most core functions such as managing investments,

directing fund flows, devising investment strategy, and managing

legal and information technology were directed from - and for the

most part, performed in - the U.S. It also appears that major cash

transfers were directed and controlled from within the U.S. by

[Allen] Stanford, Davis and, in some instances, Holt."  Van Tassel

Dec. at ¶ 9.

(b)    "SIB[L]'s two principal business activities - selling CDs and

investing (or otherwise directing) the proceeds of sale - were both

controlled from the United States, with no meaningful

management input from Antigua."  *Id.* at ¶ 12.

(c)    "CDs were sold to people from all over the world, although in

terms of dollar amount, there were more sales to U.S. citizens

(37% based on most recent statement mailing address) than to

citizens of any other country. Moreover, Stanford brokers located in the U.S. accounted for 42%-44% of al CD sales in 2007 and 48% of sales in 2008." *Id.* at ¶ 14.

    (d)    "Misinformation regarding SIB[L]'s financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from...the United States." *Id.* at ¶ 15.

    (e)    "SIB[L]'s principal operating accounts were maintained in Houston, Texas, at the Bank of Houston and Trustmark National Bank.  Only a small amount of SIB[L] funds were kept on deposit in Antigua, and these funds were kept at the Bank of Antigua, another Stanford Entity." *Id.* at ¶ 15.

211.    Moreover, the actions described above had a direct effect in the United States, in that:

    (a)    As a result of the conduct alleged herein, and related conduct, SFG, SIBL, Allen Stanford, Pendergest-Holt, Davis, and others are now the subject of the SEC Action, which is pending in the Northern District of Texas;

    (b)    As a result of the conduct alleged herein, and related conduct, criminal proceedings have been instituted, in the form of the DOJ Action, against Allen Stanford, Pendergest-Holt, King, and others in the Southern District of Texas;

    (c)       The United States Internal Revenue Service has a multi-million dollar claim for taxes and penalties owed to the United States in whole or in part due to the commercial activities described herein;

    (d)       A substantial number of Stanford's customers, including the Plaintiffs and members of the Class, were based in the United States, and the economic effects of those persons' tragic and substantial losses are being felt in the United States; and

    (e)       Antigua's unlawful actions led to the collapse of SFG, which was based in Houston, Texas.

212.    Likewise, in connection with each allegation set forth above in which Plaintiffs allege that money was paid (or otherwise provided) to Antigua using funds that the Stanford Enterprises had stolen from the Plaintiffs and other members of the Class, each such act had a direct effect in the United States because the money at issue was being funneled to Antigua from defrauded customers in the United States, and elsewhere, through SFG's operations in the United States, at the direction of the Stanford Enterprises in the United States.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF RICO – 18 U.S.C. §1962(c)

### (STANFORD ENTERPRISES)

213.    Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

214.     Plaintiffs and the Class are "persons injured in [their] business or property" within the meaning of 18 U.S.C. §1964(c).

215.     At all relevant times, the Stanford Enterprises were engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

216.     Antigua is a "person" within the meaning of 18 U.S.C. §§1961(3).

217.     At all relevant times, Antigua conducted or participated, directly or indirectly, in the conduct of the Stanford Enterprises' affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

218.     Specifically, at all relevant times, Antigua repeatedly committed the above criminal acts for the purpose of enriching itself, both financially and politically, and to otherwise further the ends of the Stanford Enterprises.

219.     Antigua conducted and participated in the affairs of the Stanford Enterprises in at least the following ways:

> (a) Directing and/or otherwise causing the Stanford Enterprises to make commercial loans to Antigua, using the proceeds of the fraud;
>
> (b) Directing, approving, and/or otherwise participating in the Stanford Enterprises' commercial development of the V.C. Bird International Airport, using the proceeds of the fraud;
>
> (c) Directing, approving, and/or otherwise participating in the Stanford Enterprises' commercial development of SIBL's and the Bank of

Antigua's offices, cricket stadium, and restaurants, using the proceeds

of the fraud;

(d) Directing, approving, and/or otherwise participating in the sale of real

estate to the Stanford Enterprises for the purpose of transferring a

portion of the proceeds of the fraud from the Stanford Enterprises to

Antigua;

(e) Directing, approving, and/or otherwise causing the Stanford

Enterprises to pay bribes to King and others, using proceeds of the

fraud;

(f) Directing, approving, and/or otherwise causing the Stanford

Enterprises to sell Caribbean Star Airlines (which the Stanford

Enterprises had established using the proceeds of the fraud) to LIAT,

which was the financial beneficiary of Antigua's participation in the

fraud;

(g) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' development of the Mount St. John Medical

Centre, using the proceeds of the fraud;

(h) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' funding of the construction of new executive

offices for the government of Antigua, using the proceeds of the fraud;

(i) Directing, approving, and/or otherwise causing Allen Stanford to

forgive a $5 million personal loan to Antigua, and provide an

additional loan to pay Antigua's back salaries and meet other

obligations, using proceeds of the fraud;

(j) Directing, approving, causing, and or otherwise participating in the

Stanford Enterprises' write off of roughly $18 million of Antigua's

debt, using proceeds of the fraud;

(k) Directing, approving, causing, and or otherwise participating in the

Stanford Enterprises' "donation" to Antigua of money needed to build

a national library, using proceeds of the fraud;

(l) Directing, approving, causing, and or otherwise participating in the

Stanford Enterprises' "donation" of $9 million to construct a higher

education complex for Antigua, using proceeds of the fraud;

(m) Directing, approving, causing, and or otherwise participating in the

Stanford Enterprises' funding of the "Empowerment Ownership

Initiative," using proceeds of the fraud;

(n) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' massive funding of the sport of cricket, using

proceeds of the fraud;

(o) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' efforts to deceive depositors and prospective

depositors in SIBL, including Plaintiffs and members of the Class, by

intentionally disseminating misleading information concerning:

Antigua's purported oversight of SIBL and the legitimacy and

solvency of SIBL, upon which Plaintiffs and members of the Class

reasonably relied; and

(p) Directing, approving, causing, and/or otherwise participating in the

Stanford Enterprises' efforts to deceive the SEC concerning the

solvency and legitimacy of SIBL's banking operations.

220.    The acts described above were related to one another as part of a common

scheme or plan, namely a scheme to defraud the Plaintiffs and the Class, and to ensure

that the Stanford Enterprises would continue to be able to defraud the Plaintiffs and the

Class, for the financial benefit of the Stanford Enterprises, the Stanford Co-Conspirators,

and Antigua.

221.    The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail

fraud) and 18 U.S.C. § 1343 (wire fraud) because Antigua, the Stanford Co-Conspirators,

and the Stanford Enterprises each knowingly and intentionally used interstate and/or

international wires and mails for the purpose of obtaining money and/or property by

means of false and fraudulent pretenses, including, among other things:

(a) disseminating false and fraudulent information to Plaintiffs and the Class,

upon which Plaintiffs and the Class reasonably relied, using interstate and/or

international telephone, the Internet, and interstate or international mails;

(b) deceiving the SEC concerning the legitimacy and solvency of SIBL, using

wire and/or mail communications between Antigua and the United States;

(c) effectuating the receipt of deposits from Plaintiffs and the Class, located throughout the United States and around the world, using electronic funds transfers and interstate and/or international mail;

(d) transferring such deposits to SIBL in Antigua, using electronic funds transfers and interstate and/or international mail; and

(e) disbursing the proceeds of the fraud to the participants, including Antigua, King, and the Stanford Co-Conspirators, using electronic funds transfers and interstate and/or international mail.

222.    Antigua committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

223.    Such unlawful conduct constituted a continuous pattern of racketeering activity spanning many years, more than 100 countries, tens of thousands of victims, and innumerable acts of wire and mail fraud.

224.    The acts of racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

225.    The acts alleged were related to each other by virtue of common participants, common victims (Plaintiffs and other members of the Class), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and the other members of the class out of, collectively, billions of dollars.

226.    At all relevant times, Antigua engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above.

227.   As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs and the Class have been injured in their business and property.  Among other things:

(a) Plaintiffs and the Class were damaged by each of the predicate acts that effectuated the transfer of proceeds of the fraud from the Stanford Enterprises to Antigua, thereby depriving the Plaintiffs and the Class of their property;

(b) Plaintiffs and the Class also were damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was transmitted by use of the wires and/or mails in interstate or foreign commerce for the purpose of executing the fraudulent scheme alleged herein, upon which information Plaintiffs and the Class reasonably relied, and which had the purpose and effect of inducing the Plaintiffs and the Class to deposit funds at SIBL, thereby depriving the Plaintiffs and the Class of their property; and

(c) Plaintiffs and the Class were also damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was transmitted by use of the wires and/or mails in interstate or foreign commerce with the purpose and effect of deceiving the SEC and/or other regulators concerning the legitimacy and solvency of SIBL, thereby prolonging the scheme, and depriving the Plaintiffs and the Class of their property.

228.   Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18

U.S.C. § 1962(c). As a result of Antigua's and the Stanford Co-Conspirators' violations

of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in

amount to be determined at trial, but believed to be in excess of $8 billion.

229.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are

entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF RICO – 18 U.S.C. §1962(c)

### (ASSOCIATION-IN-FACT ENTERPRISE)

230.    The Plaintiffs repeat, reiterate, and reallege each of the allegations set

forth above.

231.    At all relevant times, Antigua and SFG formed, and operated as, an

association-in-fact (the "Antigua-Stanford Enterprise") for the purpose of defrauding the

Plaintiffs and the Class. The Antigua-Stanford Enterprise constituted an "enterprise"

under RICO, as defined in 18 U.S.C. § 1961(4).

232.    At all relevant times, the Antigua-Stanford Enterprise was engaged in, and

its activities affected, interstate and foreign commerce, within the meaning of RICO,

18 U.S.C. § 1962(c).

233.    At all relevant times, Antigua conducted or participated, directly or

indirectly, in the conduct of the Antigua-Stanford Enterprise's affairs through a "pattern

of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation

of RICO, 18 U.S.C. § 1962(c).

234.    Specifically, at all relevant times, Antigua repeatedly committed the above criminal acts in furtherance of and for the purpose of enriching itself, both financially and politically, and to otherwise further the ends of the Stanford Enterprises.

235.    Antigua conducted and participated in the affairs of the Antigua-Stanford Enterprise in at least the following ways:

(a)    Directing, approving, and/or otherwise participating in the Antigua-Stanford Enterprise's commercial development of the V.C. Bird International Airport, using the proceeds of the fraud;

(b)    Directing, approving, and/or otherwise participating in the Antigua-Stanford Enterprise's commercial development of SIBL's and the Bank of Antigua's offices, cricket stadium, and restaurants, using the proceeds of the fraud;

(c)    Directing, approving, and/or otherwise participating in the sale of real estate transactions between the members of the Antigua-Stanford Enterprise, for the purpose of transferring a portion of the proceeds of the fraud to Antigua;

(d)    Directing, approving, and/or otherwise causing the Antigua-Stanford Enterprise to pay bribes to King and others, using proceeds of the fraud;

(e)    Directing, approving, and/or otherwise causing the sale of Caribbean Star Airlines to LIAT;

(f)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's development of the Mount St. John Medical

Centre, using the proceeds of the fraud;

(g)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's funding of the construction of new

executive offices for the government of Antigua, using the proceeds of the

fraud;

(h)     Directing, approving, causing, and or otherwise participating in the write

off of roughly $18 million of Antigua's debt, using proceeds of the fraud;

(i)     Directing, approving, causing, and or otherwise participating in the

"donation" to Antigua of money needed to build a national library, using

proceeds of the fraud;

(j)     Directing, approving, causing, and or otherwise participating in the

"donation" of $9 million to construct a higher education complex for

Antigua, using proceeds of the fraud;

(k)     Directing, approving, causing, and or otherwise participating in the

Antigua-Stanford Enterprise's funding of the "Empowerment Ownership

Initiative," using proceeds of the fraud;

(l)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's massive funding of the sport of cricket,

using proceeds of the fraud;

(m)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's efforts to deceive depositors and

prospective depositors in SIBL, including Plaintiffs and members of the

Class by intentionally disseminating misleading financial information

upon which Plaintiffs and members of the Class reasonably relied;

(n)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's efforts to deceive Plaintiffs, the class, and

potential customers of SIBL into believing that the FSRC was exercising

actual oversight over SIBL by intentionally disseminating misleading

regulatory information upon which Plaintiffs and members of the Class

reasonably relied; and

(o)     Directing, approving, causing, and/or otherwise participating in the

Antigua-Stanford Enterprise's efforts to deceive the SEC concerning the

solvency and legitimacy of SIBL's banking operations.

236.    The acts described above were related to one another as part of a common

scheme or plan, namely a scheme to defraud the Plaintiffs and the Class, and to ensure

that the Antigua-Stanford Enterprise would continue to be able to defraud the Plaintiffs

and the Class, for the financial benefit of the Stanford Enterprises, the Stanford Co-

conspirators, and Antigua.

237.    The acts set forth above constitute violations of 18 U.S.C. § 1341 (mail

fraud) and 18 U.S.C. § 1343 (wire fraud) because Antigua, the Stanford Co-Conspirators,

and the Antigua-Stanford Enterprise knowingly and intentionally used interstate and/or

international wires and mails for the purpose of obtaining money and/or property by
means of false and fraudulent pretenses in order to, among other things:

    (a)    to disseminate false and fraudulent information to Plaintiffs and the Class,
upon which Plaintiffs and the Class reasonably relied, using interstate
and/or international telephone, the Internet, and interstate or international
mails;

    (b)    to deceive the SEC, using wire and/or mail communications between
Antigua and the United States;

    (c)    to effectuate the receipt of deposits from Plaintiffs and the Class, located
throughout the United States and around the world, using electronic funds
transfers and interstate and/or international mail;

    (d)    to transfer such deposits to SIBL in Antigua, using electronic funds
transfers and interstate and/or international mail; and

    (e)    to disburse the proceeds of the fraud to the participants, including Antigua,
King, and the Stanford Co-Conspirators, using electronic funds transfers
and interstate and/or international mail.

238.    Antigua committed and/or aided and abetted the commission of two or
more of these acts of racketeering activity.

239.    Such unlawful conduct constituted a continuous pattern of racketeering
activity spanning many years, more than 100 countries, tens of thousands of victims, and
innumerable acts of wire and mail fraud. The acts of racketeering activity constituted a
"pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts

alleged were related to each other by virtue of common participants, common victims (Plaintiffs and other members of the Class), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and the other members of the class out of, collectively, billions of dollars.

240.    At all relevant times, Antigua engaged in "racketeering activity" within the meaning of 18 U.S.C. 1961(1) by engaging in the acts set forth above.

241.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs and the Class have been injured in their business and property.    Among other things:

(a)    Plaintiffs and the Class were damaged by each of the predicate acts that effectuated the transfer of proceeds of the fraud to Antigua, thereby depriving the Plaintiffs and the Class of their property;

(b)    Plaintiffs and the Class also were damaged by each of the predicate acts, in which false and fraudulent information concerning SIBL and/or SFG, upon which Plaintiffs and the Class reasonably relied, was transmitted by use of the wires and/or mails in interstate or foreign commerce for the purpose of executing the fraudulent scheme alleged herein, and with the intent to, and effect of, inducing the Plaintiffs and the Class to deposit funds at SIBL, thereby depriving the Plaintiffs and the Class of their property; and

(c)    Plaintiffs and the Class were also damaged by each of the predicate acts in which false and fraudulent information concerning SIBL and/or SFG was

transmitted by use of the wires and/or mails in interstate or foreign commerce with the purpose and effect of deceiving the SEC and/or other regulators concerning the legitimacy and solvency of SIBL, thereby prolonging the scheme, and depriving the Plaintiffs and the Class of their property.

242.    Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.  These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18 U.S.C. § 1962(c).  As a result of Antigua's and the Stanford Co-conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

243.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## THIRD CLAIM FOR RELIEF: VIOLATION OF RICO – 18 U.S.C. §1962(a)

244.    Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

245.    Antigua is a "person" within the meaning of 18 U.S.C. § 1962(a)

246.    As set forth above, Antigua received income derived, directly and indirectly, from a pattern of racketeering activity.

247.    Antigua invested, directly and indirectly, part of such income, and/or the proceeds from such income, in the acquisition of an interest in, and the establishment and operation of, the Antigua-Stanford Enterprise.

248.    In particular, Antigua reinvested part of the proceeds of such income in the purchase of Caribbean Star Airlines, an integral part of the Stanford Enterprises. Plaintiffs and the Class were damaged by that reinvestment of income because: (a) the reinvestment provided additional funds for the Stanford Enterprises to operate their scheme to defraud the Plaintiffs and the Class; and (b) the reinvestment deprived Plaintiffs and the Class of hard assets (the airline and aircraft) that would otherwise be available to satisfy their claims.

249.    Antigua also invested part of the proceeds from the Stanford Enterprises in the establishment and operation of FSRC, which became an integral part of the Antigua-Stanford Enterprise, and essential to the scheme to defraud the Plaintiffs and the Class.

250.    Plaintiffs and the Class were injured by Antigua's investment of the proceeds of such income in the establishment and operation of FSRC because Antigua, through FSRC and its head, King, deceived Plaintiffs, the Class, and the SEC concerning the legitimacy and solvency of SIBL.

251.    The injuries suffered by the Plaintiffs and the Class from Antigua's investment of racketeering income in the FSRC are separate and distinct from the injuries suffered by the Plaintiffs and the Class as a result of the predicate acts involving the earlier transfers of money from the Plaintiffs and the Class, to SFG and Antigua.

252.    As set forth above, the Antigua-Stanford Enterprise affected interstate and foreign commerce.

253.    Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion. These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18 U.S.C. § 1962(c). As a result of Antigua's and the Stanford Co-Conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

254.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## FOURTH CLAIM FOR RELIEF:
## VIOLATION OF RICO – 18 U.S.C. §1962(d)

255.    Plaintiffs repeat, reiterate, and reallege each of the allegations set forth above.

256.    As described above, Antigua, in violation of 18 U.S.C. § 1962(d), did agree and conspire with the Stanford Co-Conspirators, and those acting in concert with the Stanford Co-Conspirators, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above.

257.    In furtherance of that agreement, and in violation of RICO, Antigua knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above, with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering activity.

258.    As a direct and proximate cause of the above-described conspiracy in violation of 18 U.S.C. § 1962(d), the Plaintiffs and the Class have been injured in their property. Antigua's racketeering activities were the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion. These injuries were a foreseeable consequence of Antigua's racketeering activities and violations of 18 U.S.C. § 1962(d).

259.    As a result of Antigua's and the other Stanford Co-conspirators' violations of RICO, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

260.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages plus costs and attorneys' fees from Antigua.

## FIFTH CLAIM FOR RELIEF:
## AIDING AND ABETTING FRAUD

261.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

262.    At all relevant times, Antigua had actual knowledge of the Stanford's fraudulent activities.

263.    By reason of the foregoing, Antigua knowingly provided substantial assistance to SFG, SIBL, and the Stanford Co-Conspirators in their successful efforts to perpetrate a fraud upon Plaintiffs and other members of the Class. As set forth above, Antigua's substantial assistance variously took the forms of affirmative acts in

furtherance of the fraud, concealment of the fraud, and failures and/or refusals to act against the fraud when Antigua had the duty to do so.

264.     Antigua's active participation in aiding and abetting the fraud was the proximate cause of the Plaintiffs' and the Class members' collective loss of more than $8 billion.

265.     As a result of Antigua's active participation in aiding and abetting the fraud, Antigua is liable to Plaintiffs and the Class for the amount of their losses in amount to be determined at trial, but believed to be in excess of $8 billion.

## SIXTH CLAIM FOR RELIEF:
## AVOIDANCE OF FRAUDULENT TRANSFERS

266.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

267.     Plaintiffs and the Class are creditors of Allen Stanford, SIBL, and/or SFG, by reason of their tort claims against them, and because they deposited funds at SIBL which have not, and will not, be returned to them in accordance with their rights as depositors.

268.     In or about February, 2009, Antigua seized more than 250 acres of land owned by SFG (the "Seized Properties").

269.     Upon information and belief, the Seized Properties were commercial in nature, and the development of those properties, and their seizure by Antigua, had a direct effect in the United States in that it deprived Houston-based SFG, and Houston-

managed SIBL, of substantial value, and thereby deprived American creditors of Allen Stanford, SFG, and SIBL of substantial value to satisfy their claims.

270.    Antigua's seizure of such property effectuated the transfer of assets from Allen Stanford, SIBL, and/or SFG for less than fair value, and with the purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including Plaintiffs and the Class.

271.    As described above, Stanford made numerous "loans" to Antigua, believed to be in excess of $85 million, some or all of which have never been repaid.  In addition, Stanford made numerous outright transfers of funds to Antigua or its designees.

272.    The unpaid loans and transfer of such funds effectuated the transfer of assets from Allen Stanford, SIBL, and/or SFG for less than fair value, and with the purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including Plaintiffs and the Class.

273.    By reason of the foregoing, the transfers described above are ineffective as against Plaintiffs and members of the Class.

274.    By reason of the foregoing, pursuant to the Uniform Fraudulent Transfers Act, and common law, Plaintiffs and the Class are entitled to avoidance of the transfers.

## JURY DEMAND

275.    Plaintiffs demand a jury trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(i)     certify the Class;

(ii)    enter judgment in favor of the Class and against Antigua:
(a) awarding all damages proven at trial, in an amount not less than $8 billion;

(b) awarding treble damages, as permitted by law pursuant to RICO;

(c) ordering the avoidance of the fraudulent transfers described herein;

(d) awarding attorney fees, and costs as permitted by law; and

(e) granting such other and further relief as the Court may deem just and appropriate.

Dated: July 13, 2009

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

LACKEY HERSHMAN, L.L.P.

By:    /s/ Paul B. Lackey
       Paul B. Lackey
       State Bar Number 00791061
       Jamie R. Welton
       State Bar Number 24013732
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys for Plaintiffs*

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JOHN WADE in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan, on behalf of themselves and all others similarly situated, | § § § § § § § | Civil Action No. |
| Plaintiffs, | § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| BANK OF ANTIGUA; EASTERN CARIBBEAN CENTRAL BANK; ANTIGUA COMMERCIAL BANK;  ST. KITTS-NEVIS-ANGUILLA NATIONAL BANK LTD.; EASTERN CARIBBEAN FINANCIAL HOLDINGS COMPANY LTD; NATIONAL COMMERCIAL BANK (SVG) LTD; NATIONAL BANK OF DOMINICA LTD; AND THE COMMONWEALTH OF ANTIGUA AND BARBUDA, | § § § § § § § § § § § | **CLASS ACTION COMPLAINT** |
| Defendants. | § § | |

Plaintiffs Steven Queyrouze, Jaime Alexis Arroyo Bornstein, and John Wade in

his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan (collectively,

the "Plaintiffs"), on behalf of themselves and all others similarly-situated, by and through

their undersigned attorneys, as and for their class action complaint against Defendants,

Bank of Antigua ("Bank of Antigua"), Eastern Caribbean Central Bank ("ECCB"),

Antigua Commercial Bank, St. Kitts-Nevis-Anguilla National Bank Ltd.,  Eastern

Caribbean Financial Holdings Company Ltd., National Commercial Bank (SVG) Ltd.,

National Bank Of Dominica Ltd., and the Commonwealth of Antigua and Barbuda

("Antigua"), (Antigua Commercial Bank, St. Kitts-Nevis-Anguilla National Bank Ltd.,

Eastern Caribbean Financial Holdings Company Ltd., National Commercial Bank (SVG)

Ltd., and National Bank of Dominica Ltd. are referred to collectively herein as the "Bank

Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action to recover a portion of the losses suffered by thousands of

innocent and unsuspecting investors from around the world who entrusted their money to

R. Allen Stanford, Stanford International Bank, Ltd. ("SIBL"), and other entities

collectively marketed as being part of what was commonly referred to as the Stanford

Financial Group ("SFG").  Stanford has now been exposed as being one of the most

notorious, fraudulent, corrupt, and criminal enterprises in history.[1]

2.      Stanford did not act alone in stealing billions from the victims of this

scheme.  In addition to being directly victimized by Allen Stanford and his fellow

officers and employees at Stanford, Stanford investors were also victims of Stanford's

various collaborators and co-conspirators, including individuals and entities who have

sought to illegally profit by misappropriating or retaining Stanford assets, both before and

after the disclosure of this massive fraud.  Those assets should rightly be used to provide

at least some measure of compensation to defrauded Stanford investors.

3.      Specifically, this action seeks redress for a second brazen act of thievery

from Stanford investors, perpetrated in part even after the disclosure of the Stanford fraud

---

[1]  As used herein, "Stanford" means R. Allen Stanford and the entities that comprised the Stanford
Financial Group, including those entities' parents, subsidiaries, affiliates, officers, directors, employees,
and agents.

in February 2009, and the appointment of receivers to marshal and distribute Stanford's

assets, in the United States and Antigua. This theft was perpetrated not only by Stanford,

but also by the Bank of Antigua's putative regulator, ECCB, the corrupt government of

Antigua, and by all too willing co-conspirators at Caribbean-based financial institutions

which, unless this Court acts, will have obtained a multi-million dollar windfall at the

expense of Stanford's many victims.

4.       Shortly after the SEC commenced civil enforcement proceedings against

Allen Stanford and certain other individuals and entities alleged to be part of the Stanford

fraud (on or about February 17, 2009), ECCB, in concert with Antigua and the Bank

Defendants, seized the Bank of Antigua, and in so doing, orchestrated the intentional and

fraudulent misappropriation of the Bank of Antigua and all of its assets from Stanford's

victims.

5.       The seizure of the Bank of Antigua by the Defendants also constituted an

illegal attempt to retain the vast sums of money stolen from Stanford's investors and

funneled to Antigua through the concerted and corrupt actions of Stanford and its partner,

Antigua itself. For well over a decade, Antigua was a prime participant in, and

beneficiary of, the Stanford Ponzi scheme, and actively protected and shielded Stanford's

criminal enterprise from real regulatory scrutiny[2]. Antigua has no legitimate claim to

---

[2] On or about July 13, 2009, certain Plaintiffs commenced an action against Antigua in the District Court
for the Southern District of Texas, entitled *Frank, et al. v. The Commonwealth of Antigua and Barbuda*,
which was subsequently transferred on or about November 13, 2009 to this Court (Case No. 3:09-cv-
02165-N) seeking damages for Antigua's complicity in the Stanford fraud and for its illegal expropriation
of valuable and extensive real property interests owned by Stanford on the island (the "Expropriated
Properties"). As of the date hereof, Antigua has refused to accept formal service of the Complaint in
*Frank, et al. v. The Commonwealth of Antigua and Barbuda* (the "Antigua Complaint"). Plaintiffs

retain the vast sums of money that Stanford siphoned from investors and directed into

Antigua's coffers and to the bank accounts of corrupt Antiguan officials.

6.      Prior to its seizure by Defendant ECCB in February 2009, Bank of

Antigua was wholly-owned, either directly or indirectly by Stanford, and operated

through branches on the island of Antigua and through a representative office in Mexico.

By all accounts, including its annual reports and financial statements, and statements

issued by the ECCB just one day prior to the seizure, Bank of Antigua was a successful,

valuable banking institution.  This action seeks to recover Stanford investors' stolen

assets that are now in the Defendants' possession or under their control, as a result of: (i)

the fraudulent transfer of assets from SIBL and Stanford (and in reality from SIBL and

Stanford's investors and creditors) to the Bank of Antigua, as an integral part of the

Stanford investment fraud; and (ii) the subsequent fraudulent transfer of ownership of the

Bank of Antigua itself to the Defendants, *without the legally mandated payment of any*

*compensation to the plaintiff victims of the Stanford fraud*.  The considerable value of

the Bank of Antigua, believed to be in the tens or hundreds of millions of dollars, should

be distributed as compensation to its rightful owners, Stanford's victims and creditors.

That value should not be retained by Stanford's co-conspirators under the guise of

"Caribbean style" bank regulation, or misappropriated by what appear to be otherwise

innocent third party financial institutions, as a gift from Caribbean regulators and

politicians.

---

continue to attempt to serve the Antigua Complaint in accordance with the Hague Convention on the
Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

7.     Antigua's intentions were made clear in a candid statement by one of its top officials. In February 2009, after Antigua illegally seized the Expropriated Properties (also without paying compensation to Stanford's victims in accordance with its own laws), Antigua's Prime Minister, Baldwin Spencer, admitted that the seizure of those properties was a tactic to facilitate his country's further theft from Stanford's international investors and creditors: "We have to give ourselves a bargaining chip, so when the receivers come they have to deal with the government of Antigua and Barbuda," the Prime Minster told the Antiguan House of Representatives after it approved the land takeover measure. Antigua has used this "bargaining chip" to thus far avoid turning over the Expropriated Properties or compensating anyone for their seizure.

8.     *All* of Stanford's innocent creditors – primarily the defrauded investors of SIBL – have a right to recover their losses from whatever assets were or are owned by Stanford. This action seeks redress on behalf of the Plaintiffs and the Class for the Defendants' self-serving and self-dealing misappropriation of assets rightfully belonging to the Plaintiffs and the Class including the Bank of Antigua.

## PARTIES

9.     At all relevant times, Plaintiff Steven Queyrouze is and was a citizen of the United States residing in Louisiana.

10.    At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.

11.    At all relevant times, Plaintiff John Wade was a trustee of the Microchip ID Systems, Inc. Retirement Plan.

12.    As of February 16, 2009, Plaintiffs were customers of SIBL, had money

on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the

Class, as defined below.

13.    Prior to its seizure by ECCB, Defendant Bank of Antigua was owned

directly or indirectly, by Allen Stanford.  At all relevant times, Bank of Antigua has been

nominally headquartered in Antigua but, upon information and belief, prior to its seizure

by ECCB, all or substantially all of the senior management functions related to the Bank

of Antigua were directed from Stanford's Houston, Texas headquarters and elsewhere in

the United States by officers of Stanford, including but not limited to, Allen Stanford.

14.    ECCB was established in or about October 1983.  It is the Monetary

Authority for a group of eight island economies: Anguilla, Antigua and Barbuda, the

Commonwealth of Dominica, Grenada, Montserrat, St Kitts and Nevis, St. Lucia, and St.

Vincent and the Grenadines (the "Participating Governments").  The stated purposes of

the ECCB are: "to regulate the availability of money and credit; to promote and maintain

monetary stability; to promote credit and exchange conditions and a sound financial

structure conducive to the balanced growth and development of the economies of the

territories of the Participating Governments; to actively promote through means

consistent with its other objectives the economic development of the territories of the

Participating Governments."

15.    Antigua is an independent state within the British Commonwealth of

Nations.  After the ECCB's seizure of the Bank of Antigua (which, as described below,

was accomplished under the direction of Antigua itself), ECCB transferred part

ownership of the Bank of Antigua to Defendant Antigua, which became a forty percent (40%) shareholder of the Bank of Antigua until such time as it transferred fifteen percent (15%) ownership to Defendant Antigua Commercial Bank.

16.     Upon information and belief, Defendant Antigua Commercial Bank is a corporation with a principal place of business at Thames and St. Marys Streets, St. Johns, Antigua.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant Antigua, which in turn transferred part ownership to Antigua Commercial Bank, which became a fifteen percent (15%) shareholder of the Bank of Antigua.

17.     Upon information and belief, Defendant St. Kitts-Nevis-Anguilla National Bank Ltd. is a corporation with a principal place of business at Central Street, Basseterre, St. Kitts, West Indies.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant St. Kitts-Nevis-Anguilla National Bank Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

18.     Upon information and belief, Defendant Eastern Caribbean Financial Holdings Company Ltd. is a corporation with a principal place of business at #1 Bridge Street, Saint Lucia, West Indies.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant Eastern Caribbean Financial Holding Company Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

19.     Upon information and belief, Defendant National Commercial Bank (SVG) Ltd. is a corporation with a principal place of business at Bedford Street, Kingstown, St. Vincent and the Grenadines.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant National Commercial Bank (SVG) Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

20.     Upon information and belief, Defendant National Bank of Dominica Ltd. is a corporation with a principal place of business at Hillsborough Street, Roseau Dominica.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to National Bank of Dominica Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

## RELEVANT NON-PARTIES

21.     At all relevant times, SFG was the parent company of SIBL and a web of other affiliated financial services entities.  SFG maintained its headquarters in Houston, Texas and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida.  Upon information and belief, the activities of SFG and all of the related entities were directed from SFG's Houston, Texas headquarters.

22.     At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua and elsewhere.  SIBL was organized in Montserrat, originally under the name of Guardian International Bank.  In or about 1989, SIBL's principal banking location was moved to Antigua.

23.     From 2001 to 2008, SIBL marketed its primary investment product, certificates of deposit ("CDs"), and promised higher rates of return on those CDs than were generally offered at banks in the United States.  In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets.  In its December, 2008 Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

24.     Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995.  SGC was registered with the SEC as a broker-dealer and investment advisor.  SGC also was a member of the Securities Investor Protection Corporation, and the Financial Industry Regulatory Agency (formerly, the National Association of Securities Dealers).  SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States.  According to the Court-appointed receiver,[3] "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL."  Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

25.     Allen Stanford founded and owned SFG and its affiliated companies, including SIBL, through a holding company.  Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

---

[3] On February 16, 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud."  By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver").

26.     The Financial Services Regulatory Commission of Antigua (the "FSRC")
was created by and, at all relevant times, existed under the authority of, Antigua's
International Business Corporations Act (the "IBC Act"). The FSRC is an agency and/or
instrumentality of Antigua.

27.     During certain relevant times described below, Leroy King ("King") was
the Administrator and Chief Executive Officer for the FSRC. King, among other things,
was supposedly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's
investment portfolio, including the review of SIBL's financial reports, and the response
to requests by foreign regulators, including the SEC, for information and documents
regarding SIBL's operations. As the SEC alleged in its Second Amended Complaint in
the SEC Action, however, King "facilitated the Ponzi scheme by ensuring that the FSRC
'looked the other way' and conducted sham audits and examinations of [SIBL's] books
and records. In exchange for bribes paid to him over a period of several years, King
made sure that the FSRC did not examine [SIBL's] investment portfolio. King also
provided Stanford with access to the FSRC's confidential regulatory files." [SEC Second
Amended Complaint at p. 3]

## JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1605(a)(1),
1605(a)(2), and 1605(a)(3); 22 U.S.C. § 2370(e); and supplemental jurisdiction under 28
U.S.C. § 1367.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) on the

ground that jurisdiction is not based solely upon diversity of citizenship and a substantial

part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

30.     The class of persons that Plaintiffs seek to represent (the "Class") is

comprised of all individuals who, and entities that, as of February 16, 2009, were

customers of SIBL, with monies on deposit at SIBL and/or were holding CDs issued by

SIBL.

31.     *Numerosity.*  A class action is appropriate in this case because the Class is

so numerous that joinder of all members is impracticable.  While the precise number of

Class members and their addresses are unknown to the Plaintiffs, their identities can be

determined from SIBL's records.  Upon information and belief, Class members number

in the tens of thousands.

32.     *Commonality.*  A class action is appropriate in this case because there are

questions of law and fact common to the Class, including but not limited to: (i) whether

Bank of Antigua received fraudulent transfers from SIBL and/or other Stanford entities;

and (ii) whether Bank of Antigua has in its possession and/or under its control assets

stolen from, and properly belonging to, members of the class; (iii) whether Plaintiffs and

the Class are entitled to avoid the fraudulent transfer of assets to the Bank of Antigua;

(iv) whether the seizure of the Bank of Antigua and transfer of ownership in the Bank of

Antigua to Antigua and the Bank Defendants was a fraudulent transfer; (v) whether

Plaintiffs and the Class are entitled to avoid the fraudulent transfer of the Bank of

Antigua to Antigua and the Bank Defendants; (vi) whether Plaintiffs and the Class are entitled to compensation for the seizure of the Bank of Antigua; and (vii) a determination of the fair market value of the Bank of Antigua on the date of its seizure by the ECCB.

33.     The questions of law and fact common to the Class predominate over any questions affecting only individual members.

34.     *Typicality.* The claims of the representative Plaintiffs are typical of the claims of the Class.

35.     *Adequacy.* The representative Plaintiffs will fairly and adequately protect the interests of the Class.

36.     In the absence of class certification, there is a risk that adjudications in thousands of separate cases with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

37.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Underlying Fraud[4]

38.     Stanford's business was a massive fraud in which Stanford

misappropriated billions of dollars, falsified SIBL's financial statements, and concealed

Stanford's conduct from customers, prospective customers, and regulators in the United

States and elsewhere.

39.     Among other things, Stanford represented to the Plaintiffs and the Class

that:

(i)     the investors' assets were safe and secure because SIBL invested in

a "globally diversified portfolio" of "marketable securities;"

(ii)    SIBL had averaged double-digits returns on its investments for

over 15 years;

(iii)   Allen Stanford had solidified SIBL's capital position in late 2008

by infusing $541 million in capital into the bank;

(iv)    SIBL's multi-billion dollar portfolio was managed by a "global

network of portfolio managers" and "monitored" by a team of SFG

analysts in Memphis, Tennessee;

(v)     SIBL, in early 2009, was stronger than at any time in its history;

and

---

[4] The allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its complaint (the "Second Amended Complaint") in the civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex) (the "SEC Action"), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex) (the "Criminal Action"), the public materials cited therein, and other public materials and media reports.

(vi)     SIBL did not have exposure to losses from investments in the

fraudulent "Ponzi" scheme that had been operated by Bernard L.

Madoff (the "Madoff Scheme").

More fundamentally, Stanford represented that SIBL was a legitimate banking

institution, which made money by investing assets and generating investment returns.

40.     Each of those representations were materially false and misleading, and

were an integral part of Stanford's "business", which was really a massive "Ponzi"

scheme. In fact, by February 2009, Stanford had misappropriated billions of dollars from

Plaintiffs and the Class.

### Antigua's Participation in the Fraud

41.     Upon information and belief, Antigua entered into a corrupt and illegal

commercial partnership with Stanford, in which Antigua became an integral part of, and

beneficiary of, Stanford's multi-billion dollar international fraudulent conspiracy. In fact,

Stanford provided Antigua with vast sums of money stolen from Plaintiffs and other

members of the Class, and entered into a number of commercial business transactions

with Antigua, all with the purpose and effect of prolonging, and making Antigua a full

partner in, Stanford's criminal enterprise, receiving substantial proceeds from the fraud.

42.     In exchange for these proceeds, Antigua provided substantial assistance to,

and participated in, the fraud by, among other things: (a) adopting sham bank "reforms,"

which resulted in the appointment of Allen Stanford's attorney (and two other members

of that attorney's firm) to a "special advisory board," on the "reform" of Antigua's

banking regulations; (b) the passage of new laws that criminalized the release, by any

bank employee or Antiguan regulator, of information about an Antiguan bank customer without a court order, effectively providing Stanford with a significant shield against any investigation into its fraudulent financial schemes; (c) the appointment of Allen Stanford to the position of Chairman of the newly-created International Financial Sector Authority ("IFSA"), an Antiguan entity purportedly intended to regulate offshore banks such as SIBL, and (d) the active concealment of Stanford's fraud from the SEC and other regulators.

<u>**Seizure of the Bank of Antigua**</u>

43.   In February 2009, ECCB seized the Bank of Antigua and turned over ownership of the Bank of Antigua and all of its assets to Antigua and the Bank Defendants. A press release issued by ECCB in connection with the seizure stated:

> To protect the interests of depositors of the Bank of
> Antigua Ltd ('the Bank') and to preserve the stability of the
> financial system of Antigua and Barbuda, the Eastern
> Caribbean Central Bank ('the Central Bank'), in exercise of
> the emergency powers conferred on it by Part IIA, Article
> 5B of the Eastern Caribbean Central Bank Agreement 1983
> (the Agreement), which has the force of law in all member
> states of the Eastern Caribbean Currency Union, assumed
> control of the bank on the 20th day of February 2009. In
> that regard, the Central Bank took exclusive custody
> control and possession of all the funds, assets and other
> property and undertaking of the Bank wherever situated
> including funds on deposit at the bank.
>
> The Central Bank is therefore by law currently in control of
> the bank to the exclusion of the shareholder and any and all
> former directors of the institution.
>
> The Central Bank wishes to once again assure depositors of
> the bank that all measures are being taken to safeguard their
> interests and to maintain the stability of the financial
> system of Antigua and Barbuda.

44.     The seizure, however, which took place just one day after the ECCB

pronounced the Bank of Antigua and its liquidity situation "sound", was orchestrated and

directed by the government of Antigua, in concert with the ECCB and the Bank

Defendants, in order to deprive the Plaintiffs and the Class – all of whom are creditors of

SIBL, Allen Stanford, and the other Stanford entities – of substantial value, and to ensure

that Antigua would never be required to repay its massive debts to the various Stanford

entities for the benefit of Stanford's creditors.

45.     At the time of the seizure of the Bank of Antigua by the Defendants,

Antigua was indebted to Stanford in an aggregate amount of hundreds of millions of

dollars.  According to the 2005 Budget Statement delivered by Antiguan Minister of

Finance and the Economy, L. Errol Cort, MP to the Antiguan Parliament, Antigua's debt

to Stanford at <u>that</u> time was at least $230 million and there is no evidence that all or any

substantial portion of that indebtedness has ever been repaid by Antigua.  A considerable

portion of that debt was owing by Antigua to the Bank of Antigua pursuant to various

loans and other financial arrangements made between and among Stanford, the Bank of

Antigua and Antigua over the years, including, *inter alia*, under the Bank of Antigua

Loan Act of 1995 and the Loans (Mount St. John's Hospital Construction and Equipping)

Act 1998.

46.     Significantly, the ECCB's seizure of the Bank of Antigua, and its delivery

into the hands of Antigua and the Bank Defendants, was approved by the ECCB's

Monetary Council, *which was then chaired by Mr. Errol Cort, Minister of Finance of*

*Antigua.*  Thus, under the direction of Antigua's own Minister of Finance, Antigua

overnight transformed itself from being a major multi-million dollar obligor to the Bank of Antigua to being its largest shareholder.

47.     While steadfastly publicly maintaining its lack of culpability for its role in the Stanford fraud and refusing to return the Expropriated Properties to the court-appointed liquidators of the Stanford entities or representatives of the class for the benefit of Stanford's victims, Antigua continues to avoid paying compensation to Stanford victims and to grab additional Stanford assets to enrich itself.

48.     Following considerable negative publicity relating to its Stanford-related activities, Antiguan officials finally announced what appeared to be a positive step, Antigua's intention to repay at least a portion of its rightful debt owing to Stanford – money stolen from the Plaintiffs and the Class, and transferred by Stanford to the Government of Antigua – but not to the Stanford victims, but rather to the Bank of Antigua itself.  According to Antigua's Attorney General Justin Simon in a recent interview broadcast on Fox Business News, the money owed by Antigua to Stanford is owing "a debt to the bank [of Antigua] so that we have to deal with it on those lines." *Thus, Antigua does not intend to repay Stanford's defrauded investors.  Instead, it intends to repay an entity that was seized under Antigua's direction, and in which Antigua is now the largest shareholder.  In essence, Antigua intends to use the Plaintiffs' and the Class's money to pay itself!*

49.     The egregiousness of the self-serving seizure of the Bank of Antigua is compounded by the fact that, in violation of the ECCB's own governing document, the Eastern Caribbean Central Bank Agreement Act, 1983 (the "ECCB Act") – which has the

force of law in its member countries – Antigua and the Bank Defendants have not paid

fair value – or, indeed, *any value* – for the Bank of Antigua and its assets.  Indeed, the

ECCB Act empowers the ECCB "to acquire or sell or otherwise deal with the property,

assets and undertaking of or any shareholding in the financial institution, *at a price to be*

*determined by an independent valuer*."  (Emphasis added.)  Upon information and

belief, in violation of the ECCB Act, the ECCB has never paid to Allen Stanford, or the

Stanford entities, or their receivers or creditors, *any* price for the Bank of Antigua, and

has never undertaken an independent valuation of the Bank of Antigua for the purposes

of determining what price should be paid for the Bank of Antigua and its assets.

### Commercial Activity Having a
### Direct Effect in the United States

50.     As set forth in the pleadings in the SEC Action and Criminal Action, and

in various news reports, the Stanford "Ponzi" scheme is responsible for the theft of at

least several billion dollars from Stanford's investors and customers, including Plaintiffs

and other members of the Class.

51.     Antigua's actions described above, taken in furtherance of the Stanford

fraud, were performed: (a) outside of the United States; and (b) in connection with the

desire to maintain the cash flow from the commercial activities in Antigua that were

integral parts of Stanford's fraudulent scheme.

52.     The actions and activities of the Bank of Antigua, Antigua, as well as the

seizure of the Bank of Antigua itself had many direct effects in the United States, in large

part because Stanford was based in the United States, and inextricably linked to the

financial system of the United States.

53.     Moreover, the actions described above had a direct effect in the United States, in that:

    (a)    As a result of the conduct alleged herein, and related conduct, SFG, SIBL, Allen Stanford, and others are now the subject of the SEC Action, which is pending in the Northern District of Texas;

    (b)    As a result of the conduct alleged herein, and related conduct, criminal proceedings have been instituted, in the form of the Criminal Action, against Allen Stanford, King, and others in the Southern District of Texas;

    (c)    The United States Internal Revenue Service may have a multi-million dollar claim for taxes and penalties owed to the United States in whole or in part due to the commercial activities described herein;

    (d)    A substantial number of Stanford's customers, including members of the Class, are based in the United States, and the economic effects of those persons' tragic and substantial losses are being felt in the United States; and

    (e)    Antigua's unlawful actions led to the collapse of SFG, which was based in Houston, Texas.

54.     Likewise, in connection with each allegation set forth above in which Plaintiffs allege that money was paid (or otherwise provided) to Antigua using funds that Stanford had stolen from the Plaintiffs and other members of the Class, each such act had

a direct effect in the United States because the money at issue was being funneled to

Antigua from defrauded customers in the United States, and elsewhere, through SFG's

operations in the United States, at the direction of Stanford in the United States.

## FIRST CLAIM FOR RELIEF:
## AVOIDANCE OF FRAUDULENT TRANSFERS
## TO THE BANK OF ANTIGUA

55.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the

foregoing paragraphs.

56.     Plaintiffs and the Class are creditors of Allen Stanford, SIBL, and/or SFG,

by reason of their tort claims against them, and because they deposited funds at SIBL

which have not, and will not, be returned to them in accordance with their rights as

depositors.

57.     Upon information and belief, prior to the seizure of Bank of Antigua by

ECCB, Bank of Antigua received substantial transfers of funds from Allen Stanford,

SIBL, SFG, and other Stanford entities.

58.     Upon information and belief, a substantial portion of the assets loaned or

otherwise invested by the Bank of Antigua, including funds loaned by Bank of Antigua to

the government of Antigua, were obtained by the Bank of Antigua as a result of the

fraudulent transfer of assets to the Bank of Antigua from SIBL or other Stanford entities

with the purpose and effect of defrauding Plaintiffs and members of the Class.

59.     The transfers of funds described in the preceding paragraphs had a direct

effect in the United States in that it deprived Houston-based SFG, and Houston-managed

SIBL, of substantial value, and thereby deprived American creditors of Allen Stanford, SFG, and SIBL of substantial value to satisfy their claims.

60.     Upon information and belief, the transfer of assets from Allen Stanford, SIBL, and/or SFG to Bank of Antigua was for less than fair value, and with the purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including Plaintiffs and the Class.

61.     By reason of the foregoing, the transfers described above are ineffective as against Plaintiffs and members of the Class.

62.     By reason of the foregoing, pursuant to the Uniform Fraudulent Transfer Act, and common law, Plaintiffs and the Class are entitled to avoidance of the transfers or a judgment against the Bank of Antigua in the amount of the value of the assets transferred.

## SECOND CLAIM FOR RELIEF:
## AVOIDANCE OF FRAUDULENT TRANSFER
## BY SEIZURE OF THE BANK OF ANTIGUA

63.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

64.     Plaintiffs and the Class are creditors of SIBL because they deposited funds at SIBL which have not, and will not, be returned to them in accordance with their rights as depositors, as well as Allen Stanford, Bank of Antigua, and/or SFG, by reason of their tort claims against them and because of the theft of Plaintiffs' and the Class's assets and the transfer of those assets to the Bank of Antigua.

65.     The ECCB's seizure of the Bank of Antigua and transfer of ownership of the Bank of Antigua to Antigua and the Bank Defendants for no value was a fraudulent transfer of assets from Allen Stanford and/or other Stanford entities made with the purpose and effect of defrauding Plaintiffs and members of the Class.

66.     The transfer of Bank of Antigua to ownership by Antigua and the Bank Defendants had a direct effect in the United States in that it deprived Allen Stanford, Houston-based SFG, and Houston-managed SIBL, of substantial value, and thereby deprived American creditors of Allen Stanford, SFG, and SIBL of substantial value to satisfy their claims.

67.     Upon information and belief, the transfer of Bank of Antigua to Antigua and the Bank Defendants was for less than fair value, and with the purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including Plaintiffs and the Class.

68.     By reason of the foregoing, the transfer of the Bank of Antigua described above is ineffective as against Plaintiffs and members of the Class.

69.     By reason of the foregoing, pursuant to the Uniform Fraudulent Transfer Act, and common law, Plaintiffs and the Class are entitled to avoidance of the transfer of the Bank of Antigua or a judgment against Antigua and the Bank Defendants in the amount of the value of the Bank of Antigua on the date of transfer.

## THIRD CLAIM FOR RELIEF:
## CONVERSION

70.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

71.     As described more fully above, assets belonging to Plaintiffs and the Class were fraudulently and illegally transferred to the Bank of Antigua and substantial portions of those assets were subsequently transferred to Defendant Antigua.  Plaintiffs and the Class are the rightful owners of the assets fraudulently and illegally transferred to Bank of Antigua.

72.     As described more fully above, ECCB seized the Bank of Antigua, and Antigua and the Bank Defendants have taken control of, and asserted ownership over, the Bank of Antigua and all of its putative assets – including the assets fraudulently and illegally taken from Plaintiffs and the Class – without paying any compensation for that taking, to the exclusion of and inconsistent with Plaintiffs' rights, in violation of international law and the ECCB Act.

73.     By reason of the foregoing, Plaintiffs and the Class have been injured and damaged and demand restitution and judgment against ECCB, Antigua, and the Bank Defendants in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF:
## UNJUST ENRICHMENT

74.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

75.     As described more fully above, assets belonging to Plaintiffs and the Class were fraudulently and illegally transferred to the Bank of Antigua and substantial portions of those assets were subsequently transferred to Defendant Antigua. Plaintiffs and the Class are the rightful owners of the assets fraudulently and illegally transferred to the Bank of Antigua.

76.     Antigua and the Bank Defendants have taken control of, and asserted ownership over, the Bank of Antigua and all of its putative assets – including the assets fraudulently and illegally taken from Plaintiffs and the Class – without paying any compensation for that taking, to the exclusion of and inconsistent with Plaintiffs' rights, in violation of international law and the ECCB Act.

77.     By reason of the foregoing, Antigua and the Bank Defendants have been unjustly enriched to the detriment of the Plaintiffs by taking control of, and asserting ownership over, the Bank of Antigua, and Plaintiffs' and the Class members' assets, without paying any compensation therefor.

78.     By reason of the foregoing, Plaintiffs and the Class have been injured and damaged and demand restitution and judgment against Antigua and the Bank Defendants in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF:
## ACCOUNTING FROM BANK OF ANTIGUA

79.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

80.     By reason of the foregoing facts, Plaintiffs and the Class are entitled to an accounting from the Bank of Antigua as to the assets transferred to the Bank of Antigua.

### SIXTH CLAIM FOR RELIEF: ACCOUNTING FROM ECCB AS TO VALUE OF BANK OF ANTIGUA

81.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

82.     By reason of the foregoing facts, Plaintiffs and the Class are entitled to an accounting from the ECCB as to the value of the Bank of Antigua at the time it was seized by the ECCB.

### JURY DEMAND

83.     Plaintiffs demand a jury trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(i)     certify the Class;

(ii)    enter judgment in favor of the Class and against Defendant:
        (a) awarding all damages proven at trial;

        (b) ordering the avoidance of the fraudulent transfers described herein and disclosed during the course of discovery;

        (c) ordering an accounting;

        (d) awarding attorney fees, and costs, as permitted by law; and

        (e) granting such other and further relief as the Court may deem just and appropriate.

Dated: February 16, 2010

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

LACKEY HERSHMAN, L.L.P.

By:   /s/ Paul Lackey
      Paul Lackey
      State Bar No. 00791061
      Scott. S. Hershman
      State Bar No. 00793205
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys for Plaintiffs*

# Exhibit C

1    Q.   But when do you recall Mr. Stanford telling you for

2    the first time that the bank is going to leave Montserrat?

3    A.   After that date, for sure, yes.  In December.

4    Q.   Who decided where the bank should relocate to, that

03:32:21   5    it should be Antigua?

6    A.   Mr. Allen Stanford.

7    Q.   Did Mr. Stanford ever tell you how he picked Antigua?

8    A.   Yes, sir.

9    Q.   What did he tell you about how -- why he picked that

03:32:35   10   particular island?

11   A.   He said he had met with the then prime minister and

12   the cabinet, had become friends with -- I would say not

13   friends, he had become acquainted with them and he felt

14   that they were receptive to issuing a license to him to

03:32:54   15   operate there.

16   Q.   Did Mr. Stanford ever tell you whether he preferred

17   to do business in the Caribbean?

18   A.   Yes, sir, he did.  He said he thought that was a good

19   place to operate under the circumstances, in the

03:33:20   20   jurisdictions there, yes.

21   Q.   When you say under the circumstances, what did

22   Mr. Stanford tell you -- or did he tell you anything in

23   particular about why he liked doing business down in the

24   Caribbean?

03:33:29   25   A.   Well, he said that there's less red tape, less

1   scrutiny by regulations, there's easy entry, easy exit,

2   low capitalization.

3   Q.   You mentioned Mr. Stanford commented that he had a

4   good relationship, I think you said, with the prime

03:33:53   5   minister of Antigua?

6   A.   Said he had established a good relationship with the

7   prime minister and the cabinet, but he liked the prime

8   minister.

9   Q.   Did he explain whether he did anything to win the

03:34:11   10   friendship of the prime minister?

11   A.   Well, he explained his case.  He said that the prime

12   minister was receptive, as well as the other ministers on

13   the cabinet, and there was discussion, as he later shared

14   with me, about a particular bank on the island that the

03:34:37   15   cabinet had mentioned, prime minister had mentioned, that

16   was ailing, it was bankrupt, name of it was Bank of

17   Antigua, Limited.  And in those negotiations, there was a

18   part of an agreement, as I understood from Mr. Stanford,

19   was that part and parcel to receiving a license or doing

03:35:00   20   business, setting up in Antigua, would be for Mr. Stanford

21   to purchase, buy, redeem this ailing bank called Bank of

22   Antigua, Limited.

23   Q.   What kind of bank was the Bank of Antigua?

24   A.   It's a commercial bank, serving clients and customers

03:35:18   25   of the country Antigua Barbuda.  It would be similar to a

1  bank down the street here where you have checking accounts

2  and savings accounts and can obtain loans for various

3  business purposes or home ownership.

4  Q.    Did Mr. Stanford tell you anything about the actual

03:35:36  5  financial condition of the Bank of Antigua at the time

6  that he bought it?

7  A.    He said it was insolvent.  He said that it was under

8  water.  In fact, he said it's not under water, it's so

9  insolvent that it's sitting on the bottom of the ocean.

03:35:54  10  Q.    How much money did it cost him to buy the Bank of

11  Antigua?

12  A.    Several million dollars.

13  Q.    Could it have been approximately 40 or $50 million?

14        MR. SCARDINO:  Object to the leading question.

03:36:09  15  He's already answered it several million.

16        MR. STELLMACH:  That's not exactly a precise

17  number.

18        THE COURT:  Try to hammer the number down.

19  Overruled.

03:36:16  20        THE WITNESS:  It could have been as many as

21  $20 million.

22  BY MR. STELLMACH:

23  Q.    Okay.  Where did that money come from to buy this

24  insolvent bank down in Antigua?

03:36:26  25  A.    CD depositors is where all the money came from.

1   Q.   Did Mr. Stanford ever discuss political donations

2   that he was making to parties, preliminary parties, down

3   in Antigua?

4   A.   Yes, sir, he did.  Both the Labor Party and the

03:36:44   5   Opposition Party.  The Labor Party in Antigua was the

6   current party in power.  The Bird family was historically

7   in power.

8   Q.   Did Mr. Stanford tell you where the money for those

9   campaign contributions was coming from?

03:37:01   10   A.   Mr. Stanford wrote the checks with, but all monies

11   came from the depositors or all the Stanford companies and

12   operations.

13   Q.   Did Mr. Stanford ever make any loans to the

14   government of Antigua?

03:37:21   15   A.   There were loans made by it, yes, they did.  Yes, he

16   did.

17   Q.   Approximately how much money did he loan to the

18   bank -- I'm sorry -- to the government of Antigua?

19   A.   Approximately $40 million.

03:37:36   20   Q.   And did the government of Antigua then repay the

21   loan?

22   A.   No, sir.

23   Q.   Did there come a point when Mr. Stanford received any

24   special honors or recognition from the Antiguan

03:37:54   25   government?

| | |
|---|---|
| 1 | **A.**   Among other things, he received a diplomatic |
| 2 | passport.  He also received -- |
| 3 | **Q.**   Can you explain what a diplomatic passport is? |
| 4 | **A.**   Yes, sir.  As I understand it, it's a special |
| 5 | passport that's issued to certain individuals, insiders, |
| 6 | as it were.  It's issued to certain dignitaries, certain |
| 7 | individuals may be ambassadors, those who have special |
| 8 | ties to the government.  And it enables one to travel |
| 9 | fairly freely and have special privileges in entry and |
| 10 | exist. |
| 11 | **Q.**   You mentioned the knighthood? |
| 12 | **A.**   Yes, sir, he was knighted by the Commonwealth of |
| 13 | Antigua and Barbuda. |
| 14 | **Q.**   Did he actually use the title, Sir Allen Stanford? |
| 15 | **A.**   Yes, sir. |
| 16 | **Q.**   Did he ever explain why he used the title? |
| 17 | **A.**   One of his explanations to me was that it's good for |
| 18 | branding and it's good for marketing, a good promotional |
| 19 | item. |
| 20 | **Q.**   Did Mr. Stanford ever discuss his relationships with |
| 21 | regulators on the island of Antigua? |
| 22 | **A.**   Yes, sir, he did. |
| 23 | **Q.**   What did he tell you about an individual named Althea |
| 24 | Crick? |
| 25 | **A.**   He said that she was appointed in an interim role, I |

03:38:07
03:38:37
03:38:50
03:39:05
03:39:24

1  believe, as head of the predecessor to the Financial

2  Regulatory Services Commission, and that she needed to be

3  terminated from that position, be ousted from that

4  position.

03:39:53  5  Q.  Did he tell you whether he subsequently took steps to

6  get Ms. Crick ousted from her position as chief of the

7  regulatory body?

8  A.  Yes, sir.  He told me that he did take steps to have

9  her replaced, yes, sir.

03:40:06  10  Q.  Did Mr. Stanford ever discuss her successor as head

11  of the regulatory body with you?

12  A.  Yes, sir.  He referred to a gentleman by the name of

13  Lee King, Leroy King.

14  Q.  What did Mr. Stanford tell you about his relationship

03:40:23  15  with Leroy King, the new head of the regulatory body on

16  Antigua?

17  A.  He knew Mr. King very well, had a close relationship.

18  They, in fact, had come to an agreement to work together

19  in terms of Mr. King not digging into the examination

03:40:49  20  process that took place through the Financial Regulatory

21  Services Commission.  In other words, not dig in for

22  confirmation of investments, for example.  And this

23  agreement was codified by a blood oath, as Mr. Stanford

24  told me, that he entered into between --

03:41:17  25        MR. SCARDINO:  Objection.

```
 1              THE WITNESS:  -- Mr. Lee King and Trevor
 2 Bailey.
 3              THE COURT:  Sustained.  Next question.
 4              MR. STELLMACH:  Yes, Your Honor.
 5 BY MR. STELLMACH:
 6 Q.   Mr. Davis, what did Mr. Stanford tell you about a
 7 blood oath with Mr. King?
 8 A.   Said that he met them at the airport area -- I don't
 9 remember exactly where in the airport area -- one night,
10 and they agreed that Mr. King and Mr. Trevor Bailey,
11 Mr. King's supervisor of offshore banks, would work with
12 him in terms of shielding scrutiny on the Stanford
13 International Bank, Limited, statements, and other things,
14 I presume, and they actually -- Mr. Stanford said they
15 actually cut themselves and had a blood oath.
16 Q.   Who was Trevor Bailey?
17 A.   Mr. Bailey was a person that worked in the Financial
18 Regulatory Services Commission as Mr. King's assistant.
19 He was supervisor of banks, I believe.
20 Q.   Did Mr. Bailey remain as the supervisor of banks
21 throughout your tenure at Stanford Financial?
22 A.   No, sir.  He eventually was hired as internal auditor
23 for Stanford International Bank, limited.
24 Q.   What did Mr. Stanford tell you about his relationship
25 with Bailey who at least at the time before he hired him
```

1    as an employee was responsible for bank examinations?

2    **A.**    His relationship, as I indicated earlier in

3    testimony, was fairly close.  I presume they were blood

4    brothers.

03:43:12    5    MR. STELLMACH:  I'm about to show the witness

6    Government's Exhibit 1500.

7    **(Attorneys conferring)**

8    MR. SCARDINO:  Can we have just a second,

9    Judge --

03:44:05    10    THE COURT:  Yes, sir.

11    MR. SCARDINO:  -- before this comes in?

12    THE COURT:  Do you want to stand for a second,

13    minute or so?

14    We'll see what they're up to at this

03:44:23    15    point.  I know we have an afternoon break approaching.

16    Okay.  Let's see what they decide on this.

17    Mr. Scardino, do you want to take a break

18    at this time so you can talk it over?

19    MR. SCARDINO:  That would she great, Judge.

03:45:05    20    THE COURT:  All right.  Ladies and gentlemen,

21    it's now about 3:45.  Take a break.  Be back ready to

22    resume -- this will be our afternoon break.  And be back in

23    20 minutes.  Check your watch.  We'll see you in

24    20 minutes.

03:45:33    25    **(Recessed at 3:45 p.m.)**

*Direct-Davis/By Mr. Stellmach*

1   **(The following was held out of the presence of the jury)**

2           THE COURT:  Tell the jury we're in here with

3   the clock on.

4                 Who wants to raise it?

5           MR. SCARDINO:  Defense, Your Honor.

6           THE COURT:  All right.  Go on.

7           MR. SCARDINO:  Your Honor, we would --

8           THE COURT:  Be seated, please.

9           MR. SCARDINO:  -- respectfully object to the

10  admission of Government's 1500.  Apparently it was

11  obtained --

12           THE COURT:  You need to speak louder.

13           MR. SCARDINO:  Apparently it was obtained in a

14  manner that was not prescribed by law.  It was -- there was

15  no warrant that was -- no process used by which it could be

16  seized.  It was seized out of an office by the FBI.  And we

17  have previously filed -- or, actually, counsel prior to us

18  had filed a motion to suppress, and we respectfully suggest

19  that this would fall under that motion to suppress.

20                 Did we file one as well?

21           MR. STELLMACH:  Which was denied.

22           THE COURT:  Was it denied summarily?

23           MR. MCGUIRE:  Yes, it was, Judge.

24           MR. STELLMACH:  But we would just --

25           MR. MCGUIRE:  Reurge it.

04:11:58

04:12:07

04:12:17

04:12:37

04:12:47

*Direct-Davis/By Mr. Stellmach*

1          MR. SCARDINO:  -- reurge it for purposes of

2   this particular exhibit and further object to foundation.

3          THE COURT:  Did you object to it as an exhibit

4   beforehand pursuant to the local rule -- hold it a

04:12:57    5   second -- pursuant to local Rule 55.2B.

6          MR. SCARDINO:  I think there was a general

7   motion to suppress filed, because at the time it was filed,

8   we were not in a position to have reviewed all the

9   documents and specifically object to the documents.

04:13:16   10          THE COURT:  Also, if you file a motion to

11   suppress, it doesn't have to be specific.  Was it specific

12   on this book?

13          MR. MCGUIRE:  We mentioned, Your Honor --

14          THE COURT:  I can't hear you.

04:13:23   15          MR. MCGUIRE:  I'm sorry.  We mentioned any and

16   all articles belonging to Mr. Stanford received without a

17   warrant.

18          THE COURT:  Is that too broad?

19          MR. MCGUIRE:  I don't believe so, Your Honor.

04:13:32   20          THE COURT:  Response.

21          MR. COSTA:  Your Honor, I would response to the

22   motion, so I'll address it.  First of all, we did in the

23   response identify particular items.  So we think --

24          THE COURT:  Did he ever identify particular

04:13:40   25   items?

2813

*Direct-Davis/By Mr. Stellmach*

1    MR. COSTA:  Right.  And this was marked in the

2  Government's exhibit List that was produced before trial.

3    But, secondly --

4    MR. MCGUIRE:  Filed long before that, Your

04:13:49    5  Honor.  We didn't have --

6    THE COURT:  Well, do you object to, then, as an

7  exhibit?

8    MR. COSTA:  Not on suppression grounds.  I

9  think just a general foundation.

04:13:55   10    THE COURT:  That's what I mean.

11    MR. COSTA:  Not on suppression grounds once it

12  was identified by the government.

13    Secondly, whether it was identified or not

14  in the suppression motion, we cited in our response a clear

04:14:05   15  Fifth Circuit case from about two years ago, same

16  situation, a receivership was appointed.

17    THE COURT:  Oh, yes, the receiver turning, I

18  remember that.

19    MR. COSTA:  And the Fifth Circuit in a case

04:14:15   20  right on point said once the receiver comes in, the

21  defendant has no possessory interest in those materials

22  that are now the property of the receiver.  So the Court's

23  already ruled on it.  I mean, I don't think we need to

24  relitigate it.

04:14:26   25    THE COURT:  How about that case.  I remember

1    looking at that.  Because I did that on submission,

2    right --

3                     MR. COSTA:  Yes, Your Honor.

4                     THE COURT:  -- once I saw that?

04:14:31    5        MR. MCGUIRE:  That's correct, Your Honor.

6                     And that Fifth Circuit case failed to

7    address two controlling U.S. Supreme Court cases, which are

8    cited in our brief, Mancusi versus DeForte, which is

9    392 U.S. 364 --

04:14:44    10                   THE COURT:  Slow down a little bit.

11                   MR. MCGUIRE:  -- from 1968, and, also, it also

12   failed to address the subsequent U.S. Supreme Court case,

13   which is Ortega versus O'Connor, 480 U.S. 709, from 1987,

14   both of which said when you have a private office in a

04:14:57    15   commercial premises, whether you own the office or not but

16   as -- if you have a private office, anything within that

17   office that you normally exclude others from, police or

18   other authorities, have to obtain an amendment -- excuse

19   me -- a warrant under the Fourth Amendment before they can

04:15:15    20   search and seize any items.

21                   THE COURT:  Was that filed?  Did you file that

22   in your response?

23                   MR. MCGUIRE:  Yes, Judge, I did.

24                   THE COURT:  Where?  In --

04:15:20    25                   MR. MCGUIRE:  It was actually in the initial

1 motion.

2              THE COURT:  Initial motion.

3                    Okay.  Go on.

4              MR. COSTA:  Neither of those Supreme Court

04:15:25  5 opinions address receivership issues.  And there was a

6 Court in this case from the Dallas federal Judge, Judge

7 Godbey, saying the receiver not only can but should be

8 producing stuff in response to government inquiry.  So --

9              MR. MCGUIRE:  No, must.

04:15:38  10             THE COURT:  Must.

11             MR. COSTA:  Well, must.  Even better.

12                   So there's --

13             MR. MCGUIRE:  The --

14             THE COURT:  Hold it.  Wait.

04:15:40  15             MR. COSTA:  I mean, the main issue is this has

16 already been ruled on.  I'm not sure why we're relitigating

17 now.

18             THE COURT:  Well, he's entitled if he wants to

19 do it.  Again --

04:15:47  20             MR. COSTA:  The Rules say suppression issues

21 must be raised pretrial.

22             MR. MCGUIRE:  Which we did.

23             THE COURT:  They did, they said.

24             MR. STELLMACH:  12A.

04:15:54  25             MR. COSTA:  Right.  So, it was denied.  So I'm

2816

 1  not sure why it's being relitigated.

 2              Second of all --

 3              THE COURT:  It's not being relitigated.  It's

 4  being reargued.

04:16:00   5              MR. COSTA:  The Fifth Circuit case is right on

 6  point.  It cites a -- Fifth Circuit case from the '80s,

 7  both receivership cases.  None of the cases they cite are

 8  receivership cases.

 9              Secondly, the government argued in its

04:16:11  10  response that even if that Fifth Circuit case which is

11  right on point somehow doesn't control, certainly the good

12  faith exception applies, because the government relied on

13  Judge Godbey's order.

14              And there are about two or three Supreme

04:16:23  15  Court decisions in the last three or four years, including

16  one from last term, that say reliance on existing law,

17  which would include a federal order from Judge Godbey,

18  precludes any exclusionary remedy.

19              THE COURT:  The good faith exception came out

04:16:36  20  what, 10, 15 years ago?

21              MR. COSTA:  But it's been strengthened in the

22  last --

23              THE COURT:  Yes.

24              MR. COSTA:  -- Supreme Court terms, including

04:16:43  25  just about six months ago.

2817
*Direct-Davis/By Mr. Stellmach*

1          MR. MCGUIRE:  And if I could respond to that,

2 Your Honor.  It obviously could not be good faith on the

3 part of the government not to seek an amendment under that

4 fourth -- excuse me -- a warrant under the Fourth Amendment

04:16:51   5 when there are two controlling U.S. Supreme Court cases on

6 point that say you have to have a warrant.

7          THE COURT:  Hold it.  Now, wasn't the

8 government in -- yes, it's a U.S. Government.  But it

9 wasn't in this criminal prosecution that the place was

04:17:04  10 rated, correct, or was it?

11          MR. STELLMACH:  Seized by the receiver.

12          MR. COSTA:  The civil case --

13          THE COURT:  It was seized by the -- hold it.

14          MR. COSTA:  -- receiver seized it.

04:17:10  15          THE COURT:  That's the point, the receiver went

16 in and got it, correct, and then you got it from the

17 receiver?

18          MR. COSTA:  Right.  And the Court --

19          THE COURT:  Hold it.  I understand.  I'm not

04:17:21  20 saying I disagree with it.  They turned it over.  So in

21 effect it wasn't the classic case where they're looking at

22 that office, and before they go in, before they want -- in

23 other words, in your case, the criminal prosecution, then

24 they could wait and get a -- what do you call it -- a

04:17:39  25 warrant.  Here, the receiver got it pursuant to the SEC

*Direct-Davis/By Mr. Stellmach*

1  action, I gather, in Dallas, and then you now got it from

2  the SEC in the turnover -- the receiver --

3            MR. COSTA:  Yes.

4            THE COURT:  -- you got it from the receiver

04:17:54   5  appointed under that SEC matter; is that correct?

6            MR. COSTA:  Correct.  For the last few years,

7  we've requested materials from the receiver.  They're not

8  just not giving us stuff.  We asked for specific items.

9  And that's pursuant to Judge Godbey's order which directed

04:18:05  10  the receiver to provide that stuff to law enforcement.

11            THE COURT:  I remember.  I remember working --

12  I didn't -- you know, working back and forth.

13                  Yes, sir.

14            MR. FAZEL:  If it please the Court.  For record

04:18:14  15  purposes, two issues:  Number one -- let me work backwards.

16  As far as Mr. Costa's opinion as to recent Supreme Court

17  cases as to good faith, I would respectfully disagree with

18  his interpretation of it.  The last good faith case I think

19  he's discussing is a circumstance in which the Supreme

04:18:28  20  Court said, well, if the police officers were working on

21  the basis prior to Gant and then Gant came into effect,

22  it's not a good idea for us to punish that officer who did

23  not know about the Gant law, for example.  Therefore, he's

24  good to go and it's not suppressed.

04:18:43  25                  As far as action is concerned and --

2819

*Direct-Davis/By Mr. Stellmach*

1 police action -- state action is concerned, we briefed it

2 in our motion, but just to briefly just the Court's

3 inquiry, our position is state action is attached.  It

4 attaches when in circumstances such as this you have a

04:19:00  5 circumstance where there's police officers, U.S. marshals.

6 We have video that we attached with our submission showing

7 officers coming in with the receiver, and, therefore, we

8 have case law that shows that's state action.

9          THE COURT:  But you're saying it was seized --

04:19:13  10 it's been seized in a civil action and the receiver in the

11 civil action turned it over to the government?

12          MR. FAZEL:  Correct.  But we're saying the

13 Fourth Amendment does apply because state action occurred

14 when officers -- law enforcement officers were interacting

04:19:28  15 with the receiver.

16          THE COURT:  How can you go back and clean it up

17 in a situation like this?  I think there's no way to redeem

18 it, because they had no warrant, that's for sure.

19          MR. FAZEL:  That's for sure.

04:19:36  20          THE COURT:  And it was turned over through a

21 civil action pursuant to -- it was turned over as --

22 pursuant to a civil action -- the receiver appointed

23 pursuant to a civil action; is that correct?

24          MR. COSTA:  Yes, pursuant to a civil Court

04:19:50  25 order from Judge Godbey.

*Direct-Davis/By Mr. Stellmach*

1      THE COURT:  I understand.  I got it.

2             Anything further?

3      MR. FAZEL:  That's it.

4      THE COURT:  Overruled.

04:20:00   5             All right.  Let's bring the jury in.

6      **(The following was held before the jury)**

7      THE COURT:  Go right ahead.

8      MR. STELLMACH:  Your Honor, if I could have the

9 ELMO, the overhead?

04:20:49  10      THE COURT:  Okay.

11 BY MR. STELLMACH:

12 **Q.**   Mr. Davis, I'm asking you to look at what's been

13 marked as Government's Exhibit 1500.  Do you recognize

14 that?

04:20:57  15 **A.**   Yes, sir.

16      THE COURT:  By the way, this has been ruled on

17 already.  It's overruled.  So any objections are overruled.

18 We've talking about this for a little bit.  And 1500 is

19 admitted.

04:21:11  20 BY MR. STELLMACH:

21 **Q.**   How do you recognize it?

22      THE COURT:  In other words, prove it up, but if

23 it's proved up to my satisfaction, no other motions are

24 applicable now.

04:21:17  25 BY MR. STELLMACH:

*Direct-Davis/By Mr. Stellmach*

1    Q.    Mr. Davis, how do you recognize this book?

2    **A.**    I've seen the book before in Mr. Stanford's

3    possession.

4    Q.    Do you understand -- do you recognize what it is?

04:21:29    5    **A.**    It's a call book, yes, addresses, phone numbers, A to

6    Z.

7              THE COURT:  Before you had BlackBerries, that's

8    an address book; right?  Is that correct, sir?

9              THE WITNESS:  Yes, Your Honor.

04:21:46    10    BY MR. STELLMACH:

11    Q.    And I want to turn to a few addresses in it.

12              MR. STELLMACH:  And, Your Honor, we've redacted

13    the phone numbers and all other names of other individuals.

14    We're only offering the specific pages that we're showing

04:21:58    15    the witness.

16              THE COURT:  All right.  And the record will

17    reflect what those pages are?

18              MR. STELLMACH:  They will, Your Honor.

19              THE COURT:  But 1500 is admitted with the

04:22:03    20    understanding it's just the pages that you identify.

21              MR. STELLMACH:  To protect the privacy of the

22    individuals, that's correct, Your Honor.

23    BY MR. STELLMACH:

24    Q.    Mr. Davis, who was Lester Bird?

04:22:14    25    **A.**    He was a member of the Antigua Labor Party and prime

1    minister of the country of Antigua and Barbuda.

2    Q.   Approximately when was he prime minister?

3    A.   In the 1980s and '90s.

4    Q.   Was that Mr. Lester Bird or his father --

04:22:34    5    A.   His father in the beginning, Vere Bird, and then he

6    was -- Vere Bird was followed by Mr. Lester Bird's son.

7    Q.   And was Lester Bird the prime minister at the time

8    the bank relocated to Antigua?

9    A.   No, sir, I believe his father, Vere Bird, was at that

04:22:49    10   time.

11   Q.   I see.

12   A.   Shortly thereafter, there was an election, and

13   Mr. Lester Bird was elected following.

14   Q.   And Lester Bird was the leader of the party to which

04:22:57    15   Mr. Stanford made political contributions?

16   A.   Yes, sir.

17   Q.   And we see there that Mr. Stanford had both

18   Mr. Bird's home number and his cellphone number; is that

19   right?

04:23:09    20   A.   Yes, sir.

21   Q.   And 268, is that an Antiguan or a Caribbean area

22   code?

23   A.   Yes, it is.

24   Q.   Another individual we mentioned was Mr. Trevor

04:23:26    25   Bailey.  Could you remind us who Mr. Bailey was?

1  **A.**  Mr. Trevor Bailey was an individual who worked with

2  the FSRC, which is the Financial Regulatory Services

3  Commission, in Antigua.

4  **Q.**  In what capacity did Mr. Bailey work there?

04:23:49  5  **A.**  He was supervisor of banks, worked for Mr. Lee King.

6  **Q.**  And at some point Mr. Bailey left and went to work

7  for the bank itself, for Stanford International Bank?

8  **A.**  At some point he did, yes.

9  **Q.**  In what capacity?

04:24:05  10  **A.**  As Standard International Bank, Limited's, internal

11  auditor.

12  **Q.**  And I want to talk about Leroy King.  Can you remind

13  us who Mr. King was?

14  **A.**  Mr. King was the director of Financial Regulatory

04:24:23  15  Services Commission at the department of treasury in

16  Antigua, Barbuda.

17  **Q.**  Just going down the list, could you tell us the

18  different phone numbers Mr. Stanford had in his address

19  book for Mr. King, the types of numbers beginning with

04:24:37  20  business?

21  **A.**  Yes, sir.  He had direct lines, he had fax numbers,

22  cellphone, home phone numbers and secretary.  Also, he had

23  a New York home number, his United States cell number,

24  home.  It appears his wife, Lisa, cell number was there as

04:25:02  25  well.

*Direct-Davis/By Mr. Stellmach*

1  Q.   And at the bottom, we also see the name Gizelle

2  (phonetic) and home.  Did you understand who Giselle was.

3  A.   Yes.  Giselle was an employee of the Stanford groups

4  of companies and was also in some way related to Mr. Lee

04:25:16   5  King.

6  Q.   And Mr. King was the individual who was supervising

7  or heading the Financial Services Regulatory Commission

8  after Ms. Crick was replaced?

9  A.   Yes, sir.

04:25:38   10  Q.   Did Mr. Stanford ever tell you anything else about

11  his relationship with Mr. King and Mr. Bailey?

12  A.   Well, he spoke of the close nature of the

13  relationship.  They spoke often.  And Mr. -- Mr. Stanford

14  mentioned various phone calls that he had with Mr. King.

04:26:04   15  Q.   What did Mr. Stanford say, if anything, about

16  payments to Mr. King?

17  A.   Mr. Stanford said that he made regular cash payments

18  to Mr. King as well as Mr. Trevor Bailey at one time, yes,

19  sir.

04:26:24   20  Q.   And we'll come back to those in a bit.

21           Do you understand what Mr. Stanford was

22  making those payments for?  What did he tell you he was

23  paying them for?

24  A.   It was hush money, bribes for them to look the other

04:26:40   25  way in their examination of Stanford International Bank,

1    Limited, and other situations that came up.

2    **Q.**   After the bank moved to Antigua, where was your

3    office?

4    **A.**   I officed in Houston, Texas, between 1990 and 1998 or

04:27:08    5    '-9.

6    **Q.**   What did you do after Houston?  Did you stay in

7    Houston throughout your time working for Mr. Stanford?

8    **A.**   No, sir.  In the late '90s, I moved my office to

9    Memphis, Tennessee, following a personal move of my family

04:27:24   10    in '92, '93, to Mississippi, nearby Memphis, Tennessee.

11    **Q.**   Where was Mr. Stanford based?

12    **A.**   He had offices several places.  I believe at that

13    time in Florida, but he also had offices in Houston.

14    **Q.**   Well, did Mr. Stanford spend a lot of time with you

04:27:44   15    in Memphis?

16    **A.**   No, sir.  I would say no.

17    **Q.**   Was he on the road a lot?

18    **A.**   Yes, sir, I believe he was.

19    **Q.**   So did that mean you were running the operation?

04:27:57   20    **A.**   No, that did not mean I was running the operation.  I

21    was CFO in charge of the financial side.  No one ran the

22    companies except Mr. Stanford.  He was the chairman of the

23    board and also chief --

24             MR. SCARDINO:  Object to nonresponsive.

04:28:13   25             THE WITNESS:  -- executive officer.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STANFORD INTERNATIONAL BANK, | § | Civil Action No. 3:09-CV-0721-N |
| LTD., | § | |
| | § | |
| Debtor in a Foreign Proceeding. | § | |

### ORDER

This Order addresses the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* to May 12, 2011 [125], request that the Court take judicial notice [103], and objections to direct testimony and exhibits [149]; the Receiver's objections to the Joint Liquidators' evidence [152]; and the former Joint Liquidators' petition for recognition of foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code [4]. For the reasons that follow, the Court grants the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* and grants in part and denies in part their request that the Court take judicial notice. The Court overrules the parties' objections to each others' evidence. Finally, the Court grants in part and denies in part the Joint Liquidators' petition for recognition, holding that the Antiguan Proceeding is a foreign nonmain proceeding under Chapter 15 of the Bankruptcy Code.

### I. ORIGINS OF THE SUIT

On February 17, 2009, the United States Securities and Exchange Commission ("SEC") filed a securities enforcement action, 3:09-CV-0298-N, *SEC v. Stanford*

ORDER – PAGE 1

*International Bank, Ltd., et al.* (filed Feb. 17, 2009) ("SEC Action"), in this Court, alleging that R. Allen Stanford, through and/or with his associates and various entities under his control (the "Stanford Entities"), perpetrated a massive Ponzi scheme.  As part of that litigation, the Court "assume[d] exclusive jurisdiction and t[ook] possession" of the "Receivership Assets"[1] and the "Receivership Records"[2] (collectively, the "Receivership Estate") and appointed a Receiver to oversee the Receivership Estate, of which Stanford International Bank ("SIB") is a part.  *See* Second Am. Order Appointing Receiver, July 19, 2010, at 2-3 [1130] (the "Receivership Order"), *in* SEC Action.

Despite the Receivership Order, on February 26, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of Antigua and Barbuda ("Antiguan Court"), at the request of the Financial Services Regulatory Commission ("FSRC") of Antigua and Barbuda ("Antigua") – an entity that purported to license and regulate SIB – appointed Nigel Hamilton-Smith and Peter Wastell (the "Former Joint Liquidators) as receivers-managers of SIB.  *See* 105-17, at 4.[3]  On April 17, 2009, the Antiguan Court placed SIB into liquidation

---

[1] "The assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants [in the SEC Action] and all entities they own or control."

[2] "The books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers telephones[,] personal digital devices and other informational resources of or in possession of the Defendants [in the SEC Action], or issued by Defendants and in possession of any agent or employee of the Defendants."

[3] For the sake of brevity, the Court refers to testimony and appendices by docket numbers in place of document titles.

and appointed the Former Joint Liquidators as SIB's liquidators (the "Antiguan Proceeding").
*See id.* at 12-13. Soon thereafter, on April 20, 2009, the Former Joint Liquidators filed a
petition for recognition in this Court pursuant to Chapter 15 of the U.S. Bankruptcy Code.

On June 8, 2010, while the petition was still pending in this Court, the Antiguan Court
removed the Former Joint Liquidators as SIB's liquidators (the "Antiguan Removal Order"),
holding, among other things, that they had engaged in improper conduct with respect to
recognition proceedings in Canada. *See* 105-19, at 85. The Antiguan Removal Order
allowed the Former Joint Liquidators to remain as SIB's caretakers until the Antiguan Court
appointed new liquidators. *See id.* at 86. The Antiguan Court did so on May 12, 2011 ("JL
Appointment Order"), appointing Hugh Dickson and Marcus Wide (the "Joint Liquidators").[4]
*See* 105-20, at 5. Counsel for the Joint Liquidators first appeared in this action in August
2011 [74, 75].

After extensive briefing by the parties and parties in interest,[5] the Court held an
evidentiary hearing on the petition for recognition on December 21, 2011.[6] After
disagreement regarding whether the Joint Liquidators could, in essence, stand in as Plaintiffs

---

[4]The Antiguan Court also appointed Dickson and Wide as Receivers of Stanford Trust
Company Limited ("STCL") in November 2011. Here, they only seek recognition of the
Antiguan Proceeding involving SIB.

[5]The SEC, the Examiner whom the Court appointed to represent the interests of the
Stanford Entities' alleged victims, and the Official Stanford Investors Committee ("OSIC")
have submitted briefs and appeared at hearings in this matter.

[6]Prior to the hearing, the Joint Liquidators moved the Court to take judicial notice of
certain facts, information, and materials. The Court did not rule on this motion at the
hearing.

for the Former Joint Liquidators on their petition for recognition, the Court asked the Joint

Liquidators to file a written motion. Accordingly, the Joint Liquidators moved for

substitution as Plaintiff *nunc pro tunc*. Thereafter, the Court allowed the Receiver and the

Joint Liquidators an opportunity to file written objections to the evidence presented at the

hearing.

## II. THE COURT GRANTS THE JOINT LIQUIDATORS' MOTION TO SUBSTITUTE

The dispute over whether the Joint Liquidators may proceed on the Former Joint

Liquidators' petition for recognition began when the Receiver argued that the Court should

not consider the petition for recognition to have been filed until August 2011, the date on

which the current Joint Liquidators appeared in the suit. Jt. Br. of Receiver, Examiner, &

Investors Comm. in Resp. to Joint Liquidators' Suppl. Br. in Supp. Their Pet. for Ch. 15

Recognition 9 n.11 [119] [hereafter Receiver's Resp. to JL Suppl. Br.]. He reasoned that

because Chapter 15 of the Bankruptcy Code requires the petition for recognition to identify

the foreign representatives, *see* 11 U.S.C. § 1515, and because the petition referenced only

the Former Joint Liquidators, the petition was deficient. *See* Receiver's Suppl. Resp. to JL

Suppl. Br. at 9 n.11, 14. In response, at the December 2011 evidentiary hearing, the Joint

Liquidators orally moved the Court to substitute them as party Plaintiffs.[7]

On their current briefing of the issue, the Joint Liquidators argue that the Court should

substitute them under Federal Rule of Civil Procedure 25(c) because they hold the same

interests as and positions of the Former Joint Liquidators. *See* Joint Liquidators' Mot. Subst.

---

[7]The Court asked the Joint Liquidators to brief the issue.

ORDER – PAGE 4

as Pl. *Nunc Pro Tunc* to May 12, 2011, at 2-3. The Receiver requests that the Court refrain from considering the petition for recognition and instead order the Joint Liquidators to file an amended petition for recognition asserting themselves as the foreign representatives.[8] *See* Receiver's Resp. to JL Mot. for Subst. 6.

Despite the way the parties have framed the issue, at first blush the question before the Court appears to be one of mootness. *See, e.g., Qimonda AG v. LSI Corp.*, --- F. Supp. 2d ---, 2012 WL 777494, at *3 (S.D. Tex. 2012) (describing Supreme Court's distinction between standing and mootness). It is undoubtedly true that as foreign representatives of SIB at the time of the commencement of the action, the Former Joint Liquidators had standing

---

[8]The Receiver states that "the U.S. Receivership Parties have no objection to the Court allowing the J[oint ]L[iquidator]s to file an 'amended' petition, provided that the amendment does not relate back to the date of the filing by the [F]ormer [J]oint [L]iquidators." Jt. Resp. of Receiver, Examiner, Investors Comm., & SEC to Joint Liquidators' Mot. for Subst. as Pl. *Nunc Pro Tunc* to May 12, 2011, at 6 [146] [hereinafter Receiver's Resp. to JL Mot. for Subst.]. The Receiver reveals that his interest in having the Joint Liquidators replead to a later date is motivated by an understanding that, as per *Lavie v. Ran (In re Ran) (Ran IV)*, 607 F.3d 1017, 1025 (5th Cir. 2010), the time for determining SIB's center of main interest ("COMI") – a main point of contention in the recognition analysis – is at the time the foreign representative files the petition for recognition and, therefore, having a later COMI-determinant date will work in his favor. *See, e.g.*, Receiver's Resp. to JL Suppl. Br. 14-15 & n.15.

The Court notes that a later petition date would similarly seem to aid the Receiver's arguments regarding nonmain recognition because "[t]he use of the present tense [in the statute] implies that the court's [nonmain] establishment analysis should focus on whether the debtor has an establishment in the foreign country when the foreign representative files for recognition . . . ." *Lavie v. Ran (Ran III)*, 406 B.R. 277, 284-85 (S.D. Tex. 2009), *aff'd, Ran IV*, 607 F.3d at 1027. The Court surmises that the reason the Receiver does not wish for the Court to dismiss the action entirely is because of the number of years he has spent litigating the suit and because of the inevitability of dealing with the issue at some point during the pendency of the Stanford multi-district litigation ("MDL").

ORDER – PAGE 5

to bring their petition for recognition.[9]  *See* 28 U.S.C. § 1334(a).  Thus, at the time the Former Joint Liquidators filed their petition, the Court properly had subject matter jurisdiction over the suit.  The Court must go on to analyze, however, whether the Antiguan Court's removal of the Former Joint Liquidators as foreign representatives divested them of the personal interest necessary to continue the suit, thus rendering the action moot.[10]  *See* *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (articulating the difference between standing and mootness).

The Fifth Circuit has stated that "[s]ubject matter jurisdiction, once it validly exists among the original parties, remains intact after substitution." *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971).  However, this assertion is based on the idea that a valid Rule 25

_____

[9]In his briefing, the Receiver made the additional argument that the Antiguan Order appointing the Joint Liquidators vested all SIB's property in them as of April 15, 2009, thus retroactively divesting the Former Joint Liquidators of their rights and duties over SIB at any point in time so that the petition was deficient even when the Former Joint Liquidators filed it.  *See* Receiver's Resp. to JL Mot. for Subst. 3.  A foreign court order cannot *retroactively* divest this Court of jurisdiction.  And the Joint Liquidators aver that the JL Appointment Order "did not render the activities of the Former [Joint Liquidators] null and void, nor did it treat such Former [Joint Liquidators] as if they had never existed."  New Joint Liquidators' Reply in Further Supp. of Mot. Subst. as Pl. *Nunc Pro Tunc* 6 [148] [hereinafter JL Reply to Mot. Subst.].  Rather, the JL Appointment Order stated that it was entered "without in any way altering or affecting the legal rights of the estate of S.I.B. or of its past, present or future Liquidators" and vests the Joint Liquidators with authority over SIB "as successors to and in substitution for the [Former Joint Liquidators]."  106-4, at 2, 4.  Thus, the Receiver's argument holds no water.

[10]It seems that the Receiver's arguments lead to an outcome more severe than that for which he bargained.  If the Court finds that the current petition is moot, it cannot direct the Joint Liquidators to file an amended petition for recognition.  Rather, a finding of mootness forces the Court to dismiss the action entirely, thus negating three years of effort on both sides.

substituted party "steps into the same position of the original party." *Id.* Thus, it follows that if subject matter jurisdiction is lost among the original parties to the action before the substitution occurs, substitution cannot cure the jurisdictional defect. However, the plain language of Rule 25 specifically contemplates that a case may continue where an original party has lost an interest in the action. *See* FED. R. CIV. P. 25. So, the Court goes on to analyze whether Rule 25 cures the jurisdictional defect.[11]

Federal Rule of Civil Procedure 25 provides that a Court may substitute a party for another in the event of a transfer of interest, a former party's death or incompetency, or, if the former party was a public officer, his/her death or separation from office. *See id.* Rule 25 is procedural and thus does not provide for the survival of rights or liabilities. *See* 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1952, at 655 (3d ed. 2007). Accordingly, once a former party loses capacity via one of the methods named above, the action abates unless the action is one that survives

---

[11]The Receiver argues that Rule 25 does not apply to this proceeding because "[t]his is not a lawsuit in which the [F]ormer [Joint L]iquidators filed an action on behalf of SIB, and the J[oint ]L[iquidators] are seeking to continue that action . . . ." Receiver's Resp. to JL Mot. for Subst. 3. Rather, the Receiver continues, the Joint Liquidators "are representing . . . their own[]interest"; "Rule 15(c) has no application to these circumstances," the Receiver argues, "particularly given the specific direction that is provided by Chapter 15 of the Bankruptcy Code." *Id.* at 4.

However, the Receiver is mistaken. Rule 1001 of the Federal Rules of Bankruptcy Procedure provides that the rules of bankruptcy procedure apply to cases under the Bankruptcy Code. *See* FED. R. BANKR. P. 1001. Bankruptcy Rule 7025 provides that, subject to Bankruptcy Rule 2012, which the Court discusses below in the text, Federal Rule of Civil Procedure 25 applies in adversary proceedings. *See* FED. R. BANKR. P. 7025. And Bankruptcy Rule 1018 provides that Rule 7025, among others, applies to Chapter 15 cases. *See* FED. R. BANKR. P. 1018.

as a matter of substantive law. *See id.* at 655-56. In a federal question case, courts apply federal law to determine whether the action survives the event. *See id.* at 656.

There are numerous instances in American jurisprudence in which courts have substituted successor trustees for former trustees. For example, in the context of trusts and estates, "it is hornbook law that an action brought by a trustee 'is not ordinarily abated by his failure to continue in his office[;]' [w]hen a trustee party leaves office, 'an action is ordinarily revived in the name of the successor representative.'" *Corbin v. Blankenburg*, 39 F.3d 650, 653 (6th Cir. 1994). Based on this principle, courts have substituted successor ERISA trustees for their former counterparts. *See id.* (stating that nothing in ERISA statute suggests that civil action brought by ERISA trustee is personal to particular individual who held office upon filing suit). Additionally, the U.S. Bankruptcy Code provides that where a trustee dies, resigns, is removed, or otherwise ceases to hold office during the pendency of a case under the Code, his/her successor is automatically substituted as a party in the pending matter. FED. R. BANKR. P. 2012(b). Thus, these courts do not have a mootness issue because substantive law allows for the action to continue despite the shift in the original parties' interests. In other words, courts throughout the country rely on the legal fiction that a party's standing is not lost where substantive statutory law allows courts to substitute in a successor party. In this vein, the Court examines whether Chapter 15 of the Bankruptcy Code allows an action to proceed in this manner.[12]

---

[12]The Court acknowledges that mootness is a constitutional issue and that Congress cannot construct laws that expand the jurisdiction of the federal courts beyond the limits imposed by the Constitution. However, the Court is also mindful of the necessity of legal

Admittedly, the Court cannot decide the issue at hand solely based on the above jurisprudence because the Former Joint Liquidators were not trustees under United States law, but were rather "Foreign Representatives" under the Bankruptcy Code. However, the above jurisprudence informs the Court's substitution analysis by revealing (a) that courts may continue suits by substituting a new party in interest for a party who has lost an interest in the action if authorized by substantive law, and (b) that Congress' intention in cases involving trustees is to continue the suit by substituting the new trustee for the old.

Section 101(24) of the Bankruptcy Code defines a foreign representative as "a person or body, *including a person or body appointed on an interim basis,* authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24) (emphasis added). "The 'interim' appointment language was designed to accommodate insolvency systems which have a two stage process for commencement. [For example,] England and many of the British Commonwealth countries provide for interim or provisional fiduciaries

_____

fictions to deal with the practical needs of litigation. Such is the case here where a change in office could have the potential to negate three years of extensive briefing and hearings on the issue. To extinguish this possibility, courts have interpreted a party not to lose standing because of his/her removal from office. In a sense, courts – with the support of Congress – treat such suits as suits against/brought by an office, not an individual person. The Court will not disrupt this legal fiction because doing so would go against the weight of the caselaw, would cause impractical and inefficient results, and would go against the Supreme Court's doctrine of constitutional avoidance. *See, e.g., Hersh v. U.S. ex rel. Mukasey,* 553 F.3d 743 (5th Cir. 2008) (citing the doctrine of constitutional avoidance from several Supreme Court authorities). Thus, the Court goes on to analyze whether substantive bankruptcy law authorizes the non-abatement of Chapter 15 suits during a shift in a foreign representative office.

ORDER – PAGE 9

at the outset of a proceeding who almost always become permanent appointees." 8-1501 COLLIER ON BANKRUPTCY ¶ 1501.03 (16th ed. 2012). Because the Code does not guarantee an interim appointee fiduciary status past the interim period, the plain language of the Code indicates that Congress contemplated the possibility of having both a "former foreign representative" – the interim fiduciary – and a "successor foreign representative" – the fiduciary post-interim period. Further, Collier on Bankruptcy teaches that the U.S. analog of the interim foreign representative is the "interim trustee" under the Bankruptcy Code's section 303(g) prior to entry of an order for relief in an involuntary case or under section 701 in a liquidation case. *Id.* Chapter 3 of the Code governs U.S. interim trustees, *see* 11 U.S.C. § 322(a) (referring to trustees appointed under section 701),[13] and section 325 specifically states that "[a] vacancy in the office of trustee during a case does not abate any pending action or proceeding, and the successor trustee shall be substituted as a party in such action or proceeding," 11 U.S.C. § 325. Further, as discussed above, the Code specifically states that Federal Rule of Civil Procedure 25 applies to Chapter 15 cases, and, as the Joint Liquidators point out, Congress decidedly pointed Chapter 15 at recognizing foreign proceedings, not foreign representatives. *See generally* 11 U.S.C. § 1501, *et seq.*

Given all of the above and the fact that foreign representatives generally play the same role as trustees in U.S. bankruptcy proceedings – that of estate representatives – the Court is satisfied that Chapter 15 of the Bankruptcy Code provides the authority for an action to

---

[13]Interim trustees appointed under section 303(g) are appointed pursuant to section 701. *See* 11 U.S.C. § 303(g).

survive the removal of a foreign representative from office. Accordingly, the Court grants the Joint Liquidators' motion to substitute *nunc pro tunc*. The Court substitutes the Joint Liquidators as party Plaintiffs *nunc pro tunc* as of June 8, 2010.

### III. THE COURT GRANTS IN PART AND DENIES IN PART THE JOINT LIQUIDATORS' MOTION TO TAKE JUDICIAL NOTICE

The Joint Liquidators request that the Court take judicial notice of several items. The Court grants in part and denies in part the motion to the following extent: First, pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the filings and defenses raised in the Stanford MDL cases listed in Exhibit 1 to the Joint Liquidators' motion. Second, the Court declines to take judicial notice of the summary of defenses raised in the Stanford MDL cases, attached in chart form as Exhibit 2 to the Joint Liquidators' motion, because it is duplicative of what the Court has judicially noticed in Exhibit 1. Third, the Court takes judicial notice of the first two U.S. State Department publications listed in Exhibit 3 to the Joint Liquidators' motion, but declines to take judicial notice of the third U.S. State Department publication, as the hyperlink is non-functional. Lastly, the Court declines to take judicial notice of the various international organization and other commercial/media publications listed in Exhibit 4 to the Joint Liquidators' motion because they are publications that are subject to reasonable dispute.

### IV. THE COURT OVERRULES THE PARTIES' OBJECTIONS

At the hearing in December 2011, the Court reserved judgment on several evidentiary points and asked the parties to brief their objections. Based upon the parties' briefing, the Court overrules all objections.

The Joint Liquidators first object to various exhibits attached to the Receiver's expert witness Karyl Van Tassel's written direct testimony as irrelevant, lacking foundation/authentication, and hearsay. The Court is satisfied that Van Tassel's exhibits are admissible under Rule 703 to demonstrate what she relied upon to form her opinions. *See generally* FED. R. EVID. 703.[14]

The Joint Liquidators next object to various exhibits attached to the Receiver's written direct testimony as irrelevant, lacking foundation/authentication, hearsay, and unfairly prejudicial. In response to the hearsay objection, the Receiver argues that his exhibits are admissible as statements of a public office under Federal Rule of Evidence 803(8). *See* Receiver's Resp. to JLs' Objections 1-2 [161]. While the Court finds the Receiver's argument to be erroneous, it holds that the exhibits are admissible because they are relevant, do not lack foundation/authentication, their probative value substantially outweighs any prejudice to the Joint Liquidators, and are admissible as an exception to the hearsay rule under Rule 807. *See* FED. R. EVID. 807 (residual hearsay exception).[15]

---

[14]*See infra* note 57.

[15]*See* Tr. of Evidentiary Proceedings, Dec. 21, 2011, at 283-84 [hereinafter Hr'g Tr.] (Court overruling Joint Liquidators' objection to Receiver's testimony, stating "I'm going to admit this under the residual hearsay exception. I think this is very familiar or very similar to the exception for reports of governmental entities on conclusions they've reached in the discharge of their duties. And as the Receiver, Mr. Janvey has some obligations on behalf of the Court to sort through and try and determine what's been done and has devoted considerable time and money towards that end and I believe, under the residual exception, is entitled to testify regarding what conclusions he reached. In determining what, if any, weight I give to that, I will of course take into account the fact that this is kind of secondhand news coming from him. But I do think he's entitled to report to the Court his conclusions based on the work he's done as Receiver and the work the professionals on his behalf have

Next, the Joint Liquidators object to various portions of Stanford investor-victim Dr. John R. Wade's direct testimony as hearsay statements and under the best evidence rule. The Court holds that the alleged hearsay statements are not hearsay because the Receiver offered them to show the effect the statements had on Dr. Wade – that he *believed* SIB's headquarters was in the United States, not for the truth of the matter asserted – that SIB's headquarters *actually was* in the United States. The Court also overrules the Joint Liquidators' best evidence objection because the Receiver did not seek to prove the content of writings. *See generally* FED. R. EVID. 1002.

Lastly, the Joint Liquidators object to the December 20, 2011 letter from the Department of Justice to this Court as irrelevant and hearsay. The Court holds that the letter is relevant and admissible under the residual hearsay exception. *See* FED. R. EVID. 807.

The Court overrules the Receiver's objections for substantially the same reasons that it overrules the Joint Liquidators' objections. Moreover, the Court notes that, as the Receiver recognizes, the Court disregards any evidence that would otherwise be inadmissible.

### V. THE ANTIGUAN PROCEEDING IS A FOREIGN NONMAIN PROCEEDING

The Joint Liquidators ask the Court to recognize the Antiguan Proceeding as a foreign main proceeding. In the alternative, the Court may recognize the Antiguan Proceeding as a foreign nonmain proceeding[16] or decline to grant recognition at all.[17]

---

done and reported to him"). *See infra* note 57.

[16]Although the Receiver protests that the Joint Liquidators have requested that the Antiguan Proceeding be recognized only as a foreign main proceeding, the Court is free to consider foreign nonmain status because under the Code, foreign representatives apply to

ORDER – PAGE 13

### A. Chapter 15's Framework

Congress enacted Chapter 15 of the Bankruptcy Code via the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA") "so as to provide effective

mechanisms for dealing with cases of cross-border insolvency." *Ran IV*, 607 F.3d at 1020

(quoting 11 U.S.C. § 1501(a)). The Chapter's stated purpose is to incorporate the Model

Law on Cross-Border Insolvency into United States jurisprudence to ensure (a) cooperation

among courts and interested parties in different national jurisdictions, (b) greater legal

certainty for trade and investment, (c) fair and efficient administration of cross-border

insolvencies that protect the interests of all creditors and other interested entities, (d)

protection and maximization of the value of debtors' assets, and (e) facilitation of the rescue

of financially troubled businesses in order to protect investment and preserve employment.

*See* 11 U.S.C. § 1501.

Chapter 15 permits a representative in a foreign bankruptcy proceeding to petition a

U.S. court for recognition of the foreign proceeding under the Bankruptcy Code. *See Lavie*

*v. Ran (Ran I)*, 384 B.R. 469, 470 (S.D. Tex. 2008); 11 U.S.C. § 1515. In order for a court

---

U.S. courts "for recognition," and U.S. courts then make the determination as to what kind of recognition to grant if they determine that recognition is warranted under Chapter 15. *See* 11 U.S.C. § 1515(a) ("A foreign representative applies to the court *for recognition* of a foreign proceeding . . . ." (emphasis added)); *id.* at § 1517(b) ("Such foreign proceeding shall be recognized – (1) as a foreign main proceeding . . . ; or (2) as a foreign nonmain proceeding . . . .").

[17]*See generally* Daniel M. Glosband, *SPhinX Chapter 15 Opinion Misses the Mark*, AM. BANKR. INST. J. 44, 45 (Dec./Jan. 2007) (coauthor of the model act on which Chapter 15 is based explaining Chapter 15 framework in detail).

to recognize a foreign proceeding, (a) it must be a foreign main proceeding or a foreign nonmain proceeding, (b) the foreign representative must be a person or body, and (c) the petition must meet the requirements of section 1515.[18]  *See* 11 U.S.C. § 1515.  A foreign proceeding is a collective judicial or administrative proceeding in a foreign country under a law relating to insolvency or adjustment of debt where the debtor's assets and affairs are subject to control or supervision by a foreign court for the purpose of reorganization or liquidation.  11 U.S.C. § 101(23).  Chapter 15 distinguishes a main proceeding from a nonmain proceeding as follows: the former is pending in the country where the debtor has its center of main interests ("COMI"), whereas the latter is pending in a country where the debtor merely has an establishment.  *See* 11 U.S.C. § 1502.

Notwithstanding the above, a U.S. court may not recognize a foreign proceeding at all "if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  This exception, however, "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States."  *Ran IV*, 607 F.3d at 1021.  "[C]hapter 15 contemplates recognition of not more than one main proceeding and any combination of nonmain proceedings for the same debtor."  *In re British*

---

[18]The petition must be accompanied by (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative, (2) a certificate from the foreign court affirming the existence of the foreign proceeding and the appointment of the foreign representative, or (3) in the absence of evidence under the above prongs, any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.  The petition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor of which the foreign representative is aware, and the above-referenced documents shall be translated into English.  11 U.S.C. § 1515.

*Am. Ins. Co. Ltd.*, 425 B.R. 884, 908 (Bankr. S.D. Fla. 2010); *see also In re Chiang*, 437 B.R. 397, 399 (Bankr. C.D. Cal. 2010) (holding that debtor can only have one COMI and therefore only one main proceeding).

If the U.S. court recognizes the foreign proceeding – subject to any limitations it may impose consistent with Chapter 15's policy – the foreign representative gains the capacity to sue and be sued in United States courts and the authority to apply directly to a U.S. court for other appropriate relief. *See* 11 U.S.C. § 1509; *Ran I*, 384 B.R. at 470 (quoting *Iida v. Kitahara (In re Iida)*, 377 B.R. 243, 257 (B.A.P. 9th Cir. 2007)). If the court grants recognition as a foreign main proceeding,

> (a) the automatic stay under Bankruptcy Code section 362 (as well as the creditors' right to adequate protection and relief from the automatic stay under sections 361 and 362(d) of the Bankruptcy Code) applies with respect to the debtor and its property within the territorial jurisdiction of the United States, (b) sections 363, 549 and 552[19] of the Bankruptcy Code apply to restrict the ability to transfer such property absent court approval, and (c) unless the court orders otherwise, the foreign representative may operate the debtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and 552.

*In re SPhinX, Ltd. (SPhinX I)*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006); *see* 11 U.S.C. § 1520.

Such relief does not automatically accompany recognition as a foreign nonmain proceeding. Rather, for foreign nonmain proceedings, the court has the *discretion* to order "appropriate relief" including (a) staying the commencement or continuation of actions

---

[19]One court has noted that the reference to section 552 is a typographical error, stating that the legislative history reveals that the text should have referred to section 542. *See Chiang*, 437 B.R. at 402 n.13.

concerning the debtor and its assets; (b) suspending the right to transfer, encumber, or

otherwise dispose of the debtor's assets; (c) granting the authority to examine witnesses, take

evidence, or deliver information concerning the debtor; (d) granting the authority to

administer or realize the debtor's assets; and (e) granting any additional relief available to

a U.S. trustee with certain exceptions. *See* 11 U.S.C. § 1521. Such discretionary relief is

additionally available to foreign main proceedings.

On the other hand, if a court denies recognition, it may issue "any appropriate order

necessary to prevent the foreign representative from obtaining comity or cooperation from

courts in the United States." 11 U.S.C. § 1509. Thus, "a decision as to recognition is a

serious matter." *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 45 (Bankr. S.D.N.Y.

2008).

### B. The Antiguan Proceeding Satisfies Chapter 15's Procedural Requirements

The Antiguan Proceeding meets Chapter 15's preliminary requirements for

recognition. First, it is a "foreign proceeding" because it is collective,[20] judicial, in a foreign

---

[20]Courts have interpreted the term "collective" to mean "one that considers the rights
and obligations of all creditors." *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev.
2009). In other words, the action must have been "instituted for the benefit of creditors
generally rather than for a single creditor or class of creditors." *British Am. Ins. Co. Ltd.*, 425
B.R. at 902; *see also In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *4 (Bankr.
S.D.N.Y. 2011) ("The notion of a 'collective' insolvency proceeding is based on the ability
of a single insolvency representative to control the realization of assets for the purposes of
pro rata distribution among all creditors (subject to domestic statutory priorities), as opposed
to a proceeding designed to assist a particular creditor to obtain payment or a process
designed for some purpose other than to address the insolvency of the debtor.").
The Joint Liquidators are correct in pointing out that specific provisions of the
Antiguan International Business Corporation Act ("IBCA"), which governs the Antiguan
Proceeding, highlight the collective nature of liquidations under it. *See, e.g.*, 105-2, IBCA

country, under a law relating to insolvency,[21] and the debtor's assets and affairs are subject to supervision by a foreign court for the purpose of liquidation. *See* 11 U.S.C. § 101(23). Next, the Joint Liquidators are "person[s]." *See* 11 U.S.C. 1515. And finally, the petition meets the requirements of section 1515.[22] *See id.* Accordingly, the Court proceeds to analyze whether the Antiguan Proceeding satisfies the Code's substantive recognition requirements.

### C. The Stanford Entities' COMI is Not in Antigua

---

§§ 286, 289. The Joint Liquidators are further correct in noting that the JL Appointment Order states that the proceeding is "a collective insolvency proceeding intended to marshal in and recover all assets and value owned by, or owed to, [SIB]," and that "[a]ll creditors, depositors and investors in [SIB] shall have the right to seek to prove [their claims] in the estate of [SIB] no matter where such parties are resident or located in the world." 106-4, at 6. Although admittedly the Antiguan Proceeding is only concerned with SIB creditors and investors rather than those of *all* the Stanford Entities, the Court believes that it is still collective under Chapter 15 because it is the type of proceeding to which the Chapter was intended to apply.

The Court notes language in other U.S. court opinions that contrasts a collective proceeding to a receivership, which they state is non-collective. *See, e.g., Betcorp,* 400 B.R. at 281. However, those courts describe receiverships as "remed[ies] instigated at the request, and for the benefit, of a single secured creditor." *Id.* This is not the type of receivership in place here. Rather, the Court instituted this Receivership at the request of the SEC for the benefit of all Stanford Entities' investor-victims and creditors. Thus, although the Court does not need to find that the Receivership is collective in nature, it does so.

[21]The IBCA. *See supra* note 20.

[22]The petition for recognition is accompanied by a certified copy of the decision commencing the foreign proceeding and appointing the Former Joint Liquidators, *see* discussion *supra* Part II (substituting Joint Liquidators as plaintiffs for Former Joint Liquidators), a statement identifying all foreign proceedings with respect to SIB of which the Former Joint Liquidators were aware, *see* Decl. of Nigel Hamilton-Smith in Supp. of Pet. Recogn. Foreign Main Proceeding Pursuant to Ch. 15 of Bankr. Code 16 [3], and the above-referenced documents are in English. *See* 11 U.S.C. § 1515.

ORDER – PAGE 18

The principal issue in dispute between the parties is whether SIB's COMI is in Antigua. If so, the Court must grant the Antiguan Proceeding foreign main recognition, but if not, the Court must determine whether SIB has an establishment in Antigua, which would lead the Court to grant foreign nonmain recognition.

### 1. The Court Aggregates the Stanford Entities for COMI Purposes. – At the outset,

the Court must determine whether to aggregate the Stanford Entities. The Receiver contends that because SIB was but one of many entities in Stanford's elaborate Ponzi scheme,[23] the Court's COMI analysis should center on the aggregated Stanford Entities. As the SEC expands,

> SIB was window dressing, part of an effort to mask from United States regulatory scrutiny the massive securities fraud Stanford and others orchestrated from the United States. The law does not give effect to legal trappings that are designed for a fraudulent purpose, and, therefore, Stanford's operations should be viewed in their entirety.

SEC's First Suppl. Opp'n to Pet. Recogn. Pursuant to Ch. 15 Bankr. Code 1-2 [59]. In response, the Joint Liquidators argue that the issue of aggregation is not ripe for review because the Receiver has not moved to substantively consolidate the Stanford Entities in the

---

[23]The Court has previously stated that Stanford operated a Ponzi scheme. *See, e.g.,* Order, Mar. 31, 2011 [1310], *in* SEC Action ("The Court previously determined that the Stanford Defendants operated a Ponzi scheme." (citing Order Granting Prelim. Inj., June 10, 2010 [456], *in Janvey v. Alguire*, Civil Action No. 3:09-CV-0724 (N.D. Tex. filed Apr. 20, 2009), *aff'd*, 628 F.3d 164 (5th Cir. 2010))). Although the Court acknowledges that it may have been inconsistent in recent orders by sometimes referring to the scheme as an "alleged Ponzi scheme," *see, e.g.,* Order Denying Stanford's Mot. Dismiss, at 13 ("Stanford's alleged Ponzi scheme spanned at least a decade an involved myriad actors and entities largely owned or controlled by Stanford."), the Court here clarifies that it holds that Stanford operated a Ponzi scheme.

SEC Action, that the language of Chapter 15 contemplates a single entity, and that aggregation is not in the best interests of Stanford's victims and creditors. *See* Joint Liquidators' Resp. in Opp'n to Suppl. Briefs by Receiver Parties to Pet. Recogn. Pursuant to Ch. 15 Bankr. Code 11-13 [120] [hereinafter JL Resp. to Suppl. Briefs].

It is axiomatic that a corporation is a legal entity existing separate and apart from the persons composing it and entities related to it. However, courts equally accept that they should disregard the corporate form where that form was the means to a subversive end. *See, e.g.*, 18 AM. JUR. 2D *Corporations* § 46 (2012). Indeed, the Fifth Circuit has applied corporate disregard doctrines in numerous instances, including to determine principal place of business. *See, e.g., Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290-91 (5th Cir. 1989); *J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 412-13 (5th Cir. 1987) (stating that courts cannot apply alter ego doctrine to impute parent company's principal place of business to subsidiary in effort to avoid diversity jurisdiction, but that "a corporation may, through consolidation with another entity or the alter ego doctrine, *gain* additional places of citizenship" and stating that "a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists . . . . We therefore consider substance over form in determining the nerve center"); *Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 557 (5th Cir. 1985) ("[C]ourts will not permit themselves to be blinded or deceived by mere forms of the law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." (quoting *Chi., Milwaukee, & St. Paul Co.*

*v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501 (1918))); *cf. Frazier v. Ala. Motor Club, Inc.*, 349 F.2d 456, 460 (5th Cir. 1965) (imputing nondefendant parent corporation's situs of "doing business" for venue purposes to defendant subsidiary corporations because subsidiaries were not actually separate corporate entities).

Other circuits agree that courts should disregard formal separateness for principal place of business purposes where facts warrant piercing the corporate veil. *See, e.g., Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 61-63 (1st Cir. 1993); *Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 775 (9th Cir. 1992) ("The only recognized exception to [the rule that courts look to the principal place of business of the subsidiary] is where the subsidiary is the alter ego of the parent corporation."); *Fritz v. Am. Home Shield Corp.*, 751 F.2d 1152, 1153 (11th Cir. 1985) ("Determining a corporation's principal place of business may require a complex analysis of business relationships among a hierarchy of corporate entities, an inquiry sometimes necessitating the use of an alter ego theory."); *see also Leach Co. v. Gen. Sani-Can Mfg. Corp.*, 393 F.2d 183, 186 (7th Cir. 1968) (personal jurisdiction);[24]

---

[24]The Fifth Circuit has held that rationales for piercing the corporate veil in personal jurisdiction cases apply with equal force to diversity analyses. *Freeman*, 754 F.2d at 557-58 ("Although these cases refer to *in personam* rather than subject matter jurisdiction, their rationale applies with equal force to the latter. Indeed, it would be irrational to hold that a parent and a subsidiary have been refused for purposes of *in personam* jurisdiction, but remain separate for purposes of subject matter jurisdiction. Recognizing fusion as fusion for all jurisdictional purposes makes good sense . . . ." (internal citations omitted)).

13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3625, at 127-31, 134 (3d ed. 2009).[25]

It is appropriate to extend these corporate disregard doctrines to the Chapter 15 context. First, the COMI analysis is essentially a principal place of business analysis. *See, e.g., In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010), *aff'd*, 2011 WL 4357421 (S.D.N.Y. 2011); *British Am. Ins. Co.*, 425 B.R. at 908-09; *Basis Yield*, 381 B.R. at 48; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns II)*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd, In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns III)*, 389 B.R. 325 (S.D.N.Y. 2011); *In re Tri-Cont'l Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006). As such, federal principal place of business doctrines should apply.[26] Second, two other Chapter 15 cases applied corporate disregard doctrines to their COMI analyses. *See In re Ernst & Young, Inc.*, 383 B.R. 773, 780-81 (Bankr. D. Colo. 2008) (2008) ("While not making a final determination on the issue [of alter ego], the Court finds, based on the evidence presented,

---

[25]Although most courts agree that piercing the corporate veil is appropriate only to add an additional state of citizenship in order to destroy diversity, *see, e.g., Panalpina Welttransport GMBH v. Geosource, Inc.*, 764 F.2d 352, 354-55 (5th Cir. 1985), this requirement centers on an interpretation of 28 U.S.C. § 1332, which is inapplicable here.

[26]The Former Joint Liquidators argued that piercing the corporate veil is inappropriate where the party advocating piercing does not seek to hold the parent liable. *See, e.g.*, Antiguan Liquidators' Second Supplemental Br. Supp. of Their Pet. Recogn. Pursuant to Ch. 15 of U.S. Bankr. Code 17-18 [55] [hereinafter Former JL 2nd Suppl. Br.]. However, as just discussed, courts pierce corporate veils for other purposes, such as to determine principal places of business.

there is a reasonable probability [company 1] and [company 2] were operated as one for purposes of perpetrating a fraud on investors.");[27] *British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. at 721-22 (court considered veil-piercing issue in its Chapter 15 COMI analysis but did not pierce veil because of lack of evidence).

Finally, it would defy logic and run afoul of equity to treat a fictitious corporation as a real entity for Chapter 15 purposes. The purpose of Chapter 15 recognition is to determine the jurisdiction that is most closely associated with the debtor entity; disallowing corporate disregard doctrines would proliferate recognition of foreign proceedings that have no real or rightful interest in liquidating the real estate. Proliferating corporate fictions in the Chapter 15 context would also protect sinister characters such as Ponzi schemers who may target offshore jurisdictions to run their fraudulent empires.[28] Thus, the Court holds that corporate disregard doctrines apply in the Chapter 15 context.[29]

---

[27]Notably, the alter ego finding in *Ernst & Young, Inc.* was largely overlooked in subsequent treatises, law reviews, and legal periodicals, seemingly indicating that it was uncontroversial. The subsequent literature instead focused on the court's public policy exception analysis.

[28]Indeed, the truth of Stanford's scheme belies the Former Joint Liquidators' argument that veil piercing is not available here because it is not "necessary to prevent an injustice," *see* Former JL 2nd Suppl. Br. 18. Not aggregating the entities, in this instance, would perpetuate an injustice.

[29]The Joint Liquidators' argument that the statutory language's use of the singular throughout the Chapter bars corporate disregard doctrines, *see, e.g.*, JL Resp. to Suppl. Briefs 12, holds no water. The Court concedes that Chapter 15 refers to a debtor as an "entity," and not "entities." *See* 11 U.S.C. § 1502. However, the Court is fairly certain that Chapter 15 is also meant to apply to *real* entities and not *fictitious* entities. It would be absurd to implement a law that would encourage U.S. courts to cooperate with foreign proceedings directed at fanciful organizations. The Court will not engage in semantics that obfuscate the

Courts have explained that piercing the corporate veil for jurisdictional purposes is unwarranted in many instances, even where the corporate separation between a parent and a subsidiary is merely formal. The key is whether the corporate entities maintained their separate natures – that makes the separation "real" for jurisdictional purposes. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335-37 (1925) (personal jurisdiction). For diversity purposes, courts consider such factors as the degree of control by the parent corporation, the relationship of the activities of the subsidiary to the activities of the parent, the overlap in membership of the board of directors, and the maintenance of separate corporate books. WRIGHT, MILLER & COOPER, *supra* at 135. This Court has previously applied that standard, *see Burnside v. Sanders Assocs.*, 507 F. Supp. 165, 166 (N.D. Tex. 1980) (Hill, J.), *aff'd,* 643 F.2d 389 (5th Cir. 1981), although it later applied a more minimalist standard, stating that veil piercing depended upon "the existence on paper of the two entities, and whether they kept separate books of accounting." *See Bennett v. Steak 'N Shake Operations, Inc.*, 2010 WL 2400160, at *1 (N.D. Tex. 2010) (Lynn, J.) (discussing *Amarillo Oil Co. v. Mapco, Inc.*, 99 F.R.D. 602, 606 (N.D. Tex. 1983) (Robinson, J.)).

---

purpose of the statute.

    In further support of their argument that aggregation is inappropriate in the Chapter 15 context, the Joint Liquidators point to *Fairfield Sentry Ltd.*, 440 B.R. 60, where the court granted recognition to a feeder fund established as an investment vehicle in the Madoff Ponzi scheme. The Court finds it surprising that the parties in that case were silent regarding the effect the Ponzi scheme may have had on the debtor's COMI. However, the Court is not persuaded that the absence of veil-piercing analysis in that case should influence its decision here.

ORDER – PAGE 24

Jurisdictional veil-piercing is substantively different from veil piercing for nonjurisdictional purposes. For example, in nonjurisdictional contexts, the Court pierces the corporate veil where the owner is "using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968) (quoting *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 202 (Tex. 1962)).[30] "There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984) (quoting *Hanson Sw. Corp. v. Dal-Mac Constr. Co.*, 554 S.W.2d 712 (Tex. App. – San Antonio 1966, writ ref'd n.r.e.)) (italics omitted). Indeed, in tort cases, the party seeking to pierce the corporate veil must show that the subsidiary "is organized and operated as a mere tool or business conduit of [its parent] corporation," *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986), *superseded in part on other grounds by* TEX. BUS. CORP. ACT art. 2.21 *as recognized in W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994),[31] so that "there exists such unity between [the two corporations] that [they] cease[] to

---

[30]Federal common law and state law regarding the corporate disregard doctrines are substantively the same, *see United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 690 n.6 (5th Cir. 1985), so the Court recites the Texas standard as the law of the forum.

[31]On January 1, 2010, the Texas Business Corporation Act art. 2.21 was recodified as the Texas Business Organizations Code §§ 21.223-21.226. Via these provisions, in 1989 the Texas legislature abrogated *Castleberry* to the extent that veil-piercing analysis now requires a showing of actual fraud in cases involving a corporation's contractual obligations. *See, e.g., Acceptance Indem. Ins. Co. v. Maltez*, 619 F. Supp. 2d 289, 301 (S.D. Tex. 2008)

be separate," *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (citing

*Castleberry*, 721 S.W.2d at 272). And in contract cases, courts require a showing of actual

fraud. *See* TEX. BUS. ORGS. CODE § 21.223(b); *see also* discussion *supra* note 31.

Ultimately, under substantive veil-piercing analyses, alter ego liability is appropriate where

"holding only the [subsidiary] corporation liable would result in injustice." *SSP Partners v.

Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (quoting *Castleberry*, 721

S.W.2d at 272).

Regardless of the standard the Court employs, the Court is of the opinion that the

evidence supports piercing SIB's corporate veil. First, the Court takes judicial notice that on

March 6, 2012, a jury in Houston, Texas convicted Stanford of four counts of wire fraud, one

count of conspiracy to commit wire and mail fraud, five counts of mail fraud, one count of

conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding,

and one count of conspiracy to commit money laundering, all related to his Ponzi scheme.[32]

---

(discussing the Texas legislature's response to *Castleberry*).

[32]Specifically, the jury convicted Stanford of: (1) Count 1: conspiring to commit wire
fraud and mail fraud by soliciting and obtaining billions of dollars of investors' funds
through false pretenses, representations, and promises, all in order to obtain substantial
economic benefits for himself and others through the payment of fees, wages, bonuses, and
other monies, and unauthorized diversions, misuse, and misappropriation of funds; (2) Count
3: sending wire transfer of approximately $2.9 million from Stanford Financial Group
("SFG") account in Switzerland to Stanford's personal checking account; (3) Count 4:
sending wire transmission of approximately $700,000 from Stanford Group Company
("SGC") account in Houston, Texas to SIB account in Houston, Texas regarding an
investor's purchase of SIB CDs; (4) Count 5: sending email from Mark Kuhrt, Global
Controller of SFG Global Management, to Gilberto Lopez, Chief Accounting Officer for
SFG, in Houston, Texas, attaching a spreadsheet concerning artificial "roundtrip" real estate
transaction to transfer interests in island properties back to SIB; (5) Count 6: sending email

*See* Verdict [808] *in United States v. Stanford.* The District Court for the Southern District of Texas issued a final judgment in that case on June 14, 2012. *See* Judgment [878] *in United States v. Stanford.* Further, this Court has previously recognized that Stanford and his affiliates operated as one,[33] and there is substantial evidence in the record in this action to support that finding.

The evidence demonstrates that SIB was nothing like a typical commercial bank. Although it officially offered six deposit products,[34] it had one principal product line –

---

from Stanford to SFG employees in Houston, Texas; Memphis, Tennessee; and elsewhere, representing that SIB "remains a strong institution" and that he had recently made "two capital infusions" into the bank; (6) Counts 7-11: sending packages of documents, including investor subscription information, from SGC in Houston, Texas, to SIB in Antigua; (7) Count 12: conspiring to corruptly influence, obstruct, and impede the SEC's investigation of SFG, including the SEC's efforts to ascertain SIB's true financial condition and the content and value of SIB's investment portfolio, all in an effort to, among other things, perpetuate and prevent detection of an ongoing fraud and continue receiving economic benefits from the fraud; (8) Count 13: obstructing the SEC investigation; and (9) Count 14: conspiring to commit money laundering by causing the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts located in the Southern District of Texas and elsewhere in the United States to various bank accounts located outside of the United States.  Superseding Indictment [422], May 4, 2011, *in United States v. Stanford,* Criminal Action No. 4:09-CR-00342-001 (S.D. Tex. 2012) [hereinafter *United States v. Stanford*].

[33]*See, e.g.*, Order Granting Receiver's Mot. Summ. J., June 22, 2011, at 56 [109] *in Janvey v. Dem. Senatorial Campaign Comm., Inc.*, Civil Action No. 3:10-CV-0346-N (2011) ("The evidence further demonstrates that the Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive, source of funding was derived from SIB CDs . . . ."); Order Denying Stanford's Mot. Dismiss, Nov. 30, 2011, at 13 [1483] *in* SEC Action ("Stanford's alleged Ponzi scheme spanned at least a decade and involved myriad actors and entities largely owned or controlled by Stanford.").

[34]Beverly Jacobs, SIB's Vice President of Customer Support, testified that SIB offered three types of CDs and three types of accounts, as well as credit card services, loan facilities, letters of credit, letters of guarantee, and private banking services. 110-1, at 13, 18-23; Hr'g

certificates of deposit ("CDs") – and one principal source of funds – customer deposits from CD purchases. 115-1, at 7; *see also* 107-1, at 11. Although SIB did invest some proceeds from CD sales, the amount it invested was grossly inadequate to cover redemptions or interest payments to investors and was far less than the amount it represented that it invested to customers and the public. 115-1, at 9. SIB had been insolvent since at least 1999 and remained in business by operating as a Ponzi scheme. *See* 115-1, at 7. In other words, SIB relied on the proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors. *See id.*

Stanford was the sole owner, directly or indirectly, of more than 130 separate Stanford Entities, including SIB, in more than 14 countries. *See id.* at 7; 62, at 10-13. The Stanford Entities comprised a single financial services network referred to as SFG. *See* 115-1, at 7. As to SIB specifically, Stanford owned 100% of Stanford Bank Holdings Limited, which in turn owned 100% of SIB. *See* 62, at 12. Funds from the Stanford Entities, consisting primarily of CD proceeds, *see* 115-3, at 8, almost exclusively comprised Stanford's reported income from at least 1999 onward. *See* 115-1, at 7. Stanford controlled the Stanford Entities with substantial assistance from James Davis, Chief Financial Officer ("CFO") of Stanford Financial Group Company ("SFGC") and SIB, and Laura Pendergest-Holt, Chief Investment Officer ("CIO") of SFGC. *Id.*

The evidence demonstrates that Stanford, Davis, and Pendergest-Holt provided misinformation regarding SIB's investment strategy, earnings, and safety to financial

---

Tr. 92.

ORDER – PAGE 28

advisors at various Stanford Entities, who then used it to induce customers to purchase CDs. *See id.* at 8; *see also* 21-3, at 5. Davis determined bank earnings monthly, artificially pegging the amount at the number necessary to give the Bank an acceptable financial performance and capital ratios. 115-1, at 14.

Although in many instances Stanford and others doctored SIB's paperwork to look reassuringly like the paperwork of a real financial institution,[35] the reality is that SIB did not observe corporate formalities in all respects. For example, the SIB CD proceeds did more than just keep the bank afloat. Stanford Entities and Stanford himself received large disbursements of the proceeds. *Id.* at 9, 32-33. The evidence demonstrates, for instance, that SIB made a $1.8 billion loan payment to Stanford. *Id.* at 14; 107-1, at 19. Additionally, there were a number of material related-party transactions that SIB did not disclose in its annual financial statements. For example, a Stanford Entity would acquire real estate assets, and it would later transfer those assets among the SFG network entities, recorded at several times their original value without any evidence of capital improvements or independent appraisal. *See* 115-1, at 14, 32. Additionally, the Court notes that both the Former Joint Liquidators and the current Joint Liquidators were in agreement that Stanford operated all

---

[35]The Joint Liquidators state that "SIB entered into contracts with a number of Stanford-related entities for the provision of services, including certain oversight, marketing, investment and financial advisory, and treasury and accounting functions, and for customer, referral based services. These contracts were used as a mechanism to remove funds from SIB." New Joint Liquidators' Proposed Findings of Fact & Concs. of Law With Respect to Pet. Recogn. Pursuant to Ch. 15 U.S. Bankr. Code 23 [154] [hereinafter JL Proposed Facts & Law] (citing 106-1, at 24-26; 115-1, at 20-21; Hr'g Tr. 44-45, 131, 178). Joint Liquidator Wide also testified that the contracts "certainly weren't between arm's length parties. They were certainly related parties, yes." Hr'g Tr. 44.

ORDER – PAGE 29

of the Stanford Entities as a Ponzi scheme. 15, at 2 (Former JL Hamilton-Smith's affidavit

stating "Although I do not dispute that SIB and other Stanford entities were likely engaged

in a Ponzi scheme – indeed, my own findings to date are consistent with that allegation – I

take issue with the assertion that the companies in the Stanford group were in fact operating

as a single entity, at least so far as SIB is concerned."); Hr'g Tr. 38-39 (JL Wide stating that

on August 11, 2011 he certified to the Antiguan Court that "SIB operated a business model

which was a Ponzi scheme"); *id.* at 114-15 (JL Wide stating that he had not withdrawn or

amended the above statement); *id.* at 142 (JL Dickson testifying that he "hesitate[s] to use

the word 'Ponzi scheme' simply because [he] do[es] not] think it's a defined term" but stating

that he's "already agreed that the vast majority of – of the activity appears to be fraudulent

and new monies are used to pay existing depositors").[36]

---

[36]During the hearing, Joint Liquidator Wide attempted to backtrack from his previous
statement that SIB was run as part of a Ponzi scheme:
> A. [JL Wide:] As our investigations have continued and we've tracked the
> flow of funds and we've looked at how money was removed from control of
> the depositor, if you like, it became clear to me that the funds were being
> stripped out of SIB, partly through those contracts that were spoken about
> earlier and partly by simply removing them, putting them into other Stanford
> entities and then onwards for the benefit of either Mr. Stanford or other
> persons unknown.
> Q. [Receiver's counsel:] And how is that different than a Ponzi scheme?  Why
> did you make that distinction?
> A. From our view, it looked like the bank's money was being stolen rather
> than the bank was running a Ponzi itself.

Hr'g Tr. 90.
> Q. Are you telling this Court that since August of 2011 when you signed a
> claim saying SIB was run under a business model that was a Ponzi scheme,
> you have changed your mind and come to a different conclusion in the last 90
> days and it's – and concluded it's not a Ponzi scheme?
> A. I'm concluding there was a fraud committed, yes. And I'm concluding that,

Further, SIB's purported president, Juan Rodriguez-Tolentino, had an extremely limited role at the bank – Rodriguez-Tolentino had no control over the control, trajectory, or investment of SIB's funds, 115-1, at 27; Hr'g Tr. 181 (Jacobs stating that she believed that Rodriguez-Tolentino had no power to "free up" SIB funds to meet backlog of customer demand for their money); he referred all questions regarding SIB to Pendergest-Holt and Davis at SFG, *see* 115-1, at 27-29; his only role in the sale of CDs was to present slideshows, provided by Stanford, about SIB to potential large investors, *see id.* at 27; and he has described himself as Stanford and Davis's "puppet," in charge of only administrative tasks such as day-to-day management of basic operations, system account reviews, SIB client accounts, and customer service. *See id.* at 26-29. And, although SIB employed approximately ninety people, the evidence demonstrates that employees of other Stanford Entities largely ran SIB, as its employees[37] had no authority to make any significant managerial decisions and no access to SIB's records of investment values and income. *See id.* at 10, 15, 18, 22. Besides, the Court questions whether ninety employees could sufficiently operate a multibillion dollar bank. *See id.*

---

for SIB's point of view, its money was stolen through these variety of contracts and sometimes just outright stolen by Mr. Stanford, yes, or his other companies.

Q. Have you taken any steps to withdraw or amend your statement under oath to the Antiguan [C]ourt stating that SIB operated a business model that was a Ponzi scheme?

A. Not as yet, no.

*Id.* at 114-15.

[37]Other than James Davis.

In attempting to speak against this overwhelming evidence, the Joint Liquidators argue that the Court should instead analyze the Receiver's aggregation request as a request to substantively consolidate the Stanford Entities and that the Receiver has failed to meet the requisite showing for substantive consolidation. *See, e.g.*, JL Proposed Fact & Law 66-68. However, the Joint Liquidators' argument lacks merit.

First, substantive consolidation is inapplicable. Substantive consolidation is a mechanism for administering the bankruptcy estates of multiple, related entities. *See In re Babcock & Wilcox Co.*, 250 F.3d 955, 958 (5th Cir. 2001). This seems to presuppose that the entities to be consolidated are already in bankruptcy proceedings. Here, the only entity in a bankruptcy proceeding is SIB in Antigua. The remainder of the entities are subject to an equitable receivership – not a bankruptcy. Thus, substantive consolidation is impossible under these facts, so veil-piercing is the applicable doctrine. *See Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co., Inc.)*, 482 F.3d 319, 327 (5th Cir. 2007) (holding that bankruptcy judge's order did not substantively consolidate three juridical persons because two of the persons had not been placed into bankruptcy).[38]

_____

[38]The Court notes that some courts have held that they can order consolidation of a debtor with a nondebtor. *See* 2-105 COLLIER ON BANKRUPTCY ¶ 105.09 (16th ed. 2012). Indeed, courts are split on this issue. *See, e.g., In re Pearlman (Pearlman II)*, 462 B.R. 849, 854 (Bankr. M.D. Fla. 2012) (noting split and refusing to substantively consolidate debtor entities with nondebtor entities); *Kapila v. S&G Fin. Servs., LLC (In re S&G Fin. Servs. of S. Fla., Inc.)*, 451 B.R. 573 (Bankr. S.D. Fla. 2011) (noting that only the Ninth Circuit has substantively consolidated debtor entities with nondebtor entities). Although the Fifth Circuit has held in at least one instance that it is inappropriate to do so, *see Peoples State Bank*, 482 F.3d at 327, one court in this Circuit has held that substantive consolidation of debtor entities with nondebtor entities is appropriate where the nondebtors are the debtor's alter egos, *see Roberts v. Bass & Assocs., Inc. (In re Bass)*, 2011 WL 722384 (Bankr. W.D.

If substantive consolidation were appropriate between a debtor and nondebtor, however, the Receiver's showing would warrant it. Although courts have not developed a universally accepted standard for substantive consolidation, they frequently consider the following factors: (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (2) the presence or absence of consolidated financial statements, (3) the profitability of consolidation at a single physical location, (4) the commingling of assets and business functions, (5) the unity of interests and ownership between the various corporate entities, (6) the existence of parent and intercorporate guarantees on loans, (7) the transfer of assets without formal observance of corporate formalities, and (8) whether other remedies, such as the doctrines of alter ego and fraudulent conveyance, are available.[39] *In re E'Lite*

---

Tex. 2011); *see also Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964) (substantively consolidating debtor with nondebtor); *Helena Chem. Co. v. Circle Land & Cattle Corp. (In re Circle Land & Cattle Corp.)*, 213 B.R. 870, 876 (Bankr. D. Kan. 1997) (collecting cases but ultimately refusing to substantively consolidate debtor with nondebtor). And "[i]n circumstances that would justify piercing the corporate veil, . . . courts have also substantively consolidated the assets and liabilities of the nondebtor shareholder with the estate of the debtor subsidiary where the misconduct has been sufficiently egregious." 2-105 COLLIER ON BANKRUPTCY, *supra*.

[39]*See also In re AHF Dev't, Ltd.*, 462 B.R. 186, 195-96 (Bankr. N.D. Tex. 2011) (Jones, Bankr. J.) (providing a comprehensive list of factors: "the presence or absence of consolidated financial statements; the unity of interests and ownership between the various corporate entities; the existence of parent and intercorporate guaranties on loans; the degree of difficulty in segregating and ascertaining individual assets and liabilities; the transfer of assets without formal observance of corporate formalities; the commingling of assets and business functions; the profitability of consolidation at a single physical location; parent corporation owns all or a majority of the capital stock of the subsidiary; parent and subsidiary have common officers and directors; parent finances subsidiary; parent is responsible for incorporation of subsidiary; subsidiary has grossly inadequate capital; parent pays salaries, expenses, or losses of subsidiary; subsidiary has substantially no business except with parent; subsidiary has essentially no assets except for those conveyed by parent; parent refers to

ORDER – PAGE 33

*Eyewear Holding, Inc.*, 2009 WL 349832, at *3 (E.D. Tex. 2009) (citing *Wells Fargo Bank*

*of Tex., N.A. v. Sommers*, 444 F.3d 690, 697 n.5 (5th Cir. 2006); *In re Permian Producers*

*Drilling, Inc.*, 263 B.R. 510, 518 (W.D. Tex. 2000); and *In re Vecco Indus., Inc.*, 4 B.R. 407

(Bankr. E.D. Va. 1980)). Many of these factors overlap with the veil-piercing considerations

discussed above.[40]

To put it shortly: (1) as a Ponzi scheme, all assets and liabilities are difficult to

segregate and ascertain, (2) the absence of consolidated financial statements matters not

because Stanford and/or his associates doctored the financial statements, (3) it makes

economic sense to consolidate the entities, *see* Hr'g Tr. 255, (4) commingling of funds

among the Stanford Entities was the norm, (5) Stanford directly or indirectly owned all

---

subsidiary as department or division of parent; directors or officers of subsidiary do not act
in interests of subsidiary, but take directions from parent; formal legal requirements of the
subsidiary as a separate and independent corporation are not observed; the transfer of assets
without formal observance of corporate formalities;" and noting the different substantive
consolidation tests).

[40]*But cf. In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005) (noting that veil
piercing and substantive consolidation doctrines have subtle differences).

For examples of cases where courts have substantively consolidated the estates of
entities involved in Ponzi schemes, see *In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 73
(2d Cir. 2004); *Levy v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 347 F.3d 880, 882
(11th Cir. 2003); *In re Bonham*, 229 F.3d 750, 763-71 (9th Cir. 2000); *Wesbanco Bank
Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1258 (6th Cir.
1997); *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir. 1996); *Grassmueck v. Am. Shorthorn
Ass'n*, 365 F. Supp. 2d 1042, 1043 (D. Neb. 2005); *In re Pearlman (Pearlman I)*, 450 B.R.
219 (Bankr. M.D. Fla. 2011); *Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch.
Inc.)*, 347 B.R. 708, 711 (Bankr. C.D. Cal. 2006); *Jacobs v. Matrix Capital Bank (In re
Apponline.com, Inc.)*, 315 B.R. 259, 267 (Bankr. E.D.N.Y. 2004); *Breeden v. L.I. Bridge
Fund, LLC (In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 567 (Bankr. N.D.N.Y. 1999);
and *Henderson v. Allred (In re W. World Funding, Inc.)*, 54 B.R. 470, 472 (Bankr. D. Nev.
1985).

Stanford Entities, (6) SIB "loaned" Stanford $1.8 billion without a guaranty, (7) Stanford and his associates transferred assets among the Stanford Entities in disregard of corporate formalities, and (8) other remedies are available. On balance, the evidence overwhelmingly supports substantive consolidation were it to apply.[41]

---

[41]The Joint Liquidators argue that substantive consolidation is unwarranted because it is not in the best interest of the creditors. *See, e.g.*, JL Proposed Facts & Law 67-68. In support, they point to a balancing test adopted by certain courts. *See id.* at 67. The Second Circuit has simplified the test into two factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on the debtors' separate identity in extending credit, and (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Permian Producers Drilling*, 263 B.R. at 518 (citing *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)). Notably, "[t]he presence of either factor provides a sufficient basis to order consolidation." *Id.* (citing *Bonham*, 229 F.3d at 765-66).

First, the Court notes that it is not substantively consolidating the Stanford Entities. However, even if it were, this test would not bar substantive consolidation. One cannot plausibly read the Second Circuit's second factor to mean that every single creditor must benefit from consolidation. Consolidation of entities inherently entails the addition of more creditors who attempt to stake a claim to the bankruptcy pot. So, in effect, each consolidation harms creditors to the extent that it dilutes each creditor's individual recovery. Rather, prong two of the Second Circuit test focuses on whether "'the time and expense necessary even to attempt to unscramble the[] [entities] [is] so substantial as to threaten the realization of any net assets for all the creditors,' or where no accurate identification and allocation of assets is possible." *Augie/Restivo*, 860 F.2d at 519 (last bracket in original) (citing *Chem. Bank NY Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)). Courts have found the requisite level of entwinement where "the debtor corporations were operated as a single unit with little or no attention paid to the formalities usually observed in independent corporations, . . . the officers and directors of all, so far as ascertainable, were substantially the same and acted as figureheads for [the owner], . . . funds were shifted back and forth between the corporations in an extremely complex pattern and in effect pooled together, loans were made back and forth, borrowings made by some to pay obligations of others, freights due some pledged or used to pay liabilities and expenses of others, and withdrawals and payments made from and to corporate accounts by [the owner] personally not sufficiently recorded on the books." *Kheel*, 369 F.2d at 846. This is clearly analogous to the facts here. Additionally, the Receiver and his expert, Karyl Van Tassel, have declared that aggregation will not seriously dilute investors' recovery as SIB investor claims will comprise the vast majority of claims against the Stanford Entities, *see* Hr'g Tr. 221-22; Receiver's Resp. to

The Receiver has shown that Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud. Each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise. To ignore these findings would elevate form over substance – thereby legitimizing the corporate structure that Stanford utilized to perpetrate his fraud and running afoul of Fifth Circuit precedent cautioning courts to look beyond the surface. Thus, because SIB did not observe corporate formalities and because all the Stanford entities were "operated as one for purposes of perpetrating a fraud on investors," *Ernst & Young, Inc.*, 383 B.R. at 781, the Court pierces SIB's corporate veil and aggregates the Stanford Entities.

   2. *The Stanford Entities' COMI is in the United States.* – Chapter 15 of the Bankruptcy Code states that "in the absence of evidence to the contrary, the debtor's registered office, . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). However, the Receiver has presented evidence to the contrary, which rebuts the presumption, and, as always, the burden rests on the Joint Liquidators to establish that Antigua is the Stanford Entities' COMI.[42]

-----

Antiguan Liquidators' Dec. 3 Suppl. Br. 61 [61]. *But see* Hr'g Tr. 226-32 (Joint Liquidators questioning Van Tassel about the effect of the addition of Stanford's U.S. tax liabilities as well as other Stanford Entities' claims upon aggregation). Moreover, there is evidence to support prong one of the test. *See* discussion *infra* regarding SIB's marketing materials referring to a global network of entities.

   [42]As Judge Lifland, coauthor of the model act underlying Chapter 15, explained in the seminal case, *Bear Stearns II*:
      Section 1516(c) provides that "[i]n the absence of evidence to the

ORDER – PAGE 36

Although Chapter 15 does not define COMI, courts have looked to a variety of factors

contrary, the debtor's registered office, . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr.E.D.Cal.2006) (["In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, 'center of main interests.' The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e., the burden of proof, away from the foreign representative seeking recognition as a main proceeding.").

The legislative history to section 1516(c) further explains that "the presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." *See* H.R.REP. NO. 31, 109th Cong., 1st Sess 1516 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 175. This presumption "permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful." *See* [Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 1019, 1033 (2007)]. This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat. *Id.*

Chapter 15 changed the Model Law standard that established the presumption in "the absence of *proof* to the contrary," to a presumption in "the absence of *evidence* to the contrary." The legislative history explains that the word "proof" was changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. *See* H.R.REP. NO. 109-31, 112-13 (2005). According to one commentator, "[w]hatever may be the proper interpretation of the EU Regulation, the Model Law and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the COMI." *See* Westbrook[, *supra*, at 1033-34]. Accordingly, "[i]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interest is in the same country as the registered office." *See In re Tri-Continental Exchange Ltd.*, 349 B.R. at 635; *see also In re Petition of Lloyd*, Case No. 05-60100(BRL), Verified Petition under Chapter 15 for Recognition of a Foreign Proceeding, ¶ 9 ECF # 2, *www.nysb.uscourts.gov* (Debtor was mutual insurance company registered in France but demonstrated that center of main interest was located in the United Kingdom ("UK")).

*Bear Stearns II*, 374 B.R. at 127-28 (footnotes omitted).

to make the determination, including:

> [T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or a majority of the creditors who would be affected [by] the case; and/or the jurisdiction whose law would apply to most disputes.

*Ran IV*, 607 F.3d at 1023 (citing *SPhinX*, 351 B.R. at 117).

The Fifth Circuit has stated that "*[a]dditionally*, it is important that the debtor's COMI be ascertainable by third parties." *Id.* at 1025 (emphasis added). It explains that "[t]he presumption [underlying the ascertainability factor] is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor . . . ." *Id.* at 1026; *see also Betcorp*, 400 B.R. at 286 ("The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction . . . be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated."). The above caselaw seems to contemplate that, although important, ascertainability is but one of many factors to consider in the COMI analysis. *See, e.g.*, *Betcorp*, 400 B.R. at 286 ("This [COMI] inquiry examines the debtor's administration, management, and operations *along with* whether reasonable and ordinary third parties can discern or perceive where the debtor is conducting these various functions." (emphasis added)); *In re Millennium Global Emerging Credit Master Fund Ltd.*, --- B.R. ---, 2012 WL 2403406, at *3 (S.D.N.Y. 2012) ("Courts *also* take into consideration the expectations of creditors and other interested parties . . . . In order to protect the expectation

interests of creditors, investors and other interested third parties, courts ask whether the debtor's COMI would have been 'ascertainable' to interested third parties." (emphasis added)).[43]

Ultimately, the COMI determination is analogous to a principal place of business analysis under U.S. law. *See, e.g., British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. at 720; *Fairfield Sentry Ltd.*, 440 B.R. at 64; *British Am. Ins. Co.*, 425 B.R. at 908-09; *Basis Yield*, 381 B.R. at 48; *Bear Stearns II*, 374 B.R. at 129; *Tri-Cont'l Exch.*, 349 B.R. at 634. In 2010, the Supreme Court substantially clarified the law concerning "principal place of business" in adopting the "nerve center" test. Specifically, it stated: "'Principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192.

---

[43]*But see, e.g., Bear Stearns III*, 389 B.R. at 335 ("[The COMI] concept derives from the European Union Convention on Insolvency Proceedings . . . . The regulation adopting the EU Convention explains that [COMI] means 'the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.'"); *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.) (SPhinX II)*, 371 B.R. 10, 19 (S.D.N.Y. 2008) (affirming bankruptcy court's opinion, which stated that "COMI must be identified based on criteria that are: (1) objective; and (2) ascertainable by third parties."); *Chiang*, 437 B.R. at 403 ("[T]he location of the COMI is an objective determination based on the viewpoint of third parties . . . ."); *Tri-Cont'l Exch.*, 349 B.R. at 634-35 ("[T]he key question is the situs of the conduct of the administration of the debtor's business on a regular basis that is known to third parties.").

These decisions do not sway the Court. Rather, it believes that it would be illogical for an ascertainability requirement to strictly apply to all Chapter 15 cases. Although the purpose of Chapter 15 is to ensure cooperation among bankruptcy proceedings around the world, Congress cannot have intended to grant formal recognition to letterbox companies merely because the schemers were adept at pulling the wool over investors, creditors, and regulators' eyes. Surely, it is against U.S. public policy to reward such gamesmanship and manipulation.

Although it stated that this will "normally be the place where the corporation maintains its

headquarters," it cautioned that this is only the case where "the headquarters is the actual

center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office

where the corporation holds its board meetings [for example] . . . ." *Id.* The Court explained

that the shorthand headquarters approach is useful because "[t]he public often (though not

always) considers it the corporation's main place of business." *Id.* at 1193. The Supreme

Court was thus mindful that the location of a registered office or headquarters might provide

insight into a company's principal place of business, although that location is not necessarily

indicative of the business' locus of control, or nerve center. This is where the Court begins

its analysis.[44]

---

[44]The Joint Liquidators contend that the Court should adopt the rulings of foreign authorities regarding recognition either under principles of res judicata or comity. Antigua, Switzerland, and the United Kingdom have refused this Receivership recognition. In contrast, Canada has recognized the Receiver as a foreign representative and the Receivership as the foreign main proceeding.

As a practical matter, res judicata is inappropriate in this instance because the foreign decisions are inconsistent. However, even if they were consistent, the decisions do not bind this Court. Particularly problematic are the following: In the United Kingdom, (a) the court placed the burden of proof on the Receiver, whereas under U.S. law the burden is on the Joint Liquidators, (b) the court limited its analysis to objectively ascertainable factors, whereas in U.S. jurisprudence it is one of many factors, and (c) the court analyzed the time period from the time that the Antiguan court instituted the foreign liquidation proceeding, whereas under U.S. law the relevant time period to analyze is at the time the representative files the Chapter 15 petition. The Swiss decision did not apply the Model Law upon which Chapter 15 is based and thus did not make a COMI determination. The Antiguan decision similarly did not analyze the Model Law because Antigua has not adopted it. Finally, the Canadian decision rested on the Former Joint Liquidators' unclean hands, an issue that is not before the Court in the same way.

The Court also cannot adopt any of the foreign decisions under the doctrine of comity. "[C]omity is not an element of recognition; it is rather, a consideration once recognition is granted." *In re Ran (Ran II)*, 390 B.R. 257, 292 (Bankr. S.D. Tex. 2008), *aff'd*, *Ran III*, 406

As explained in more detail above, R. Allen Stanford, a dual U.S. and Antiguan citizen,[45] was the sole owner, directly or indirectly, of the more than 130 Stanford Entities. 115-1, at 7. He controlled the Stanford Entities with substantial assistance from Davis and Pendergest-Holt, both U.S. citizens. *Id.* Stanford lived and worked principally in Houston,

---

B.R. 277, *aff'd*, *Ran IV*, 607 F.3d 1017; *see also Bear Stearns III*, 389 B.R. at 334 ("Both the plain language and legislative history of Chapter 15 . . . require[] a factual determination with respect to recognition before principles of comity come into play."); *In re Loy*, 380 B.R. 154, 164 (Bankr. E.D. Va. 2007) ("[T]he foreign representative must first pass through the bankruptcy court by way of a foreign proceeding recognition *prior* to applying to a court in the United States for relief requiring the comity or cooperation of that court." (emphasis added) (citing *Iida*, 377 B.R. at 257)); Westbrook, *supra* note 42, at 1024 ("A central point of the Model Law was meant to be adoption of a structure less amorphous than comity and a procedure more suited to bankruptcy than the ancient machinery of judgment recognition."). U.S. courts have specifically chosen to conduct their own COMI analyses despite prior foreign court COMI determinations. *See, e.g.*, *Ran II*, 390 B.R. at 267 ("Chapter 15 does not provide for recognition of an insolvency proceeding based on a foreign court's determination that it has jurisdiction as the location of the debtor's [COMI]. Indeed, Chapter 15 requires the U.S. court to make an independent evaluation of the location of the debtor's [COMI] at the time a petition for recognition is presented." (internal citation omitted)); *SPhinX I*, 351 B.R. at 120 n.22 ("[N]otwithstanding the respect that this Court has for the Cayman Court, even if the Cayman Court had made such a [foreign main proceeding] determination[,] it would not be binding on this Court."), *aff'd*, *SPhinX II*, 371 B.R. 10. Accordingly, the Court declines to apply or adopt the rulings of any authorities in the United Kingdom, Switzerland, Antigua, or Canada regarding recognition of the Antiguan Proceeding.

  [45]Antigua granted Stanford citizenship and knighthood. *See* 116-11, at 4; 117-6, at 19-48.
  The Former Joint Liquidators argued that the Court is bound to find that Stanford's residence was not in the United States because Judge Hittner, who oversaw Stanford's criminal proceeding, decided as much in June 2009. *See* Order [52], June 30, 2009, *in United States v. Stanford*. However, Judge Hittner did not base his decision on the entirety of this record, and suffice it to say that interests weighed in a pretrial detention proceeding are different than the interests weighed here. Thus, on this record the Court reaches a different conclusion than Judge Hittner. The evidence before the Court reveals that Stanford initially resided on the mainland United States and later also resided in St. Croix, U.S.V.I. *See* 116-1, at 3-4.

Texas; Miami, Florida; and Christiansted, St. Croix, U.S.V.I. *Id.* Davis and Pendergest-Holt lived in Mississippi and had offices in Houston, Texas; Tupelo, Mississippi; and Memphis, Tennessee. *Id.* The Stanford Entities' headquarters was in Houston, Texas. *See id.* at 37. Stanford never lived in Antigua, and Antigua did not serve as the base of the Stanford Entities' operations. 116-11, at 3.

Most of the Stanford Entities' revenue came from selling CDs. CD sales largely bypassed Antigua, as depositors wishing to deposit funds were usually introduced to SIB through their financial advisors, who maintained primary if not sole contact with the depositor and were often located where the depositor resided. *See* 115-1, at 33-34; Hr'g Tr. 124-26. U.S. investors exclusively purchased CDs through broker-dealers in the United States at SGC. 110-1, at 19; Hr'g Tr. 189. All financial advisors, regardless of location, would send client applications and requisite paperwork to Antigua, *see* 110-1, at 14, and SIB would then deposit the funds into U.S., Canadian, and English banks, *see id.* at 15; Hr'g Tr. 186-87. Investors wired money to Canadian banks or English banks. *See* Hr'g Tr. 186-87. Those who wished to pay via check provided checks to their financial advisors at a non-Antiguan location.[46] *See* 115-1, at 31; Hr'g Tr. 186. Financial advisors would send the checks to SIB in Antigua, and, after endorsing them, SIB would send the checks to Houston,

---

[46]Jacobs testified that "SIB maintained a handful of financial advisors at its offices in Antigua who obtained customers directly, sold CDs, provided financial advice to customers, and other such similar services, if requested by the customer." 110-1, at 23. However, this "handful" of financial advisors pales in comparison to the advisers located outside of Antigua. The Court also notes that Antiguan law and SIB's own policies prohibited SIB from serving Antiguans. *See* Hr'g Tr. 39.

Texas for deposit in Canada or the United Kingdom. *See* Hr'g Tr. 186-87; 110-1, at 15.[47]

After deposit, Davis would then disburse the funds among the Stanford Entities. *See* 115-1,

at 9.

Stanford's broker-dealers included SGC in the United States, Stanford Bolsa y Banca

S.A. in Mexico, Comisionista de Bolsa in Colombia, and others. *Id.* at 33. Stanford

overwhelmingly marketed his CDs through Stanford broker-dealers in non-Antiguan

territories. *Id.* In fact, the Joint Liquidators concede that "[t]he vast majority of SIB products

were not sold from Antigua."[48] JL Proposed Facts & Law 20. In reality, broker-dealers in

the United States generated substantially more CD sales, by dollar amount, than broker-

dealers in any other country, and no other country approached the magnitude of the United

States as a generator of CD sales. 115-1, at 34; *see also* Hr'g Tr. 127-28 (JL Dickson stating

that he couldn't disagree with Van Tassel's testimony that financial advisors at SGC in

United States were responsible for 42-48% of SIB CD sales in 2007 and 2008). According

to the Receiver, U.S. residents hold more CDs, in terms of number and dollar amount, than

---

[47]SIB kept a small amount of funds at the Bank of Antigua, another Stanford Entity. $9 million was deposited into the Bank of Antigua at Davis' direction in November and December 2008, just before the February 2009 freeze. The timing of the transfers could indicate that this was meant to be a "flight fund." *See* 21-20, at 6, 8.

[48]The Joint Liquidators go on to explain that "SIB had a number of non-exclusive referral agreements with authorized financial advisory offices in several countries throughout the world who referred customers to SIB, in exchange for referral fees." JL Proposed Facts & Law 20-21 (citing 106-1, at 26-27; 106-14; 111-1, at 15; Hr'g Tr. 125; 115-1, at 32). They state that the amounts invoiced to SIB in Antigua and referral fees paid by SIB, either through TD Bank in Canada or Trustmark Bank in the United States, ranged from approximately $18 million in 2000 to approximately $157.7 million in 2008. 107-1, at 20; 107-2.

the residents of any other country in the world, including Antigua. 115-1, at 35 (showing

that the United States comprised 7,072 clients, which accounted for 25.26% of clients, and

$2,660,676,142 in deposit amount, which accounted for 37% of dollar amounts).[49]

Stanford employees managed and directed the CD enterprise from the United States

with no meaningful input from Antigua. Although SIB, the issuing bank, was chartered and

registered in Antigua, 106-1, at 16-17, Stanford and Davis controlled it – with assistance

from Pendergest-Holt – from various places within the United States. *See, e.g.*, 115-1, at 7-8;

Hr'g Tr. 178-181. And Davis facilitated several millions of dollars in transfers of CD

proceeds among the Stanford Entities. *See* 115-1, at 9, 30, 32-33. Antiguan employees were

excluded from decisions regarding SIB's self-professed primary business:[50] CD-proceed

investments.[51] *See, e.g., id.* at 15, 17-18. Other Stanford Entities managed and directed the

---

[49]According to the Receiver, the next highest client and dollar amount belonged to Mexico, with 2,801 clients (10%) and $605,649,240 (8.42%). 115-1, at 35. The Joint Liquidators argue that customers in Latin America constituted approximately 71.7% of total customers and 58.56% of the total amount of deposit. 124-2. Regardless of whether this is true, the Court is concerned with client statistics by country – not region of the world. Further, the Court finds the Receiver's tabulation to be more credible than the Joint Liquidators' competing numbers.

[50]In SIB's disclosure statement for the U.S. Accredited Investor Certificate of Deposit Program, it stated: "Our primary business is the investment of funds deposited with us by depositors." 3, at 52.

[51]Indeed, the Joint Liquidators state that "[d]ecisions and implementation of decisions as to the use and investment of the funds generated by the sale of SIB CDs and SIB deposits, to the extent invested at all, were made by Stanford related entities, Stanford, Davis, or [Pendergest-Holt]." JL Proposed Facts & Law 23 (citing 110-1, at 12; Hr'g Tr. 115, 179, 181, 284).
    SIB employees were paid with funds administered from Houston. 115-1, at 26. CFO Davis and President Rodriguez-Tolentino were paid by other Stanford Entities in the United

investment accounts, and, although those entities sent bank statements to SIB in Antigua, personnel from other Stanford Entities reviewed and processed them. *See* Hr'g Tr. 179; 111-1, at 4; 115-1, at 11-18. Only Stanford, Davis, and Pendergest-Holt were primarily responsible for investments and investment accounting. 115-1, at 18.

Stanford and his associates in the United States generated and maintained SIB's financial information. Stanford, Davis, Pendergest-Holt, and other U.S. residents disseminated false information regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, value of its investment portfolio, and other matters to financial advisors around the world for use in inducing potential investors to purchase CDs. *Id.* at 39-42. Indeed, Davis managed the Stanford Entities Tier 1 assets – cash and cash equivalents – via the Treasury Department in Houston, Texas. *Id.* at 10-11. SIB invested its Tier 2 assets – investments and a small amount of cash or cash equivalents – with outside money managers at banks in the United Kingdom and Switzerland. *Id.* at 11-13. Pendergest-Holt and her team of research analysts in Memphis

---

States. *Id.* Although SIB employees performed limited administrative, bookkeeping, and operating functions in Antigua, these functions were heavily dependent upon Stanford's global human resources, accounting, and information technology ("IT") groups. *Id.* at 18, 22. SIB's Antiguan employees were primarily responsible for keeping client accounting records current, generating client statements, and performing certain private banking functions such as paying credit card bills. *Id.* at 22. Although the Joint Liquidators aver that the following departments were operational at SIB: operations, client services, general affairs, systems operations, accounting, compliance, quality control, human resources, protocol, and internal audit, *see* 106-1, at 18, 21; 110-1, at 9-12, the Receiver's evidence reveals that SIB's workforce of ninety employees could not have handled anything more; the SIB workforce was simply insufficient to operate SIB's CD business, much less the multi-billion dollar Stanford Entities enterprise. *See* 110-1, at 8 (stating that there were ninety SIB employees at SIB's peak).

oversaw these investments. *Id.* Finally, Stanford and Davis, with assistance from Pendergest-Holt and her team, managed Tier 3 assets – illiquid real estate, private equity investments, and undisclosed sham loans to Stanford. *Id.* at 13-14. Davis provided the fallacious investment earning amounts for Tier 3 assets; Stanford and his U.S. employees, consulting with outside U.S. counsel, created the inflated $3.174 billion real estate figure, representing a 50-fold baseless inflation of the properties; $1.8 billion of Tier 3 assets were notes receivable from Stanford, representing sham loans to him that he funneled to Stanford Entities, 76% of which were outside Antigua; and finally, an inflated $1.2 billion value was assigned to "merchant banking" assets, consisting mostly of equity and debt investments in private and public companies, most of which were headquartered in the United States. *Id.*[52]

Additionally, extensive SIB client records exist in the United States, and records regarding SIB's investments and cash balances were kept outside of Antigua, predominantly generated (i.e., fancifully created) and maintained in the United States by Stanford and Davis. *See id.* at 19.[53] Davis and other Houston-based Stanford employees – such as Harry Failing, Stanford's longtime accountant in Houston – also generated false reports to disseminate to

---

[52]As of February 2009, SIB reported that it had: $31.8 million in cash – approximately $8 million located in Antigua; $345 million in investments by outside money managers in Canada, Switzerland, and the United Kingdom; $1.2 billion in merchant banking in the United States; $1.8 billion in notes receivable by Stanford (i.e., loans to Stanford); and $3.174 billion in real estate in Antigua. 115-1, at 14. All of these assets were purportedly directed and managed from the United States. *Id.* at 9-13. And, as stated above, Stanford and his associates doctored most, if not all, of the numbers.

[53]Documents and records also exist in Antigua, *see* JL Proposed Facts & Law 29-32 (describing the files in detail), although, as explained above, many were based on doctored numbers provided by Stanford, Davis, and other associates outside of Antigua.

Stanford Entity investors and potential investors regarding SIB's assets and liquidity.[54] *Id.* at 20-21. Stanford Entity employees in the United States wrote SIB's purported internal audit reports. *Id.* at 23. Although an Antiguan audit firm, C.A.S. Hewlett & Co. Ltd. also performed audits, the Receiver has shown that these were of minimal utility and veracity given that the firm did not review the records in the United States.[55] *Id.* at 23-24.

As for SIB, Stanford Entity employees in the United States fulfilled most of its core operational needs. *Id.* at 7-8, 15, 21-22. This includes, but is not limited to, legal, training, investment, accounting, human resources, compliance, IT, and public relations services. *See id.* at 14-15, 21-22. All of SIB's directors were non-Antiguans, and all but two were U.S. citizens. *Id.* at 7. The Board met via tele- or video-conference or in person in Antigua, and once in Miami, Florida. 106-1, at 23; 115-1, at 7-8. Stanford Entity employees in the United States also received vastly more monetary compensation than employees in Antigua. Management, administrative, and marketing fees paid to Stanford Entities in the United States and the U.S.V.I. – $268 million in 2008 – compared to total salary and benefits paid to SIB's Antiguan employees – $3.6 million in 2008 – illustrate this disparity. 115-1, at 24-25. Indeed, the Joint Liquidators agree "that the amount of money that [SIB] was paying its employees was a tiny fraction of the millions and millions it was paying to these other Stanford [E]ntities." *See* Hr'g Tr. 45, 132-33.

---

[54]Failing, in particular, had a significant role in the structure of the Stanford Entities. 115-1, at 8.

[55]Additionally, there is evidence that Charlesworth Hewlett, SIB's "independent" auditor, received funds from SFG over and above his audit fees. *See* 42, at 3-4.

Stanford and his associates similarly managed and controlled other Stanford Entities from the United States. As discussed above, SFG and SGC were both U.S. companies, and at least approximately sixty-six other Stanford Entity companies were incorporated in the United States. *See* 62, at 10-13. STCL's core function, trust administration of mostly SIB CDs, was conducted in the United States, even though its physical structure was in Antigua, 115-1, at 25-26; its records were held in the United States, *id.* at 19; and its management and staff were paid from the United States, *id.* at 26. Of the remaining Stanford Entity companies not specifically incorporated in the United States, Stanford or a U.S. Stanford Entity owns 100% or nearly 100% of approximately forty-three of them; Stanford or a U.S. Stanford Entity owns 100% or nearly 100% of approximately twenty-eight more as a second-level parent; Stanford owns 100% of approximately eight more companies as a third-level parent; and finally, Stanford owns 100% or nearly 100% of the approximately three remaining companies as the ultimate parent. *See* 62, at 10-13.

Mixed evidence exists regarding third parties' expectations. Although much of the depositor opening documentation refers to SIB's domicile in Antigua and contains Antiguan law and jurisdiction clauses, *see* 110-1, at 26-36, and the marketing materials refer to SIB's Antiguan headquarters, *see id.* at 36, there is also evidence that many third parties were made to believe that the Stanford Entities were either U.S. enterprises, were U.S.-regulated, or had a substantial U.S. presence. For example, SIB held itself out to creditors, borrowers, other obligees, and the U.S. Internal Revenue Service ("IRS") as having locations in Memphis,

Tennessee and Houston, Texas. 115-1, at 25.[56] SIB solicited or intended to solicit CD purchasers in all fifty U.S. states, and it made regulatory filings with state securities regulatory agencies in the United States. *Id.* Even the Antiguan government stated that Stanford ran SIB from Houston, Texas -- referring to Antigua as a mere transit point. *Id.* at 115.

Most CD purchasers never saw or interacted with Antiguan employees, and notably, only a small number actually went to SIB's Antiguan location to attempt to redeem their CDs. *See* 106-1, at 19-20 (reporting that approximately 150 customers went to Antigua to demand return of their funds around the time SIB was shut down). Investors instead dealt only with their financial advisors, few of whom were based in Antigua. *See* 115-1, at 33-34. *But see* Hr'g Tr. 28-31, 35-36 (two SIB investors stating that in addition to contact with their non-Antiguan financial advisors, they had some contact with SIB employees in Antigua and/or believed SIB's headquarters to be in Antigua). These financial advisors were essentially the face of the Stanford enterprise to investors, providing CD applications, CD investment managing, and Stanford brokerage accounts. *See, e.g.,* 115-1, at 33-34. The financial advisors disseminated reports prepared by Stanford, Davis, Pendergest-Holt, and others, *id.* at 39-42, which portrayed a global group of companies under the name SFG, headquartered in the United States, *id.* at 37-41. SIB's marketing materials, in fact, advertised that it was able to pay higher interest, in part, because of "synergies" and cost-

---

[56]This is in contrast to the Joint Liquidators' argument that SIB only had offices in Antigua and Canada. 106-1, at 20, 22.

savings that resulted from it being part of SFG and because of a globally diversified investment strategy. *Id.* at 38.

Ultimately, it is manifestly clear from the Court's findings of fact in this section and in Part V.C.1 above that the Stanford Entities' COMI was in the United States. In summary: (1) SIB, the Bank of Antigua, and STCL were only nominally headquartered in Antigua, and SIB's major activities, CD sales and investment of funds, took place outside of Antigua; a substantial number of the other aggregated Stanford Entities were headquartered outside of Antigua; (2) Stanford, Davis, Pendergest-Holt, and others who actually managed the Stanford Entities did so largely from the United States; (3) Stanford Entities and banks outside of Antigua primarily held the Stanford Entities' primary assets; (4) the vast majority of the Stanford Entities' investor-victims and creditors reside outside of Antigua; (5) although the Court does not here decide that U.S. law applies to all disputes, this Court is the jurisdictional locus of the entire Stanford Entities enterprise and estate, *see* Receivership Order; and (6) the Stanford Entities' nerve center (center of direction, control, and coordination) is in the United States. Thus, under the *SPhinX* COMI factors and under the U.S. principal place of business analysis, the Stanford Entities COMI is in the United States.[57]

Accordingly, the Antiguan Proceeding is not a foreign main proceeding, and the Court goes on to analyze whether it is a foreign nonmain proceeding.

---

[57]The Court notes that even if the Stanford Entities were not aggregated, it would still find that SIB's COMI is in the United States given the above factual findings, which largely center on CD sales and SIB's activities. The Court also notes it would reach this same result if it sustained the Joint Liquidators' hearsay objections to Van Tassel's exhibits and the Receiver's exhibits.

### D. The Stanford Entities Have an Establishment in Antigua

The Court notes again that the Joint Liquidators have not requested foreign nonmain recognition. Indeed, their petition only requests foreign main recognition. However, this technicality makes no difference. Chapter 15 specifically contemplates that a foreign representative applies for recognition generally. *See* 11 U.S.C. § 1509(a) ("A foreign representative may commence a case under section 1504 by filing directly with the court *a petition for recognition* of a foreign proceeding under section 1515." (emphasis added)); 11 U.S.C. § 1515(a) ("A foreign representative applies to the court *for recognition* of a foreign proceeding in which the foreign representative has been appointed by filing a *petition for recognition*." (emphases added)). It is for the Court to then decide whether the proceeding qualifies for recognition as either a foreign main or foreign nonmain proceeding. *See generally* 11 U.S.C. § 1517. Thus, having decided that the Antiguan Proceeding is not a foreign main proceeding, the Court analyzes whether the Antiguan Proceeding is a foreign nonmain proceeding.

A foreign nonmain proceeding means a proceeding "pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). Chapter 15 defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). Courts have likened this to a "local place of business." *See Bear Stearns II*, 374 B.R. at 131. A bankruptcy court in this Circuit has defined a "place of operations" as "'a place from which [commercial] economic activities are exercised on the

market (i.e. externally) . . . ,' in the country in which the foreign proceeding is maintained."
*Ran III*, 406 B.R. at 285 (bracketed text inserted).

As discussed above, the Stanford Entities had at least two physical structures in Antigua registered as separate businesses – SIB and Bank of Antigua. Although Antiguan law barred the Stanford Entities from doing business in Antigua, *see* Hr'g Tr. 39, the Stanford Entities could and did do business with its Antiguan employees and Antiguan trust companies. This resulted in 578 Antiguan clients: 31 individuals and 547 trust and corporate entities,[58] for a total of two percent of the total SIB customers and four percent of the total monies invested in SIB according to the Joint Liquidators. *See* 124-1, at 2-3. Additionally, SIB employees carried out functions related to three types of accounts, credit card services, loan facilities, letters of credit, letters of guarantee, and private banking services at SIB's facility according to Jacobs, *see supra* note 34, and at the time the Former Joint Liquidators filed their petition, SIB still had some employees at its facility, *see* JL Proposed Facts & Law 78-79 (stating that to this day four employees work at the SIB facility, fielding calls and inquiries from investor-victims). Bank of Antigua held at least some of SIB's purported funds. And finally, the Stanford Entities issued loans to the Antiguan government.[59] Thus,

---

[58]The Court notes that it is unclear whether the trusts included in the number above have Antiguan residents as ultimate beneficiaries. *See* Hr'g Tr. 122-23 (JL Dickson testifying eight days prior to the filing of this evidence that there were about 500 trusts where ultimate beneficiary residence information was unanalyzed).

[59]The Court notes but does not here consider Stanford's personal relationship with Antigua: Stanford used CD proceeds to influence Antiguan Prime Minister Lester Bird and his government for several years. *See* 116-11, at 6-7. Later, when the United Progressive Party came to power in 2004, Stanford immediately sought to foster close relations with the

the Stanford Entities conducted a measurable amount of local business in Antigua sufficient

to have an establishment there, so the Court grants the Antiguan Proceeding foreign nonmain

recognition.

### E. The Court Grants Limited, Conditional Relief

Section 1509 states that recognition generally entails that (1) the foreign

representative has the capacity to sue and be sued in a U.S. court, (2) the foreign

representative may apply directly to a U.S. court for appropriate relief in that court, and (3)

a U.S. court shall grant comity or cooperation to the foreign representative. 11 U.S.C. §

1509. However, section 1509 also states that this automatic relief "is subject to any

limitations that the court may impose consistent with the policy of this chapter." *Id.* Section

---

Party's members through favorable deals with the new government – for example, Stanford paid the government $1 million for the construction of an Antiguan national library, $10 million for an Antiguan entrepreneurial fund, and $25 million for the construction of a higher education complex. *See id.* at 7-8.  He also agreed to write off $50 million in debt that Antigua owed to the Stanford Entities.  *See id.*  Concurrent with these payments, the Antiguan government ratified Stanford's acquisition of a piece of real estate in Antigua. *See id.* at 8.

Additionally, Stanford had an extremely close personal relationship with Leroy King, the former administrator and chief executive officer of the FSRC (SIB's purported Antiguan regulator), where, in addition to cash payments amounting to hundreds of thousands of dollars, Stanford provided King with the use of his fleet of private jets to travel throughout the United States and Caribbean and the use of a SIB corporate car. *See id.* at 13.  In exchange, King facilitated Stanford's fraud by obstructing the SEC investigation and abdicating FSRC's oversight responsibilities. *Id.*  The Receiver specifically outlines King's actions in his direct testimony, *see* 116-11, at 12-21, which included providing confidential SEC communications to Stanford, falsely telling the SEC that the FSRC had investigated SIB and that any further investigation was unwarranted, replying to SEC communications as dictated by Stanford, Davis, and SFG's general counsel, and posting on the FSRC's website that the FSRC performed continuous off-site supervision of SIB in the form of analyses of quarterly returns and annual audited financial statements, *id.*

1521 allows a court, "at the request of the foreign representative,"[60] to "grant any [additional] appropriate relief" in order to "effectuate the purpose of this chapter and to protect the assets of the debtors or the interests of the creditors." *See* 11 U.S.C. § 1521. A court should similarly condition that relief as it considers appropriate. *See* 11 U.S.C. § 1522(a-b).

This action has a peculiarly worrying history. Notwithstanding the Antiguan institution of proceedings despite this Court's Receivership Order, *see supra* p.2, the long account of happenings in the life of this suit demonstrates that the Joint Liquidators' repeated interference with the Receivership has been the norm. For example, early on in the action, without notice to the Receiver or the Canadian court, the Former Joint Liquidators entered one of the Stanford Entities in Canada and wiped its computer systems clean of information.[61] Second, the current Joint Liquidators have attempted numerous times to unseat the Receiver from his role as the recognized foreign representative in Canada. Further, the Joint Liquidators have actively objected to criminal seizure proceedings by the U.S. Department of Justice ("DOJ") in Canada, the United Kingdom, and Switzerland, 92, at 11-16, and have taken affirmative steps to block the repatriation of Estate assets generally in the United Kingdom and Canada, Hr'g Tr. 50. Fourth, the Joint Liquidators have proven to be extremely litigious and calculating in this Court, filing multiple notices of objection to

---

[60]Because in their petition for recognition the Former Joint Liquidators asked the Court to grant "other and further relief as is appropriate under the circumstances," *see* Pet Recogn. of Foreign Main Proceeding Pursuant to Ch. 15 of Bankr. Code 5, the Court considers section 1521's additional relief.

[61]The Antiguan Court thereafter removed the Former Joint Liquidators, rebuking them for their actions.

ORDER – PAGE 54

the Receiver's requests in this and other Stanford MDL suits, and filing motions to pursue claims the Receiver was already pursuing.[62] The Joint Liquidators have admitted that they seek funds first and foremost to fund their current operations, which include challenging the Receiver's authority worldwide, not to distribute to investor-victims and creditors. *Id.* at 50-53.

Finally, the Joint Liquidators have similarly been vocal about their preference that the Stanford Entities – or at least SIB – be placed in U.S. bankruptcy proceedings rather than continue as an equity receivership. *See, e.g.,* Tr. of Hr'g on Receiver's Mot. Entry Claims Procedure, Apr. 25, 2012, at 26 [1579], *in* SEC Action ("Frankly, our belief is [SIB] should have been put in a bankruptcy, those particular entities, or just – just liquidate, just shut down."). Although the Court does not here opine on the propriety of bankruptcy proceedings

---

[62]The Court also notes that the Receiver has presented evidence that Stanford had illicit dealings with and undue influence over the government of Antigua and Barbuda. For example, (a) SFGC and the Bank of Antigua, two Stanford Entities, loaned the Antiguan government more than $90 million that remains unpaid, *see* JL Proposed Facts & Law 53 ("It is undisputed that loans were made by Stanford or Stanford related entities, other than SIB, that are estimated to amount to an aggregate of approximately US$150 million." (citing 115-1, at 41-42)); *see also* 115-1, at 42-44; (b) the Antiguan Offshore Financial Sector Planning Committee, with Stanford as the chairman, successfully influenced Antigua to remove the offenses of "false accounting," "fraud," and "illegal deposit-taking" from its Money Laundering Prevention Act, *see* 116-11, at 9-12, causing the U.S. Department of Treasury Financial Crimes Enforcement Network to issue an advisory requiring financial institutions to give enhanced scrutiny to all transactions involving Antiguan offshore banks, *id.* at 12-13; and (c) King, the former administrator and chief executive officer of the FSRC, received monetary and nonmonetary benefits from Stanford in apparent exchange for obstructing the SEC's investigation of the Stanford Entities and abdicating the FSRC's oversight responsibilities, *see id.* at 13-22. The Court notes that the FSRC fired King in May 2009, King is under indictment in Texas, and he is currently appealing extradition proceedings in Antigua. 106-1, at 28; 116-11, at 21. Perhaps relatedly, the Joint Liquidators have strangely made no efforts to assert any claims against the Antiguan government.

for the Stanford Entities, it notes that the collective wisdom of the Receiver, the Examiner, OSIC, and the SEC is that an equity receivership is preferable to bankruptcy,[63] and notes further that the current equity Receivership consists of more than 100 actions – more than 90 of which are active and have been pending for years – and an active claims process readying for an initial distribution to investor-victims and creditors.  Thus, any future attempts to involuntarily place the Stanford Entities into bankruptcy proceedings would severely disrupt the current Receivership and result in untold expenditures of funds currently earmarked for Stanford investor-victims and creditors.  Given this history, the Court's findings of fact, and the potential for duplication of effort and resulting diminution of funds for Stanford investor-victims and creditors, the Court believes that only strictly limited, conditional relief is warranted under its holding of foreign nonmain recognition.

Specifically, the Court limits the relief granted under section 1521 to "the examination of witnesses [and] the taking of evidence or the delivery of information concerning [SIB's] assets, affairs, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(4). This limited relief facilitates the Joint Liquidators' U.S. discovery needs related to the Antiguan liquidation

---

[63]The SEC reminds the Court that
> [R]eceivership proceeding[s] . . . [are] well-recognized vehicle[s] for ensuring the preservation, management, and, if appropriate, distribution of assets secured in a securities enforcement matter.  Indeed, courts recognize that . . . the appointment of receivers in enforcement actions furthers the policies of the federal securities laws. *See SEC v. Wen[c]ke*, 622 F.2d 1363, 1373 (9th Cir. 1980).  The policies are particularly implicated in a case like this one where the evidence is overwhelming that Stanford's fraud (and, in fact, [SIB] even if viewed in isolation) was orchestrated from the United States.

SEC's Second Suppl. Opp'n to Pet. Recogn. Pursuant to Ch. 15 of Bankr. Code 2 [101] [hereinafter SEC 2nd Suppl. Opp'n].

proceeding. The Court then conditions all relief on (a) the Joint Liquidators' making available to the Receiver, the Examiner, OSIC, and the SEC all of SIB and STCL's records, documents, data, and any other relevant information regarding SIB and STCL under their control, possession, or knowledge, wherever located; (b) requiring the Joint Liquidators to use best efforts to acquire reciprocal rights for the Receiver in Antiguan courts; (c) precluding the Joint Liquidators from taking any action to disrupt, interfere, or otherwise prevent efforts related to the Receivership by the U.S. DOJ, the SEC, any other U.S. government agency, the Receiver, the Examiner, and OSIC absent approval of this Court; (d) precluding the Joint Liquidators from duplicating efforts by the Receiver, the Examiner, and OSIC, including playing any role – unless consented to by the Receiver, Examiner, and OSIC – in the prosecution of claims or actions that the Receiver and/or OSIC have already commenced prior to the date of this Order; (e) precluding the Joint Liquidators from filing any litigation or other proceeding in the United States, unless approved by this Court; (f) precluding the Joint Liquidators from filing U.S. bankruptcy petitions without the consent of the Receiver, the Examiner, OSIC, the SEC, and this Court; (g) requiring the Joint Liquidators to consult with the Receiver, the Examiner, OSIC, and the SEC and use best efforts to adopt a common claims and/or distribution process; (h) requiring the Joint Liquidators to apply to this Court for the authority to make any payment from SIB or STCL assets for any activity undertaken by them in the United States or to any U.S. person; and (i) requiring the Joint Liquidators to apply to this Court for the authority to take any action whatsoever in the United States except for "the examination of witnesses [and] the taking of

evidence or the delivery of information concerning [SIB's] assets, affairs, rights, obligations or liabilities."

To the extent that the Joint Liquidators require a court order from Antigua to comply with the above conditions, the Court leaves it up to the Joint Liquidators to attempt to obtain one. This Court will not modify its conditions simply because the Joint Liquidators are unable to secure the authority to comply.

In fashioning the above relief, the Court is careful to strike a "balance between relief that may be granted to the foreign representative and the interests of persons that may be affected by such relief." *See In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010). Particularly, the Court seeks to instill reciprocal cooperation between the Antiguan and U.S. parties and parties in interest, as well as provide for checks on the Joint Liquidators' activity similar to the way that this Court oversees the Receiver, Examiner, and OSIC's activities. In this way, the Court balances the needs of the parties in interest with the needs of Stanford's investor-victims and creditors.

### F. Any Public Policy Problem is Resolved by the Court's Conditional Relief

The Receiver and the SEC ardently argue that the Court should not grant the Antiguan Proceeding foreign recognition of any kind because doing so would be against the public policy of the United States. *Cf. In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009) (refusing to grant recognition on public policy grounds). Specifically, they argue that recognition is against U.S. public policy because (a) the Antiguan Proceeding violates this Court's Receivership Order, (b) Stanford's influence in Antigua created favorable Antiguan

banking laws by which Stanford was able to perpetrate his fraud, (c) the FSRC and the Antiguan government were intimately involved and/or implicated in Stanford's fraud, (d) the Antiguan government has failed to cooperate with the Receiver and has expropriated Receivership assets, including real estate and Bank of Antigua's assets, (e) the Joint Liquidators' goal is to take full control of the Receivership Estate to the detriment of Stanford investor-victims and creditors, (f) the Antiguan Proceeding and Stanford Entities' documents in Antigua are subject to Antiguan secrecy laws, (g) the distribution scheme under the IBCA is inappropriate, and (h) the Joint Liquidators have made no showing that recognition would provide any benefit or advantage to the Receivership Estate or its investor-victims and creditors. *See* Receiver's Proposed Facts & Law 49-50; JL Proposed Facts & Law 47. The Court holds that recognition as granted here is not against U.S. public policy because the conditions imposed by the Court adequately address the concerns of the Receiver and SEC.

### CONCLUSION

The Court grants the Joint Liquidators' motion for substitution as Plaintiff *nunc pro tunc* to June 8, 2010 and grants in part and denies in part their request that the Court take judicial notice. The Court overrules the parties' objections to each others' evidence. Finally, because the Stanford Entities' COMI is in the United States and they have an establishment in Antigua, the Court grants the Antiguan Proceeding foreign nonmain recognition, granting in part and denying in part the Joint Liquidators' petition for recognition. The Court grants the Joint Liquidators limited, conditional relief under Chapter 15.

ORDER – PAGE 59

In accordance with this Order, the Court orders the Clerk of the Court to terminate Peter Wastell and Nigel Hamilton-Smith as Plaintiffs and add Marcus Wide and Hugh Dickson as Plaintiffs.

Signed July 30, 2012.

David C. Godbey
United States District Judge

ORDER – PAGE 60