# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | **SECOND AMENDED COMPLAINT** |
| v. | § § § | Case No.: 3:09-cv-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT AND LEROY KING | § § § § § § § § § § | |
| Defendants, | § § | |
| and | § § | |
| STANFORD FINANCIAL GROUP COMPANY and THE STANFORD FINANCIAL GROUP BLDG INC., | § § § § | |
| Relief Defendants. | § § | |

Plaintiff Securities and Exchange Commission alleges:

### SUMMARY

1.      For at least a decade, R. Allen Stanford and James M. Davis executed a massive Ponzi scheme through entities under their control, including Stanford International Bank, Ltd. ("SIB") and its affiliated Houston-based broker-dealers and investment advisers, Stanford Group Company ("SGC") and Stanford Capital Management ("SCM"). Stanford and Davis, acting in concert with the other defendants, misappropriated billions of dollars of investor funds and falsified SIB's financial statements in an effort to conceal their fraudulent conduct.

2.      By year-end 2008, SIB had sold more than $7.2 billion of self-styled "certificates of deposits" (the "CD") by touting: (i) the bank's safety and security; (ii) consistent, double-digit

returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.

3.      Contrary to SIB's public statements, Stanford and Davis, by February 2009, had misappropriated billions of dollars of investor money and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by Stanford.

4.      In an effort to conceal their fraudulent conduct and maintain the flow of investor money into SIB's coffers, Stanford and Davis fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements. Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments. SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt. Stanford and Davis signed these falsified financial statements.

5.      Laura Pendergest-Holt, the chief investment officer of Stanford Financial Group ("SFG") and a member of SIB's investment committee, facilitated the fraudulent scheme by misrepresenting to investors that she managed SIB's multi-billion investment portfolio of assets and supervised a sizeable team of analysts to monitor the portfolio.

6.      Leroy King, the administrator and chief executive officer of Antigua's Financial Services Regulatory Commission (the "FSRC"), facilitated the Ponzi scheme by ensuring that the FSRC "looked the other way" and conducted sham audits and examinations of SIB's books

and records. In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine SIB's investment portfolio. King also provided Stanford with access to the FSRC's confidential regulatory files, including requests by the Commission for assistance in investigating SIB as a possible Ponzi scheme. King further obstructed the Commission's investigation by allowing Stanford to dictate the substance, and even content, of the FSRC's responses to the Commission that relayed false assurances that there was no cause for concern as to SIB and by withholding information requested by the Commission that would have revealed Stanford's fraud.

7.      In addition to sales of the CD, SGC and SCM advisers, since 2004, have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data. The false data enabled SGC/SCM to grow the SAS program from less than $10 million in 2004 to over $1.2 billion in 2009 and generate fees for SGC/SCM (and ultimately Stanford) in excess of $25 million. The fraudulent SAS performance results were also used to recruit registered financial advisers with significant books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.

8.      By engaging in the conduct described in this Complaint, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt directly or indirectly, singly or in concert, engaged, and unless enjoined and restrained, will again engage in transactions acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, aided and abetted such violations. Likewise, through his

actions, King aided and abetted, and unless enjoined and restrained, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]. In addition, through conduct described herein, Stanford, SGC, and SCM violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted such violations. Finally, through their actions, SIB and SGC violated Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(d)].

## JURISDICTION AND VENUE

9.     The investments offered and sold by the Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

10.     Plaintiff Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to temporarily, preliminarily and permanently enjoin Defendants from future violations of the federal securities laws.

11.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

12.     Defendants have, directly or indirectly, made use of the means or instruments of

transportation and communication, and the means or instrumentalities of interstate commerce, or

of the mails, in connection with the transactions, acts, practices and courses of business alleged

herein.   Certain of the transactions, acts, practices and courses of business occurred in the

Northern District of Texas.

## DEFENDANTS

13.     Stanford International Bank, Ltd. purports to be a private international bank

domiciled in St. John's, Antigua, West Indies.  SIB claims to serve 50,000 clients in over 100

countries, with assets of more than $7.2 billion.  Unlike a commercial bank, SIB claims that it

does not loan money.  SIB sells the CD to U.S. investors through SGC, its affiliated investment

adviser.

14.     Stanford Group Company, a Houston-based corporation, is registered with the

Commission as a broker-dealer and investment adviser.  It has 29 offices located throughout the

United States.   SGC's principal business consists of sales of SIB-issued securities, marketed as

certificates of deposit.  SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc.,

which in turn is owned by R. Allen Stanford.

15.     Stanford Capital Management, a registered investment adviser, took over the

management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007.

SCM markets the SAS program through SGC.

16.     R. Allen Stanford, a citizen of the U.S. and Antigua and Barbuda, West Indies, is

the chairman of the board and sole shareholder of SIB and the sole director of SGC's parent

company.  During the Commission's investigation, Stanford refused to produce documents and

information accounting for the bank's multi-billion dollar investment portfolio.

17.     James M. Davis, a U.S. citizen and resident of Baldwyn, Mississippi, is a director and the chief financial officer of SFG and SIB.  Davis maintains offices in Memphis, Tennessee, and Tupelo, Mississippi.  During the Commission's investigation, Davis refused to provide documents and information accounting for the bank's multi-billion dollar investment portfolio.

18.     Laura Pendergest-Holt, is the chief investment officer of SFG and a resident of Baldwyn, Mississippi.  She was appointed to SIB's investment committee on December 7, 2005.  She supervises a group of analysts who "monitor" the performance of a small portion of SIB's portfolio.

19.     Gilberto Lopez, a U.S. citizen and resident of Spring, Texas, worked in SFG's Houston, Texas, office, as the chief accounting officer of SFG and its affiliate, Stanford Financial Group Global Management, LLC ("SFGGM").    In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG and SFGGM. Lopez is not a CPA.

20.     Mark Kuhrt, a U.S. citizen and resident of Christiansted, St. Croix, U.S. Virgin Islands, is the global controller for SFGGM.  In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG, and SFGGM.  Kuhrt reported at various times to Lopez and Davis, but also directly to Stanford. Kuhrt is not a CPA.

21.     Leroy King, a citizen of the U.S. and of Antigua and Barbuda, West Indies, is the administrator and chief executive officer of Antigua's FSRC.  Educated in the United States, he maintains residences in Antigua and in Atlanta, Georgia, where his wife lives.  King has over 20 years of experience in the United States banking industry.  King also serves on the board of directors of a U.S. registered broker-dealer and investment adviser based in Miami, Florida.

## RELIEF DEFENDANTS

22.     Stanford Financial Group Company, a Florida company owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities.  SFG employees also provide accounting, legal, marketing and other services to many entities under Stanford's control, including SIB, SGC and SFGGM.

23.     The Stanford Financial Group Building Inc., a Texas corporation owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities.

## STATEMENT OF FACTS

### Stanford International Bank

24.     Stanford controls dozens of companies that operate under the name Stanford Financial Group.  Stanford is the sole owner of SFG, SIB, SFGGM and dozens of other affiliated companies.

25.     SIB, one of SFG's affiliates, is a private, offshore bank located in Antigua.

26.     The primary product offered by SIB is a self-styled certificate of deposit.  SIB sold more than $1 billion of the CD per year between 2005 and 2008, including sales to U.S. investors.

27.     SIB marketed the CD to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement.  In connection with the private placement, SIB filed several Forms D with the Commission.

28.     SIB paid disproportionately large commissions to SGC as compensation for the sale of the CD.  SGC received a 3% trailing fee from SIB on sales of the CD by SGC advisers.

SGC advisers received a 1% commission upon the sale of the CD, and were eligible to receive as much as a 1% trailing commission throughout the term of the CD.

29.     SGC used this generous commission structure to recruit established financial advisers.  The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to investors.

30.     In 2007, SIB paid SGC and its affiliates more than $291 million in management fees and CD commissions, up from $211 million in 2006.

31.     SIB aggregated customer deposits, and then purportedly reinvested those funds in a "globally diversified portfolio" of assets.  As of November 28, 2008, SIB reported approximately $8.6 billion in total assets and an investment portfolio in excess of $8.4 billion.

32.     In selling the CD, SIB told investors that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) the bank had averaged double-digits returns on its investments for over 15 years; (iii) Stanford had solidified SIB's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) the bank, in early 2009, was stronger than at any time in its history; and (vi) the bank did not have exposure to losses from investments in the Madoff fraud scheme.  These representations were false.

## SIB's Fraudulent Sale of CDs

### Misappropriation of Investor Funds and Undisclosed Private-Equity Investments

33.     In selling the CD to investors, SIB touted, among other things, the CD's safety, security and liquidity.

34.     In its CD marketing brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the bank's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers" and the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."

35.     In its 2006 and 2007 Annual Reports, SIB told investors that the bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." More specifically, as seen below, SIB represented that its year-end 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments:



36.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisers, in February 2008, that the "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."

37.     SIB's annual reports also represented that "SIB does not expose its clients to the risks associated with commercial loans . . . the Bank's only lending is on a cash secured basis."

38.     Stanford and Davis approved and/or signed the Annual Reports, brochure and training materials.

39.     Contrary to SIB's representations regarding the liquidity and safety of its portfolio, investors' funds were not invested in a "well-diversified portfolio of highly marketable securities." Instead, Stanford misappropriated a significant portion of the bank's investment portfolio. And SIB internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

40.     By year-end 2008, Stanford had misappropriated more than $1.6 billion from SIB. To conceal the theft, some of the transfers of CD investor money to Stanford were documented, after the fact, as personal "loans." Stanford's signature appears on at least $720 million in promissory notes to SIB that were recovered from his personal accountant's office, including promissory notes dated December 31, 1999, December 31, 2000, December 31, 2001, December 31, 2002 and December 31, 2003. Other "loans," particularly those in more recent years, were tracked in internal accounting records.

41.     These promissory notes were typically created after Davis had, at Stanford's direction, wired out billions dollars of SIB investor funds to Stanford or his designees. Stanford used the money to, among other things, fund his "personal playground," including more than $400 million to fund personal real estate deals (*e.g.*, The Sticky Wicket Restaurant) and more than $36 million to subsidize Stanford 20/20, an annual cricket tournament boasting a $20 million purse.

42.     Lopez and Kuhrt (in addition to Stanford and Davis) were well aware of the more than $1.6 billion in "loans" to Stanford, tracking many of the transfers in a spreadsheet entitled "Shareholder Funding, Assumption of Debt and Notes Payable." Stanford made few, if any,

payments required by the terms of the promissory notes. Instead, Stanford and Davis frequently rolled the outstanding loan balances and interest owed by Stanford to SIB into new, larger promissory notes.

43.     Between February 2 and February 8, 2009, Stanford and Davis participated in meetings with a core group of senior executives in Miami, Florida for the purpose of preparing Pendergest-Holt and SIB's president for sworn testimony before the Commission staff. During these meetings, Stanford and Davis admitted that they had misappropriated investor funds by making these putative loans to Stanford.

44.     During the Miami meetings, Davis and Pendergest-Holt collaborated on a presentation that included a pie chart detailing the allocation of assets in SIB's investment portfolio. The pie chart reflected, among other things, that SIB's investment portfolio was primarily comprised of (grossly over-valued) real estate (50.7%) and promissory notes payable by Stanford (29.47%).

45.     Four days after the Miami meetings, Pendergest-Holt made a two-hour presentation to the Commission's staff – and subsequently testified under oath – regarding the whereabouts of SIB's multi-billion dollar investment portfolio. During her presentation and testimony, Pendergest-Holt denied any knowledge concerning the allocation of the vast majority of the bank's assets, despite knowing that more than 80% of SIB's investment portfolio was comprised of undisclosed personal "loans" to Stanford, undisclosed private equity and real estate deals.

46.     The personal "loans" to Stanford were inconsistent with representations that had been made to investors. SIB's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related party transactions entered into by SIB. But

SIB's "loans" to Stanford were not disclosed in that section of SIB's annual reports from 2004 through 2008, in its quarterly reports to the FSRC or anywhere else. Stanford, Davis, Lopez and Kuhrt, with full knowledge of the "loans" to Stanford, prepared, reviewed and authorized the filing and dissemination of these false and misleading annual reports.

47.     Contrary to the representations in the bank's annual reports that its "only form of lending is done on a cash-secured basis solely to existing clients," SIB exposed investors to the risks associated with more than $1.6 billion in unsecured personal "loans" to Stanford.

### *Falsification of Financial Statements*

48.     Stanford's misappropriation of investors' assets (and the poor performance of SIB's investment portfolio) created a giant hole in SIB's balance sheet. To conceal their fraudulent conduct and thereby ensure that investors continued to purchase CDs, Davis and Stanford, in concert with Lopez and Kuhrt, fabricated the growth, composition and performance of SIB's investment portfolio to give the appearance that the bank's investments were highly profitable.

49.     In its training materials for the SGC advisers, SIB represented that it earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years:



STANFORD INTERNATIONAL BANK
Return Vs. Interest Paid To Depositors

50.    SIB marketed the CD using these purported returns on investment.

51.    SIB claimed that its high returns on investment allowed it to offer significantly higher rates on the CD than those offered by U.S. banks.  For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an investment of $100,000.  On November 28, 2008, SIB quoted 5.375% on a 3-year flex CD, while U.S. bank CDs paid under 3.2%.

52.    In SIB's Annual Reports, SIB told investors that the bank earned from its "diversified" investments approximately $642 million in 2007 (11%), and $479 million in 2006 (12%).

53.    SIB's investment income included in its annual reports was fictional.    In calculating SIB's investment income, Stanford and Davis typically provided to SIB's internal accountants, including Lopez and Kuhrt, a predetermined return on investment for the bank's portfolio.  Using this predetermined return, SIB's accountants, including Lopez and Kuhrt, reverse-engineered the bank's financial statements.    After they calculated the fictional investment income and asset growth and received Stanford and Davis' approval, Kuhrt and Lopez created and booked false accounting entries.

54.    Through their actions, Stanford, Davis, Lopez and Kuhrt caused SIB to report investment income that the bank did not actually earn and, thereby, greatly inflated the value of its investment portfolio.  Specifically, Stanford, Davis, Lopez and Kuhrt prepared and reviewed SIB's financial statements, including the annual reports that were provided to investors and posted on the bank's website.

55.    To hide the fabrication of SIB's double-digit annual returns on investment, Davis, Lopez and Kuhrt developed and implemented an elaborate and complex set of protocols for handling SIB financial information in which: (i) all SIB-related financial and other information was transferred to thumb drives and then deleted from servers located in the United States; (ii) back-up files were kept on a portable hard drive referred to as "the football;" (iii) paper SIB-related files were regularly flown to Antigua via Stanford's private jets, where they were burned; and (iv) electronic spreadsheets used to prepare the fraudulent financials were protected with passwords that were distributed via text message (to avoid detection on email servers).

56.    Between February 2 and February 6, 2009, Stanford and Davis admitted, following a meeting with a core group of senior executives (including Pendergest-Holt) in Miami, Florida, that they had falsified SIB's financial statements.

### *Misrepresentation of Capital Infusions and Bogus Real Estate Transactions*

57.    As world financial markets experienced substantial declines in 2008, it became apparent to Stanford and Davis that SIB could not credibly report investment profits in the 11% to 15% range (as it had done in previous years). Stanford and Davis agreed that SIB would for the first time show a "modest" loss to avoid raising too many red flags. In other words, they wanted to tell a "more believable lie."

58.    Stanford and Davis knew that reporting a loss would cause SIB to fall below minimum regulatory capital requirements. Accordingly, Stanford informed Davis and other employees that he, in an effort to assure investors that SIB was financially sound, would contribute capital to the bank in two infusions of $200 million and $541 million. SIB touted the $541 million capital infusion to investors in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that

depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

59.     Stanford, Davis and Pendergest-Holt approved the December 2008 Monthly Report.

60.     The purported capital infusions by Stanford were backdated, fictitious and engineered to give the appearance that SIB had achieved "desired" levels of capital.

61.     Stanford, Davis, Lopez and Kuhrt considered two alternatives for disguising the fictitious capital contributions.   First, Kuhrt and his subordinates proposed a massive restructuring project in which Stanford would contribute personal holdings, including most of his real estate and global banking interests, to SIB as "capital."   When one of Kuhrt's subordinates complained that the task could not be completed on the required timeline, and that the value of the companies to be contributed to SIB would have to be impaired first because "none of them had ever turned a profit," Stanford, Davis, Kuhrt and Lopez turned to another strategy.

62.     In December 2008, well after Stanford had purportedly infused the $200 million and $541 million in additional capital into SIB, Stanford, Davis, Lopez and Kuhrt concocted another scheme.   Stanford, Davis, Lopez and Kuhrt approved and implemented a scheme whereby they "papered" a series of fraudulent round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by SIB in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

63.     To give the appearance that the above-referenced capital infusions actually occurred, Stanford, Davis, Kuhrt and Lopez falsified accounting records to give the appearance that:

- SIB sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIB the $63.5 million);

- the Stanford-controlled entities, at Stanford and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Stanford's personal debt to SIB, Stanford contributed to SIB $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation);

- Stanford then contributed to SIB additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

64.      These transactions did not infuse real capital into SIB.  In fact, the entire process was fabricated *after* the reported capital contributions allegedly occurred.   Moreover, the purported transactions do not validate the capital infusion claims because the inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles.  SIB did not secure an appraisal and had no other reasonable support for such a drastic increase in value.   And the transactions among Stanford-controlled entities were not the kind of arm's-length transactions required to justify a 5000% increase in value.  Nevertheless, on a mere promise from Stanford that the land would appraise for over $3 billion, Stanford, Davis, Kuhrt and Lopez used $63.5 million of real estate to plug a multi-billion dollar hole in SIB's balance sheet and wipe-out a portion of Stanford's billions in debt owed to SIB.

65.     Stanford, Davis, Kuhrt and Lopez, by virtue of their participation in the purported real estate transactions, knew that: (i) Stanford did not make a $541 million capital infusion into SIB; and (ii) the value of the real estate used to support the purported cash infusion was approximately $63.5 million, not $3.2 billion.

66.     Following Stanford, Davis, Lopez and Kuhrt's creation of the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate.  Yet, SIB did not disclose the transactions in its December 2008 newsletter, which touted Stanford's purported capital infusion.  Moreover, Stanford's real estate investments were wholly inconsistent with SIB's representations to investors regarding SIB's investment portfolio (*i.e.*, marketable securities and no real estate).

*Misrepresentations Regarding Management of SIB's Investment Portfolio*

67.     Prior to making investment decisions, prospective investors routinely asked how SIB safeguarded and monitored its assets.  Investors frequently inquired whether Stanford could "run off with the money."

68.     In response to this question, at least during 2006 and much of 2007, Pendergest-Holt trained SIB's senior investment officer ("SIO") to tell investors that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.  In communicating with investors, the SIO followed Pendergest-Holt's instructions, telling investors that SIB's entire investment portfolio was managed by a global network of money managers and monitored by a team of 20-plus analysts.

69.     Neither Pendergest-Holt nor the SIO disclosed to investors that SIB segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments

with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and

(iii) undisclosed assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1

represented approximately 9% ($800 million) of SIB's portfolio. Tier 2, prior to the bank's

decision to liquidate $250 million of investments in late 2008, represented approximately 10% of

the portfolio. And Tier 3 represented approximately 80% of SIB's investment portfolio.

      70.    Neither Pendergest-Holt nor the SIO disclosed that the bank's Tier 3 assets were

managed and/or monitored exclusively by Stanford and Davis. Likewise, they did not disclose

that Stanford and Davis surrounded themselves with a close-knit circle of family, friends and

confidants, thereby eliminating any independent oversight of SIB's assets.

      71.    Neither Pendergest-Holt nor the SIO disclosed to investors that the "global

network" of money managers and the team of analysts did not manage any of SIB's Tier 3

investments and, in reality, only monitored approximately 10% of SIB's portfolio. In fact,

Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIB's portfolio

because that information "wouldn't leave an investor with a lot of confidence." Likewise, Davis

instructed the SIO to "steer" potential CD investors away from information about SIB's

portfolio.

### *Misrepresentation That SIB Was "Stronger" Than Ever Before*

      72.    On January 10, 2009, Stanford, Davis and Pendergest-Holt spoke to SGC's Top

Performer's Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

      73.    During the meeting, Davis stated that SIB was "stronger" than at any time in its

history. Stanford, Davis and Pendergest-Holt represented that SIB was secure and built on a

strong foundation, and that its financial condition was shored up by Stanford's capital infusions.

74.     But Davis failed to disclose that he had been informed only days earlier by the head of SIB's treasury that, despite SIB's best efforts to liquidate Tier 2 assets, SIB's cash position had fallen from the June 30, 2008 reported balance of $779 million to less than $28 million.

75.     Stanford and Davis failed to disclose to the SGC sales force that: (i) Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIB's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIB investors' funds had been invested in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate); and (iv) the purported 2008 capital infusions by Stanford were a fiction.

76.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIB's investment portfolio.  In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIB's entire investment portfolio and only monitored approximately 10% of the bank's investments.  She also failed to disclose that SIB had invested investors' funds in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate).

77.     Stanford, Davis and Pendergest-Holt also failed to disclose that on or about December 12, 2008, Pershing, LLC, SGC's clearing broker-dealer, informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD, citing suspicions about SIB's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

78.     Stanford, Davis and Pendergest knew that SGC advisers would use the information provided to them during the Top Performer's Club meeting to sell CDs.

### Exposure to Losses From Madoff-related Investments

79.     In the December 2008 Monthly Report, SIB told CD investors that the bank "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

80.     Contrary to this statement, Stanford, Davis and Pendergest-Holt knew, prior to the release of the Monthly Report, that SIB had exposure to losses from investments with Madoff.

81.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIB had invested, detailing SIB's exposure to Madoff-related losses.

82.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIB had exposure to Madoff-related losses in two additional funds through which SIB had invested.   That same day, Davis, Pendergest-Holt and others consulted with Stanford regarding the bank's exposure to Madoff-related losses.

83.     Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

### Leroy King's Role in the Fraudulent Scheme

84.     Leroy King was the administrator and chief executive officer of the FSRC, which is charged with the regulation and supervision of all offshore banks licensed in Antigua, including SIB.

85.     From at least February 2005, and continuing  over a multi-year period, Stanford paid to King thousands of dollars in bribes, using money transferred from SIB to a Stanford-

controlled account at the Bank of Antigua, an onshore Antiguan bank owned and controlled by Stanford.  King caused certain of these bribes to be deposited into U.S. bank accounts.

86.     In addition to the cash payments, Stanford gave to King and his wife significant non-cash benefits, including: (i) use of Stanford's fleet of private jets to travel throughout the United States and the Caribbean; (ii) use of an SIB corporate car; and (iii) 2004 Super Bowl tickets for King and a companion.  Stanford subsequently hired King's Super Bowl companion as a human resources project manager in Houston.

87.     In exchange for the bribes, King facilitated SIB's fraud by obstructing the SEC's investigation into SIB and abdicating the FSRC's oversight responsibilities.

88.     On June 21, 2005, King, in response to an inquiry from the SEC, represented to the SEC staff that the FSRC had examined SIB and based on its examinations had concluded that "any further investigation of 'possible' fraudulent activities of [SIB] was unwarranted."  King continued by saying that "it is the opinion of the FSRC that [SIB] has conducted its banking business to date in a manner the FSRC considers to be fully compliant."  King had no basis for these representations.  In exchange for the bribes from Stanford, King promised that the FSRC would not audit SIB's investment portfolio.  In fact, on at least one occasion in or about May 2003, King removed from an examination of an SIB affiliate an inquisitive FSRC employee that "got too close to the fire."

89.     King also provided Stanford access to the FSRC's confidential regulatory files, including written requests by the Commission's staff for information regarding SIB.  For example, on September 25, 2006, the Commission's staff faxed a letter to King requesting the FSRC's assistance with its investigation of SIB.  That same day, Stanford, Davis, and SFG's

general counsel discussed the Commission letter and outlined for King precisely how they wanted him to respond to the Commission staff's request.

90.     On October 10, 2006, King did as Stanford instructed, sending a letter to the Commission's staff that tracked the response dictated by Stanford, Davis and SFG's general counsel. King's letter falsely stated: "We wish to assure the SEC that the FSRC's most recent onsite examination conducted just five months ago confirmed [SIB's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations. The FSRC has further confirmed through its continuous visits and supervision of [SIB] that there are no other issues or matters of concern with [SIB.]" In fact, King knew there was no basis for this assurance.

91.     At or around the same time King was responding to the above-referenced inquires, Stanford and King, in concert with others, withheld information from the SEC, citing reliance on inapplicable bank secrecy laws in Antigua.

92.     During the same time period that King was accepting bribes from Stanford, the FSRC's website assured potential investors that the regulator conducted annual on-site examinations of all Antiguan offshore banks (like SIB) to determine their solvency, to review the quality of their investments and to verify the accuracy of their returns. The FSRC's website also told investors that it performed "continuous off-site supervision in the form of an analysis of quarterly returns and annual audited financial statements, with follow-up on prescribed corrective actions." King knew that these representations were false with regard to the FSRC's "oversight" of SIB.

93.     King, by virtue of the FSRC's review of SIB's market materials and annual reports, was also aware that SIB touted that the bank was subject to the FSRC's audits,

regulatory inspections, and licensing requirements. He knew that these representations were false. Moreover, SIB, SGC and SFG employees regularly told investors that their CDs were safe because of the FSRC's audits, misrepresentations that would have been publicly debunked but for King's misconduct.

**SGC and SCM's Fraudulent Mutual Fund Sales**

94.     From 2004 through 2009, SGC and SCM induced clients, including non-accredited, retail investors, to invest in SAS, a proprietary mutual fund wrap program, by touting a fraudulent track record of "historical performance."

95.     SGC/SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books"). For example, the following chart from a 2006 pitch book presented clients with the false impression that SAS accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately 13 percentage points:

| Calendar Year Return | | | | | | |
| As of July 2005 | | | | | | |
| | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

96.     SGC/SCM used these performance results to grow the SAS program to over $1 billion in 2008.

97.     SGC/SCM also used the SAS track record to recruit financial advisers with significant books of business away from competitors. After arriving at Stanford, the newly-hired financial advisers were incentivized to put their clients' assets in the CD.

98.     Other than the fees paid by SIB to SGC/SCM for CD sales, SAS was the most significant source of revenue for SGC/SCM.   In 2007 and 2008, SGC/SCM received approximately $25 million in fees from the marketing of SAS.

99.     The SAS performance results used in the 2005 through 2009 pitch books were fictional and/or inflated.   SGC/SCM misrepresented that SAS performance results, for 1999 through 2004, reflected "historical performance" when, in fact, those results were fictional, or "back-tested," numbers that did not reflect the results of actual trading.

100.    SGC/SCM, with the benefit of hindsight, picked mutual funds that performed extremely well from 1999 through 2004, and presented the performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

101.    SGC/SCM also used "actual" model SAS performance results for 2005 and 2006 that were inflated by as much as 4 percentage points.

102.    SGC/SCM told investors that SAS had positive returns for periods in which actual SAS clients lost substantial amounts.   In 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%.   In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%.   And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%.

103.    SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated.   And they also knew that the pre-2005 track record was purely hypothetical.

104.    As early as November 2006, SGC/SCM investment advisers began to question why their clients were not receiving the returns advertised in the pitch books.   In response to

these questions, SGC/SCM hired an outside performance reporting expert to review the SAS performance results.

105.    In late 2006 and early 2007, the expert informed SGC/SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points.    Moreover, the expert informed SGC/SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the purported SAS performance results over actual client performance.    Finally, in March 2008, the expert informed SGC/SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

106.    Despite its knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record and never asked the performance expert to audit the pre-2005 performance.    In fact, in 2008 pitch books, SGC/SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" alongside the audited 2005 through 2008 figures.    SGC/SCM's outside consultant testified that it was "misleading" to present audited performance figures alongside back-tested figures.

107.    Finally, as indicated the chart below, SGC/SCM blended the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance:

Calendar Year Return
As of March 2008

| | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 12.40% | 14.66% | 8.62% | 16.16% | 32.84% | -3.33% | 4.32% | 18.04% | 22.59% |
| S&P 500 | -9.44% | 5.49% | 15.79% | 4.91% | 10.88% | 28.68% | -22.10% | -11.89% | -9.11% | 21.04% |

Annualized Returns
(not annualized if less than 1 year)

| | YTD | 1 year | 3 years | 5 years | 7 years | Since inception |
|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 0.80% | 9.38% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -5.08% | 5.85% | 11.32% | 3.70% | 2.45% |

108.    As evidence by its use of fictional and/or inflated performance results in the pitch books, SGC/SCM knowingly misled investors in connection with the sale of SAS.

## CAUSES OF ACTION

### FIRST CLAIM
### AS TO
### SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

109.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

110.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (i) employed devices, schemes and artifices to defraud;  (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

111.    As a part of and in furtherance of their scheme, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used contracts, written offering documents, financial statements, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the referenced misrepresentations and omissions knowingly or with severe and gross recklessness.

113.    For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

**SECOND CLAIM**
**AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5**

114.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

115.    If Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt did not violate Exchange Act Section 10(b) and Rule 10b-5, in the alternative, each in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.  Likewise, King, in the manner set forth above, knowingly or with severe recklessness, provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.

116.    For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King aided

and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**AS TO**
**SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT**
**Violations of Section 17(a) of the Securities Act**

117.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

118.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or

indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means

and instruments of transportation and communication in interstate commerce and by use of the

mails, have: (i) employed devices, schemes or artifices to defraud; (ii) obtained money or

property by means of untrue statements of material fact or omissions to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (iii) engaged in transactions, practices or courses of business

which operate or would operate as a fraud or deceit.

119.    As part of and in furtherance of this scheme, SIB, SGC, SCM, Stanford, Davis,

Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used

contracts, written offering documents, promotional materials, investor and other correspondence,

and oral presentations, which contained untrue statements of material fact and which omitted to

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

120.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the

referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the

truth.

121.    For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and

Kuhrt have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM
### AS TO STANFORD, SGC, AND STANFORD CAPITAL
#### Violations of Sections 206(1) and 206(2) of the Advisers Act

122.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

123.    Stanford, SGC and SCM, directly or indirectly, singly or in concert with others,

knowingly or recklessly, through the use of the mails or any means or instrumentality of

interstate commerce, while acting as investment advisers within the meaning of Section 202(11)

of the Advisers Act [15 U.S.C. § 80b-2(11)]: (i) have employed, are employing, or are about to

employ devices, schemes, and artifices to defraud any client or prospective client; or (ii) have

engaged, are engaging, or are about to engage in acts, practices, or courses of business which

operates as a fraud or deceit upon any client or prospective client.

124.    For these reasons, Stanford, SGC and SCM have violated, and unless enjoined,

will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)

and 80b-6(2)].

### FIFTH CLAIM
### AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING
#### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

125.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

126.    Based on the conduct alleged herein, Stanford, Davis, Pendergest-Holt, Lopez,

Kuhrt, and King, in the manner set forth above, knowingly or with severe recklessness provided

substantial assistance in connection with the violations of Advisers Act Sections 206(1) and

206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] alleged herein.

*SEC v. Stanford International Bank, Ltd., et al.*                                              29
*Second Amended Complaint*

127.    For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**SIXTH CLAIM**
**AS TO SIB AND SGC**
**Violations of Section 7(d) of the Investment Company Act**

128.    Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

129.    SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

130.    SGC, directly or indirectly, singly or in concert with others, acted as an underwriter for SIB, an investment company not organized or otherwise created under the laws of the United States or of a State that made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

131.   For these reasons, SIB and SGC have violated, and unless enjoined, will continue to violate Section 7(d) of the Investment Company Act [15 U.S.C. § 80a-7(d)].

## SEVENTH CLAIM
## AS TO RELIEF DEFENDANTS

132.   Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

133.   Relief Defendants each were recipients, without consideration, of proceeds of the fraudulent and illegal CD sales alleged herein. Each of these Relief Defendants profited from the fraud by obtaining illegal proceeds under circumstances in which it is not just, equitable, or conscionable for them to retain the illegal proceeds. Consequently, each of them has been named as a Relief Defendant.

134.   Relief Defendants should disgorge their ill-gotten gains and any other property or assets purchased with such gains.

## RELIEF REQUESTED

Plaintiff Commission respectfully requests that the Court:

## I.

Temporarily, preliminarily and permanently enjoin: (i) SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King from violating, or aiding and abetting violations of, Section 10(b) and Rule 10b-5 of the Exchange Act; (ii) SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt from violating Section 17(a) of the Securities Act; (iii) SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King from violating, or aiding and abetting violations of, Sections 206(1) and 206(2) of the Advisers Act; and (iv) SIB and SCG from violating Section 7(d) of the Investment Company Act.

## II.

Order Defendants and Relief Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

## III.

Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for their securities law violations.

## IV.

Order such further relief as this Court may deem just and proper.

Dated January 8, 2010                    Respectfully submitted,

                                          s/ David B. Reece
                                         STEPHEN J. KOROTASH
                                         Oklahoma Bar No. 5102
                                         J. KEVIN EDMUNDSON
                                         Texas Bar No. 24044020
                                         DAVID B. REECE
                                         Texas Bar No. 24002810
                                         MICHAEL D. KING
                                         Texas Bar No. 24032634
                                         D. THOMAS KELTNER
                                         Texas Bar No. 24007474
                                         JASON ROSE
                                         Texas Bar No. 24007946

                                         U.S. Securities and Exchange Commission
                                         Burnett Plaza, Suite 1900
                                         801 Cherry Street, Unit #18
                                         Fort Worth, TX  76102-6882
                                         (817) 978-6476 (dbr)
                                         (817) 978-4927 (fax)

# Exhibit F

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

<table>
<tr><td>SECURITIES AND EXCHANGE COMMISSION,</td><td>§</td></tr>
<tr><td></td><td>§</td></tr>
<tr><td>Plaintiff,</td><td>§</td></tr>
<tr><td></td><td>§</td></tr>
<tr><td>v.</td><td>§</td></tr>
<tr><td></td><td>§</td></tr>
<tr><td>STANFORD INTERNATIONAL BANK, LTD.,</td><td>§</td></tr>
<tr><td>STANFORD GROUP COMPANY,</td><td>§</td></tr>
<tr><td>STANFORD CAPITAL MANAGEMENT, LLC,</td><td>§</td></tr>
<tr><td>R. ALLEN STANFORD, JAMES M. DAVIS, and</td><td>§</td></tr>
<tr><td>LAURA PENDERGEST-HOLT</td><td>§</td></tr>
<tr><td></td><td>§</td></tr>
<tr><td>Defendants.</td><td>§</td></tr>
</table>

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB 1 7 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

Case No.:

**3-09CV0298-L**

## ORDER APPOINTING RECEIVER

This matter came before me, the undersigned United States District Judge, on the motion of Plaintiff Securities and Exchange Commission ("Commission") for the appointment of a Receiver for Defendants Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, and Laura Pendergest-Holt ("Defendants"). It appears that this Order Appointing Receiver is both necessary and appropriate in order to prevent waste and dissipation of the assets of Defendants to the detriment of the investors.

IT IS THEREFORE ORDERED that:

1.     This Court assumes exclusive jurisdiction and takes possession of the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control ("Receivership Assets"), and the books and records, client lists, account statements, financial and accounting documents, computers,

computer hard drives, computer disks, internet exchange servers telephones, personal digital devices and other informational resources of or in possession of the Defendants, or issued by Defendants and in possession of any agent or employee of the Defendants ("Receivership Records").

2.      Ralph S. Janvey of Dallas, Texas, is hereby appointed Receiver for the Receivership Assets and Receivership Records (collectively, "Receivership Estate"), with the full power of an equity receiver under common law as well as such powers as are enumerated herein as of the date of this Order. The Receiver shall not be required to post a bond unless directed by the Court but is hereby ordered to well and faithfully perform the duties of his office: to timely account for all monies, securities, and other properties which may come into his hands; and to abide by and perform all duties set forth in this Order. Except for an act of willful malfeasance or gross negligence, the Receiver shall not be liable for any loss or damage incurred by the Receivership Estate, or any of Defendants, the Defendants' clients or associates, or their subsidiaries or affiliates, their officers, directors, agents, and employees, or by any of Defendants' creditors or equity holders because of any act performed or not performed by him or his agents or assigns in connection with the discharge of his duties and responsibilities hereunder.

3.      The duties of the Receiver shall be specifically limited to matters relating to the Receivership Estate and unsettled claims thereof remaining in the possession of the Receiver as of the date of this Order. Nothing in this Order shall be construed to require further investigation of Receivership Estate assets heretofore liquidated and/or distributed or claims of the Receivership Estate settled prior to issuance of this Order. However, this paragraph shall not be

construed to limit the powers of the Receiver in any regard with respect to transactions that may have occurred prior to the date of this Order.

4.      Until the expiration date of this Order or further Order of this Court, Receiver is authorized to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate.

5.      As of the date of entry of this Order, the Receiver is specifically directed and authorized to perform the following duties:

(a)      Maintain full control of the Receivership Estate with the power to retain or remove, as the Receiver deems necessary or advisable, any officer, director, independent contractor, employee, or agent of the Receivership Estate;

(b)      Collect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated, the income and profit therefrom and all sums of money now or hereafter due or owing to the Receivership Estate with full power to collect, receive, and take possession of, without limitation, all goods, chattel, rights, credits, monies, effects, lands, leases, books and records, work papers, records of account, including computer maintained information, contracts, financial records, monies on hand in banks and other financial initiations, and other papers and documents of other individuals, partnerships, or corporations whose interests are now held by or under the direction, possession, custody, or control of the Receivership Estate;

*SEC v. Stanford International Bank, Ltd., et al.*

(c)     Institute such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate. All such actions shall be filed in this Court;

(d)     Obtain, by presentation of this Order, documents, books, records, accounts, deposits, testimony, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P., or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony may be located;

(e)     Without breaching the peace and, if necessary, with the assistance of local peace officers or United States marshals to enter and secure any premises, wherever located or situated, in order to take possession, custody, or control of, or to identify the location or existence of, Receivership Estate assets or records;

(f)     Make such ordinary and necessary payments, distributions, and disbursements as the Receiver deems advisable or proper for the marshaling, maintenance, or preservation of the Receivership Estate. Receiver is further authorized to contract and negotiate with any claimants against the Receivership Estate (including, without limitation, creditors) for the purpose of compromising or settling any claim. To this purpose, in those instances in which Receivership Estate assets serve as collateral to secured creditors, the Receiver has the authority to surrender such assets to secured creditors, conditional upon the waiver of any deficiency of collateral;

*SEC v. Stanford International Bank, Ltd., et al.*

(g)     Perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate;

(h)     Enter into such agreements in connection with the administration of the Receivership Estate, including, but not limited to, the employment of such managers, agents, custodians, consultants, investigators, attorneys, and accountants as Receiver judges necessary to perform the duties set forth in this Order and to compensate them from the Receivership Assets;

(i)     Institute, prosecute, compromise, adjust, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve the value of the Receivership Estate, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order and likewise to defend, compromise, or adjust or otherwise dispose of any or all actions or proceedings instituted against the Receivership Estate that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

(j)     Preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants;

(k)     Promptly provide the United States Securities and Exchange Commission and other governmental agencies with all information and documentation they may seek in connection with its regulatory or investigatory activities;

(l)     Prepare and submit periodic reports to this Court and to the parties as directed by this Court; and

*SEC v. Stanford International Bank, Ltd., et al.*

(m)     File with this Court requests for approval of reasonable fees to be paid to the Receiver and any person or entity retained by him and interim and final accountings for any reasonable expenses incurred and paid pursuant to order of this Court.

6.     Upon the request of the Receiver, the United States Marshal's Office is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, or control of, or identify the location of, any Receivership Estate assets or records.

7.     Creditors and all other persons are hereby restrained and enjoined from the following actions, except in this Court, unless this Court, consistent with general equitable principals and in accordance with its ancillary equitable jurisdiction in this matter, orders that such actions may be conducted in another forum or jurisdiction:

(a)     The commencement or continuation, including the issuance or employment of process, of any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action; or

(b)     The enforcement, against the Receiver, or any of the defendants, of any judgment that would attach to or encumber the Receivership Estate that was obtained before the commencement of this proceeding.

8.     Creditors and all other persons are hereby restrained and enjoined, without prior approval of the Court, from:

(a)     Any act to obtain possession of the Receivership Estate assets;

(b)     Any act to create, perfect, or enforce any lien against the property of the Receiver, or the Receivership Estate;

(c)    Any act to collect, assess, or recover a claim against the Receiver or that would attach to or encumber the Receivership Estate; or

(d)    The set off of any debt owed by the Receivership Estate or secured by the Receivership Estate assets based on any claim against the Receiver or the Receivership Estate.

9.    Defendants, their respective officers, agents, and employees and all persons in active concert or participation with them who receive notice of this Order by personal service or otherwise, including, but not limited to, any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm, and each of them, are hereby ordered, restrained, and enjoined from, directly or indirectly, making any payment or expenditure of any Receivership Estate assets that are owned by Defendants or in the actual or constructive possession of any entity directly or indirectly owned or controlled or under common control with the Receivership Estate, or effecting any sale, gift, hypothecation, assignment, transfer, conveyance, encumbrance, disbursement, dissipation, or concealment of such assets. A copy of this Order may be served on any bank, savings and loan, broker-dealer, or any other financial or depository institution to restrain and enjoin any such institution from disbursing any of the Receivership Estate assets.  Upon presentment of this Order, all persons, including financial institutions, shall provide account balance information, transaction histories, all account records and any other Receivership Records to the Receiver or his agents, in the same manner as they would be provided were the Receiver the signatory on the account.

10.    Defendants, and their respective agents, officers, and employees and all persons in active concert or participation with them are hereby enjoined from doing any act or thing whatsoever to interfere with the Receiver's taking control, possession, or management of the

*SEC v. Stanford International Bank, Ltd., et al.*

Receivership Estate or to in any way interfere with the Receiver or to harass or interfere with the

duties of the Receiver or to interfere in any manner with the exclusive jurisdiction of this Court

over the Receivership Estate, including the filing or prosecuting any actions or proceedings

which involve the Receiver or which affect the Receivership Assets or Receivership Records,

specifically including any proceeding initiated pursuant to the United States Bankruptcy Code,

except with the permission of this Court. Any actions so authorized to determine disputes

relating to Receivership Assets and Receivership Records shall be filed in this Court.

    11.    Defendants, their respective officers, agents, and employees and all persons in

active concert or participation with them who receive actual notice of this Order by personal

service or otherwise, including any financial institution, broker-dealer, investment adviser,

private equity fund or investment banking firm, and each of them shall:

    (a)    To the extent they have possession, custody, or control of same, provide

immediate access to and control and possession of the Receivership Estate assets and records,

including securities, monies, and property of any kind, real and personal, including all keys,

passwords, entry codes, and all monies deposited in any bank deposited to the credit of the

Defendants, wherever situated, and the original of all books, records, documents, accounts,

computer printouts, disks, and the like of Defendants to Receiver or his duly authorized

agents;

    (b)    Cooperate with the Receiver and his duly authorized agents by promptly

and honestly responding to all requests for information regarding Receivership Assets and

Records and by promptly acknowledging to third parties the Receiver's authority to act on

behalf of the Receivership Estate and by providing such authorizations, signatures, releases,

attestations, and access as the Receiver or his duly authorized agents may reasonably request;

*SEC v. Stanford International Bank, Ltd., et al.*

(c)     Provide the Commission with a prompt, full accounting of all Receivership Estate assets and documents outside the territory of the United States which are held either: (1) by them, (2) for their benefit, or (3) under their control;

(d)     Transfer to the territory of the United States all Receivership Estate assets and records in foreign countries held either: (1) by them, (2) for their benefit, or (3) under their control; and

(e)     Hold and retain all such repatriated Receivership Estate assets and documents and prevent any transfer, disposition, or dissipation whatsoever of any such assets or documents, until such time as they may be transferred into the possession of the Receiver.

12.     Any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm or person that holds, controls, or maintains accounts or assets of or on behalf of any Defendant, or has held, controlled, or maintained any account or asset of or on behalf of any defendant or relief defendant since January 1, 1990, shall:

(a)     Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, gift, or other disposal of any of the assets, funds, or other property held by or on behalf of any defendant or relief defendant in any account maintained in the name of or for the benefit of any defendant or relief defendant in whole or in part except:

(i)     as directed by further order of this Court, or

(ii)     as directed in writing by the Receiver or his agents;

(b)     Deny access to any safe deposit boxes that are subject to access by any Defendant; and

(c)     The Commission and Receiver may obtain, by presentation of this Order, documents, books, records, accounts, deposits, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P., or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony may be located;

13.     The Defendants, their officers, agents, and employees and all persons in active concert or participation with them and other persons who have notice of this Order by personal service or otherwise, are hereby restrained and enjoined from destroying, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any contracts, accounting data, correspondence, advertisements, computer tapes, disks or other computerized records, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state, or local business or personal income or property tax returns, and other documents or records of any kind that relate in any way to the Receivership Estate or are relevant to this action.

14.     The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to the Defendants, or any company or entity under the direction and control of the Defendants, to himself. Further, the Receiver is hereby authorized to open and inspect all such mail to determine the location or identity of assets or the existence and amount of claims.

*SEC v. Stanford International Bank, Ltd., et al.*

15.    Nothing in this Order shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Defendants, their agents, officers, or employees.

So Ordered and signed, this _16th_ day of February 2009.

_____
UNITED STATES DISTRICT JUDGE

_SEC v. Stanford International Bank, Ltd., et al._

# Exhibit G

Linda J. Robbins, CSR, RDR, CRR

Page 8

1    before.

2          So to the extent any of you have a collective spokes-

3    man, that's just lovely.  If not, if you're the fourth

4    person speaking in a similarly-situated spot, you don't

5    really need to stand up if all you're going to do is say,

6    "Me, too."

7          So with that in mind, what says the Receiver?

8          Oh, and let me also tell you, we have some folks who

9    are listening in by a remote phone connection.  So I need

10   for you to please come up and use the podium and the micro-

11   phone there so the people who are not physically present

12   in the courtroom can also hear what you have to say.

13               MR. SADLER:  Good morning, Your Honor.

14               THE COURT:  Morning.

15               MR. SADLER:  Kevin Sadler for the Receiver.  Mr.

16   Janvey is present as well.

17         There are two issues I'll speak to, and one is to

18   answer the question that Your Honor asked us to think about

19   at the hearing last time, which was with respect to all the

20   cases in the MDL which are ones that the Receiver has the

21   view should remain stayed per the litigation injunction

22   that's been in place and which -- which not.  And so let me

23   speak to -- to that first.

24         I think it breaks out fairly simply.  I have a list of

25   the cases, but I don't need to go one by one.  Our view,

1    Your Honor, is that the cases where a Receivership entity or

2    SEC defendants or financial advisors are defendants, that

3    those cases ought to remain stayed for the reasons we've

4    argued before, for the reasons set forth in your March 2010

5    Order discussing the litigation injunction.

6        So that's our view on the cases that ought to remain

7    stayed where a Receivership entity, an SEC defendant or

8    financial advisors are -- are defendants.

9        That then leaves a collection of other cases, of cases

10   against banks, cases against insurance companies, cases

11   against Pershing, cases against the government of Antigua.

12   I am not meaning to leave others out, but like that.  And

13   the Receiver's view is those should not be stayed per the

14   litigation injunction, they should go forward on -- on

15   their own processing, on merits without respect to the

16   litigation injunction.

17       Our issue there, of course, is coordination of

18   discovery because almost all these cases will involve

19   people requesting documents and other information from

20   the Receiver.

21       So, in that respect, we're very interested in a

22   coordinated approach to discovery served on the Receiver.

23   I think we'll be able to do that, given that I know four

24   of those cases that -- that we don't think are subject to

25   litigation injunction involve counsel who are on the Investor

Page 10

1    Committee.  So we would be talking to them in any event.

2         So with respect to those cases not stayed, our primary

3    concern is -- is simply controlling the cost and the burden

4    on the Receivership Estate with respect to -- to litigation

5    so that we don't -- we don't do things multiple times and --

6    and run up the bill, because we're all very concerned about

7    cost.

8         But that -- those are our two views on this collection

9    of MDL cases.  A certain group ought to remaining stayed for

10   the reasons we've already talked about and the other group

11   should go forward in -- in whatever coordinated fashion is

12   appropriate.

13             THE COURT:  Okay.  Just so our record is clear,

14   could you perhaps file a letter that identifies by cause

15   number the ones that you think are still stayed and that

16   way everybody will be on the same page on your position on

17   that?

18             MR. SADLER:  I'd be happy to get that submitted

19   either late today or first thing in the morning.

20             THE COURT:  No hurry.

21             MR. SADLER:  Okay.  Have I addressed the Court's

22   questions or is there anything else on this MDL issue?

23   That's really our -- our simple view on -- on that matter.

24             THE COURT:  One of the miscellaneous ones is the

25   In Re:  Tax Liability of John Does.  What's your temperature

1    on that?

2              MR. SADLER:  Your Honor, that case is proceeding

3    in the -- I guess I'd call it the discovery phase.  That

4    is, the IRS is still requesting, and we are still providing,

5    information to them.  That's the status of it from our point

6    of view.

7         What further proceedings the IRS intends to do or bring

8    is -- is not known to us.  But right now it's proceeding in

9    an orderly fashion with us providing additional information

10   that's essentially responsive to the subpoenas.

11             THE COURT:  Okay.  All right.  Thank you very much.

12             MR. SADLER:  Thank you, Your Honor.

13             THE COURT:  SEC?

14             MR. REECE:  Good morning, Your Honor.  David Reece

15   on behalf of the SEC.

16        At the risk of being the first person to kind of repeat

17   what one of the lawyers said, we have conferred with counsel

18   for the Receiver and we generally agree with the position

19   that he took in terms of the relationship between the

20   Receivership cases and the nonReceivership cases.

21             THE COURT:  Okay.  Thank you.

22        Examiner?

23             MR. LITTLE:  Good morning, Your Honor.  Let me

24   come up with two hats actually because my examiner hat is

25   not going to take very long.  Me, too.

Linda J. Robbins, CSR, RDR, CRR

Page 12

1    With respect to the split between cases, there may be

2    a little bit of -- the only distinction I might draw with

3    respect to the split of cases is that with respect to the

4    pursuit of lawsuits against the former financial advisors,

5    it certainly makes sense to me for that to stay -- those

6    to stay stayed until such time as the Fifth Circuit rules

7    on the pending appeal from the Court's injunction Order.

8    Once we've gotten advice from New Orleans, we may

9    want to revisit that issue with respect to the financial

10   advisors.

11   Let me also speak for a moment to the Court's request

12   to the Investor Committee.  We're actually having our --

13   our first real live meeting when we're done here today.  And

14   so we'll be sitting down with the Receiver and Receiver's

15   counsel and five of the seven members of the Investor

16   Committee.

17   So I'm not sure that the Investor Committee is yet at

18   a point to opine as a committee about the issues before

19   you, although I suspect you will hear from Mr. Morgenstern,

20   Mr. Snyder, and Mr. Valdespino, all of whom are plaintiff

21   counsel in one or more of the cases that are the MDL

22   proceedings.

23         THE COURT:  And how is the overlap between the

24   plaintiffs' counsel and the investor suits and the Investor

25   Committee?

1         MR. LITTLE:  We are -- we have seven members of

2    the Investor Committee:  myself; Mr. Morgenstern, who is

3    counsel in I think two of the pending cases; Mr. Snyder,

4    who is counsel in two of the pending cases and represents a

5    large number of Latin American investors.

6         Mr. Valdespino, who is counsel I think in one or two

7    of the cases, represents a very large number of Venezuelan

8    investors.  Jaime Pinto, who is a Peruvian attorney who

9    represents a number of Peruvian investors.  He's not counsel

10   in any of the pending cases.

11        Then Ms. Angie Kogutt, who is the individual investor

12   and the organizer and leader of the Stanford Victims

13   Coalition.  And then Dr. John Wade, who is a Louisiana

14   investor who also sort of represents the Stanford Trust

15   Company hunk of investors.

16        THE COURT:  One of the things that I want to

17   explore, and you may be appropriately situated to answer

18   that, is whether we're going to end up with arm wrestling

19   between the individual plaintiffs' counsel in the investor

20   suits and the Investor Committee in the Receivership.

21        MR. LITTLE:  I don't think we will, Your Honor.

22   I think the -- the goal of the -- the counsel who are on

23   the Investor Committee is to work with the Receiver to,

24   you know, get to both the plaintiffs and the defendants in

25   these investor lawsuits the information they need from the

1    Receiver as quickly and as efficiently and as with as little

2    burden on the Receivership as possible.  And that's really

3    sort of the topic number one for our conversation this

4    afternoon.

5              THE COURT:  And, Mr. Sadler, if the Receiver

6    wants to speak to this, too, I'm happy to give you another

7    opportunity to talk about it perhaps at the end.

8        To what extent is there likely to be any arm wrestling

9    between the Receiver and the investor plaintiffs to the

10   extent they are going after the same or similar pots of

11   money?

12             MR. LITTLE:  Part of the -- I think part of the

13   goal of the Committee and the Receiver, Your Honor, is to

14   be sure we're not doing that, so that if the Receiver has

15   already instituted a lawsuit against some group of folks,

16   it would be the Investor Committee's role or -- or thought

17   to not go after that same group of folks but instead to

18   focus our attentions on third party defendants and others

19   who the Receiver has not yet brought an action against or

20   perhaps doesn't have standing to bring an action against or

21   doesn't have the -- or doesn't have the resources to bring

22   an action against.

23             THE COURT:  Those are very different issues.  Part

24   of what you're telling me is--and I mean this in a positive

25   and affirming way--there are side deals going on dividing

Linda J. Robbins, CSR, RDR, CRR

Page 15

1    up the potential pool of recoverable assets; and by private

2    agreement among the Receiver and the plaintiffs' counsel

3    and the Investor Committee, certain assets are being carved

4    out of the Receivership.

5        Do I need to be worried about that?

6            MR. LITTLE:   I don't think that's what I'm telling

7    you.   I think the stipulation that was entered and was

8    made into the Order that created the Investor Committee

9    contemplated that the Receiver and the Investor Committee

10   would not -- would try not to do the same things.

11       And -- and we're simply trying to conform to the Order

12   so that if -- if third party investor plaintiffs are already

13   suing banks --

14           THE COURT:   Uh-huh.

15           MR. LITTLE:   -- there's no great reason for the

16   Receiver to go and start his own lawsuit to pursue those

17   same banks.

18           THE COURT:   And what happens to the proceeds when

19   you collect a gigantic pot of money from the defendant

20   banks?

21           MR. LITTLE:   I fully expect that Mr. Sadler will

22   then weigh into the lawsuit to be heard from at that time.

23           THE COURT:   Uh-huh.

24           MR. LITTLE:   But in terms of the discovery and

25   the prosecution of the action, we don't want to duplicate

# Exhibit H

2/1/03.

# LOAN AGREEMENT

## STANFORD FINANCIAL GROUP COMPANY

U.S. $40,000,000.00 LOAN

TO

## THE GOVERNMENT OF ANTIGUA AND BARBUDA,
through its duly appointed representative

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 173

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made as of August 30, 2001 by and between:

THE GOVERNMENT OF ANTIGUA AND BARBUDA (the "Borrower"), through its duly appointed representative,

AND

STANFORD FINANCIAL GROUP COMPANY, a corporation duly incorporated under the laws of the State of Florida, United States of America, (the "Lender").

## WITNESSETH:

WHEREAS, Borrower has requested that Lender make available to Borrower a loan facility in a principal amount of up to forty million dollars (US$ 40,000,000.00) for the purposes of financing shortfalls, if any, in the funds normally available to Borrower to pay the wages and salaries of its employees and to repay certain of its existing debts.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

## ARTICLE I
## DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the respective meanings indicated opposite each of them:

"Account Charge"

The Account Charge of even date herewith executed by Borrower in favor of Lender, pursuant to which Borrower pledges as security for the Loan, among other things, all Tax Revenues on deposit in the Current Account and all funds on deposit in the Compensating Account, together with any renewals, replacements, substitutions or amendments thereof made from time to time.

"Advance"

A portion of the Loan funds disbursed by the Lender to or for the benefit of Borrower from time to time under this Agreement.

"Advance Request"

Each of Borrower's periodic requests for an Advance of Loan funds.

"Affiliate"

As to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person (excluding any trustee under or

# TABLE OF CONTENTS

Page

**ARTICLE I** DEFINITIONS ..................................................................1

**ARTICLE II** THE LOAN ....................................................................4

    2.1      Interest and Term. ...............................................................4
    2.2      Bank Accounts ....................................................................5
    2.3      Use of Loan Funds .............................................................6
    2.4      Net Payments .....................................................................6
    2.5      Additional Security ...........................................................6

**ARTICLE III** DISBURSEMENT OF ADVANCES .............................7

    3.1      Advance Requests ..............................................................7
    3.2      Ratification .........................................................................7
    3.3      Protective Advances ..........................................................7
    3.4      Limitation ...........................................................................7
    3.5      Prepayment ........................................................................8

**ARTICLE IV** CONDITIONS PRECEDENT .......................................8

    4.1      Conditions to First Advance ..............................................8
    4.2      Conditions to Subsequent Advances ..................................9

**ARTICLE V** REPRESENTATIONS AND WARRANTIES ................9

    5.1      Capacity; Binding Obligations ..........................................10
    5.2      Authorization and Non-Contravention ............................10
    5.3      No Litigation .....................................................................10
    5.4      No Other Defaults .............................................................10
    5.5      Approvals ..........................................................................10
    5.6      Full Disclosure .................................................................11
    5.7      Statements .........................................................................11
    5.8      No Enforcement Event; Compliance ...............................11

**ARTICLE VI** AFFIRMATIVE COVENANTS ...................................11

    6.1      Payments ...........................................................................11
    6.2      Continued Existence of Tax Revenues .............................11
    6.3      Costs ..................................................................................11
    6.4      Loan Funds ........................................................................11
    6.5      Financing Activities ..........................................................11
    6.6      Liens ..................................................................................12

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 175

6.7      Records and Reports
6.8      Notice to Lender ..................................................................12
6.9      Adverse Proceedings..............................................................12
6.10     Indemnity ..........................................................................12
6.11     Compliance .........................................................................13
6.12     Parliamentary Approval ..........................................................13
                                                                                13

ARTICLE VII   NEGATIVE COVENANTS..............................................................13

7.1      No  Property Transfers; No Further Encumbrances
7.2      Further Assurances.................................................................13
7.3      No Assignment of Loan ...........................................................13
7.4      No Adverse Actions................................................................13
7.5      Additional Indebtedness...........................................................13
                                                                                13

ARTICLE VIII   DEFAULT AND REMEDIES ...........................................................13

8.1      Enforcement Events.................................................................14
8.2      Remedies.............................................................................14

ARTICLE IX   ASSIGNMENT ...............................................................................16

9.1      Assignment by Lender..............................................................16
9.2      Disclosure ...........................................................................16

ARTICLE X   GENERAL CONDITIONS AND OTHER COVENANTS ...........................17

10.1     Evidence of Disbursals; Previous Disbursals ..................................17
10.2     No Third-Party Beneficiaries....................................................17
10.3     Indemnity ...........................................................................17
10.4     Notices ..............................................................................18
10.5     Governing Law; Service of Process; Venue ...................................18
10.6     No Usury.............................................................................19
10.7     Exchange Rate ......................................................................19
10.8     Writing Required ...................................................................20
10.9     Partial Invalidity...................................................................20
10.10    Interpretation.......................................................................20
10.11    Assignment..........................................................................20
10.12    Binding Effect.......................................................................20
10.13    Loan Agreement Governs .........................................................21
10.14    Counterparts.........................................................................21
10.15    Time of Essence.....................................................................21
10.16    Waiver of Immunity................................................................21
10.17    Act of State Doctrine..............................................................21
10.18    No Jury Trial ........................................................................21
                                                                                21

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 176

## ANNEX INDEX

Annex A       -       Borrower's Debts
Annex B       -       Form of Advance Request
Annex C       -       Form of Legal Opinion from Borrower's Antiguan Counsel
Annex D       -       Form of Legal Opinion from Borrower's English Counsel

any committee with responsibility for administering any employee benefit plan) or is a    ector or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 25% or more of any class of the voting stock or other equity interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock or other equity interests, by contract or otherwise.

"Amortization Date"   December 1, 2002.

"Applicable Taxes"   All taxes specified in the definition of "Tax Revenues" below.

"Borrower"   As defined in the preamble to this Agreement.

"Borrower's Antiguan Counsel"   The Attorney General of Antigua and Barbuda, Ministry of Justice and Legal Affairs, Queen Elizabeth Highway, St. John's, Antigua, or counsel designated by the Attorney General and acceptable to Lender.

"Borrower's English Counsel"   Solicitors Charles Russell, 8-10 New Fetter Lane, London EC4A IRS, or counsel designated by the Attorney General and acceptable to Lender.

"Collateral Proceeds"   The Tax Revenues.

"Compensating Account"   As defined in Section 2.2.

"Current Account"   As defined in Section 2.2.

"EC$"   Eastern Caribbean Central Bank Dollars.

"Effective Date"   August 30, 2001.

"Enforcement Event"   As defined in Section 8.1.

"Finance Act"   As defined in Section 4.1(c).

"Loan"   The US $40,000,000.00 credit facility made available to Borrower by Lender, which is evidenced by the Note, governed by this Agreement, and secured by the Account Charge and other Security Documents.

- 2 -

"Loan Documents"

This Agreement, the Note, the Account Charge, the other Security Documents, and all other instruments or documents pertaining to the Loan executed from time to time in favor of Lender by Borrower or any other Obligor.

"Maturity Date"

August 29, 2016.

"Note"

The Promissory Note of even date herewith executed by Borrower in favor of Lender in the principal amount of US $40,000,000, together with any renewals, replacements, substitutions or amendments thereof made from time to time.

"Obligor"

Borrower, any other person giving security for the Loan, and any other person liable or to become liable for the Loan from time to time.

"Parties"

Collectively, Lender and Borrower.

"Person"

An individual, partnership, corporation, business trust, governmental authority, joint venture or other entity of whatever nature.

"Security Documents"

The Account Charge and any registered bill of sale, collateral assignment, Account Charge, lien, charge, hypothecation, security agreement or other instruments or documents executed from time to time in favor of Lender by any Borrower with respect to any of the collateral securing the Loan.

"Tax Revenue"

The revenues derived by Borrower from the assessment of the following taxes, all of which are committed by Borrower to repay the Loan: (i) all of the Embarkation Tax, which is assessed by Borrower pursuant to the *Embarkation Tax Act Cap 146, as amended*, or any Act which replaces this Act; (ii) all of the proceeds of the Property Tax in excess of EC $4,700,000.00, which Property Tax is assessed by Borrower pursuant to the *Property Tax Act 2000, as amended*, or any Act which replaces this Act; and (iii) all of the Tax on the Throughput Levy, which is assessed by Borrower pursuant to the *Petroleum Act Cap 326, as amended*, or any Act which replaces this Act, PROVIDED that the total revenues committed to repay the loan under the abovementioned Acts shall not be less than EC$16,000,000 in any successive twelve (12) month period.

"US$"

United States Dollars.

- 3 -

## ARTICLE II
## THE LOAN

Subject to all applicable terms and conditions of the Loan Documents, Lender agrees to make the Loan to Borrower and Borrower agrees to accept the Loan from Lender.

2.1   **Interest and Term.**

(a)   The outstanding principal balance of the Loan from time to time shall bear interest at the rate of nine and one-half percent (9.5%) per annum, calculated on the basis of the actual days elapsed in an assumed year of 360 days, and payable in arrears on the first day of each calendar month.  Borrower shall initially pay Lender on the first day of each month only the interest accruing on the Loan; however, commencing with the first monthly payment due on or after the Amortization Date, Borrower shall pay Lender equal monthly installments of principal and interest on the first day of each calendar month in an amount determined by Lender that is sufficient to repay the entire principal balance of the Loan then outstanding over a fifteen (15) year period commencing on the Amortization Date.  This fifteen (15) year period extends beyond the stated Maturity Date and is referenced solely for determining the amount of the amortization payments; notwithstanding said amortization period, a balloon payment equal to the entire remaining principal balance of the Loan, together with all accrued and unpaid interest, shall be due and payable in full on the Maturity Date.

(b)   If for whatever reason the outstanding principal balance of the Loan increases after the Amortization Date as a result of Advances made after the Amortization Date or otherwise, the amount of the equal monthly installment payments due from Borrower shall be increased by Lender to an amount determined by Lender to be sufficient to repay the increased outstanding principal balance of the Loan after such Advances are made over the number of months then remaining in the original fifteen (15) year amortization period referred to in subsection (a) above.  No such increase in the monthly installment amount shall operate to extend the Maturity Date of the Loan, although it may change the amount of the balloon payment due on the Maturity Date.

(c)   Notwithstanding the ordinary annual interest rate set forth in subsection (a) above and in the Note, the entire outstanding principal balance of the Loan shall at Lender's option bear interest at thirteen percent (13%) per annum (the "**Default Rate**") during the existence of any Enforcement Event; provided, however, that if the Enforcement Event consists solely of Borrower's failure to pay any monthly installment of principal or interest on the Loan on the date when such installment is due, then (i) Lender shall not impose the Default Rate unless the monthly installment payment is delinquent more than ten (10) days, (ii) if the installment payment is delinquent more than ten (10) days, Lender may in its sole discretion impose the Default Rate on the entire outstanding balance of the Loan retroactively from the date the delinquent installment was due until the installment is paid in full, and (iii) Lender's option to impose the Default Rate is independent of, and may be exercised in addition to, Lender's option to impose the late payment charge described in subsection (d) below or any other right Lender may have hereunder, under any other Loan Document or pursuant to any law, rule or regulation. The ten (10) day grace period described in the preceding sentence for imposition of the Default Rate does not apply to any failure by Borrower to pay the Loan upon its stated Maturity Date or upon acceleration of maturity as provided in this Agreement, nor does this grace period apply to

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 180

any other Enforcement Even* *her than non-payment of a monthly     *stallment of principal or interest.

(d)     If any monthly installment payment of principal or interest is not made by Borrower to Lender within five (5) days after such payment is due, then for each such delinquent installment Borrower shall pay to Lender a late payment charge in the amount of US$500, as liquidated damages to cover the extra expenses to Lender of handling such late payment.  Borrower acknowledges and agrees that the exact amount of such extra expenses incurred by Lender is difficult to determine in advance and that said late payment charge constitutes a reasonable good faith estimate of such expenses and is not a penalty or interest.  Lender's option to impose a late payment charge is independent of, and may be exercised in addition to, Lender's option to impose the Default Rate described in subsection (c) above or any other right Lender may have hereunder, or under any other Loan Document or pursuant to any law, rule or regulation.

2.2     **Bank Accounts**.  Concurrently with the execution of this Agreement, the following bank accounts are being established with banks or other financial institutions designated by Lender (collectively, the "**Financial Institution**") and pledged to Lender by Borrower, as additional security for the Loan:

(a)     During the term of the Loan, Borrower shall maintain with the Financial Institution, in United States Dollars, a compensating balance account (the "**Compensating Account**"), in which a minimum balance equal to US$370,000 shall be maintained at all times (the "**Minimum Balance**").     All funds in the Compensating Account shall accrue interest at Financial Institution's "Flex CD" rate, or such other similar rate as is commercially available, as adjusted from time to time, except that during the existence of any Enforcement Event the funds in the Compensating Account shall not accrue any interest.  Until the Loan is fully and finally repaid, no funds may be withdrawn from the Compensating Account without the written consent of Lender in its sole discretion. The Compensating Account and all funds therein from time to time are and shall be assigned and pledged to Lender as additional security for the Loan.  Borrower shall execute in favor of Lender the Account Charge and such other account charges and account assignments and other instruments and documents as Lender or the Financial Institution may require in order to perfect the pledge and assignment of the Compensating Account and the funds therein as security for the Loan.

(b)     In addition to the Compensating Account described in the foregoing subsection, during the term of the Loan, Borrower shall maintain with the Financial Institution a current restricted deposit account (the "**Current Account**"), in which Borrower shall deposit on or before the fifteenth (15th) day of each calendar month all Tax Revenues collected by Borrower or by any other governmental agency or authority during the preceding calendar month.     All Tax Revenues, the Current Account and all funds therein from time to time are and shall be assigned and pledged to Lender as additional security for the Loan, and for purposes of this pledge and assignment; all partial collections of such Tax Revenues from any person shall also be deemed pledged by Lender as additional security for the Loan.  Borrower shall execute in favor of Lender such account charges and account assignments and other instruments and documents as Lender and the Financial Institution may require in order to perfect the pledge and assignment of the Tax Revenues, Current Account and the funds therein as security for the Loan.

- 5 -

(c)     Borrower hereby    vocably authorizes Lender to withdraw funds from the Current Account to pay itself monthly installment payments as the same become due from time to time on the Loan, notwithstanding that Borrower may not have requested the particular withdrawal and regardless of whether any Enforcement Event then exists. Although the Current Account has been established, among other reasons, as a mechanism for the payment of monthly installments due on the Loan from time to time, neither the establishment of the Current Account nor any other provision of this Agreement or any other Loan Document shall be deemed or construed to release or discharge or otherwise affect Borrower's absolute obligation to pay the required monthly installments on the Loan in accordance with the Loan Documents. Similarly, nothing contained in this Agreement shall require Borrower to use the Current Account to pay such monthly installments, and Borrower may pay the same from other sources. Unless Borrower notifies Lender in advance that it has elected to fund a monthly installment payment from another source, Lender shall automatically withdraw funds from the Current Account and apply the same to such payment on the date due, to the extent that sufficient funds are available in the Current Account. Lender shall not be required to do so if an Enforcement Event then exists. If sufficient funds are not available in the Current Account or if the existence of an Enforcement Event or any other circumstance excuses Lender from applying funds from the Current Account to the installment payment then due, then Borrower shall make the necessary payment when due to Lender from other sources immediately on demand therefor by Lender.

(d)     If any Enforcement Event exists beyond any applicable grace or cure period, then Lender shall have the immediate right to apply and offset or direct the Financial Institution to apply and offset, any and all funds in either or both of the Compensating Account or the Current Account against any interest, principal, fees or other sums owing from Borrower to Lender under the Loan Documents, whether or not then due. Lender shall notify Borrower of any such application or offset of funds (unless such notice is prohibited by any applicable law), but such notice is not a precondition to Lender's right to apply and offset, or Lender's right to direct the Financial Institution to apply and offset, the funds on account of an Enforcement Event at any time in its sole discretion.

2.3     **Use of Loan Funds**.  Borrower shall use the Loan funds advanced to it by Lender exclusively to: (i) pay the wages and salaries of its employees, and (ii) repay Borrower's debts listed on Annex "A". Lender, in its sole discretion, may authorize the use of Loan funds for any other purpose; provided, however, that any such authorization shall not obligate Lender to increase the original principal amount of the Loan.

2.4     **Net Payments**.  All amounts payable under this Agreement shall be made in immediately available U.S. funds and without set-off or counterclaim and clear of and without deduction for any and all present and future taxes, levies, imports, deductions, charges, withholdings, contributions, services, surcharges, exchange commissions, penalties and all liabilities with respect thereto imposed by any governmental or taxing authority.

2.5     **Additional Security**.  In the event that the Tax Revenues collected by Borrower in any successive twelve (12) months period falls below EC$16,000,000, Lender shall have the right to designate any additional source of funds or additional collateral of Borrower, other than funds from the Offshore Financial Sector (the "**Additional Collateral**") to secure the Loan. The Additional Collateral designated by Lender shall be at the sole discretion of Lender. Upon such

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 182

designation by Lender, Borrᴏᴡer shall perform such actions and deliver such documentation to Lender as is necessary for Lender to secure the Additional Collateral as collateral for the Loan. Borrower's failure to comply with the provisions of this Section 2.5 shall constitute an Enforcement Event.

# ARTICLE III
## DISBURSEMENT OF ADVANCES

Subject to compliance with all of the conditions of this Agreement and the remaining Loan Documents, Lender shall make Advances of Loan funds to Borrower as requested by Borrower in accordance with the provisions of this Agreement.

3.1    **Advance Requests.**  Borrower may require the disbursement of all or any part of the amount of the Loan at any time before the Maturity Date unless an Enforcement Event has occurred.    Each Advance Request must be made pursuant to an Advance Request form substantially in the form of the Advance Request form attached hereto as Annex "B", and must be signed by a properly authorized official of Borrower.   Prior evidence of such authority, satisfactory to Lender in its sole discretion, must be made available to Lender.  In addition, each Advance Request (i) shall specify the amount of the Advance requested and contain instructions for its disbursement, (ii) shall attach such supporting documentation as is requested by Lender from time to time, and (iii) shall certify that Borrower shall use the funds to be disbursed to it by Lender exclusively for the purposes set forth in Section 2.3 of this Agreement.   Furthermore, each Advance Request shall be irrevocable and binding on Borrower and shall be delivered to Lender by telecopier or telex, confirmed immediately in writing by courier.  Lender shall not be required to disburse Advances (i) more frequently than semi-monthly or (ii) during the existence of any Enforcement Event.  Lender shall not be required to approve any Advance Request for an amount less than US$1,000,000.

3.2    **Ratification.**  Except as otherwise previously or concurrently disclosed to Lender in writing, each Advance Request by or on behalf of Borrower shall be deemed to ratify and confirm that all representations and warranties of Borrower in this Agreement and the other Loan Documents remain true and correct as of the date of the Advance Request.  Unless Lender is notified to the contrary before disbursing the Advance, Borrower's acceptance and use of the Advance shall be deemed to ratify and confirm that all such representations and warranties remain true and correct on the date of the Advance.

3.3    **Protective Advances.**  Notwithstanding the face amount of the Note, Lender shall at all times have the right (but not the obligation) to advance any additional funds which Lender may in its sole discretion deem necessary or appropriate from time to time in order to preserve or protect the collateral for the Loan, or to enforce any of Lender's rights or remedies, or for any other reason permitted or provided under this Agreement or any other Loan Document. All such additional Advances shall bear interest at the Default Rate, shall be payable on demand of Lender, and shall be secured as protective Advances under the Account Charge and the other Security Documents.

3.4    **Limitation.**  No Advance shall constitute a waiver by Lender of any conditions precedent to any subsequent Advances.  Lender shall not be obligated to approve any Advance of Loan

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 183

funds for purposes other than those contemplated in this Agreement. Lender shall neither be required to segregate specific funds in any manner for the purposes of this Agreement nor to supervise the proper application or distribution of funds to third parties; the sole obligation of Lender shall be to advance the Loan funds as directed by Borrower, upon Borrower's compliance with and subject to all of the applicable terms of the Loan Documents.

3.5    **Prepayment.**   The Loan may be prepaid by Borrower, in whole or in part, without incurring any prepayment penalty.   Payments shall be applied first to any fees or charges incurred in connection with this Loan, and then to accrued and unpaid interest with the balance, if any, to the principal of the Loan.

**ARTICLE IV**
**CONDITIONS PRECEDENT**

Lender shall not be required to make any Advance of Loan funds unless the applicable conditions precedent set forth in this Article have been satisfied.

4.1    **Conditions to First Advance.**   The following conditions precedent shall apply to the first Advance of Loan funds following the Advance referred to in Section 10.1:

(a)    Borrower shall have executed and delivered to Lender the Note, the Account Charge, this Agreement and all other Loan Documents required by Lender, all in form and content satisfactory to Lender. In addition, Borrower shall have executed or caused to be executed (as may be appropriate) and delivered to Lender any other instruments or documents which Lender or Lender's counsel may reasonably consider necessary or appropriate in connection with the Loan;

(b)    Borrower shall have executed and delivered to Lender and the Financial Institution such documentation as Lender and the Financial Institution may require for the establishment and pledge of the Compensating Account and the Current Account, and Borrower shall have deposited the Minimum Balance in the Compensating Account. In addition, Lender shall have received evidence satisfactory to it in its sole discretion that all other collateral securing the Loan is and remains in place, and that Lender's security interest in such collateral remains perfected;

(c)    Lender shall have received a certified copy of the legislation authorizing Borrower to borrow the Loan as required by virtue of the Finance and Audit Act Cap. 168 (the "**Finance Act**"), together with a copy of the Cabinet Decision, certified by the Secretary of the Cabinet, authorizing Borrower to enter into this Agreement and the other Loan Documents and specifying the person or persons authorized to sign this Agreement and the other Loan Documents on behalf of Borrower;

(d)    Lender shall have received a legal opinion from Borrower's Antiguan Counsel in substantially the form of Annex "C" and a legal opinion from Borrower's English Counsel in substantially the form of Annex "D";

(e)    No Enforcement Event shall exist under this Agreement or any other Loan Document, and no act shall have been committed or event occurred or be then occurring which with the passage of time and/or the giving of notice would constitute any such Enforcement Event;

- 8 -

Loan Documents shall be true and correct on and as of the date of the disbursement of the Advance with the same effect as if Borrower had made them on such date;

(g)   Borrower shall have paid Lender for all charges and fees incurred by Lender in connection with any of the Loan Documents, including any legal fees incurred in the preparation of any of the Loan Documents;

(h)   No litigation or proceedings shall be pending or threatened (including any bankruptcy, insolvency or similar proceedings) against Borrower which litigation or proceedings, in Lender's exclusive judgment, is likely to have any effect on the Loan or any collateral securing the Loan; and

(i)   No event, circumstance or condition shall exist or shall have occurred which could, in Lender's exclusive judgment, delay or prevent Borrower from paying the Loan.

4.2   **Conditions to Subsequent Advances**.   The following conditions precedent shall apply with respect to each subsequent Advance of Loan funds requested by Borrower after the initial Advance of Loan funds:

(a)   All conditions precedent to the first Advance set forth in Section 4.1 shall have been satisfied;

(b)   No Enforcement Event shall exist under this Agreement or any other Loan Document, and no act shall have been committed or event occurred or be then occurring which with the passage of time and/or the giving of notice would constitute any such Enforcement Event;

(c)   The representations and warranties made by Borrower in this Agreement and all other Loan Documents shall be true and correct on and as of the date of the disbursement of the Advance with the same effect as if Borrower had made them on such date;

(d)   No litigation or proceedings shall be pending or threatened (including any bankruptcy, insolvency or similar proceedings) against Borrower which litigation or proceedings, in Lender's exclusive judgment, is likely to have any effect on the Loan or any collateral securing the Loan;

(e)   No event, circumstance or condition shall exist or shall have occurred which could, in Lender's exclusive judgment, delay or prevent Borrower from paying the Loan; and

(f)   Lender shall have received any original Loan Documents that were required to be recorded in order to make them effective under applicable law or to perfect the lien described therein.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to make the Loan and to perform the covenants herein contained, Borrower makes the following representations and warranties to Lender, each of which shall survive the execution and delivery of this Agreement and all other Loan Documents:

- 9 -

5.1   **Capacity; Binding Obligations**.  Borrower has full power, capacity and legal right to collect the Collateral Proceeds, pledge the Collateral Proceeds and all other collateral pledged by Borrower as collateral for the Loan, to execute and deliver this Agreement and each other Loan Document and to perform and observe all of its obligations thereunder, pursuant to the laws of Antigua and Barbuda.  The Note, the Account Charge, this Agreement and all other Loan Documents executed by the Borrower constitute valid and binding obligations of Borrower, enforceable against it in accordance with the respective terms thereof.

5.2   **Authorization and Non-Contravention**.  Borrower has obtained the approval of the Loan by its Cabinet in accordance with the Finance Act and shall, on or before September 15, 2002 (the "**Approval Date**"), (i) obtain parliamentary approval of the Loan in accordance with the Finance Act, and (ii) cause the Parliament of Borrower to enact enabling legislation allowing the Collateral and the Obligations (as those terms are defined in the Account Charge) to be a charge upon the Consolidated Fund (as that term is defined in the Antigua and Barbuda Constitution Order 1981) of Borrower.  Borrower's failure to obtain parliamentary approval of the Loan or to cause the Parliament of Borrower to enact enabling legislation (as set forth above) on or before the Approval Date shall constitute an Enforcement Event.  Subject to the foregoing provisions of this Section 5.2, the execution, delivery and performance of this Agreement, the Note, the Account Charge and all other Loan Documents by Borrower have been duly authorized by all necessary governmental, corporate and legal actions and do not and shall not conflict with or constitute a default under any law, by-law, ordinance, regulation, indenture, agreement or instrument to which Borrower is a party or by which Borrower or its assets may be bound or affected. The Collateral Proceeds and the related Applicable Taxes have been duly enacted by the Parliament of Antigua and Barbuda, are lawful and enforceable in all respects, and do not conflict with or contravene any constitutional provision or any other law, by-law, regulation or ordinance.

5.3   **No Litigation**.  Except as otherwise previously or concurrently disclosed to and approved by Lender in writing, there are no actions, suits or proceedings pending or (to the best knowledge of Borrower) threatened against or affecting Borrower or any collateral securing the Loan or involving the validity or enforceability of the Applicable Taxes, Collateral Proceeds or any Loan Document before any court of law or equity or any administrative board or tribunal or before or by any governmental authority.

5.4   **No Other Defaults**.  Except as otherwise previously or concurrently disclosed to and approved by Lender in writing, Borrower is not in default under (i) any indenture, agreement or instrument to which it is a party or by which Borrower or any of the collateral securing the Loan may be bound, nor (ii) any regulation, order, writ, judgment, injunction, decree or demand of any court or tribunal or governmental authority, which in either case would have any material adverse effect on the Loan or the collateral securing the Loan.

5.5   **Approvals**.  Borrower has duly obtained all permits, licenses, approvals and consents from, and made all filings with, any governmental authority (and the same have not lapsed nor been rescinded or revoked) which are necessary in connection with the execution and delivery of any Loan Document, the performance of its obligations thereunder, and the enforcement of any Loan Document.

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 186

5.6 **Full Disclosure.** There is no fact that Borrower is aware of and has not disclosed to Lender in writing that could materially adversely affect the Loan, the Collateral Proceeds, or any other collateral securing the Loan, or the ability of Borrower to perform its obligations under any of the Loan Documents.

5.7 **Statements.** This Agreement and all financial statements, budgets, schedules, opinions, certificates, confirmations, statements, applications, affidavits, reports, agreements and other materials submitted to Lender in connection with or in furtherance of this Agreement by or on behalf of Borrower fully and fairly state the matters with which they purport to deal, and neither misstate any material fact nor, separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

5.8 **No Enforcement Event; Compliance.** No Enforcement Event exists under this Agreement or any other Loan Document, and no act has been committed or event has occurred or is occurring which, with the passage of time and/or the giving of notice, would constitute an Enforcement Event. Borrower is in full compliance with all covenants, terms and conditions contained in this Agreement or any other Loan Document.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any amount remains payable with respect to the Loan or otherwise pursuant to any Loan Document, Borrower hereby covenants and agrees with Lender as follows:

6.1 **Payments.** Borrower shall pay when due and owing all sums payable to the Lender under the Note, this Agreement, the Account Charge and any other Loan Document.

6.2 **Continued Existence of Tax Revenues.** Borrower shall do or cause to be done all things necessary to preserve and keep in force and effect the existence of the (i) Tax Revenues and the related Applicable Taxes, and (ii) all laws, ordinances, statutes, rules, codes, orders and other legislation which provide for the forfeiture of property to Borrower. Borrower shall do or cause to be done all things necessary to maximize the amount of the Collateral Proceeds collected by it or on its behalf.

6.3 **Costs.** Borrower shall pay, and shall hold Lender harmless against, all costs incurred by Lender in connection with the Loan, including without limitation any and all taxes, duties, recording costs, fees, commissions, premiums, fees and costs of Lender's counsel, and out-of-pocket administrative expenses of Lender.

6.4 **Loan Funds.** Borrower shall use the Loan funds only for the specific purposes for which Lender disburses them, and Borrower shall receive all such funds and shall hold the right to receive them as a trust fund for the sole purpose of paying the wages and salaries of Borrower's employees and to repay the indebtedness described in Section 2.3.

6.5 **Financing Activities.** Borrower shall maintain adequate books and records with respect to all revenues collected, revenues earned by Borrower from any statutory corporation, contributions from all other sources including grants from other governments or external agencies, and expenses incurred. All such books, records and information shall, upon Lender's

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 187

request, be made available f Borrower to Lender at a centralize office or site provided, however, such office or site snall be situated on Borrower's premises. Borrower shall keep Lender apprised of all events, actions or activities which affect or may affect the financial circumstances of Borrower. Borrower shall provide Lender semi-annual reports regarding (a) budget performance; (b) domestic and external loans issued in the public sector in Antigua and Barbuda; (c) sales of any government asset for an amount exceeding US$300,000; (d) investments by Borrower in any Person, including the purchase of equity or debt securities or the acquisition of an interest in any other venture; (e) projected monthly cash balances of Borrower; (f) proposed procurements of goods and services by Borrower in an amount, exceeding US$300,000 and proposed procurements of goods and services by Borrower outside of Borrower's ordinary course of business or practice; and (g) any other information that may be requested and deemed by Lender to be material in determining the financial stability of Borrower.

6.6     **Liens**. Borrower shall not commit or permit or suffer to occur any act or omission whereby any collateral for the Loan shall be impaired or threatened or whereby any interest therein shall become subject to any lien, attachment, judgment, charge or other encumbrance whatsoever. Borrower shall not directly or indirectly do anything or take any action which might prejudice any of the right, title or interest of Lender in or to any of collateral securing the Loan or impose or create any direct or indirect obligation or liability on the part of Lender with respect thereto.

6.7     **Records and Reports**. Borrower shall maintain adequate books and records with respect to all Collateral Proceeds collected by it or on its behalf. Lender shall be entitled to inspect such books and records at all reasonable times, and shall provide such other financial information as Lender may reasonably request from time to time, all of which must be satisfactory to Lender and be prepared in accordance with generally accepted accounting principles consistently applied.

6.8     **Notice to Lender**. Borrower shall promptly advise Lender of (a) any notice of any actual or purported default received by Borrower in respect of any other indebtedness owed by Borrower to any person; (b) any lawsuits pending against Borrower claiming an amount in excess of the sum of US$1,000,000 or affecting the collateral securing the Loan; and (c) the existence of any Enforcement Event, or the commission of any act or occurrence of any event which, with the passage of time and/or the giving of notice, would constitute an Enforcement Event or a default in respect of any other indebtedness of Borrower to any person.

6.9     **Adverse Proceedings.** Borrower shall use its best efforts to oppose and defend any actions or proceedings that are filed or are threatened to be filed seeking to (i) enjoin or otherwise prevent or declare invalid or unlawful or adversely affect the validity or priority of the liens and security interests granted to Lender under the Security Documents; (ii) adversely affect the financial condition of Borrower or the ability of Borrower to fulfill any of its obligations under the Loan Documents. Without limiting the generality of the foregoing, Borrower shall resist the entry of any temporary or permanent injunction and shall seek the stay of any such injunction that may be entered, and Borrower shall use its best efforts to bring about a favorable and speedy disposition of such proceedings.

- 12 -

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 188

6.10   **Indemnity**. If the i    der is named as a party to any lawsuit brought at any time against Borrower or with respect to the Loan, the Collateral Proceeds or other assets and property securing the Loan, then Borrower shall defend, indemnify and hold Lender harmless from any and all claims, demands, damages, liabilities, judgments, losses, costs, expenses and attorneys' fees arising out of or resulting from any such lawsuit or any related appeal.

6.11   **Compliance**. Borrower shall comply at all times with the terms and conditions of this Agreement and all other Loan Documents, including all restrictive covenants affecting the collateral securing the Loan. Borrower shall also comply with all applicable laws, rules, regulations, ordinances and other requirements of any governmental authorities.

6.12   **Parliamentary Approval**. Borrower shall obtain parliamentary approval of the Loan on or before the Approval Date.

# ARTICLE VII
## NEGATIVE COVENANTS

So long as any amount remains payable with respect to the Loan or otherwise pursuant to any Loan Document, Borrower covenants and agrees that without the prior written consent of Lender, which Lender may grant or withhold in its sole discretion:

7.1   **No Property Transfers; No Further Encumbrances**. Borrower shall not sell, transfer, lease or convey all or any part of the Collateral Proceeds or other collateral securing the Loan. Borrower shall also not further encumber all or any of the Collateral Proceeds or all or any part of any other collateral securing the Loan. Borrower, however, shall have the right to pledge other Borrower's property to secure additional indebtedness as provided under Section 7.5.

7.2   **Further Assurances**. Borrower shall execute in favor of Lender such instruments and documents as Lender may require in its sole discretion to ratify, confirm, secure and assure that (i) the Security Documents remain in full force and effect and are not adversely affected by any action or omissions of Borrower, (ii) the Additional Security, if any, is appropriately pledged and assigned to Lender and thereafter, remains in full force and effect and is not adversely affected by an action or omissions of Borrower, and (iii) that no Enforcement Event shall then exist.

7.3   **No Assignment of Loan**. Borrower shall not assign or transfer any of its rights under any Loan Document or in or to any proceeds of the Loan without the written approval of Lender, which it may grant or withhold in its sole discretion.

7.4   **No Adverse Actions**. Borrower shall not take any actions, or cause any actions to be taken, that (i) would or could adversely affect the collateral securing the Loan, (ii) would or could reduce the amount of the Collateral Proceeds collected by Borrower or on its behalf; or (iii) would or could adversely affect Lender's interest hereunder or under any other Loan Document.

7.5   **Additional Indebtedness**. Borrower shall not incur additional indebtedness, or seek to make any agreement, arrangement, commitment or undertaking to incur any additional indebtedness (i) equal to or greater than EC$7,500,000, in a single transaction, or in the aggregate over any twelve (12) month period during the period commencing on the Effective

- 13 -

Date and ending on the s^nd anniversary thereof, or (ii) ↲ ↲l to or greater than EC$20,000,000 in a single transaction or in the aggregate over any twelve (12) period during the period commencing on the day after the second anniversary of the Effective Date and ending on the fifth anniversary of the Effective Date, without Borrower first having obtained written approval from Lender authorizing Borrower to incur such indebtedness, which approval may be withheld in Lender's absolute discretion. Borrower further acknowledges and agrees that any breach of this covenant shall be deemed to be an Enforcement Event pursuant to this Agreement, and Lender shall be entitled to exercise any and all rights and remedies available to it in connection therewith, in accordance with this Agreement.

## ARTICLE VIII
## DEFAULT AND REMEDIES

8.1     **Enforcement Events**.  The occurrence of any of the following events shall constitute an "Enforcement Event" under this Agreement:

(a)     Any failure by Borrower to pay any sum when due under the Note, this Agreement or any other Loan Document (and the continuation of such failure beyond the expiration of the grace period, if any, provided therein for such payment); or

(b)     Any failure by Borrower to observe any of the negative covenants set forth in Article VII which if caused or occasioned or permitted voluntarily by Borrower would breach any negative covenant set forth in Article VII (in which case Borrower shall have a thirty-day grace period to cure the same); or

(c)     Any representation, warranty, affidavit, certificate or statement made or delivered to Lender by or on behalf of Borrower from time to time in connection with the Loan, this Agreement or any other Loan Document shall prove false, incorrect or misleading in any respect deemed material by Lender; or

(d)     Borrower's failure to remove any involuntary lien against any of the collateral securing the Loan or any part thereof within forty-five (45) days after its filing; or

(e)     Any modification amendment, repeal or rescission of any Applicable Tax that would reduce the amount of Tax Revenues collected, would adversely affect the collection of such Tax Revenues, or otherwise would adversely affect Lender in any way; or

(f)     Any modification amendment, repeal or rescission of any law, regulation, code, statute, order, ordinance or legislation of any kind that would reduce the amount of the Collateral Proceeds collected, would adversely affect the collection of such Collateral Proceeds, or otherwise would adversely affect Lender in any way; or

(g)     Any failure by Borrower to comply within thirty (30) days with any notice of violation of any covenant affecting any of the collateral securing the Loan or from any party entitled to enforce such covenant (or, in the case of a curable noncompliance requiring longer than thirty (30) days for its cure, its failure to commence to comply within said period and thereafter to pursue such cure diligently to completion); or

- 14 -

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 190

(h)     Any failure by Bon..ver to comply within ten (10) days with a requirement, order or notice of violation of a law, ordinance, or regulation issued or promulgated by any governmental authority claiming jurisdiction over any of the collateral securing the Loan (or within such longer time period as may be provided by the terms of such order or notice), or, in the case of a curable noncompliance requiring longer than the applicable time period for its cure, its failure to commence to comply with said order or notice within said period or failure thereafter to pursue such cure diligently to completion; or

(i)     Borrowers' inability for fifteen (15) days to satisfy any condition precedent to any requested disbursement of Loan funds; or

(j)     Any failure by Borrower to maintain the Minimum Balance in the Compensating Account or to produce additional funds after Lender determines in its exclusive judgment that there are not sufficient funds in the Current Account to cover a monthly installment; or

(k)     Any default by Borrower in the payment of any indebtedness (whether direct or contingent and whether matured or accelerated) to Lender, or any of Lender's Affiliates, provided, however, a payment default by Borrower in the Hurricane Relief Loan disbursed over a period commencing February 12, 1999 in the amount of EC $13,500,000 and loans incurred to establish the International Financial Sector Regulatory Authority disbursed over a period commencing December 1, 1999 in the amount of EC $4,893,146.60 and January 31, 2000 in the amount of EC $215,596.37 shall not constitute an Enforcement Event, as such term is defined in this Agreement; or if a moratorium or any other restriction shall be declared or imposed by Borrower (or any authority asserting or exercising *de jure* or *de facto* government, legislative, or police powers in Antigua and Barbuda) in relation to its indebtedness to Lender or any of Lender's Affiliates, on the repayment of Borrower's debts; or

(l)     Borrower (or any authority asserting or exercising *de jure* or *de facto* government, legislative, or police powers in Antigua and Barbuda) declares, cancels, suspends, renounces or defers unilaterally the obligation of Borrower to pay any portion of the Loan or any other loan or indebtedness of Borrower to Lender, or to any of Lender's Affiliates for any reason, by moratorium law, rescheduling or otherwise; or

(m)     The anticipatory repudiation by Borrower of its obligations under any Loan Document or under any other document pursuant to which it is indebted to Lender, or any of Lender's Affiliates, or any declaration by Borrower of its intention not to perform any such obligations as and when the same become due; or

(n)     The issuance or filing of any levy, lien, attachment, charging order, garnishment or other process against any of the collateral securing the Loan, including any Collateral Proceeds or any other funds held in the Compensating Account or the Current Account or any other account of Borrower held on behalf of, or secured by, Lender in connection with the Loan; or

(o)     The failure to obtain any permit, license, approval or consent from, or to make any filing with, any governmental authority (or the lapse or revocation or rescission thereof once obtained or made) which is necessary in connection with the Loan, any Loan Document or the

- 15 -

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 191

enforcement thereof, or if it snall become unlawful for Lender to make or maintain the Loan or for Borrower to perform any of its respective obligations under any Loan Document; or

(p)     If at any time Lender deems itself insecure for any reason whatsoever (notwithstanding any grace period in any Loan Document), or if any change or event shall occur which in Lender's exclusive judgment impairs any security for the Loan, increases Lenders' risk in connection with the Loan, or indicates that the Borrower or any other Obligor may be unable to perform their respective obligations under any Loan Document, or

(q)     Any failure by Borrower to observe or perform any other covenant or agreement made by it in any Loan Document, including this Agreement, or in any other document related to any other indebtedness of Borrower with Lender, or any of Lender's Affiliates, or the occurrence of any other default under the terms of any Loan Document, including this Agreement, or in any other document related to any other indebtedness of Borrower with Lender, or any of Lender's Affiliates, and the continuation of such failure or default beyond the expiration of the grace period, if any, provided therein for the cure of such failure or default.

8.2     **Remedies.** Any Enforcement Event under this Agreement and any default by Borrower under any other agreement with Lender or any of Lender's Affiliates, relating to any other indebtedness by Borrower with Lender or any of Lender's Affiliates, shall also constitute a default under the Note, the Security Documents and all other Loan Documents, which shall entitle Lender, at its option and at any time, to demand repayment of the Loan in full, to accelerate the maturity of the Loan and/or to exercise any and all rights and remedies provided in any Loan Document, including this Agreement, or under applicable law, and all such remedies shall be deemed cumulative and not mutually exclusive. The applicable grace period (if any) for each default is included by definition in the term "Enforcement Event", and in no event shall any provision of this Agreement or any other Loan Document be construed to permit "tacked" or cumulative grace periods. No waiver by Lender of any such default, nor of any term or condition in any Loan Document, shall be deemed a waiver of any subsequent default of the same or any other kind nor a waiver of any other term or condition in any Loan Document. No such waiver shall be effective or deemed to exist unless evidenced by a writing duly executed by Lender, and then only to the extent expressly stated in such writing.

## ARTICLE IX
## ASSIGNMENT

9.1     **Assignment by Lender.** As the initial Lender party to this Agreement, Lender may assign to one or more assignees all or any portion of the Loan without the consent of Borrower, provided, however, Lender shall provide Borrower ten (10) days prior notice of such assignment. Notwithstanding any such assignment, Borrower shall not be required to deal directly with any other lender, but only with Lender as agent for future assignees. Borrower shall cooperate with Lender and any future assignee in effectuating any assignment permitted by this Section. Lender and any future assignee may at any time collaterally assign or pledge its interest in the Loan to any bank, and a Lender which is a "fund" may at any time collaterally assign or pledge all or any portion of its rights under this Agreement to secure such Lender's indebtedness, in each case without the prior written consent of Borrower, provided that each such collateral assignment shall be made in accordance with applicable law and shall be either to an institutional lender, and

- 16 -

no such collateral assignment sha.. release a Lender from any of its obligations hereunder. For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments do not prohibit assignments creating security interests, including, without limitation, any pledge or assignment by a Lender of its interest in the Loan to any United States Federal Reserve Bank in accordance with applicable law and terms hereof.

9.2  **Disclosure.**  Lender agrees to take normal and reasonable precautions and exercise due care to maintain the confidentiality of all information identified as "confidential" or "secret" by Borrower and provided to it by Borrower under this Agreement or any other Loan Document, and neither it nor any of its Affiliates shall use any such information other than in connection with or in enforcement of this Agreement and the other Loan Documents, except to the extent such information (a) was or becomes generally available to the public other than as a result of disclosure by the Lender, or (b) was or becomes available on a non-confidential basis from a source other than the Borrower, provided that such source is not bound by a confidentiality agreement with a Borrower known to the Lender; provided, however, that Lender may disclose such information (i) at the request or pursuant to any requirement of any governmental authority to which Lender is subject or in connection with an examination of Lender by any such authority; (ii) pursuant to subpoena or other court process; (iii) when required to do so in accordance with the provisions of any applicable requirement of law; (iv) to the extent reasonably required in connection with any litigation or proceeding to which Lender or its Affiliates may be party; (v) to the extent reasonably required in connection with the exercise of any remedy hereunder or under any other Loan Document; (vi) to Lender's independent auditors and other professional advisors; (vii) to any participant or assignee, actual or potential, provided that such person agrees in writing to keep such information confidential to the same extent required of the Lender hereunder; and (viii) as to Lender, as expressly permitted under the terms of any other document or agreement regarding confidentiality to which Borrower is party or is deemed a party with Lender.

## ARTICLE X
## GENERAL CONDITIONS AND OTHER COVENANTS

Borrower and Lender further covenant and agree as follows:

10.1  **Evidence of Disbursals; Previous Disbursals.**  Borrower hereby acknowledges and agrees that written documentation in Lender's possession evidencing disbursements under the Loan from Lender to Borrower shall be prima facie evidence that such disbursements were made by Lender on the dates indicated in such documentation.  Borrower acknowledges that, simultaneously herewith, Lender is making Advances of Loan funds to Borrower in the principal amount of US$40,000,000.  Borrower acknowledges and agrees that, pursuant to Section 2.1(a), the Loan funds so Advanced shall accrue interest as of August 30, 2001.

10.2  **No Third-Party Beneficiaries.**  Lender's inspection, review or approval of matters pertaining to the Loan Documents and the Loan has no purpose other than to determine investment quality from Lender's point of view and is not done for the benefit of anyone other than Lender. Under no circumstances shall any person whomsoever (other than the parties to this Agreement and their respective permitted successors and assigns) be deemed a beneficiary of the

- 17 -

Document.

10.3   **Indemnity**.  Borrower shall indemnify Lender, and hold Lender harmless of and from any and all: (a) claims of brokers arising by reason of the Loan; (b) documentary stamp taxes or intangible taxes or excise taxes or other taxes, and any interest or penalties in connection therewith, which may be assessed against or deemed applicable to the Loan or any Loan Documents whatsoever; (c) claims or demands of any parties whatsoever arising from or growing out of, in any manner, the Loan; (d) litigation related to any of the foregoing; and (e) costs or expenses incurred by Lender in connection with any such claims, demands, taxes, interest, penalties or litigation (including attorney's fees and appellate attorney's fees).  In the event Lender is made a party to any suit at law or equity or made to defend any counterclaim or any administrative proceeding, Borrower shall provide Lender with counsel of Lender's choosing and shall pay the reasonable fees and costs of such counsel.

10.4   **Notices**.   Unless specifically provided otherwise, any notice for purposes of this Agreement shall be in writing and shall be given personally or by prepaid certified mail (return receipt requested), in which latter case notice shall be deemed effectively made when the receipt is signed or when the attempted initial delivery is refused or cannot be made because of a change of address of which the sending party has not been notified. Until the designated addresses are changed by notice given in accordance with this Section, any notices between Borrower on the one hand and Lender on the other shall be sent to the respective addresses set forth below:

|  |  |
|---|---|
| <u>Borrower:</u> | Government of Antigua and Barbuda<br>Prime Minister<br>St. John's Street<br>St. John's, Antigua |
| <u>With a copy to:</u> | Solicitor General of Antigua and Barbuda<br>Attorney General's Chambers<br>Redcliffe Street<br>St. John's, Antigua |
| <u>Lender:</u> | Stanford Financial Group Company<br>201 S. Biscayne Blvd.<br>12th floor<br>Miami, Florida 33131<br>Attention:  Executive Director/CEO |
| <u>With a copy to:</u> | Stanford Financial Group<br>5050 Westheimer<br>Houston, Texas 77056<br>Attention:  Office of the General Counsel |
| <u>And a copy to:</u> | Hunton & Williams<br>Fleetway House, 6th floor<br>25 Farrington Street |

- 18 -

APPENDIX IN SUPPORT OF PLAINTIFFS'<br>MOTION FOR JURISDICTIONAL DISCOVERY<br>PAGE 194

<sup>T</sup> ondon EC4A 4AB

..tention: Charles Ashton

10.5   **Governing Law; Service of Process; Venue.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of England and Wales, irrespective of conflict of laws principles. Borrower shall appoint Solicitors Charles Russell, 8-10 New Fetter Lane, London, England EC4A IRS, or such other person acceptable to Lender in its sole discretion, to serve as Borrower's registered agent (the "**Registered Agent**") for service of process in accordance with the terms and conditions of a registered agent acceptance form which shall be in form acceptable to the Lender, and executed and delivered to the Lender prior to the execution of the Note. Service upon the Registered Agent may be made by mailing or delivering a copy of such process to Borrower in care of the Registered Agent at such address as the Registered Agent shall designate in writing to Lender, and Borrower hereby irrevocably authorizes and directs the Registered Agent to accept such service on its behalf.  As an alternative method of service, Borrower also irrevocably consents to the service of any and all process in any such action or proceeding by the mailing via certified mail of copies of such process to Borrower at its address set forth above or at such other address as shall be designated by Borrower in writing to Lender.  Borrower hereby irrevocably agrees that all actions or proceedings in any way, manner or respect arising out of or from or related to this Agreement shall be litigated only in courts having situs within England and Wales.  Borrower hereby consents and submits to the jurisdiction of any such court on any such suit, action or proceeding. Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions, including Antigua and Barbuda, by suit on the judgment or in any other manner provided by law.  Borrower further agrees that it can be judicially required to comply with its obligations hereunder in any court in Antigua and Barbuda and without in any way limiting or derogating from its submission to the jurisdiction of any court of competent jurisdiction in England and Wales, as provided above.  Borrower hereby waives any right it may have to transfer or change the venue of any litigation brought against it in accordance with this Section.  Nothing in this paragraph shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower, or its property in the courts of other jurisdictions.

10.6   **No Usury.** In no event shall any agreed or actual exaction charged, reserved or taken as an advance or forbearance by Lender as consideration for the Loan exceed the limits (if any) imposed or provided by the law applicable from time to time to the Loan for the use or detention of money or for forbearance in seeking its collection; Lender hereby waives any right to demand such excess. In the event that the interest provisions of any Loan Documents or any exactions provided for therein shall result at any time or for any reason in an effective rate of interest that transcends the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by Lender in excess of those lawfully collectible as interest shall be applied against the principal of the Loan immediately upon receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and Lender had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 195

10.7   **Exchange Rate**. If for the purpose of obtaining payment or of obtaining or enforcing a judgment against Borrower in any court it becomes necessary to convert a sum owing to Lender in U.S. dollars into another currency, then the rate of exchange used shall be that at which Lender could purchase U.S. dollars in New York, New York, U.S.A. with the other currency in accordance with normal banking procedures on the business day preceding the day on which final judgment is obtained. Notwithstanding any judgment in such other currency, the obligations of Borrower with respect to the Loan shall be discharged only to the extent that (i) Lender can purchase U.S. dollars with the other currency in accordance with normal banking procedures on the business day following Lender's receipt of any such sum adjudged to be due in the other currency, and (ii) Lender can remit the purchased U.S. dollars to its office at the address set forth in this Agreement. If the U.S. dollars so purchased and remitted are less than the sum owing in U.S. dollars, then Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Lender on demand against such loss. During any time that the Note bears interest at the maximum lawful rate, interest shall be calculated on the basis of the actual number of days in the respective calendar year rather than an assumed year of 360 days.

10.8   **Writing Required**. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated except by the written agreement of the party against whom is sought enforcement of the change, waiver, discharge or termination.

10.9   **Partial Invalidity**.   Any provision of this Agreement, the Note or the other Loan Documents which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

10.10   **Interpretation**. The term "Lender" shall be deemed to include any subsequent Lenders to which all or any portion of the Loan may hereafter be transferred as provided herein or otherwise. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other genders.   Captions and headings in this Agreement are for convenience only and shall not affect its construction.   All references in this Agreement to Schedules, Exhibits, Sections, Annexes, subsections, paragraphs and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another documents.   All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America, unless such reference specifically identifies another currency.

10.11   **Assignment**.   Lender may assign all or part of its rights under the Loan or any Loan Document, which shall inure to the assignee to the extent of such assignment, and the Lender may grant participation interests in the Loan to other financial institutions or other lenders, in connection with any such assignment or participation, the assigning Lender may disclose to the assignee or participant any and all information held by or known to such Lender at any time with respect to Borrower, provided that Lender shall notify Borrower ten (10) days prior to any such assignment. Borrower shall have no right to assign Borrowers' rights or delegate Borrowers' duties under any Loan Document without the prior written consent of Lender, which Lender may grant or withhold in its sole discretion.

- 20 -

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 196

10.12 **Binding Effect.** All of the covenants, agreements, provi ʒns and conditions in this Agreement shall be binding   on the parties hereto and their respec ve successors and assigns, and shall inure to the benefit of the Lender and its respective successors and assigns, and to the benefit of Borrower and its respective permitted successors and assigns; no other person shall be deemed a benefited party hereunder under any circumstances.

10.13 **Loan Agreement Governs.** The Loan is governed only by the Loan Documents and there are no other agreements or understandings with respect to the Loan, whether oral or written, in effect between Lender on the one hand and Borrower on the other hand. In the event of any conflict between the terms of this Agreement and any terms of any other Loan Document, the terms of this Agreement shall govern.

10.14 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one instrument. Lender shall have the right unilaterally to correct patent errors or omissions in this Agreement or any other Loan Document.

10.15 **Time of Essence.** Time shall be of the essence of this Agreement.

10.16 **Waiver of Immunity.** Borrower represents and warrants to Lender that the indebtedness evidenced by this Agreement, the Note and the other Loan Documents does not contravene any law and was incurred by Borrower for lawful and legitimate public purposes, being the payment of wages and salaries of its employees for the benefit of the people of Antigua and Barbuda and that Borrower has full right, power, and authority to incur and secure said indebtedness, to execute the Note and other Loan Documents, and to pay the Loan with interest and perform the other obligations of Borrower set forth herein and in the other Loan Documents. The Note is supported by the full faith and credit of Borrower, and Borrower shall not seek to exercise its sovereign, executive or legislative power to annul, breach, nullify, invalidate, render unlawful or terminate this Agreement, the Note or any other Loan Document, or to render impossible or impractical the exercise of the rights of Lender, or the performance of its obligations, under this Agreement, the Note or any other Loan Document. Borrower hereby irrevocably and unconditionally waives any and all defenses it may possess based in whole or in part upon the doctrine of sovereign immunity with respect to the Loan, the Note, this Loan Agreement and the agreements, instruments and transactions contemplated thereby. Borrower also hereby expressly and irrevocably waives any special rights or immunities which it may have under the laws of Antigua and Barbuda.

10.17 **Act of State Doctrine.** Borrower hereby expressly and irrevocably waives any defense or claim it may have to delay, hinder or stop the enforcement of the Loan Documents based directly or indirectly upon the Act of State doctrine.

10.18 **No Jury Trial.** BORROWER AND LENDER HEREBY SEVERALLY, VOLUNTARILY, KNOWINGLY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENT OR CONCERNING THE LOAN AND/OR SECURITY THEREFOR OR PERTAINING TO ANY. TRANSACTION RELATED TO OR CONTEMPLATED IN ANY LOAN DOCUMENT, OR

- 21 -

ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) ACTIONS, REGARDLESS OF WHETHER SUCH ACTION OR PROCEEDING CONCERNS ANY CONTRACTUAL OR TORTIOUS OR OTHER CLAIM. BORROWER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO LENDER IN EXTENDING THE CREDIT DESCRIBED HEREIN, THAT LENDER WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT SUCH BORROWER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS NOTE AND UNDERSTANDS THE LEGAL EFFECT OF THIS JURY TRIAL WAIVER.

**[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]**

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 198

Case 3:09-cv-02165-N-BG   Document 21   Filed 12/21/10   Page 201 of 234   PageID 502

year first above written.

SIGNED, SEALED and DELIVERED                          )

by the Minister of State with Responsibility for Finance    )

SENATOR THE HONORABLE ASOT A. MICHAEL    )

for and on behalf of                                 )

the Government of Antigua and Barbuda                )

in the presence of:                                  )

_PhEly_                                              )
      PHILIPPA A.GLYNN

SENATOR THE HONORABLE ASOT A. MICHAEL
Minister of State with Responsibility for Finance
of the Government of Antigua and Barbuda



SIGNED by the undersigned for STANFORD            )

FINANCIAL GROUP COMPANY acting                    )

herein as Lender before and in the                )

presence of:                                      )

KIMBERLEY AYR WOOD                                )

STANFORD FINANCIAL GROUP COMPANY

By: _R. Marian Alvarado_
Name: Mauricio Alvarado
Title: General Counsel

- 23 -

# Exhibit I

No. 8 of 1998.   *The Loans (Mount St. John's Hospital Construction and Equipping) Act, 1998.*   1   ANTIGUA AND BARBUDA

[ L.S. ]



I Assent,

**James B. Carlisle,**
*Governor-General.*

17th July, 1998.

**ANTIGUA AND BARBUDA**

**No. 8 of 1998**

**AN ACT to make provisions for the borrowing of money for the purposes of constructing and equipping a new hospital at Mount St. John's.**

[ *30th July, 1998* ]

ENACTED by the Parliament of Antigua and Barbuda as follows—

**1.** This Act may be cited as the Loans (Mount St. John's Hospital Construction and Equipping) Act 1998.

Short title.

**2.** Notwithstanding the provisions of any other Act, the Minister responsible for Finance is authorised to borrow the sums of money specified in column 2 of Schedule 1 not exceeding an aggregate sum of **Thirty-one** Million dollars in currency of the United States of America from the Banks and Institutions specified in column 1 of Schedule 1 (in this Act referred to as the lenders) on such terms and conditions as may be agreed upon between the Minister responsible for Finance and the lenders.

Minister is authorised to borrow Thirty-one Million in United States Currency.

**3.** The money borrowed under the authority of this Act shall be applied to the construction and equipping of Mount St. John's Hospital in Antigua.

Application of money borrowed.

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 200

ANTIGUA  2
AND
BARBUDA

*The Loans (Mount St. John's Hospital*
*Construction and Equipping)*
*Act,* 1998.

No. 8 of 1998.

Power to authorise
payment and to
exempt from
taxes.

**4.** (1) The Minister responsible for Health may, from time to time, authorise the Board of the Medical Benefits Scheme to transfer funds from its general account into a special account under the control of the Accountant General for the purpose of giving effect to the terms of any agreement entered into by the Minister responsible for Finance with the lenders in respect of the money borrowed under the authority of this Act.

Cap. 140.

(2) The Cabinet may approve the remission in whole or in part of ai y stamp duty or fee payable under any Stamp Act where he considers such remission necessary to give full effect to any agreement, instrument, guarantee or under-taking under this Act.

Exemption from
Exchange Control
Act.

**5.** The Exchange Control Act does not apply to any transaction required to effect payment of any sum in accordance with the terms of any agreement, promissory note, instrument, guarantee or under-talung under this Act.

Principal and
interest charged
on the Consoli-
dated Fund.

**6.** The principal sum borrowed under the authority of this Act and the interest thereon are charged upon and payable out of the Consolidated Fund.

Ratification of
terms and
condition.

**7.** The terms and conditions of the Loan agreed to between the Minister and the Lenders and set out in Schedule II are hereby ratified.

**SCHEDULE I**

| Column I | Column II |
|---|---|
| **Lenders** | **Sums** |
| Bank of Antigua | US$2,000,000.00 |
| Stanford Financial Group Ltd., and its Affiliated Companies and Syndicated Participants | US$29,000,000.00 |

No. 8 of 1998.    *The Loans (Mount St. John's Hospital*    3    ANTIGUA
*Construction and Equipping)*    *AND*
*Act, 1998.*    BARBUDA

## Exhibit A

**Registration Section:**          **Ottos New Town**

**Block:**          **610 1791B**

**Parcels:**          **50, 54 and 78**

## SCHEDULE II

February 3, 1998

Honourable John St. Luce
Minister of Finance
Ministry of Finance
Government of Antigua and Barbuda
High Street
St. John's Antigua, W.I.

Dear Minister St. Luce:

### Re: Loan of Proposed Medical Center for Antigua and Barbuda

We wish to advise you that bank of Antigua Limited (the "Agent") together with a
consortium of financial institutions (hereinafter collectively referred to as the "Lend-
ers") has approved your request for a construction loan in the amount of
US$31,000,000.00 (the "Loan"), such loan to be made in accordance with the Lenders'
procedures and subject to the following:

1. BORROWING ENTITY:   Government of Antigua and Barbuda and the
Medical Benefits Board of Control (hereinafter collectively referred to as the "Bor-
rower").

2. TERMS OF THE LOAN:

   A.    AMOUNT: US $31,000,000.00

   B.    TERM:   Thirty (30) years

   C.    INTERESTRATE:   Interest for the loan shall be computed at the annual

| ANTIGUA 4 | *The Loans (Mount St. John's Hospital* | No. 8 of 1998. |
|---|---|---|
| AND | *Construction and Equipping)* | |
| BARBUDA | *Act, 1998.* | |

rate of 9.8%. *All* interest will be calculated on the basis of a 360-day calendar year.

D.  DEFAULT RATE:  From and after the occurrence and during the continuation of any event of default under the Loan, at Lender's sole discretion,  and regardless of  whether Lender also elects any other remedies under the Loan, the entire unpaid principal balance of the Loan and any other sums owing shall bear interest at an augmented annual rate (the "Default Rate") equal to 10.8%.

E.  PAYMENT:  Monthly payments of accrued interest only for the period terminating the earlier of (i) two (2) years from the date of the first advance under the Loan; or (ii) substantial completion of the Project (as will be defined in the loan documentation). Thereafter equal monthly payments of principal and interest, in an amount that would be sufficient to repay the outstanding debt in full in thirty (30) years from the date of the Loan. The outstanding balance of any sums due shall be payable at maturity. To the extent funds may be available therein, payments shall be automatically debited by Agent from the current account established by the Medical Benefits Board of Control pursuant to article 2.G.ii) below, for that purpose.

F.  PREPAYMENT:  The Loan may be prepaid in part or in whole at anytime without prepayment penalties.

G.  ESTABLISHMENT OF BANK ACCOUNTS:

   i)  COMPENSATING BALANCES:  Borrower shall at all times during the term of the Loan maintain compensating balances with the Agent in an amount not less than U.S. $1,481,482.00.

   ii)  CURRENT ACCOUNT:  In addition to the compensating balances referred to immediately above, Borrower shall during the term of the Loan maintain a current account with the Agent to which Borrower shall make the following deposit:  an amount equal to the greater of (i) U.S. $271,000.00 or (ii) the total amount collected by Borrower pursuant to the increased two precent (2%) **Medical** Benefits Levy since the last such deposit. Borrower may, so long as the Loan is not in default, withdraw such amounts in the current account in excess of U.S. $271,000.00. In no event, shall the minimum balance in the current account be less than U.S. $271,000.00 at any time other than as a result of any payment made on the Loan.

No. 8 of 1998.     *The Loans (Mount St. John's Hospital*     5     ANTIGUA
*Construction and Equipping)*                         AND
*Act, 1998.*                              BARBUDA

H.   LATE PAYMENT:   Any payment not made within ten (10) days after
such payment is due shall be subject to a late charge of U.S. $500.00. The
foregoing is without prejudice to the Lenders' right to charge interest on
the Loan at the Default Rate set forth for defaults in article 2.D above.
However, in the event of such a delinquency, the application of the Default
Rate will not be imposed until after 30 days of delinquency has passed.
Should a payment be delinquent for more than 30 days, then, at Agent's
sole discretion, the Default Rate may be imposed. If agent does elect to
enforce this penalty, it shall apply retroactively from the beginning of said
delinquency and against the entire loan balance during the period of
default.

3. LOAN PURPOSE:   Financing the construction of a medical center for Antigua
and Barbuda (the "Medical Center") located at St. John's, **Antigua** and to repay the
interim loan facility extended by Bank of Antigua, as evidenced by that certain
promissory note dated September 1, 1997 in the amount of E.C. $14,000,000.00.

4. SECURITY:   The Loan shall be evidenced and secured by the following:

A.   A Loan Agreement among the Lenders and Borrower and a Note in the
principal amount of the Loan to be given by the Borrower to the Agent on
behalf of the Lenders.

B.   A first-ranking pledge and security interest over all funds collected by the
Medical Benefits Board of Control pursuant to the increased two percent
(2%) Medical Benefit Levy.

C.   A first-ranking pledge and security interest over all accounts established
pursuant to article 2.G above.

D.   A full, first-ranking charge and caution over the property described on
Exhibit A hereto, and any buildings and improvement thereon (hereinafter
the "Property").

E.   A security interest which shall be first-ranking (other than any purchase-
money security interest) on all of the items of personal property of the
Borrower to be placed upon and used in connection with the Property
during the term of the Loan. The personal property of the Borrower to be
so granted as security shall include, but not be limited to, furniture,
equipment, fixtures, supplies, and materials, now or hereafter located on
the Property or utilized in the operation or construction of any improve-

| ANTIGUA 6 | *The Loans (Mount St. John's Hospital* | No. *8* of 1998. |
|---|---|---|
| AND | *Construction and Equipping)* | |
| BARBUDA | *Act,* 1998. | |

ments on the Property.

F.   An assignment to Lenders of Borrower's rights and title to all architect's plans, architect's contracts, construction contracts, permits and security deposits and all other legal documents and agreements relating to the Property or the construction of any building or improvements thereon.

*G.*   A first-ranlung security interest in all contract rights, general intangibles and payment rights of Borrower relating to or arising from the Medical Center over the entire term of the Loan.

H.   Such insurance coverage in favor of the Lenders as Lenders may request for the replacement value of the property described at 4. D and 4. E above.

I.   Such other agreements and instruments as shall be required by Agent, Lenders or their respective counsel, including, but not limited to, those documents set forth in Exhibit B attached hereto entitled Hospital Loan Document Checklist. Notwithstanding the foregoing, however, Lenders shall agree that none of the aforementioned items under this article 4 shall encumber any such real property owned or operated by the Medical Benefits Board of Control that are not specifically included herein, and if so requested, Lenders will release such assets from any claim or charge which they may exercise. Lenders further agree that the real property owned or operated by the Medical Benefits Board of Control and not specifically included herein shall not be subjected by the Lenders to any lien, writ, order or any other encumbrance for the purpose of enforcing any judgement that the Lenders may obtain against the Medical Benefits Board of Control in respect of this transaction.

5. BORROWER'S REPRESENTATIONS:   This commitment has been issued to Borrower on the basis of information, data and other materials submitted by Borrower. Any misinformation, misrepresentations or withholding of material information related to Borrower's application for the Loan shall, at the option of Agent, entitle Lenders to cancel this commitment and terminate their obligation hereunder.

6. COMMITMENT TO SURVIVE LOAN CLOSING:   This commitment shall survive the Loan closing and none of the obligations and undertakings hereunder shall cease and terminate until the entire Loan, together with all interest and fees due and other amounts which may accrue pursuant hereto and/or to the Loan documents executed in connection herewith, shall have been paid in full and until all obligations and undertakings of the Borrower have been completed in full and discharged.

7. CONDITIONS TO THIS COMMITMENT:   Any obligation of the Agent and

No. 8 of 1998.     *The Loans (Mount St. John's Hospital*    7     ANTIGUA
                             *Construction and Equipping)*                *AND*
                                    *Act, 1998.*                  BARBUDA

the Lenders to proceed with the Loan evidenced by this commitment shall be subject to the preparation and execution of Loan documentation in form and substance satisfactory to the Lenders and their legal counsel in their sole discretion. In addition, the Agent and Lenders and their legal counsel must be satisfied in their sole discretion with all matters pertaining to the construction of the Medical Center, including without limitation all plans, contracts and circumstances relating thereto, and all necessary third-party and governmental actions must have been duly taken.

**8.** LOAN DOCUMENTS TO GOVERN: This commitment shall be incorporated by reference in the Loan documents and the terms hereof shall be deemed as binding as if fully set forth therein. Should there be any apparent or evident contradiction between the terms of this commitment and any of the terms of the Loan documents, the Loan documents shall govern. It is understood that, in addition to the various provisions contemplated in this letter, the Loan documents will include representation and warranties, events of defaults, covenants, and negative covenants by the Borrower, as well as other provisions, which the Lenders in their discretion believe to be reasonable and appropriate for a credit such as the Loan.

**9.** GENERAL CONDITIONS: There are attached hereto and made a part hereof certain additional general conditions of the commitment which general conditions shall apply with the same force and effect as all of the other terms and conditions contained herein.

**10.** MODIFICATIONS: No change or modification of this commitment shall be valid unless such change or modification is made in writing and signed by the parties hereto. This commitment contains the entire agreement between the parties hereto and there are no promises, agreements, conditions, undertakings, warranties, or representations, either written or oral, expressed or implied, between the parties other than as set forth herein.

**11.** AVAILABILITY AND DISBURSEMENT OF LOAN FUNDS: Loan funds will be disbursed only upon satisfaction of all conditions as set forth in the Loan documentation.

**12.** GOVERNING LAW AND JURISDICTION: This commitment letter is, and the Loan and Loan documentation shall be, governed by the laws of Antigua and Barbuda. For any dispute or disagreement relating to this letter, the Loan or the Loan documentation, the Borrower submits to the nonexclusive jurisdiction of the courts of Antigua and Barbuda, waives any claim that such court is an inconvenient forum,

ANTIGUA   8          *The Loans (Mount St. John's Hospital*          No. *8* of 1998.
AND                 *Construction and Equipping)*
BARBUDA                        *Act*, 1998.

waives any claim or right to immunity the Borrower or its property may now or hereafter
enjoy, waives trial by jury, and agrees that service of process may be effected, in
addition to any other manner permitted by applicable law, by mailing a copy of the
summons and complaint to the Borrower by any form of registered or certified mail at
the address of the Borrower set forth above, such process to be effective 15 days after
posting.

**13.** FULL FAITH AND CREDIT:   The loan must enjoy the full faith and credit of
the State of Antigua and Barbuda. In the event of any change, which the Lenders in their
discretion deem detrimental to the Medical Benefits Levy referred to in this letter, the
Lenders may declare the Loan in default and all sums outstanding immediately due and
owing.

**14.** DOLLAR TRANSACTION:   This is an international credit transaction in
which the borrowing in United States dollars and the payments and repayments in such
currency and in the United States are of the essence, and no payment or repayment in
any other currency or jurisdiction will be adequate or acceptable.

**15.** PLACE AND METHOD OF PAYMENT:   All payments in connection with
the Loan shall be made in good and immediately available in United States dollars by
credit to the account of the Agent, as Agent may in writing instruct Borrower. All such
payments shall be free and clear of all deductions, withholdings, taxes, charges, fees,
set-offs or counterclaims of any nature whatsoever in the State of Antigua and Barbuda,
all of which shall be for the sole account of the Borrower. To the extent, the Loan (or
the Agent or any Lender in respect of the Loan) shall, for any reason whatsoever,
become subject to any such deduction, withholding, tax charge, fee, set-off or
counterclaims the Borrower shall pay such additional amount(s) as may be necessary
so that the net amount of such payment actually received by Lenders shall be the same
as if such tax, charge, etc. had not been applicable.

**16.** NO BROKERAGE FEE:   The borrower represents and warrants it has not
engaged the services of any broker or consultant to whom a fee is due or has been paid
in respect of the Loan.

**17.** LEGAL FEES AND EXPENSES OF COUNSEL FOR THE AGENT:   For the
account of the Borrower.

**18.** ENTRY INTO EFFECT AND TERMINATION OF THE
COMMITMENT:   This commitment shall be valid when accepted by the Borrower

No. **8** of **1998**.     *The Loans ( M o m St. John's Hospital*     9     ANTIGUA
*Construction and Equipping)*     AND
*Act, 1998.*     BARBUDA

and delivered to Agent within 60 days **from** the date hereof, together with a check in
the amount of U.S. **$92,500.00** payable to the Agent representing a non-refundable
commitment fee. Acceptance of this commitment by the Borrower on or prior to that
date constitutes agreement to comply with the terms and conditions contained herein.
From and after execution of this commitment, the Borrower shall be obligated to
reimburse the reasonable fees and expenses of legal counsel to the Agent and the
Lenders, including the connection with the preparation and execution of both this letter
and the Loan documentation, regardless of whether the loan documentation is ever
executed or the Loan is made. This commitment shall remain in full force and effect until
May **31, 1998**. If the Borrower fails for any reason whatsoever to comply with **all** the
terms and conditions contained herein or attached hereto or fails to close the Loan by
May **31,1998**, the commitment letter shall be null and void without further obligation
or notice by agent or Lenders.


This letter supersedes our letter to you dated December **19, 1997**, Please indicate
your acceptance of this commitment by signing and returning to us the attached copy.


*Sincerely,*
Bank of Antigua Limited.



**by: Kenny Byron,**
*President and CEO*


The undersigned accept and agree to all of the terms and conditions set forth therein.



BORROWER:
**Government of Antigua and Barbuda**


By:                                                   **Date: 13 Feb. 1998**

Name:     **John E. St. Luce,**


Title:     *Minister of Finance, Agriculture, Land,*
*Fisheries, Planning & Co-operatives*

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 208

| ANTIGUA   10 | *The Loans (Mount St. John's Hospital* | No. 8 of 1998. |
|---|---|---|
| *AND* | *Construction and Equipping)* | |
| BARBUDA | *Act,* 1998. | |

MEDICAL BENEFITS BOARD OF CONTROL

By:                                                     **Date: 24 Feb. 1998**

Name:     **Hilroy A. Willet,**

Title:      *Chairman*

MEDICAL BENEFITS BOARD OF CONTROL

cc:   **Prime Minister Lester Bird**
      **Honourable Robin Yearwood**
      **Honourable Sam Aymer**
      **Jeff Smith**
      **Arnold Knoche**
      **R. Allen Stanford**

Passed the House of Representatives this 5th          Passed the Senate this 18th day
day of June, 1998.                                    of June, 1998.

**B. Harris,**                                        **(Sen.) L. Smith,**
*Speaker.*                                            *Vice President.*

**S. Walker,**                                        **S. Walker,**
*Clerk to the House of Representatives.*              *Clerk to the Senate.*

Printed at the Government Printing Office, Antigua and Barbuda,
by Rupert Charity, Government Printer
—By   Authority, 1998.

800—7.98                                              *[ Price $4.00 ]*

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 209




While by no means Christmas in Antigua, to the joy of many, can be considered a "white Christmas", it is a time of much activity centered around family, loved ones, and friends. With only a little over a week before Christmas day, Antiguans and Barbudans are already full of Christmas cheer.

HOME   ABOUT GOVERNMENT   NEWS CENTER   INFORMATION CENTER   USEFUL LINKS   PHOTOS   VIDEOS   EMAIL   CONTACT US

NEWS BEATS:   Ministry of Agriculture supports increased production of Cotton

Search

You are here: Home » Press Releases

## Statement from the Government of Antigua & Barbuda on the Stanford Victims Coalition Claims March 19th, 2010

*Posted On: March 22, 2010*



The allegation by the self styled Stanford Victims Coalition that the State of Antigua & Barbuda was a partner in, and beneficiary of, R. Allen Stanford's alleged criminal behavior is totally unfounded.

Despite the Coalition's claims and insinuations, the Baldwin Spencer Administration, which assumed office in March 2004, did not sell any Crown lands to Stanford; received no loans from Stanford; and was not a beneficiary of any largesse of Stanford. In fact, R. Allen Stanford considered this administration an obstacle to his ambitions.

Stanford was the sole owner of two banks in Antigua & Barbuda: Stanford International Bank Ltd., an off-shore financial entity registered under our International Business Corporations Act with, and regulated by, our Financial Services Regulatory Commission (FSRC), and the Bank of Antigua, registered under the Companies Act and licensed to operate ordinary banking business under our Banking Act, but regulated by the Eastern Caribbean Central Bank (ECCB).

The business of Stanford International Bank Ltd. was run from Houston, Texas, and its books maintained in Memphis, Tennessee. The bank was operating in Antigua as a transit point and for purposes of registration and regulation.

While the Government and People of Antigua & Barbuda can understand the frustration and disappointment being experienced by the SIBL depositors, we cannot countenance the attack these persons have begun to wage on our country without first looking at other entities and organizations  including the United States  regulatory authorities. Information in our possession supports the following:

1. In late 1998, despite objections by the State of Florida's top banking lawyer, Richard Donelan, Florida's regulators gave sweeping powers to Stanford that allowed him to operate and open a trust office in Miami, which was hardly regulated by the US authorities.
2. In December 1998, a Memorandum of Agreement was signed by Arthur M. Simon, the then Director of the Division of Banking for the State of Florida's Department of Banking and Finance, and Yolanda Suarez, the then Secretary of Stanford Trust Company Limited, authorizing the establishment of a foreign trust office  the first company of its kind ever set up in the state.
3. Between 1998 and 2003, over 2000 customers purchased certificates of deposit from the Miami office lured by the promise of receiving yields higher than those offered by other United States banks.
4. Brokers generated millions of unreported dollars from depositors, particularly Latin Americans, who were lured by the promise of high returns and who hardly questioned Stanford's bona fides as long as their accounts grew on paper. In the first six years, the office, known as Stanford Fiduciary Investor Services, took in US$600 million from customers, Florida state and court records show.
5. It is reported that some of the millions went to support Stanford's lavish lifestyle, which included private jets, personal loans, expensive cars, and mansions,

 facebook   You Tube

 Antigua and Barbuda's 2011 Throne Speech
*Adobe Acrobat required to view the entire speech.*

### MORE STORIES

- CARDI's Open Day Highlight Techniques To Improve Food Security
- Governor General Dame Louise Lake Tack brings Christmas cheer to Mental Hospital patients
- AIDA cruises among cruise lines to return to Antigua and Barbuda for 2011/2012 cruise season
- Antigua and Barbuda formalized diplomatic relations with the Sovereign Order of Malta.
- Antigua and Barbuda Throne Speech to be Delivered Thursday
- More related articles...

### FEATURED VIDEO




converted by Web2PDFConvert.com

including a US$10.5 million home in Gables Estates, Florida that he has since torn down, the records show.

6. Nevertheless, as far back as 2003, some investors had begun questioning the legitimacy of SIBL's certificates of deposit, and the United States. Securities & Exchange Commission was aware to the best of our information, knowledge and belief of these reports and other complaints some of which had been lodged by former Stanford employees, themselves... We are not aware whether, or to what extent, the SEC took investigative or corrective measures.

7. Since the arrest of Stanford, Arthur Simon has admitted that his actions in 1998 should have been done differently, that he would have liked to have stopped the Trust company from doing what it did, and that, in hindsight, "tighter provisions should have governed the operations. Further, Linda Charity, Florida's Director of the Division of Financial Institutions, admits that "there was no one that specifically regulated the office .

8. On Tuesday February 16, 2009, a Court Order was made by a judge in the Northern District of Texas appointing a Receiver over all of Stanford's assets wherever located. When the international and local media reported this breaking news, there began literally a run on the Bank of Antigua, with customers withdrawing millions from the bank.

9. By February 18, 2009 the Eastern Caribbean Central Bank (ECCB) had to extend credit to the bank in the sum of EC$19M; by February 24, the amount was EC$79M, and the final figure stood at EC$89M when normalcy was restored. The amount represents a debt for which Antigua & Barbuda is currently responsible.

10. The prompt intervention by the ECCB was necessary in order to maintain the stability of the OECS Monetary Union as well as, the stability of the common currency shared by 8 OECS countries.

11. On February 23, 2009 the ECCB assumed control and management of the Bank under its emergency powers given by the law which created it. A new corporate entity, the Eastern Caribbean Amalgamated Financial Company Ltd., comprising representatives of the indigenous banks in the OECS, was incorporated as an agent of the ECCB to run the day-to-day affairs of the Bank of Antigua. That was necessary to prevent a financial meltdown within the OECS grouping, given our common currency, which is tied to the US$ and has remained constant and stable since its pegging in 1971.

The Bank of Antigua continues to do business and credibility has been restored and is being maintained. The ECCB has commissioned an international firm to evaluate the Bank's assets and worth with a view to purchasing the Bank, given Stanford's continued inability to provide policy directives. There has, to date, been no purchase of the Bank. Both the SEC Receiver and Stanford's representatives have been kept informed by the ECCB of its operations and intentions regarding the Bank.

It is alleged that, by failing to properly regulate SIBL, Leroy King, the former Administrator of the FSRC, facilitated Stanford's Ponzi Scheme for personal gain. In the wake of his indictment on these charges in the United States Federal Court, the Cabinet of Antigua & Barbuda moved to officially strip King of his position. He is now the subject of pending extradition proceedings to stand trial in the USA. There is neither now nor was there any collusion between Stanford and the Spencer administration.

Following the revelations surrounding the alleged Ponzi fraud scheme operated by Stanford, our Government commissioned an investigation of the FSRC to identify any systemic failures or breaches in operational procedures both within the FSRC and in its examinations of off-shore financial institutions. This was conducted by a group of international experts, whose findings were that Antigua & Barbuda's international finance laws and regulations, of themselves, could not be faulted.

As everyone knows by now, Stanford International Bank Ltd. is in liquidation. Apart from the Bank of Antigua which, as an integral part of the OECS banking system had to be rescued by the ECCB's intervention none of Stanford's other local businesses were profitable; in fact, some have been closed, since they were highly dependent on massive monthly injections of capital from Houston, Texas.

The Bank of Antigua has invested a large part of the funds of its depositors including monies from citizens and residents of Antigua & Barbuda and customers in the United States in Florida, particularly, and these assets continue to be under the control of the SEC Receiver. As to the source of the funds used to purchase the Bank's fixed assets (three parcels of land in St. John's), to date, there has not yet been any determination of this matter by the Liquidator.

To date there has not been any service of any legal process on the government through the Ministry of Foreign Affairs or the diplomatic channel by any person or persons in this matter.

The Government of Antigua & Barbuda continues to take every practical and legal measure



Web2PDF
converted by Web2PDFConvert.com

to position ourselves to win this battle.   We do not take lightly the threats of the self styled Stanford Victims Coalition. Our overseas missions and consulates are playing and will continue to play a critical role in the government□s actions, as will our Tourism offices. We are in discussions with overseas counsel and intend to defend our country, our Treasury, our citizens□ welfare and our patrimony.

We encourage all patriotic Antiguans and Barbudans □ wheresoever they may reside □ to marshal their forces and join in our collective defence of fair Antigua and Barbuda.

*Copyright 2010 - Government of Antigua and Barbuda*
*All rights reserved.*

*Privacy Policy | Contact Us*

ANTIGUA AND BARBUDA



RESOLUTION AUTHORISING THE SECRETARY TO THE CABI-
NET TO CAUSE A
DECLARATION TO BE MADE FOR THE ACQUISITION OF LAND
DESCRIBED IN THE SCHEDULE FOR A PUBLIC PURPOSE

STATUTORY INSTRUMENT

2009, No. 10

*[ Printed in the Official Gazette Vol. XXIX No. 32*
*dated, 24th April, 2009. ]*

Printed at the Government Printing Office, Antigua and Barbuda,
by  Eric T. Bennett, Government Printer
— By Authority, 2009.

800—4.09                                              *[ Price$ 3.65 ]*

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 213

*Resolution authorising the Secretary to the Cabinet to cause a declaration to be made for the acquisition of land for a public purpose.*

2009, No. 10

2009, No. 10    *Resolution authorising the Secretary to the Cabinet to cause a decla-*
*ration to be made for the acquisition of land for a public purpose.*

## ANTIGUA AND BARBUDA

## STATUTORY INSTRUMENTS

## 2009, No. 10

*(In substitution of Statutory Instrument No. 10 of 2009 published in
Gazette No. 21, Volume XXIX)*

## RESOLUTION AUTHORISING THE SECRETARY TO THE CABINET TO CAUSE A DECLARATION TO BE MADE FOR THE ACQUISITION OF THE LAND DESCRIBED IN THE SCHEDULE FOR A PUBLIC PURPOSE.

**WHEREAS** by section 3 of the Land Acquisition Act Cap. 233, it is provided that if the Cabinet considers that any land should be acquired for public purpose they may, with the approval of the Legislature, cause a declaration to that effect to be made by the Secretary to the Cabinet in the manner provided under section 3 of the said Act;

**AND WHEREAS** the appointment by the US District Court for the Northern District of Texas of a Receiver to take control of the assets of Stanford International Bank Ltd; Stanford Group Company and R. Allen Stanford (among others) threatens the financial viability of the Bank of Antigua, the prompt payment by the Stanford group of companies of their massive outstanding debt to local suppliers, and the continued employment of over eight hundred employees at a time of global financial crisis;

**AND WHEREAS** the Cabinet considers that the parcels of land described in the Schedule hereto be acquired for a public purpose, namely to protect the national economy and give necessary support and assistance to the local banking sector and its regulatory authority, the Eastern Caribbean Central Bank;

**NOW, THEREFORE, BE IT RESOLVED** by this Honourable House that the Secretary to the Cabinet be authorised to cause a declaration to be made in the manner provided under section 3 of the Land Acquisition Act Cap. 233 to the effect that the parcels of land described in the Schedule hereto are required for a public purpose.

### SCHEDULE

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 215

*Resolution authorising the Secretary to the Cabinet to cause a declara-*
*tion to be made for the acquisition of land for a public purpose.*

2009, No. 10

| REGISTERED PROPRIETOR | REGISTRATION SECTION | BLOCK | PARCEL | AREA | LOCATION |
|---|---|---|---|---|---|
| Stanford International Bank Limited | Barnes Hill & Coolidge | 41 2094A | 383 | 3.25 | Bank of Antigua, Airport |
| Stanford International Bank Limited | Barnes Hill & Coolidge | 41 2264A | 91 | 0.2 | Coolidge |
| Stanford International Bank Limited | Barnes Hill & Coolidge | 41 2294A | 92 | 0.2 | Coolidge |
| Pelican Island Properties | St. Phillips North | 25 3190A | 1 | 29 | Pelican Island |
| Maiden Island Holdings Ltd. | Crabbs Peninsula & Neighbouring Islands | 21 2692A | 5 | 4 | Crabbs Peninsula |
| Maiden Island Holdings Ltd. | Crabbs Peninsula & Neighbouring Islands | 21 2692A | 6 | 4 | Crabbs Peninsula |
| Maiden Island Holdings Ltd. | Crabbs Peninsula & Neighbouring Islands | 21 2692A | 8 | 8 | Crabbs Peninsula |
| Maiden Island Holdings Ltd. | Barnes Hill & Coolidge | 41 2294A | 113 | 1.84 | Shell Beach |
| Maiden Island Holdings Ltd. | Barnes Hill & Coolidge | 41 2595A | 2 | 2 | Maiden Island |
| Gilberts Resort Development Holdings Ltd. | Gilberts | 22 2890A | 11 | 86 | Coconut Hall Area |
| Stanford Hotel Properties | Barnes Hill & Coolidge | 41 2195B | 286 | 3.25 | Sugar Mill Hotel Area |
| REGISTERED PROPRIETOR | REGISTRATION SECTION | BLOCK | PARCEL | AREA | LOCATION |

2009, No. 10
*Resolution authorising the Secretary to the Cabinet to cause a decla-*
*ration to be made for the acquisition of land for a public purpose.*

| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2195B | 287 | 4.25 | Sugar Mill Hotel Area |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 52 | 3 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 54 | 1.38 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 56 | 1.57 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 57 | 0.92 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 100 | 9.83 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 118 | 19.61 | Runway 10 V.C. Bird International Airport |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 69 | 11.35 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 70 | 2.7 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 71 | 5.42 | Airport Compound |
| **REGISTERED PROPRIETOR** | **REGISTRATION SECTION** | **BLOCK** | **PARCEL** | **AREA** | **LOCATION** |

APPENDIX IN SUPPORT OF PLAINTIFFS'
MOTION FOR JURISDICTIONAL DISCOVERY
PAGE 217

*Resolution authorising the Secretary to the Cabinet to cause a declaration to be made for the acquisition of land for a public purpose.*          2009, No. 10

| REGISTERED PROPRIETOR | REGISTRATION SECTION | BLOCK | PARCEL | AREA | LOCATION |
|---|---|---|---|---|---|
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 72 | 0.64 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 74 | 1.18 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 96 | 3.83 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 112 | 5.32 | Shell Beach |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2195B | 307 | 1.78 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2094A | 429 | 4.3 | Airport Compound |
| Stanford Development Company Limited | Barnes Hill & Coolidge | 41 2294A | 45 | 15 | Airport Compound |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1148 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1149 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1164 | 0.2 | Cedar Valley Springs |

2009, No. 10          *Resolution authorising the Secretary to the Cabinet to cause a declaration to be made for the acquisition of land for a public purpose.*

| REGISTERED PROPRIETOR | REGISTRATION SECTION | BLOCK | PARCEL | AREA | LOCATION |
|---|---|---|---|---|---|
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1165 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1166 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1167 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1169 | 0.2 | Cedar Valley Springs |
| Stanford Developmnet Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1175 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1176 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1177 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1178 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1179 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1200 | 0.2 | Cedar Valley Springs |

*Resolution authorising the Secretary to the Cabinet to cause a declaration to be made for the acquisition of land for a public purpose.*                2009, No. 10

| | | | | | |
|---|---|---|---|---|---|
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1201 | 0.2 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1202 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1203 | 0.25 | Cedar Valley Springs |
| Stanford Development Company Limited | Cassada Gardens & New Winthropes | 42 1894A | 1204 | 0.25 | Cedar Valley Springs |
| Bank of Antigua Limited | St. John's Central | 65 1692D | 55 | 0.1 | High Street St. John's |
| Bank of Antigua Limited | St. John's Central | 65 1692D | 58 | 0.2 | High Street St. John's |
| Bank of Antigua Limited | St. John's Central | 65 1692D | 62 | 0.1 | High Street St. John's |

Passed the House of Representatives on the 26th day of February, 2009.

Passed the Senate on the 27th day of February, 2009.

**D. Gisele Isaac-Arrindell,**
*Speaker.*

**McKenzie Frank,**
*President.*

**T. Thomas,**
*Clerk to the House of Representatives.*

**T. Thomas,**
*Clerk to the Senate.*

# Exhibit J



Official Website for the Government of
# Antigua and Barbuda
ab.gov.ag

| Home | About Government | Media Centre | Information Centre | Spotlight | Directory | A&B TV | Photos | Email | Help |

*You are here: Home » Press Releases*

## Statement From The Government Of Antigua & Barbuda On The Stanford Victims Coalition Claims March 19th, 2010

*Posted On: March 22, 2010*



The allegation by the self styled Stanford Victims Coalition that the State of Antigua & Barbuda was a partner in, and beneficiary of, R. Allen Stanford's alleged criminal behavior is totally unfounded.

Despite the Coalition�s claims and insinuations, the Baldwin Spencer Administration, which assumed office in March 2004, did not sell any Crown lands to Stanford; received no loans from Stanford; and was not a beneficiary of any largesse of Stanford.� In fact, R. Allen Stanford considered this administration an obstacle to his ambitions.

Stanford was the sole owner of two banks in Antigua & Barbuda: Stanford International Bank Ltd., an off-shore financial entity registered under our International Business Corporations Act with, and regulated by, our Financial Services Regulatory Commission (FSRC), and the Bank of Antigua, registered under the Companies Act and licensed to operate ordinary banking business under our Banking Act, but regulated by the Eastern Caribbean Central Bank (ECCB).�

The business of Stanford International Bank Ltd. was run from Houston, Texas, and its books maintained in Memphis, Tennessee. The bank was operating in Antigua as a transit point and for purposes of registration and regulation.

While the Government and People of Antigua & Barbuda can understand the frustration and disappointment being experienced by the SIBL depositors, we cannot countenance the attack these persons have begun to wage on our country without first looking at other entities and organizations � including the United States� regulatory authorities.� Information in our possession supports the following:

In late 1998, despite objections by the State of Florida�s top banking lawyer, Richard Donelan, Florida�s regulators gave sweeping powers to Stanford that allowed him to operate and open a trust office in Miami, which was hardly regulated by the US authorities. In December 1998, a Memorandum of Agreement was signed by Arthur M. Simon, the then Director of the Division of Banking for the State of Florida�s Department of Banking and Finance, and Yolanda Suarez, the then Secretary of Stanford Trust Company Limited, authorizing the establishment of a foreign trust office � the first company of its kind ever set up in the state.

Between 1998 and 2003, over 2000 customers purchased certificates of deposit from the Miami office lured by the promise of receiving yields higher than those offered by other



[Search]

**WADADLI BILLBOARD**

**TRACK THE LATEST ATLANTIC TROPICAL WEATHER SYSTEMS HERE**

Music From Antigua
Slow Dance By Red Hot
Fla…
0:00 - 0:00

| Highlights | Whats New |

**LIME Party Monarch Semi-Finalist 2012**
*July 9, 2012*

**2012 Common Entrance Results**
*July 6, 2012*

**PDV Caribe Antigua and Barbuda Ltd.**
*June 20, 2012*

**Draft Declaration LICA WICBC Ministers Of Sports Meeting 2012**
*April 24, 2012*

**OECS Electronic Government for Regional Integration Project - E-GRIP**
*April 19, 2012*

more highlights »

| A & B TV | Photos | A&B NEWS |

Antigua Carnival 2012 - Wadadli Beer Calypso Monarch - De Bear - "Time To Take Your Place"

United States banks.

Brokers generated millions of unreported dollars from depositors, particularly Latin Americans, who were lured by the promise of high returns and who hardly questioned Stanford's bona fides as long as their accounts grew on paper. In the first six years, the office, known as Stanford Fiduciary Investor Services, took in US$600 million from customers, Florida state and court records show.

It is reported that some of the millions went to support Stanford�s lavish lifestyle, which included private jets, personal loans, expensive cars, and mansions, including a US$10.5 million home in Gables Estates, Florida that he has since torn down, the records show.� Nevertheless, as far back as 2003, some investors had begun questioning the legitimacy of SIBL's certificates of deposit, and the United States� Securities & Exchange Commission was aware to the best of our information, knowledge and belief of these reports and other complaints some of which had been lodged by former Stanford employees, themselves.� We are not aware whether, or to what extent, the SEC took investigative or corrective measures.

Since the arrest of Stanford, Arthur Simon has admitted that his actions in 1998 should have been done differently, that he would have liked to have� stopped the Trust company from doing what it did, and that, in hindsight, "tighter provisions� should have governed the operations. Further, Linda Charity, Florida�s Director of the Division of Financial Institutions, admits that "there was no one that specifically regulated the office�.

On Tuesday February 16, 2009, a Court Order was made by a judge in the Northern District of Texas appointing a Receiver over all of Stanford's assets wherever located. When the international and local media reported this breaking news, there began literally a run on the Bank of Antigua, with customers withdrawing millions from the bank.

By February 18, 2009 the Eastern Caribbean Central Bank (ECCB) had to extend credit to the bank in the sum of EC$19M; by February 24, the amount was EC$79M, and the final figure stood at EC$89M when normalcy was restored. The amount represents a debt for which Antigua & Barbuda is currently responsible.

The prompt intervention by the ECCB was necessary in order to maintain the stability of the OECS Monetary Union as well as, the stability of the common currency shared by 8 OECS countries.

On February 23, 2009 the ECCB assumed control and management of the Bank under its emergency powers given by the law which created it. A new corporate entity, the Eastern Caribbean Amalgamated Financial Company Ltd., comprising representatives of the indigenous banks in the OECS, was incorporated as an agent of the ECCB to run the day-to-day affairs of the Bank of Antigua. That was necessary to prevent a financial meltdown within the OECS grouping, given our common currency, which is tied to the US$ and has remained constant and stable since its pegging in 1971.

The Bank of Antigua continues to do business and credibility has been restored and is being maintained. The ECCB has commissioned an international firm to evaluate the Bank's assets and worth with a view to purchasing the Bank, given Stanford�s continued inability to provide policy directives. There has, to date, been no purchase of the Bank. Both the SEC Receiver and Stanford's representatives have been kept informed by the ECCB of its operations and intentions regarding the Bank.

It is alleged that, by failing to properly regulate SIBL, Leroy King, the former Administrator of the FSRC, facilitated Stanford's Ponzi Scheme for personal gain.� In the wake of his indictment on these charges in the United States Federal Court, the Cabinet of Antigua & Barbuda moved to officially strip King of his position. He is now the subject of pending extradition proceedings to stand trial in the USA. There is neither now nor was there any collusion between Stanford and the Spencer administration.

Following the revelations surrounding the alleged Ponzi fraud scheme operated by Stanford, our Government commissioned an investigation of the FSRC to identify any systemic failures or breaches in operational procedures both within the FSRC and in its examinations of off-shore financial institutions.� This was conducted by a group of international experts, whose findings were that Antigua & Barbuda�s international finance laws and regulations, of themselves, could not be faulted.

As everyone knows by now, Stanford International Bank Ltd. is in liquidation. Apart from the Bank of Antigua � which, as an integral part of the OECS banking system had to be rescued by the ECCB�s intervention � none of Stanford's other local businesses were



**Antigua Carnival 2012 - Jumpy - Tian Winter**
*Length 10.07 mins*



**Jaycees Caribbean Queen Show_Talent_St Lucia**
*Length 4.49 mins*



www.antigua**animals**.com

**More Stories**

**Double win for Tian Winter at Party Monarch Competition**
*August 5, 2012*

**Miss Dominica Wins the 2012 Jaycees Caribbean Queen Pageant**
*August 4, 2012*

**Tropical Storm Ernesto-Advisory**
*August 3, 2012*

**Soul and Steel Meets at Panorama**
*August 2, 2012*

**Officials Get Set To Engage Stakeholders on Convention of Rights of the Child**
*August 2, 2012*

more articles »

rescued by the LCDO's intervention – none of Stanford's other local businesses were profitable; in fact, some have been closed, since they were highly dependent on massive monthly injections of capital from Houston, Texas.

The Bank of Antigua has invested a large part of the funds of its depositors – including – monies from citizens and residents of Antigua & Barbuda and customers in the United States – in Florida, particularly, and these assets continue to be under the control of the SEC Receiver. As to the source of the funds used to purchase the Bank's fixed assets (three parcels of land in St. John's), to date, there has not yet been any determination of this matter by the Liquidator.

To date there has not been any service of any legal process on the government through the Ministry of Foreign Affairs or the diplomatic channel by any person or persons in this matter.

The Government of Antigua & Barbuda continues to take every practical and legal measure to position ourselves to win this battle. – We do not take lightly the threats of the self styled Stanford Victims Coalition. Our overseas missions and consulates are playing and will continue to play a critical role in the government's actions, as will our Tourism offices. We are in discussions with overseas counsel and intend to defend our country, our Treasury, our citizens' welfare and our patrimony.

We encourage all patriotic Antiguans and Barbudans – wheresoever they may reside – to marshal their forces and join in our collective defence of fair Antigua and Barbuda.

---

**Media Center**
- News and Press Releases
- Notices and Announcements
- ABS TV / Radio

**Information Center**
- Laws and Regulations
- Statistics and Reports
- Forms and Licenses
- Government Policy

**Spotlight**
- ICTFEST
- Antigua and Barbuda MET Office
- A&B Buzz Magazine

---

Copyright 2012 - Government of Antigua and Barbuda
All rights reserved.

Privacy Policy  |  Contact Us

# Exhibit K

06/16/2004 16:24 FAX                                                    ☒012/012

GUARANTEE AND POSTPONEMENT OF CLAIM                          Form BA-28

To:

    BANK OF ANTIGUA LIMITED

PART I

*For valuable consideration,* the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the

liabilities which ............................ **FREE TRADE AND PROCESSING ZONE**

..........................................................................................................

..........................................................................................................

(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank: *the liability of the Guarantor hereunder being limited to*

the sum of ........................ **ONE MILLION .00/100**.................................................... dollars *with interest from the date of demand for payment.*

*And the Guarantor agrees* (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

(2) That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

(3) That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

(4) That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

(5) That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding as a continuing security on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

(6) That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

(7) That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

(8) That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

(9) That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.

*73*

(10)   That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)   That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event of the liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank, and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)   The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)   This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)   There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this

(1) Here specify island.

(2) Here specify any other jurisdiction.

instrument may be instituted in any court of competent jurisdiction in (1) ...ANTIGUA AND BARBUDA.....

and in (2) ........ANY OTHER TERRITORIES...............................................................

...................................................................................................................

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b)  This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at .......COOLIDGE..................................... this .............TENTH...........

day of .....................JUNE........................... A.D. 19.98......

WITNESS: _[signature]_

A separate seal should be affixed opposite the signature of each guarantor.

MINISTER OF FINANCE

SEAL 173

⊠075/081

06/15/2004 17:54 FAX

(10)  That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)  That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event of the liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank; and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)  The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)  This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)  There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) ...ANTIGUA AND BARBUDA.....  *and in* (2) ........ANY OTHER TERRITORIES.................................................................
...............................................................................................................................
at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b) This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

*(1) Here specify Island.*
*(2) Here specify any other jurisdiction.*

Given under Seal at .......COOLIDGE........................................................ this ............TENTH............

day of ...................JUNE............................................... A.D. 19.98......

WITNESS:

*A separate seal should be affixed opposite the signature of each guarantor.*

MINISTER OF FINANCE

SEAL

GUARANTEE AND POSTPONEMENT OF CLAIM                                    Form BA-28



To:

BANK OF ANTIGUA LIMITED

PART I

*For valuable consideration*,  the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the

*To be initialled by the witness and the person who signs the form*

liabilities which .......... ********** INTERNATIONAL FINANCIAL SECTOR AUTHORITY ***********

....................................................................................................................

....................................................................................................................

(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank; *the liability of the Guarantor hereunder being limited to*

*To be initialled by the witness and the person who signs the form. Where it is desired to secure the full liability of the customer the clause in italics should be noted out and nothing added.*

*the sum of* .......... ****************215,596.37 ***************************** *dollars* *with interest from the date of demand for payment.*

**And the Guarantor agrees** (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

(2)  That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

(3)  That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

(4)  That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

(5)  That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding as a continuing security on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

(6)  That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

(7)  That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

(8)  That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

(9)  That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.

(10)   That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)   That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event of the liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank; and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)   The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)   This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)   There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) .ANTIGUA .&. BARBUDA......... *and in* (2) ....ANY .OTHER .TERRITORY.........................................................................
.............................................................................................................

*(1) Here specify island.*
*(2) Here specify any other jurisdiction.*

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b)  This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at 1000 AIRPORT BOULEVARD ........................... this .20.........................
day of ....JANUARY.......................................... A.D. 19. 2000.

WITNESS:

*separate seal should be affixed opposite the signature of each guarantor.*

**14**

GOVERNMENT OF ANTIGUA & BARBUDA      { SEAL }

70

@ 072/081

GUARANTEE AND POSTPONEMENT OF CLAIM                                         Form BA-23

To:

BANK OF ANTIGUA LIMITED

PART I

**For valuable consideration,** the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the liabilities which ..........................................**INTERNATIONAL FINANCIAL SECTOR AUTHORITY**.........................................

*To be initialled by the witness and the person who signs the form.*

...................................................................................................................................................

.........................................................................................................................................................
(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank; *the liability of the Guarantor hereunder being limited to*

*To be initialled by the witness who signs the form. Where it is desired to secure the full balance of the customer the clause in italics should be ruled out and nothing added.*

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* 4,893, 146.60 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
the sum of .......................................................................................................................... dollars
*with interest from the date of demand for payment.*

**And the Guarantor agrees** (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

(2) That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

(3) That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

(4) That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

(5) That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding as a continuing security on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

(6) That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

(7) That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

(8) That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

(9) That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.

(10)   That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)   That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank; and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)   The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)   This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)   There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) .....ANTIGUA & BARBUDA....... *and in* (2) ......ANY OTHER TERRITORY..................................................................

........................................................................................................................................................

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(1) Here specify island.
(2) Here specify any other jurisdiction.

(b)   This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at .......1000 AIRPORT BOULEVARD.......................... this ...................26..........

day of ........NOVEMBER............................................ A.D. 19..99....

WITNESS:

separate seal ould be affixed pposite the gnature of each uarantor.

GOVERNMENT OF ANTIGUA & BARBUDA

MINISTER OF FINANCE

SEAL

en

GUARANTEE AND POSTPONEMENT OF CLAIM                                    Form BA-28

To:

BANK OF ANTIGUA LIMITED

PART I

**For valuable consideration,** the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the

To be initialled by
the witness and the
person who signs
the form

liabilities which ..... National Parks Authority ........................................................

...............................................................................................................

...............................................................................................................

(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank; *the liability of the Guarantor hereunder being limited to*

To be inserted by
the witness and the
person who signs
the form. Where it
is desired to secure
the full liability of
the customer the
clause in italics
should be ruled out
and nothing added

the sum of ..... Two Hundred Fifty Thousand - 00/100 ..................................... dollars
*with interest from the date of demand for payment.*

**And the Guarantor agrees** (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

(2) That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

(3) That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

(4) That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

(5) That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

(6) That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

(7) That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

(8) That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

(9) That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.

2150

76

(10)    That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

### PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)    That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank, and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)    The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

### PART III

(13)    This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)    There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) Antigua & Barbuda

(1) Here specify island.

(2) Here specify any other jurisdiction.

*and in* (2) .... any other territory ...................................................................................

................................................................................................................................................

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b)  This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at ........ St. Johns ............................................... this ........ 31 ....

day of .............. MARCH ........................... A.D. 19. 95 ....

WITNESS:

A separate seal should be affixed opposite the signature of each guarantor.

Financial Secretary

GOVERNMENT OF ANTIGUA & BARBUDA

SEAL

GUARANTEE AND POSTPONEMENT OF CLAIM                              Form BA-28

To:

BANK OF ANTIGUA LIMITED

## PART I

*For valuable consideration,* the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the

liabilities which .......................... NATIONAL PARKS AUTHORITY

...................................................................................................................................

..........................

(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank; *the liability of the Guarantor hereunder being limited to*

*the sum of* ................................ ONE HUNDRED FIFTY THOUSAND – 00/100 ........................... *dollars*
*with interest from the date of demand for payment.*

**And the Guarantor agrees** (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

(2)   That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

(3)   That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

(4)   That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

(5)   That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding as a continuing security on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

(6)   That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

(7)   That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

(8)   That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

(9)   That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.

Case 3:09-cv-00721-N   Document 116-8   Filed 12/05/11   Page 28 of 108   PageID 10098

2152



(10)   That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)   That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event of the liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank, and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)   The provisions of this Part II are independent and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)   This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)   There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this
Here specify instrument may be instituted in any court of competent jurisdiction in (1) ...ANTIGUA & BARBUDA...........
d.
Here specify and in (2) ....ANY OTHER TERRITORY............................................................................
other juris-
on.
..............................................................................................................................................

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b) This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at ........................ ST. JOHNS ......................... this ........ 28th

day of ............ July .......................... A.D. 19 94 ....

WITNESS: .

separate seal
ould be affixed
equite the
Nature of each
Grantor.

MINISTER OF FINANCE

SEAL

79

GUARANTEE AND POSTPONEMENT OF CLAIM

Form BA-18

To:

BANK OF ANTIGUA LIMITED

PART I

*For valuable consideration,* the undersigned (herein referred to as the "Guarantor") hereby guarantees payment to Bank of Antigua Limited (forthwith after demand therefor as hereinafter provided) of the

*To be initialled by the witness and the person who signs the form.*

liabilities which    **St. John's Development Corporation** ..................................................

.............................................................................................................................

.............................................................................................................................

(herein referred to as the "customer") has incurred or is under or may incur or be under to the Bank, whether arising from dealings between the Bank and the customer or from any other dealings by which the customer may become in any manner whatever liable to the Bank; *the liability of the Guarantor hereunder being limited to*

*To be initialled by the person who signs the form. Where it is desired to secure the full liability of the customer this clause in italics should be ruled out and nothing added.*

*the sum of* .. **Two Million Seven Hundred Thousand – 00/100** ................................................... *dollars with interest from the date of demand for payment.*

    *And the Guarantor agrees* (1) That if more than one Guarantor executes this instrument the provisions hereof shall be read with all grammatical changes thereby rendered necessary and each reference to the Guarantor shall include the undersigned and each and every one of them severally and this guarantee and all covenants and agreements herein contained shall be deemed to be joint and several.

    (2)   That the Bank may grant extensions of time or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the customer and with other parties and securities as the Bank may see fit, and may apply all moneys received from the customer or others, or from securities, upon such part of the customer's liability as it may think best, without prejudice to or in any way limiting or lessening the liability of the Guarantor under this guarantee.

    (3)   That the Bank shall not be bound to exhaust its recourse against the customer or other parties or the securities it may hold before being entitled to payment from the Guarantor under this guarantee.

    (4)   That any loss of or in respect of securities received by the Bank from the customer or any other person, whether occasioned through the fault of the Bank or otherwise, shall not discharge pro tanto or limit or lessen the liability of the Guarantor under this guarantee.

    (5)   That this shall be a continuing Guarantee and shall cover present liabilities (if any) of the customer to the Bank and all liabilities incurred after the date hereof and shall apply to and secure any ultimate balance due or remaining due to the Bank and shall be binding as a continuing security on the Guarantor, provided that the Guarantor or the executors or administrators of the Guarantor may determine his or their further liability under this Guarantee by thirty days' written notice given to the branch of the Bank at which the customer's account is kept and this Guarantee shall not apply to any liabilities of the customer to the Bank incurred after the expiration of thirty days from the date of receipt of such notice by the said branch.

    (6)   That any change or changes in the name of the customer, or (if the customer be a partnership) any change or changes in the membership of the customer's firm by death or by the retirement of one or more of the partners or by the introduction of one or more other partners shall not affect or in any way limit or lessen the liability of the Guarantor hereunder and this guarantee shall extend to the person, firm, or corporation acquiring or from time to time carrying on the business of the customer.

    (7)   That where the customer is a corporation or partnership the Bank shall not be concerned to see or inquire into the powers of the customer or its directors, partners or agents acting or purporting to act on its behalf, and moneys, advances or credits in fact borrowed or obtained from the Bank in professed exercise of such powers shall be deemed to form part of the liabilities hereby guaranteed, even though the borrowing or obtaining thereof was irregularly, defectively or informally effected or in excess of the powers of the customer or its directors, partners or agents.

    (8)   That any account settled or stated by or between the Bank and the customer shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due by the customer to the Bank is so due.

    (9)   That should the Bank receive from the Guarantor a payment or payments in full or on account of the liability under this guarantee, the Guarantor shall not be entitled to claim repayment against the customer or the customer's estate until the Bank's claims against the customer have been paid in full; and in case of liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act or any composition with creditors or scheme of arrangement, the Bank shall have the right to rank for its full claim and receive all dividends or other payments in respect thereof until its claim has been paid in full and the Guarantor shall continue liable up to the amount guaranteed, less any payments made by the Guarantor, for any balance which may be owing to the Bank by the customer; and in the event of the valuation by the Bank of any of its securities and/or the retention thereof by the Bank, such valuation and/or retention shall not, as between the Bank and the Guarantor, be considered as a purchase of such securities, or as payment or satisfaction or reduction of the customer's liabilities to the Bank, or any part thereof.



(10)   That the Guarantor shall make payment to the Bank of the amount of the liability of the Guarantor forthwith after demand therefor is made in writing and such demand shall be deemed to have been effectually made when an envelope containing it addressed to the Guarantor at the last address of the Guarantor known to the Bank is deposited, postage prepaid and registered, in the Post Office and the liability of the Guarantor shall bear interest from the date of such demand to be computed according to the usual mode of the Bank in dealing with such indebtedness as well after as before any judgment of a Court of competent jurisdiction.

## PART II

### AND FOR THE FURTHER SECURITY OF THE BANK THE GUARANTOR AGREES:

(11)   That any debts or claims against the customer now or at any time hereafter held by the Guarantor are and shall be held by the Guarantor for the further security of the Bank, and as between the Guarantor and the Bank are hereby postponed to the debts and claims against the customer now or at any time hereafter held by the Bank, and any such debts and claims of the Guarantor shall be held as trustee for the Bank and shall be collected, enforced or proved subject to and for the purposes of this agreement and any moneys received by the Guarantor in respect thereof shall be paid over to the Bank on account of its said debts and claims; and no such debt or claim of the Guarantor against the customer shall be released or withdrawn by the Guarantor unless the Bank's written consent to such release or withdrawal is first obtained and the Guarantor shall not permit the prescription of any such debt or claim by any statute of limitations or assign any such debt or claim to any person other than the Bank or ask for or obtain any security or negotiable paper for or other evidence of any such debt or claim except for the purpose of delivering the same to the Bank; and the Bank may at any time give notice to the customer requiring the customer to pay to the Bank all or any of such debts or claims of the Guarantor against the customer and in such event such debts and claims are hereby assigned and transferred to the Bank; and in the event of the liquidation, winding up or bankruptcy of the customer (whether voluntary or compulsory) or in the event that the customer shall make a bulk sale of any of the customer's assets within the provisions of any Bulk Sales Act, or any composition with creditors or scheme of arrangement, any and all dividends or other moneys which may be due or payable to the Guarantor in respect of the debts or claims of the Guarantor against the customer are hereby assigned and transferred to and shall be due and be paid to the Bank; and for such payment to the Bank this shall be a sufficient warrant and authority to any person making the same; and the Guarantor shall at any time and from time to time at the request of and as required by the Bank, make, execute and deliver all statements of claims, proofs of claim, assignments and other documents and do all matters and things which may be necessary or advisable for the protection of the rights of the Bank under and by virtue of this instrument.

(12)   The provisions of this Part II are independent of and severable from the provisions of Part I and shall remain in force whether or not the Guarantor is liable for any amount under Part I and whether or not the Bank has received the notice referred to in paragraph 5; provided, however, that the provisions of this Part II may be terminated by the Guarantor, by written notice to the branch of the Bank at which the customer's account is kept, at any time when the Guarantor is not liable for any amount under Part I by reason of the fact that the customer is not indebted or liable to the Bank.

## PART III

(13)   This instrument is in addition and supplemental to all other guarantees and/or postponement agreements (whether or not in the same form as this instrument) held or which may hereafter be held by the Bank.

(14)   There are no representations, collateral agreements or conditions with respect to this instrument or affecting the Guarantor's liability hereunder other than as contained herein.

(15) (a) The Guarantor agrees that any legal suit, action or proceedings arising out of or relating to this instrument may be instituted in any court of competent jurisdiction in (1) ...... Antigua & Barbuda ...........

(1) Here specify island.
(2) Here specify any other jurisdiction.

*and in* (2) ................. any other territory .........................................

at the option of the Bank and the Guarantor hereby accepts and irrevocably submits to the jurisdiction of the said courts and acknowledges their competence and irrevocably agrees to be bound by any judgment thereof, provided that nothing herein shall limit the Bank's right to bring proceedings against the Guarantor in the courts of any other country.

(b)   This instrument shall extend to and enure to the benefit of the successors and assigns of the Bank and shall be binding upon the Guarantor and the heirs, executors, administrators and successors of the Guarantor.

Given under Seal at ........................................................ this ............14ᵗʰ..........................

day of ............................................ October ... A.D. 19. 98 ......

WITNESS:

A separate seal should be affixed opposite the signature of each guarantor.

MINISTER OF FINANCE
GOVERNMENT OF ANTIGUA & BARBUDA

{ SEAL }

# Exhibit L

**Forget the Democrats and Republicans. YOU may have the best chance of winning in November!** If you have a $500,000 portfolio, download the latest report by *Forbes* columnist Ken Fisher's firm. It tells you what we think may happen in the 2012 elections and why. This must-read report includes research and analysis you can use in your portfolio right now. Don't miss it!   Click Here to Download Your Report!   FISHER INVESTMENTS®

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.     Order a reprint of this article now

## THE WALL STREET JOURNAL.
WSJ.com

THE A-HED   |   March 5, 2002, 1:05 a.m. ET

# R. Allen Stanford Casts Shadow Over Antigua, Island of the Sun

By PETER FRITSCH | Staff Reporter of THE WALL STREET JOURNAL

ST. JOHN'S, Antigua -- This sun-drenched Caribbean island, famous for its cricket stars, palm-flattening hurricanes and outsized corruption scandals, is fast gaining another reputation: as the personal fief of R. Allen Stanford, a Texas developer and international banker.

There is little in this former British colony, which includes the island of Barbuda, that isn't being branded by Mr. Stanford, a distant relative of Stanford University's founder.



His company, Stanford Financial Group, an international banking concern in Houston, has $14 billion under management. The 51-year-old Mr. Stanford owns Antigua's biggest commercial and offshore banks, a local airline, Caribbean Star, and Antigua's biggest newspaper. He is the former chairman of the government board that oversees Antigua's offshore financial sector.

Since he also lends a great deal of money to the government, he puts off many Antiguans wary of his imposing influence. At the moment, some people are complaining about Antigua's intention to nationalize the Half Moon Bay hotel, taking it from its American owners and, they suspect, selling it to Mr. Stanford.

Mr. Stanford doesn't disclaim an interest in the hotel, but he denies having a deal. "Am I pushing the government? Absolutely not," he says.

*R. Allen Stanford*

Besides, he's busy on other fronts. An Antiguan citizen since 1999, Mr. Stanford is underwriting the construction by a Chinese company of a majestic state hospital now mired in a corruption scandal and new executive offices for the government. He is spending undisclosed millions on a cricket stadium, hotel, cinema and restaurant -- the Sticky Wicket -- on the grounds of the airport.

"I love this place and its people," says Mr. Stanford. That relationship deepened four years ago, he says, when he met a local Catholic priest with wounds in his hands and feet that he believed to be the stigmata of Jesus Christ. As a memento of that life-changing experience, Mr. Stanford carries with him a vial with the congealed fluids drained from the priest's foot.

Where most banks balk at lending to a bloated and revenue-strapped government with a record of mismanagement and corruption -- it hasn't presented audited national accounts to its Parliament in a decade -- Mr. Stanford has ponied up about $65 million. In short, says a recent editorial in Mr. Stanford's Antigua Sun, he is that unusual benefactor who has eschewed personal profit to boldly answer John F. Kennedy's famous call: "Ask not what your country can do for you, ask what you can do for your country."

Mr. Stanford's detractors say the government of Prime Minister



Lester Bird has become so indebted to Mr. Stanford over the past 12 years that it is only a matter of time before the two-island nation of 70,000 sees another, less altruistic side of the voluble Texan. "This man has a lien on our whole country," says government opposition party leader Baldwin Spencer.

That may be an overstatement, but consider the recent discovery made by an independent commission investigating official corruption in the building of the new hospital. In the course of its investigation, it found that Mr. Stanford's Bank of Antigua was being repaid a $30 million construction loan with money coming directly from the island's social-security system. One angry commission member asked Bank of Antigua's president, Kenny Byron, whether the government "was being taken to the cleaners" in the deal. Mr. Byron told the commission, "Yes."

In an interview, Mr. Stanford says he doesn't lend money to the government "without an absolute guarantee of getting paid." He gets those guarantees by having government airport-exit taxes, property taxes and landing fees signed over to his bank. "It's like one of those automatic debit-card deals," he says.

The Half Moon Bay hotel's owner, Natalia Querard of New York, a small woman who inherited the hotel from her parents, fears her property could be the next withdrawal. The government recently took a step toward nationalizing the hotel, closed since a 1995 hurricane heavily damaged it, ostensibly for the good of a population that depends heavily on tourism.

No sooner had the government announced its plan to seize the property late last year than Mr. Bird and his chief of staff, Asot Michael, told Parliament Mr. Stanford was a prime candidate to acquire the property.

Mr. Michael, in a public-relations assault on the Half Moon's owner, recently declared her an "enemy of the state" -- a statement since satirized in song on the radio by a local calypso band. In one public tirade, Mr. Michael said: "No white woman can be allowed to own such property!"

Nestled along a pristine and secluded beach named by cable TV's Travel Channel as one of the world's best, the Half Moon, with its 100 seaside rooms, is worth rebuilding, and it is worth fighting for. Before its destruction, the hotel played host to Elton John, John Le Carre and Bjorn Borg.

Late last year, Mr. Stanford flew down golf-course designers from Jack Nicklaus Designs to survey the Half Moon's nine-hole course for its 18-hole potential, Nicklaus executives say. On Dec. 22, Mr. Stanford's newspaper, the Sun, scooped the West Indies media with the news that Mr. Stanford had the Half Moon in his sights.

Only days later, the Sun broke another big story: Mr. Stanford would forgive a $5 million personal loan to the government and follow up that act of generosity with the first tranche of a $40 million loan to pay the bureaucracy's back salaries and meet other government obligations. "We've made very clear to the government that this does not at all look good" in light of the government's moves to confiscate Half Moon, says a U.S. official.

The U.K. government (the islands are a Commonwealth country), a number of U.S. politicians and private Antiguan businesses have decried the government's sequestration of Half Moon as a dangerous signal to private investors. But the island's largest private investor, Mr. Stanford, has remained conspicuously mum on the case. He and his local bankers have refused to discuss the row between the government and the Half Moon's owners, while the Sun has editorialized for Mr. Stanford's involvement.

Speaking for the first time on the matter to the press, Mr. Stanford confirms his interest in buying Half Moon

"if the government gets title to it free and clear." He adds: "This is an asset that truly needs to be productive for the betterment of a little country; eminent domain, that's what it's all about, just as long as the owners are compensated fairly."

Mr. Bird didn't respond to repeated interview requests but has denied the fix is in for Mr. Stanford, citing the interest of two other hotel groups (which have since disclaimed any interest to The Wall Street Journal.)

Mr. Michael referred all questions on the matter to Tourism Minister Molwyn Joseph, a man who in 1996 lost a previous cabinet post for his role in smuggling a 1932 Rolls-Royce onto the island.

"Our country is a victim of the Half Moon's owners," he says. "It's clear that unlike investors like Mr. Stanford, they don't have the money to rehabilitate the hotel."

In fact, as recently as Feb. 15, the World Bank's International Finance Corp. reiterated its willingness to lend to Mrs. Querard, whose fund-raising efforts were stalled for years by a dispute with a former partner in the hotel. Several months ago, a syndicate of five European banks was also ready to grant a loan but finally declined to do so because of the government's failure to issue a standard letter of comfort blessing the deal.

Other potential lenders have been scared off by Antigua's reputation. Under five decades of Bird-family rule, its leaders have been involved in well-documented scandals ranging from smuggling guns to South Africa and the Medellin cocaine cartel to raiding the social-security kitty for their own plastic surgeries.

"The government has done everything it can to obstruct the lawful owners' legitimate funding attempts," says Ian Moncrief-Scott, a British investor working with Mrs. Querard. The government has snubbed his requests to discuss efforts to raise funds for the hotel despite letters of introduction from the British High Commission for Antigua. "By this seizure, we are effectively being forced to sell to Mr. Stanford," Ms. Querard says.

With nothing left to do but make a public notice of the Half Moon's seizure, the government isn't in the mood to entertain more debate on the issue. After Mr. Michael, the chief of staff, recently saw his arguments for Half Moon's expropriation shot down on local radio show "Big Issues," the government quickly revoked the work permit of the show's Barbadian host.

Mr. Stanford says such actions are common in Antigua and that he is as much a victim of government caprice as anyone else is. "There's a misconception that I'm in bed with Lester Bird," he says. "I don't always get my way as people think I do."

The Texan, whose offshore banking activities here have come under close U.S. State Department and Treasury scrutiny in the past, says he hopes to steer clear of politics. He's focusing on plans to develop Antigua's airport into a choice entertainment destination for West Indians and his preponderantly Latin American bank clients. To help ferry them in, he is negotiating the acquisition of AMR Corp.'s American Eagle regional Caribbean operations out of San Juan, Puerto Rico.

What the expanding Stanford empire will mean for Antiguans remains unclear. As one recent caller to a radio talk show dedicated to Mr. Stanford and the Half Moon fight concluded glumly in his English patois: "You know, mon, we folk can be bought for a drink of rum and a chicken leg."

**Write to** Peter Fritsch at peter.fritsch@wsj.com

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

## You Might Like

After Bikini-Girl Ban, Cosplay in Spotlight

The Case of 'The Jefferson Lies'

Paul Ryan Discloses $1 Million to $5 Million Family Trust

Melbourne Remains Most Livable City

Sen. Al Franken Talks Bankruptcy

hotdigidee@yahoo.com

## From Around the Web

Content from Sponsors What's this?

Heart Attack: How Your Body Warns You Days Before (Newsmax.com)

Osteoporosis: Coffee and Calcium Loss (HealthCommunities)

A Family Hit! Delicious Enchilada Casserole (Williams-Sonoma)

2012 New Gray Hair Trend (Hair Color For Women)

Hot Dog Toppings Across the US (Dinner Tool)

# Exhibit M

# Bloomberg

# Stanford's Island Empire Implodes as Antigua Grabs Properties

By Adam Daigle and Thomas Black - Mar 11, 2009

March 11 (Bloomberg) -- R. Allen Stanford, clad in jeans and a white polo shirt embroidered with his corporate eagle-shield logo, told employees on Antigua in 2005 that he spent "millions and millions and millions of dollars" on the island "to attract the wealthiest people in the world."

Potential clients "have to go back literally blown away," the Texas banker said, according to a video of the meeting provided by Howard Allen, an Antiguan filmmaker who said he was hired to shoot it. Stanford said on the tape that he was upset by opposition to his latest development plans.

The financier, 58, accused by the U.S. of running an $8 billion Ponzi scheme, built Antigua into a marketing showcase for his Stanford Financial Group by lending its government at least 230 million Eastern Caribbean dollars ($85 million) and handing checks to public officials, according to interviews and documents.

At the same time, the state sold him land at what former Prime Minister Lester Bird called cut-rate prices, appointed him to the agency regulating his offshore bank and handed him the title "Sir."

Stanford's island empire-building ended when the U.S. Securities and Exchange Commission sued the banker and two colleagues on Feb. 17 over sales of certificates of deposit from his Antigua-based Stanford International Bank Ltd. The U.S. stepped up enforcement after financier Bernard Madoff was arrested in December and accused of running the largest Ponzi scheme in history. He told investors their accounts held $64.8 billion, according to papers filed in Manhattan federal court.

800 Jobs

On Feb. 27, the parliament of Antigua and Barbuda voted in an emergency session to seize 254 acres of Stanford's land, according to Wendy Gordon, a spokeswoman for Prime Minister Winston Baldwin Spencer. The move was intended to preserve 800 jobs, the government said in a news release. Financial authorities also took over the Stanford-owned Bank of Antigua and Stanford International.

A federal judge in Dallas froze Stanford's assets and placed his U.S. operations into receivership. Chuck Meadows, an attorney who said he was representing Stanford in the asset freeze, told the judge March

2 that the banker denied the Ponzi scheme allegations.

A Ponzi scheme, named for 1920s financier Charles Ponzi, is a fraudulent transaction whereby early investors are paid high returns from money contributed by later participants.

Stanford started his Caribbean financial career on the island of Montserrat in the mid-1980s and moved what became Stanford International Bank to Antigua in 1990, when Bird's father, V.C. Bird, was running the government.

Bought Local Bank

He soon bought the local Bank of Antigua, which was going bankrupt, Lester Bird, who succeeded his father as prime minister in 1994, said in a Feb. 21 telephone interview.

In 1995, Stanford's Bank of Antigua loaned the government EC$35 million to cover expenses including worker salaries and contributions to the pension fund, according to the government's Web site.

Two years later, Bird urged Natalia Querard to sell the 110- acre Half Moon Bay beach resort and golf course to Stanford, she said in an interview at her apartment in Antigua. The property, shattered by Hurricane Luis in 1995, sits on a half-mile long, white-sand beach on the southeast coast.

Querard said she refused to sell the still-shuttered hotel and the government moved to claim the property by eminent domain, which she fought for more than a decade. In December 2007, the U.K. Privy Council, which serves as the final arbiter for Antiguan legal issues, ruled that Antigua had the right to take the land after the owners didn't rebuild.

Several Investors

"The expropriation of Half Moon Bay is the result of what a person like Stanford, when brought to a jurisdiction like Antigua, can produce," Querard said. Bird said in the telephone interview that Stanford was just one of several investors the government sought to develop the beach property.

Stanford became a citizen of his adopted country in 1999 and was the "the most influential money man in the country," according to a paper scholar Douglas Payne wrote that year on Antigua's governance for the Center for Strategic and International Studies, a Washington-based nonprofit research group.

"I won't deny that Allen Stanford and others have some reasonable influence with the government, but it is predicated on the fact that they are investors," Payne quoted Bird as saying.

Just before the 1999 election that gave Bird a second term, Stanford fired two editors at the Antigua Sun newspaper he owned after they protested his quashing of an article that criticized the Bird government, according to the Committee to Protect Journalists and the CSIS report.

'Top-Notch Team'

That year, U.S. authorities criticized a Stanford-led effort to rewrite the island nation's banking laws. Bird had appointed him to the board of the Antiguan entity that regulated offshore banks.

Stanford hired a "top-notch team of former U.S. legal and regulatory professionals" to help the country adopt anti-money- laundering rules, his company spokeswoman, Suzanne Hamm, said in a 2006 statement to Bloomberg.

Thomas Cash, a member of that group, and a former special agent in charge of the Drug Enforcement Agency's Florida and Caribbean Division, said in a March 2 interview that Stanford "didn't have any role in developing the standards," though he "attended a few meetings."

The result was a watering down of Antigua's money laundering laws just as the U.S. was looking to tighten them, Jonathan Winer, a deputy assistant secretary of state at the time, said in a 2006 interview.

'Ceded Oversight'

A State Department cable sent from the U.S. Embassy in 1999 said "the Antiguan government has effectively ceded oversight of its offshore sector to an offshore banker and his minions." Winer said the banker referred to was Stanford.

That led the U.S. Treasury to label Antigua and Barbuda a money laundering risk, only the second time it had issued such a warning against an entire nation. In 2001, after months of negotiations with U.S. officials, Antigua strengthened its banking laws and the Treasury lifted the warning.

Stanford's role "was unprecedented, bizarre, inappropriate, an obvious conflict of interest," Winer said in an interview last month.

In 2003, Bird announced that his government and Stanford agreed that the Texas banker would spend EC$256 million, including EC$40 million on a development just outside the airport. A further EC$135 million would go to restore the reef and build a home on Maiden Island, a 19-acre piece of land shaped like the head of a Texas Longhorn steer, with red mangroves along the shoreline.

'Surrendering Patrimony'

Then-opposition leader Spencer, who became prime minister in 2004, criticized the agreement as "surrendering the people's patrimony," according to a copy of the speech on the United Progressive Party Web site.

The airport complex, along a palm-lined boulevard, includes both Stanford banks, a development company, the Stanford Cricket Ground and two restaurants -- the Sticky Wicket and the Pavilion, which boasts an 8,000-bottle wine cellar "constructed with antique timber oak, handmade brick and weathered French limestone," according to its Web site.

In November 2003, Spencer accused Stanford in a speech posted on his party's Web site of throwing "two fistfuls of dollars" at two Bird cabinet officials for their support on a swap of land.

"This has touched a very raw nerve in my body," Stanford said at a news conference denying the allegations, according to an account on the government's Web site. "I have never in my life bribed or done anything illegal or unethical in my business endeavors, much less in Antigua," he was quoted as saying.

He said the EC$200,000 he gave to the politicians was for "constituency development," according to the account. Then he announced he was donating a second check for EC$100,000 to each.

'Knight Commander'

In 2006, at the request of Bird's Antigua Labor Party, Stanford was named "Knight Commander of the Most Distinguished Order of the Nation." He adopted the title, "Sir Allen."

Bird said his dealings with Stanford were based on the banker's willingness to spend to develop the island.

"I was not a tremendous personal friend of his as many people are trying to say," he said in the interview. "I was the prime minister and we had an excellent relationship as the largest investor in the country."

Spencer moved to stop the banker's land accumulation after he defeated Bird to become prime minister in March 2004, he said in a Feb. 18 interview after a political rally on the island.

Antigua Debt

By that time, Antigua owed Stanford EC$230 million, according to a 2004 budget speech by Finance Minister Errol Cort posted on the government's Web site. Cort said the island was budgeting about EC$524 million for tax revenue in the fiscal year.

In that address, Cort announced that Stanford had agreed to write off EC$50 million of the debt, donate EC$1 million to build a national library, create a EC$10 million fund to support small businesses and build a EC$25 million higher education complex.

Antigua, in turn, gave what Cort termed the "green light" to Stanford's acquisition of Guiana Island.

The Spencer administration's rejection of further development at the airport led to the 2005 meeting with scores of workers, who sat on white folding chairs in front of two gleaming white jets at Stanford's private hangar. In the video, he said the government wasn't making payments on any of his loans, and that they "can't pay their bills."

He warned that all his future plans, including a resort on Guiana Island and the reef on Maiden Island where he was building his own home, were dependent on approval of the projects.

Manicured Lawns

"This will change all your lives for the better," he said.

Today, the area around Stanford's hangar, which he described in the video as "disused," is landscaped with palms and manicured lawns. It is surrounded by a wall and security gate, where a guard stops visitors from entering. The Maiden Island reef restoration was completed in 2005. Stanford bought Guiana Island last year, though it remains undeveloped.

In the banker's view, as he told his employees in the video, his investments on Antigua were "the biggest thing that has ever happened in this country, historically, financially, economically.'"

The government sought to seize Stanford's land to "protect the patrimony of Antigua and Barbuda," Spencer told the Antigua Sun on Feb. 26. "We have done something historical and unprecedented."

To contact the reporters on this story: Alison Fitzgerald in Washington at afitzgerald2@bloomberg.netThomas Black in Monterrey, Mexico, at tblack@bloomberg.net.

To contact the editor responsible for this story: William Glasgall at wglasgall@bloomberg.net.

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# Exhibit N

Sign into the Guardian using your Facebook account

**theguardian | TheObserver**

Big interview

# We have lift-off

Houston billionaire Sir Allen Stanford tells Andy Bull how, from his base in Antigua, he hopes to revive Caribbean cricket and sell the game to middle America

The Observer, Saturday 1 March 2008

Colorado is not a place that many people associate with cricket. But, while the hype surrounding the Indian Premier League suggested that the future direction of the game was being shaped within the confines of a Mumbai auction house, something equally significant was occurring in the small town of Fort Collins, in the shadow of the Rocky Mountains.

A typical American town, Fort Collins has no cricket team or pitch and had no interest in the game. Until three months ago, that is, when the 125,000 inhabitants were given a crash course in cricket courtesy of the Texas-born billionaire Allen Stanford. He is the man bankrolling a cricket revolution in the West Indies. While recent developments in India have been dramatic, what Stanford is doing in the Caribbean is even more extraordinary, starting with the inter-island competition that bears his name.

Last week he issued an 'OK Corral' challenge to Australia and England to take on his West Indies All Stars in a winner-takes-$20million Twenty20 game. That made headlines, but what was less well reported is that he also spent $3.5m (£1.75m) on a unique experiment. He wanted to see what would happen when you introduced Stanford 20/20 to a town that had no previous exposure to cricket. A marketing team hit Fort Collins with door-to-door pamphleting and adverts screaming 'You gotta see this!' on hoardings and in newspapers. He hosted viewing parties, flew over coaches to hold net sessions and employed people to sit in bars and explain the rules to passing customers. Each match in this year's Stanford 20/20 was broadcast during prime time to Fort Collins' 56,000 homes and he flew a party including the mayor to Antigua.

Not many people heard about this outside the town because it was not being done for publicity. It was the first step in a serious, concerted effort to make the Stanford 20/20 one of the world's most watched sports tournaments. It is shown in the UK by Sky, as well as in India, Australia and North America. Stanford sincerely believes that he has found a family-friendly TV sport of the future.

In 2007 Stanford was ranked the 239th-richest individual in America by Forbes magazine. His wealth management firm - Stanford Financial - has clients in 136 countries on six continents and is worth more than $50billion. The power that his wealth provides when exercised in a country as small as Antigua is difficult to comprehend. He owns the national bank, runs the airline, paid for the hospital, and built the hotels. The island is, to a degree, his fiefdom; the government awarded him a knighthood, presented

by Prince Edward, in 2006. His money has also bought him the co-operation of the West Indies Cricket Board and of 14 great former players, his fellow knights Viv Richards and Garry Sobers among them, who nominally act as the tournament's board of directors.

His relationship with Antigua's government and, in particular, the murkier aspects of his property deals on the island have attracted criticism from some areas. The Wall Street Journal reported on irregularities in his business transactions in 2002. In the same article the author reported that Stanford's affection for Antigua was strengthened when he met Father Gerard Critch, a priest on the island who was afflicted by stigmata in 1998. Stanford reportedly carries a vial of congealed fluids extracted from Critch's foot as a memento.

He set up the Stanford 20/20 in 2006. It features 20 teams, from the traditional homes of West Indian cricket - Barbados, Jamaica, Trinidad, Guyana - but also from Bermuda, St Maarten in the Dutch Antilles and the US Virgin Islands. Every game is played at his custom-built ground outside St John's, the Antiguan capital. Each boundary hoarding carries Stanford's name, as does every piece of merchandise, from the signature shiny black bats to the temporary tattoos given out on the gate. Stanford is so rich that he does not need this tournament to make money. At first the only financial gain for Stanford, who also sponsors golf and polo, was through raising his company's profile and entertaining clients.

That seems a slender return, given the sums involved. He has pledged $130m to West Indian cricket over five years, with the eventual aim of making all the competing teams fully professional. He is already bankrolling four sides (Anguilla, Antigua & Barbuda, Nevis and St Lucia) to practise and play full-time. They have their own physiotherapists, nutritionists and equipment. 'West Indies cricket was dying, just dying, because we were trying to run this thing like we were amateurs down here and you can't do that,' Stanford says. 'A bank-teller playing the game at the weekends? How can you do that? These kids are going to eat, sleep and breathe cricket.'

As he pays their wages, the professional players are under Stanford's control. He could feasibly withhold them from the Test team, but he insists: 'It would be totally counter-productive for me to do that, there'd be fighting, be bad PR, why would I do that?'

A large part of Stanford's investment is being spent in a much more conspicuous manner. Trinidad & Tobago received $1.2m for winning this year's event, while Jamaica picked up $600,000 for losing the final by nine wickets. Stanford has installed a $50,000 antique clock in his pavilion. Any batsman who hits it with a six will win $200,000 for himself, and the same amount for a random member of the 8,000 crowd. Every game is sold out.

While awarding journeyman spinner Dave Mohammed $100,000 for bowling four overs and taking four for 20 is unlikely to do much for Caribbean cricket in the short term, Stanford has a genuine desire to make West Indies the best team in the world. He is building an infrastructure that will pay dividends in years to come, including two cricket academies.

So when did he decide to rescue the sport in the islands? 'Three years ago, Mikey Holding and I were having lunch, and we were talking about the demise of West Indies cricket and what you can to do to revive it.' Stanford lives in St Croix in the US Virgin Islands, having moved to the Caribbean in the 1980s because of the tax breaks and the warm weather. He has been in the area long enough to know that 'when cricket, which is the glue that binds us all together, comes up, we go up with it, and when it sinks down we all sink with it. My initial thought was just to do anything to give West Indies a shot in the arm. But this thing was a lot more successful than any of us thought.'

'This thing' is not exactly cricket as we know it. A brochure explaining the rules to the citizens of Fort Collins begins: 'Traditional cricket is a fairly formal affair, with longer matches drawn out over a period of days, and there are even breaks for lunch and tea. This is not 20/20 cricket.' Beneath there is a picture of a man in whites with a large red cross painted through him.

Stanford is equally blunt about Test matches. 'This is entertainment, just like going to a movie. The purists lose sight of that: it's entertainment, that's it. If you don't get that then you're living in the Sixties. Dancing, music, 20/20, this is the way we play it, for entertainment. You go to any sporting event in the world right now, it's being driven by television. And people aren't going to turn on if you do something dry and boring, there's got to be all kinds of stuff happening. If something doesn't give you instant excitement and enthusiasm, you're not going to watch it.

'If we can take West Indies cricket from where it is now, and move it up to where it can be, and rightfully ought to be, we've got to understand the dynamics of marketing and selling this product.' He adds that 'cracking America is not driving this product, but make no mistake, it is important, very important'.

His tournament is explicitly tailored towards an American TV audience. Each winning player received a $5,000 gold championship ring, aping the Super Bowl, and there was a $10,000 'play of the day' prize. The final was a terrible game, but that just meant the firework display and soca concert that followed started earlier.

If there is nothing pure about the way Stanford treats cricket, he still has some conservative views. 'It used to be, when I was growing up, you started in pro sports with a team and you finished your career with that team. Now, where's the loyalty?' In an era when sport is increasingly contested - as in the IPL - between arbitrary franchises composed of well paid foreign players, Stanford believes he has one crucial advantage.

'What you see here can't be emulated anywhere else, they can't do it in India, they can't do it in Australia... we have island versus island competition. As long as we can keep that pure, we'll have something no one else has in the whole world.

'You're born and bred in Nevis, then that's where you play from. We have a litmus test of residency. If you can keep kids from Nevis playing their sport there from the beginning of their career to the end, not only do you get loyalty from the fans, but you get a rivalry between the players that you're not going to get anywhere else.'

Stanford's manner invites a certain scepticism. He is a booming Texan with a bent for robust management-speak and a penchant for smacking people on the back. He is often caught on camera high-fiving spectators, or throwing his arm around Curtly Ambrose or another of his 'legends'. It is worth remembering, though, that the huge sum of money he is investing in cricket is almost an irrelevance to him.

'At my stage of life [58] you want to have fun. I was at a funeral in Houston yesterday for a very dear friend, who knew me 20 years. He was only six months older than me. Cancer got him, and boom, he's gone, five weeks. You want to be close to your family, your friends and have fun in what you do, and I'm fortunate enough that I can do those things. This is a lot of fun.'

While that still holds true, there is no doubt that his attitude has changed in the three years since he conceived the idea. 'I've put the financial resources in place to quickly move this thing forward. I've got the business plan, the best board of directors in the world, I know how to do things in business that are successful. We've got the foundation, now we're going build on it, and in three years West Indies will be the best Twenty20 team in the world.'

Some will scoff, but Stanford is serious. In 2009 Cuba will compete in the 20/20. Initially they were prevented from joining by the US trade embargo, but Stanford 'badgered the State Department and the Treasury' into giving approval.

This has become, as he says, 'big business'. And that, after all, is his speciality. The contrast between his tournament and the dismal 2007 World Cup could not be starker. 'They [the ICC] made some real bad judgment decisions, they did things from afar, they didn't get on the ground, know the pulse. If you're going to come here and try to cram something down somebody's throat, you're losing the great opportunity that every unique place in the world presents to you.'

Certainly Stanford has the ambition, money and organisation to have a major impact on the evolution of cricket. While he is seeking to enable cricket in the Caribbean to be financially self-sustaining, at this moment it is very much subject to his whims. If he were to exit the scene suddenly, he would leave a burgeoning organisation behind him, but one with little funding. For now, though, he is massively enthused by the project.

Does this make him a threat to the cricket establishment? 'I'll reverse the question: just who is the establishment in cricket at the moment?' It is a pertinent point. Control at the moment seems to rest with whoever has the deepest pockets and Stanford is, after all, intending to buy a game against Australia or England by luring the players with the prospect of a $20m payday. While cricket in India has entered a free-for-all frenzy, Stanford has tied up the Caribbean and the Americas all to himself. Perhaps we should be looking west as well as east if we want to see what the future of cricket looks like.

## Ads by Google

Www Abnamro
Refinance From 2.250% (2.370 APR). See Qualifying Rates. BBB Rated 'A'
TheEasyLoanSite.com/AbnAmro
FreeCreditScore.com™
A Good Credit Score = 700 & Above. See Yours Now for $0.
www.FreeCreditScore.com
CHASE Official Site
Get $125! Open a Chase Checking Account - Learn More.
www.chase.com/$125Offer

©2012 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit O



LOOK SHARP                                              LIVE SMART

# Did This Man Pull Off the Most Brazen Swindle of All?

Antigua may seem like a tiny island paradise, but the Texas billionaire Allen Stanford—that's *Sir* Allen—lived very, very large there. Local critics say he treated the place like his personal corruption kingdom. And U.S. investigators claim he scammed his clients out of billions of dollars. **Aram Roston** travels to Antigua to check out the damage and speaks with the disgraced man himself, whose investment in his story is, well, highly emotional

BY ARAM ROSTON

June 2009



ON THE EVENING OF APRIL 20, just over two months after the Securities and Exchange Commission accused Texas billionaire Allen Stanford of a "massive, ongoing fraud," I put in a call to Stanford's lawyer, Dick DeGuerin. I'd been trying to reach Stanford for several weeks without any luck, but suddenly, to my surprise, DeGuerin said that if I wanted to speak with the disgraced banker, the moment was now. "Here's Allen," he said, putting him on the line. Stanford had spent the day in DeGuerin's Houston office, talking to reporters from a handful of outlets, defending his honor and lashing out at others—and now he was doing the same thing with me. "You and every other son of a bitch asking me these questions," he said. "You sons of bitches, all you want to talk about is something sexy! I was not defrauding people! There was no hocus-pocus! No damned Ponzi scheme going on!" But even in his anger, and after the insults subsided, there was something charming and likable about him—a jest he dropped into his rants, a plainspoken curse, a plea to my empathy and ego. I could see how I might have invested money with him. There were things he wanted to know from me, too, mostly having to do with what the people in Antigua, his adopted nation, were saying about him. And whom had I talked to, anyway?

On the day after the SEC announced its civil charges, I flew to Antigua and landed at V. C. Bird International Airport. I went through customs, picked up my rental car, drove past the parking garage managed by the Stanford Development Company, then past the Stanford Cricket Ground, next to which stood Stanford's cricket-themed restaurant, the Sticky Wicket, then on past the office of his newspaper, the *Antigua Sun* (which ignored the story of the SEC's investigation the day after it broke), and eventually made my way to the mother ship of his operations, Stanford International Bank, a stately building surrounded by palm trees and vibrant flower beds. When I parked my rental car and walked up to the front door of the bank, I was met by a guard wearing the distinctive insignia of Stanford's security force and hollering, "Leave now! Go now! Get out!"

Stanford International Bank was the core of what the SEC alleges was a "massive Ponzi scheme" that sucked in about $8 billion in "self-styled 'certificates of deposits'" from thousands of investors in the U.S., Central America, and Europe. So I wasn't the only one trying to get inside. In the days I was on Antigua, a steady pilgrimage of devastated investors—including, locals told me, a several-time Major League all-star, who flew here from spring training—arrived on the island and made their way to the bank. In the lobby of my hotel one morning I spoke with Esteban Sousa, a Venezuelan businessman, who sat surrounded by five other businessmen in the same predicament that he was in: If they didn't get their money, they'd have nothing. "My wife's money! My money! This is a nightmare," he said with his head in his hands. Later that day, Sousa and his friends flew home empty-handed.

Not everyone in Antigua was despairing, though. For one, there was an election campaign in full swing, and all along the twisting, bumpy roads, past the Technicolor flowers and up and down the hills overlooking the white-sand beaches that ring the island, cars were traveling with speakers jerry-rigged to their roofs, broadcasting the

slogans of the candidates for prime minister—"Lester Bird!" or "Baldwin Spencer!" or in one case: "Allen Stanford is a con man!"

In the restaurants, wealthy Antiguans gathered to talk about the latest cricket results or about Stanford's demise. On my second day there, I sat in a lovely place run by a woman who used to be a high-fashion model and who moved here in the '90s with her then boyfriend Robin Leach, host of *Lifestyles of the Rich and Famous*. A few tables away sat a man named Bill Cooper—William W. Cooper—who's been wanted in the United States since 1999, when the federal government indicted him for money laundering and fraud. He was dressed like a yachtsman, ordering grappa for his table, and at one point he strode over to mine to congratulate the woman I was dining with, a longtime nemesis of Stanford's, who he assumed should be celebrating herself. The next day, in yet another lovely restaurant, I ran into Jay Cohen, who in 2000 had earned special notoriety as the first person ever convicted on federal charges for running an offshore Internet sports-gambling operation, and who spent two years in federal prison before returning to Antigua. What were the odds, I said to a lawyer I was speaking with, of running into a fugitive and a convicted felon on consecutive days? He shrugged and smiled. "Small island," he said.

*****

**UNLIKE BERNIE MADOFF,** whose name now often appears in the same sentence as his, Robert Allen Stanford, the six-foot-four-inch former bodybuilder from Mexia, Texas, has doubled down on the denials of guilt and the outraged victimization. In our conversation, he insisted that the Stanford Financial Group was "a very well-run organization with the best people in the world, and the U.S. government came in and destroyed it all in two days." There is a lot that would suggest otherwise. According to the SEC, Stanford's multibillion-dollar empire was audited by a tiny accounting firm, for instance; his father and his Baylor University roommate—James Davis, who was charged in civil court along with Stanford and who in late March agreed to cooperate with federal investigators—sat on his board of directors; and Stanford promised consistently high rates of return ("improbable, if not impossible," as the SEC put it) no matter what the economy was doing.

In 2006, the nation of Antigua and Barbuda honored Stanford as a Knight Commander of the Most Distinguished Order of the Nation, and he immediately commenced referring to himself as Sir Allen, and employees were expected to do the same. He became the hero of Caribbean cricket fanatics (the West Indies team he bankrolled is called the Stanford Superstars) and the bane of the sport's English traditionalists by injecting cricket with the kind of money it had never seen. "His egomania displayed itself, more than anywhere else, in the cricket matches," one Antiguan told me. He paid a prize of $20 million for a match in a tournament the *Times* of London sniffed at as "meaningless and undignified." He openly flirted with players' wives, causing outrage in the British press when he was videotaped with one star English player's pregnant wife perched on his knee. And in June 2008 he irritated the entire United Kingdom by landing a helicopter at the traditional British cricket ground, Lord's, where he then showed off a Plexiglas crate full of cash.

Antigua was where the money went, but the investors came from all over the globe. The holdings of the Stanford Financial Group stretched across the Western Hemisphere, and based on allegations, it appears their main function was to raise deposits for his Antiguan bank. Last summer I called a money-laundering expert named Jack Blum to help me understand the workings of Stanford International. "It's a mystery bank," Blum told me. "Nobody's ever been able to prove anything. When I first became aware of them in the late '90s, it was a small thing. Now, suddenly, out of nowhere, it's representing billions."

Stanford entered the offshore-banking business in the mid 1980s, basing his operations on the tiny island of Montserrat. But when British authorities moved against his Montserrat bank in the early '90s, he needed a new base, which is when he began his long and fruitful relationship with the Antiguan government.

Those who still defend Stanford talk of him as a man of the people, and for all his cartoonish extravagances, in some ways, and certainly in his own mind, he was. "I'm not a mansion, gold-faucet type of guy," he told me, and then went on to describe "the best two years of my life," when he lived on Maiden Island, a once uninhabited twenty-three-acre natural treasure that he bought from the Antiguan government for no money down and where he installed a specially constructed artificial reef that kept strangers at bay. It was a simple life, he said. "No phone. I took a boat to work. Never should have left that island."

Stanford liked to drive himself along Antigua's rutted roads in his four-wheel-drive SUV. One afternoon, he parked his truck and walked up the steps of a little bar called On the Ground, a hole-in-the-wall with wooden-lathe windows that let in the island breeze. Walter Sweeney, the bar's owner, calls Stanford "the greatest man I've ever met." Stanford would often pay with hundred-dollar bills and refuse the change, Sweeney told me. "I'd have to put six Carib beers on the bar. I used to just put them up there one at a time. But he said, 'No, put six there,

Walt!' And then he drinks them like that: one, two, three, four, five, six!" Sweeney smiled, recalling how, after Stanford guzzled them down, he would stretch and flex his muscles a bit and say, "Oh, Walt, now I feel like going to the gym," and then walk out of the bar and drive himself off down the road. "From the time he got here, he let everyone know what he's gonna do in Antigua," Sweeney said. "It was no secret. He and the government got along. He had no fear of investing his money here."

In May 1993, Stanford's bank made its first big loan to the government of Antigua, for $3.7 million at 13 percent interest. That same day, Stanford, just 43 years old, signed a "trust" that gave him immense control over the airport grounds that would later become the center of his operations.

According to Jack Blum, "He bought the prime minister." Many Antiguans now seem to agree—though that's a separate issue from whether Stanford is guilty of what the SEC is accusing him of. And even if he is, there appears to be genuine ambivalence here about what it will mean for Antigua, since a lot of people here viewed him not as a neocolonialist but as a protector of their interests against the great bully to the north. I joined a group of businessmen and lawyers one day at an outdoor table at the Trade Winds Hotel, high on a hill overlooking tranquil Dickenson Bay. John Fuller, a powerful Antiguan lawyer, sat at the head of the table, cursing at anyone who told him to put his cigarette out. The secret to Stanford's success was simply money laundering, he said. "He must have been washing money. The way that he spent money caused concern for everyone. He spent it *hugely*. He spent it *wildly*, and it became inexplicable." Fuller knew Stanford and had even represented one of his companies for a time. "The only two ways he could spend money like that were, one, he was spending depositors' money, or two, he was laundering money!"

When I raised the possibility that his bank was engaged in money laundering, Stanford exploded on the line. It was "absolute horseshit," he said, and went on to claim that the entire Antiguan banking system was "too small for money laundering. It doesn't happen there. It happens in places like Miami and Atlanta. You're painting pirates in the Caribbean, making it out to be a nefarious island."

John Fuller's brother, James, was a longtime adviser to former prime minister Lester Bird, whose family dominated Antiguan politics from the nation's inception, in 1981, up to 2004, when Bird was defeated by an opposition party that railed against his relationship with the "neocolonialist" Allen Stanford. One afternoon, I sat with Fuller in Stanford's restaurant, eating Sticky Wicket burgers and talking Antiguan politics. The relationship between Bird and Stanford wasn't corruption, he said, just business. "In Antigua," Fuller explained, "you've got to lick ass to take the investors as they come!"

"I never bought Lester Bird—that's horse manure," Stanford told me. "Lester Bird's no more in my pocket than anyone."

Despite Stanford's defense of the Antiguan banking system against charges of corruption, the notion doesn't seem to be quite so far-fetched. This past March, I spoke with David Tinsley, a former supervisory agent for the DEA who ran a large money-laundering task force out of Miami. Tinsley himself is a controversial character who was fired and rehired by the DEA after a disagreement involving an informant, and he now runs a private intelligence company called 5 Stones Intelligence. He told me he contacted Stanford for the first time in 1999, as Stanford was preparing to fly from D.C. to Houston. When Stanford answered the phone, Tinsley told him that he'd found dirty money in Stanford's bank, a lot of it, and that he'd already sent out subpoenas. Stanford told his pilots to reroute his flight, and within hours he touched down at the Miami airport, then drove to the secure DEA compound in the center of the city. "We were somewhat staggered that he would come talk to us without a truckload of attorneys," Tinsley said.

As Stanford sat in a DEA conference room, impeccably dressed and polite, Tinsley told him that he'd been tracking the money of the legendary Mexican drug lord Amado Carrillo Fuentes, who'd apparently stashed some of his funds in Stanford International. "Mr. Tinsley," Stanford finally said, "if you tell me this money's bad and get a seizure order, I'll personally deliver it."

Tinsley shook his head as he recounted the scene, still surprised by Stanford's willingness to cooperate. "He said, 'If I have other accounts you want to know about, just tell me. I'll let you see them!'" Agents say Stanford also told them he'd been approached by international spy services—Tinsley assumed he meant the British secret-intelligence service, MI6—who wanted access to his customer accounts. "I want you to be aware," Tinsley recalled Stanford telling him, "I've never helped them, but I'm helping you."

Tinsley suspected that access to Stanford's books would open up a gigantic trove of information about drug money, and several months after that meeting, Tinsley tried to recruit a Stanford International executive, offering $250,000 to become a confidential informant for the DEA. But Stanford's employee turned him down.

"The pathology of loyalty in that company," Tinsley said, "was *very* strong."

The next time Tinsley met Stanford, not long after that, Stanford embraced him and said, "My good friend! Why did you try to recruit my employee?" Right before Tinsley retired from the DEA, though, in 2008, Stanford called him one more time. "He offered me a job," Tinsley said. "He said to come and see him."

*****

**STANFORD MAY HAVE** had no greater nemesis on Antigua than Makeda Mikael, a 66-year-old grandmother of ten. Mikael runs the "fixed-base operations" at the airport, which means she handles all the private jets that fly into and out of Antigua. I sat with her in her office one afternoon and talked about the grip Stanford had over much of the island. "This is the sort of insanity that comes in a small island in the clutches of a man with that kind of money," she said. "He can buy everybody, and he ended up buying a whole lot of people."

We walked out onto the tarmac, and Mikael pointed out Stanford's massive hangar, which looms above her office. One evening, long before things became vicious between them, she peeked through the open hangar doors and saw Stanford standing there, alone, gazing at his newest private jet—a Bombardier Global Express, capable of flying him from Texas to London without refueling. "You should have seen him," she said, describing how he walked along the length of the plane, smiling to himself. "He was like a kid," she said. "He was so happy."

Not long after that, she got a phone call from the United States. It was Stanford on the line, cheery and engaging. "Hello, doll. This is Allen." He wanted to get into the fixed-operations business, he told her. He wanted them to work together. "I was the only thing in his way," she said as we stood there on the tarmac. "The only thing until he had complete control."

Around the same time, Stanford began contributing and cozying up to politicians back in the States like never before. According to the watchdog group the Center for Responsive Politics, between its PAC and individual contributions from its employees, Stanford Financial Group donated at least $2.4 million to both parties over the past nine years. (Stanford personally donated about $900,000.) And since 1999, the company spent another $4.8 million on lobbyists, including James Conzelman, the former chief of staff of the House Financial Services Committee chairman.

On January 15, 2003, Mikael was there on the tarmac as some of the most powerful men on Capitol Hill stepped down from Stanford's luxury jets into the Antiguan sun. There was representative Robert Ney (R-Ohio), who later became notorious for his dealings with Jack Abramoff and was convicted of conspiracy and making false statements (and who in 2005 entered lavish praise of Allen Stanford in the *Congressional Record*). Pete Sessions (R-Texas), a key leader in GOP financial-services regulation, was also there, as were Philip Crane (R-Illinois) of the powerful Ways and Means Committee, Donald Payne (D-New Jersey) of the International Relations Committee, and Max Sandlin (D-Texas) and Gregory Meeks (D-New York), both of whom sat on the Financial Services Committee.

The men had ostensibly come to Antigua for a conference sponsored by the Inter-American Economic Council, but whether they were aware of it or not, they were also there to make clear to all of Antigua that Stanford had the blessing of the U.S. government. As James Fuller, then adviser to the prime minister, told me, "They acted like they worked for Stanford. The American politicians put the stamp of approval on him." Stanford often bragged of his political ties, Fuller said. "Everyone here in Antigua, including me, got the idea that he had had the approval of the very top levels of the American government."

During my conversation with him, Stanford did indeed seem proud of his political connections. He described being among a group of one hundred businessmen who spent a weekend with President George Bush in Crawford, "talking about what's wrong with the country and the world—just kind of a think tank. I've got photos of me and the president," he said, though he then added, in a tone that almost made you feel sorry for him, "Big deal." (A spokesman for President Bush told me, "The president had no relationship with Allen Stanford.")

Stanford's was an equal-opportunity largesse, though, which he sees not as influence peddling but as an exercise in democracy. He described being in Denver for the Democratic convention, "on a stage with Madeleine Albright and Nancy Pelosi," but then also expressed his opinion that Tom DeLay, whom he considers a friend, "got the shaft." "I also like Chris Dodd and Chuck Schumer. And Pete Sessions, he's a very good friend, and I think the world of him."

Back in January 2003, even Makeda Mikael was impressed. "I thought he must be somebody real good," she said. "Antigua felt happy to see so many of them. We thought that they were coming because they wanted to help

Antigua and make it a better place. I mean, he couldn't be money laundering, he couldn't be into anything bad, if all the American politicians came here with him."

Soon after Stanford's guests flew back to D.C., the government of Antigua leased him the last chunk of airport land he wanted, which included the last one on which Mikael's office stood. Soon after the deal, construction workers showed up and fenced in her office to bar her from access to the runway. She hired somebody to tear the fence down, then filed a suit against Stanford Development Company. "He started to fence me in so I would not be able to work," she said. "I wasn't able to get any help from the government, because he's the government's best friend—the friend of the prime minister."

In 2004, after the opposition party defeated Lester Bird, there was hope among some on the island that Stanford's grip on the country would loosen. That hope soon proved naive. Instead, once again, he flew in a group of American politicians. And once again Mikael watched as representatives Payne, Sessions, and Meeks, as well as John Sweeney (R–New York) and Donna Christensen (D–U.S. Virgin Islands) lined up on the tarmac. Stanford introduced them to the new prime minister of Antigua, Baldwin Spencer, and the next day the *Antigua Sun* reported giddily: "Mr. Stanford personally provided four private jets to facilitate the visit, and entertained the delegation yesterday evening at a dinner banquet at the Pavilion"—Stanford's upscale restaurant, the best in Antigua.

As for Makeda Mikael, she steadily gathered documents—land-purchase agreements and lists of political contributions—to corroborate her belief that Stanford had co-opted the government and was unlawfully trying to take over her business. Her case went all the way up to an appeals court in England, the Privy Council (the functional equivalent of the U.S. Supreme Court for anyone living in the British Commonwealth), and late last year the council ruled in her favor, validating her claims that Stanford had tried to undermine her and take her business. When I suggested that that must have been a very good day for her, she gave a rueful shake of her head. "Vindication is not a celebratory affair," she said.

*****

**IN SEPTEMBER 2008**, though, as the bottom was dropping out of the global economy, Allen Stanford was still smiling broadly. On CNBC he boasted about how he'd wisely stayed out of the subprime-derivatives market. "We decided not to take that risk," he told the anchor, before confirming for the viewers that, yes, it was indeed fun being a billionaire. Later he calmly told a BBC reporter, "We're sitting on a huge pile of cash, and we're looking to acquire stuff—*quality* stuff."

Months later it all came crumbling down. On February 17, more than a dozen federal agents swept into the gleaming headquarters of the Stanford Financial Group in Houston as a federal judge issued an emergency order putting all of Stanford's holdings into receivership. His twenty-nine offices in the United States were shuttered. His money, his planes, his yacht, his real estate—it was all frozen as the FBI hunted for him to serve him the civil papers. Two days later, agents found him in Fredericksburg, Virginia, in his girlfriend's mother's home.

SEC investigators allege that of the $8 billion on deposit in Stanford International Bank, Sir Allen had taken "bogus personal loans" amounting to $1.6 billion—which happens to be almost precisely the same as the 2008 GDP of the nation of Antigua and Barbuda. (In our interview, Stanford repeatedly insisted that the funds "were not *lent*. They were *invested*.") Where the rest of the money went is still being investigated. In late March, his old confidant and college roommate, James Davis, started cooperating with investigators, talking, according to his lawyer, about Swiss bank accounts and shell corporations around the world.

Stanford got overheated when the subject of Davis came up. "I don't know what the hell Jim Davis is saying," he said. "I depended on Jim Davis to do his job."

Toward the end of the conversation, though, his tone became much less combative, and he recaptured what I imagined was much of his old swagger. He told me he would have been moved up on the Forbes list of the 400 richest people in America. "I would have been 190th, before all this shit hit the fan," he said, though he then added, in a tone that seemed a perfect mix of defiance and regret: "I don't care." I asked him about what he missed most, and he talked about how his life had been constrained, how the government had "sealed it shut. Your credit cards have all been cancelled. Of course you don't have a job. Your paycheck. The only money you have is in your wallet." He still could get politicians on the phone, though, he said. "The ones that like me and know me. Pete Sessions, I could get him on the phone."

Then, oddly, he asked if I'd ever lost anyone I'd loved. He said both his younger brothers died tragically (one, Texas county records show, died by a "self-inflicted gunshot wound"). He sounded near tears. "This is my

lifewe're talking about," he said. "It is not a story. It's my *life*." He told me to think about what it was like to lose someone I love. Think of that, he said, "and *then* you write it." The man who stands accused of lying to thousands of investors and taking billions of dollars from them and spending it on his outrageously lavish life had one last request for me. "Can you have some human capacity," he asked, "to write something that is real?"

ARAM ROSTON *is an Emmy-winning investigative journalist and the author of* The Man Who Pushed America to War: The Extraordinary Life, Adventures, and Obsessions of Ahmad Chalabi.

TAGS
New smakers, Allen Stanford, Antigua