# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
November 22, 2016
Lyle W. Cayce
Clerk

No. 15-10717

JOAN GALE FRANK; JON A. BELL; DOCTOR SAMUEL BUKRINSKY; JAIME ALEXIS ARROYO BORNSTEIN; PEGGY ROIF ROTSTAIN; JUAN C. OLANO; JOHN WADE, in his capacity as trustee of the Microchip ID Systems, Inc. Retirement Plan, on behalf of themselves and all others similarly situated,

      Plaintiffs–Appellees,

v.

THE COMMONWEALTH OF ANTIGUA AND BARBUDA,

      Defendant–Appellant.

---

Cons. w/ No. 15-10788

THE OFFICIAL STANFORD INVESTORS COMMITTEE,

      Plaintiff–Appellee,

v.

ANTIGUA AND BARBUDA,

      Defendant–Appellant.

Appeals from the United States District Court
for the Northern District of Texas

Before WIENER, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

These consolidated cases involve Defendant–Appellant, the Commonwealth of Antigua and Barbuda ("Antigua"), and its alleged involvement with the Stanford Ponzi scheme. As a foreign nation, Antigua challenged the district court's jurisdiction in each suit under the Foreign Sovereign Immunities Act ("FSIA"). The district court determined that it had jurisdiction over the suits under both the commercial activity and waiver exceptions of the FSIA. Antigua appeals these rulings. We REVERSE in part and REMAND.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The consolidated cases involved in this appeal are: (1) No. 15-10717, *Frank et al. v. Commonwealth of Antigua & Barbuda* and (2) No. 15-10788, *Official Stanford Investors Committee v. Antigua & Barbuda*. Plaintiffs in the first suit, the "*Frank* suit," are individual customers[1] of Stanford International Bank, Ltd. ("SIBL") that "had money on deposit at SIBL, and held [certificates of deposit ("CDs")] issued by SIBL." Plaintiff in the second suit, the Official Stanford Investors Committee ("OSIC"), the "*OSIC* suit," is a court-appointed committee representing the interests of SIBL depositors and the court-appointed receiver and receivership estates. Defendant–Appellant Antigua is an island nation located in the Caribbean. Both the *Frank* and *OSIC* suits were filed over Antigua's alleged involvement with the Stanford Ponzi scheme and were consolidated on appeal solely to address whether the district court has jurisdiction over Antigua under the FSIA.

---

[1] The *Frank* suit was filed by several individuals as a class action, but, for clarity, we will refer solely to the first named individual, Joan Gale Frank, on behalf of the potential class.

A.  **Stanford Ponzi Scheme**

To understand the underlying allegations in both suits, a brief explanation of the Stanford Ponzi scheme is required.[2] Allen Stanford owned and operated multiple financial entities, including the SIBL, which was an offshore bank located in Antigua. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 (5th Cir. 2013). Through these entities, Stanford sold CDs to investors, promising exceptionally high rates of return. *Id.* Most of the funds raised from the sale of these CDs were never invested, as promised, but were used to pay back other investors in the scheme. *Id.* When the scheme collapsed in 2009, Stanford had sold over $7 billion in fraudulent CDs. *Id.* at 188–89. Stanford was subsequently convicted of multiple federal crimes and was sentenced to 110 years' imprisonment. *United States v. Kuhrt*, 788 F.3d 403, 412 (5th Cir. 2015); *Janvey*, 712 F.3d at 189.

B.  **Antigua's Alleged Involvement in the Scheme**

The primary allegation in both the *Frank* and *OSIC* suits is that Antigua acted as an active and willing participant in Stanford's scheme and knowingly provided Stanford and his businesses a safe harbor from regulatory scrutiny. Plaintiffs in both suits allege that Stanford and Antigua engaged in a quid pro quo relationship in which Stanford provided Antigua financial incentives to encourage and ensure its involvement in his scheme by bribing public officials and providing loans to Antigua, which were never repaid. Specifically, Plaintiffs allege that the "loans were merely a way to transfer the proceeds of the Ponzi scheme to Antigua." In exchange for the loans, they allege that "Antigua assisted Stanford by conferring legitimacy on the fraudulent enterprise and on Stanford himself, providing assurance to investors that the

---

[2] For more information on the Stanford Ponzi scheme, see *United States v. Stanford*, 805 F.3d 557 (5th Cir. 2015), and *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013).

activities of SIBL and Stanford were legitimate and subject to regulatory authority."

Plaintiffs contend that as part of its involvement in the Ponzi scheme, Antigua allowed Stanford undue influence over the regulations his organizations would be subject to. They also allege that Stanford exerted undue influence over the individuals charged with ensuring that he and his organizations were in compliance with the relevant regulations. Crucial to Antigua's alleged involvement with Stanford's scheme was the Financial Services Regulatory Commission of Antigua ("FSRC") and Leroy King, the FSRC's Administrator and Chief Executive Officer, who were tasked with regulating the SIBL. Plaintiffs allege that Stanford bribed King in order to allow the SIBL to escape regulatory scrutiny from the FSRC.

## C.   *Frank* Suit

In July 2009, Frank filed a complaint on behalf of himself and similarly situated individuals alleging various claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a claim for aiding and abetting fraud, and a claim to recover fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Antigua filed a motion to dismiss in December 2010, alleging that the district court lacked jurisdiction under the FSIA and that Frank failed to state a claim upon which relief could be granted. Frank subsequently abandoned the RICO claims. In June 2015, the district court granted Antigua's motion in part and denied it in part. Specifically, the district court dismissed Frank's TUFTA claim for lack of standing and held that it had jurisdiction under the FSIA over the aiding and abetting fraud claim, which is the only remaining claim on appeal.

## D.   *OSIC* Suit

In February 2013, OSIC filed a complaint alleging two breach of contract claims, a claim for avoidance and recovery of fraudulent transfers under

TUFTA, a claim for aiding and abetting fraud, a claim for aiding and abetting a breach of fiduciary duty, civil conspiracy, and a claim for aiding and abetting violations of the Texas Securities Act. Antigua moved to dismiss in January 2014, arguing that the district court lacked jurisdiction under the FSIA and that OSIC failed to state a claim upon which relief could be granted. The district court granted Antigua's motion in part and denied it in part. Specifically, the district court dismissed OSIC's TUFTA claims for constructive fraudulent transfers occurring prior to February 15, 2009, but held that it had jurisdiction over all of OSIC's remaining claims, including its TUFTA claims for actual fraudulent transfers.

## II. JURISDICTION AND STANDARD OF REVIEW

Under the collateral order doctrine,[3] this Court has interlocutory appellate jurisdiction over a motion to dismiss on the basis of sovereign immunity. *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 286 n.4 (5th Cir. 1993).

Our review of a district court's sovereign immunity ruling under the FSIA is de novo. *Id.* at 287. This Court may "decide only legal issues when [it] review[s] an appeal from a collateral order." *United States v. Moats*, 961 F.2d 1198, 1202 (5th Cir. 1992). "This rule carries even more weight here because the district court resolved FSIA immunity . . . on the basis of the complaint," *id.* (citation omitted),[4] and, as such, we must assume the truth of the facts asserted, *see Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993).

---

[3] "[T]he collateral order doctrine accommodates a 'small class' of rulings, not concluding the litigation, but conclusively resolving 'claims of right separable from, and collateral to, rights asserted in the action.'" *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). These claims are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

[4] In FSIA cases, jurisdictional discovery may be permitted to resolve factual disputes crucial to determining whether a foreign state is immune from suit. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992). No such discovery was conducted in this case.

Case: 15-10717    Document: 00513796807    Page: 6    Date Filed: 12/14/2016
Case 3:09-cv-02165-N-BQ   Document 83   Filed 12/14/16   Page 6 of 12   PageID 1281
No. 15-10717 cons. w/ No. 15-10788

## III. DISCUSSION

### A.    The FSIA

A suit is properly dismissed when a court lacks subject matter jurisdiction over the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The FSIA "provides the sole source of subject matter jurisdiction in suits against a foreign state." *Dale v. Colagiovanni*, 443 F.3d 425, 427–28 (5th Cir. 2006); *see also* 28 U.S.C. § 1604. "The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts." *Dale*, 443 F.3d at 428 (quoting *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.*, 182 F.3d 380, 388 (5th Cir. 1999), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010)).

"However, a district court can exercise subject matter jurisdiction over a foreign state if one of the statute's exceptions apply." *Id.* at 428 (quoting *Byrd*, 182 F.3d at 388). A foreign state "need only present a prima facie case that it is a foreign state; and, if it does, the burden shifts to the party opposing immunity to present evidence that one of the exceptions to immunity applies." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000). Once the party seeking the exception has "assert[ed] at least some facts that would establish the exception," "the party seeking immunity bears the ultimate burden of proving the nonapplicability of the exception[] raised by its opponent." *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 390 n.14 (5th Cir. 1991).

This appeal involves two exceptions to sovereign immunity under the FSIA—the commercial activity exception and the waiver exception. We will address each in turn.

## B. Commercial Activity Exception

On appeal, Antigua contests the district court's application of the commercial activity exception in both suits. It does not contest the application of this exception to the breach of contract claims in the *OSIC* suit "to the extent that they are . . . limited to the contracts alleged in the OSIC Complaint." Therefore, regardless of our resolution of this appeal, the *OSIC* suit will proceed on the breach of contract claims.[5] Therefore, we address only the district court's holding on the commercial activity exception as it applies to OSIC's tort and TUFTA claims, as well as *Frank*'s aiding and abetting claim.

The commercial activity exception contains three clauses,[6] each describing different circumstances in which the exception applies. *See* 28 U.S.C. § 1605(a)(2). This appeal involves the third clause of the exception, which provides that a foreign state is not immune from suit in the United States when "[1] the action is based . . . upon an act outside the territory of the United States [2] in connection with a commercial activity of the foreign state

---

[5] Determining if subject matter jurisdiction exists under the FSIA requires a court to answer two questions—first, whether a party is a "foreign state" to which the Act applies, and second, whether any exception to the presumption of foreign sovereign immunity applies under the circumstances. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488–89 (1983). Although these *together* determine subject matter jurisdiction, it appears that the second part of the inquiry—regarding exceptions to foreign sovereign immunity—may be waived per the wording of the statute itself. *See* 28 U.S.C. § 1605(a)(1) (providing that a party can expressly or implicitly waive its immunity from the jurisdiction of the United States courts). As such, we see no reason why a party should not be permitted to waive the application of foreign sovereign immunity by failing to dispute the application of a particular exception under the Act.

[6] In full, the commercial activity exception provides that:
(a) "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . .

28 U.S.C. § 1605(a)(2).

elsewhere and [3] that act causes a direct effect in the United States." *Id.* "The first two elements ensure that 'there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign.'" *Aldy ex rel. Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 75 (5th Cir. 1996) (emphasis omitted) (quoting *Stena Rederi*, 923 F.2d at 386). The third element ensures there is a jurisdictional nexus with the United States. *Arriba*, 962 F.2d at 533. Our analysis focuses on the "direct effect" requirement.

The "direct effect" requirement involves a determination of whether the acts the suits are "based upon" had "a direct effect in the United States." 28 U.S.C. § 1605(a)(2). "[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity,'" *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (second alteration in original) (quoting *Weltover, Inc. v. Republic of Arg.*, 941 F.2d 145, 152 (2d Cir. 1991)), and "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption," *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quoting *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978)). There is no requirement that the effect be "'substantial' or 'foreseeable,'" but it cannot be "purely trivial." *Id.* (quoting *Weltover*, 504 U.S. at 618).[7]

In determining whether an act had a direct effect in the United States, "[t]he question is, was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1111 (5th Cir. 1985) (quoting *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir. 1981)).

---

[7] In its brief, Antigua argues that "a specific act causing the direct effect must be legally significant to the cause of action." While many other circuits have adopted this requirement, the Fifth Circuit has expressly rejected it. *See Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 894 (5th Cir. 1998).

Case: 15-10717    Document: 00513796807    Page: 9    Date Filed: 12/14/2016
Case 3:09-cv-02165-N-BQ   Document 83   Filed 12/14/16   Page 9 of 12   PageID 1284
No. 15-10717 cons. w/ No. 15-10788

Although place of payment is not a decisive factor on its own, *id.* at 1112, this Court has previously held "that a financial loss incurred in the United States by an American plaintiff, if it is an immediate consequence of the defendant's activity, constitutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception to the FSIA," *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 897 (5th Cir. 1998).[8] In *Voest-Alpine* the Bank of China refused to pay on a letter of credit owed to the plaintiff, and the plaintiff sued for breach. *Id.* at 890–91. This Court held that the plaintiff, which was an American company, "suffered a nontrivial financial loss in the United States in the form of funds not remitted to its account at a Texas bank" and that failure to be paid was an "'immediate consequence' of the Bank of China's actions." *Id.* at 896. Therefore, the "direct effect" requirement was met. *Id.* at 897.

A "direct effect" may also exist when a contract with a foreign nation was to be performed and payment was to be made in the United States. *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 218–19 (5th Cir. 2009). In *Weltover*, the Supreme Court held that Argentina's rescheduling of bond maturity dates had a "direct effect" in the United States. 504 U.S. at 618–19. Explaining its conclusion, the Court noted that "[b]ecause New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States." *Id.* at 619.

---

[8] In its brief, Antigua urges that *Voest-Alpine* is distinguishable because "the alleged commercial activities of Antigua are quite removed from (and unrelated to) the Appellees' financial losses." This argument rests on a misunderstanding of the third clause of the commercial activity exception. Antigua appears to believe the "direct effect" element must relate to the "commercial activity." Rather, the "direct effect" element requires that the conduct the suit is "based upon" have a direct effect in the United States. *See* 28 U.S.C. § 1605(a)(2).

9

On appeal, Frank and OSIC argue that two different financial losses had a "direct effect" on investors in the United States: (1) Stanford's Ponzi scheme itself and (2) Antigua's failure to repay the loans it received from Stanford. In regard to the argument that Antigua's actions had a "direct effect" on American investors who bought Stanford's fraudulent CDs, unlike *Weltover* and *Voest-Alpine*, the financial loss to American investors involved in Stanford's Ponzi scheme is not an "immediate consequence" of Antigua's actions. "Defining 'direct effect' to permit jurisdiction when a foreign state's actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff, would foster uncertainty in both foreign states and private counter-parties." *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 238 (2d Cir. 2002). While Antigua may have helped facilitate Stanford's sale of the fraudulent CDs, Stanford's criminal activity served as an intervening act interrupting the causal chain between Antigua's actions and any effect on investors. *See, e.g.*, *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 79–80 (2d Cir. 2010); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988). Therefore, Plaintiffs' first theory fails to satisfy the "direct effect" requirement.

Plaintiffs' second theory—that Antigua's failure to repay Stanford's loans resulted in financial loss in the United States—similarly fails. Plaintiffs have offered some evidence indicating that at least two of the loans identified in the complaint may require payment in the United States. Additionally, at least one of the loan agreements indicates that the lender, Stanford, was located in the United States. But, the relationship between Antigua and Plaintiffs is too indirect to satisfy the "direct effect" requirement. [9] Unlike

---

[9] This Court has previously held that the "direct effect" element was met in a transaction involving an "indirect" relationship. *See Byrd*, 182 F.3d at 391. In *Byrd*, the indirect relationship at issue was between an assignee to a lease and one of the original parties to the contract. *Id.* at 390–91. As this Court noted in *Byrd*, an assignee to a lease stands in the place of the original party to the contract. *Id.* at 391. Therefore, the relationship between Plaintiffs and Antigua is distinguishable, as Plaintiffs do not have the same rights

*Voest-Alpine* and *Weltover*, the financial loss in this case was not directly felt by Plaintiffs, who are investors and customers of Stanford and the SIBL. The financial loss due to Antigua's failure to repay the loans was most directly felt by Stanford who was the actual lender in the loan transactions.

Because we find that Antigua's actions did not cause a "direct effect" in the United States, we need not consider the other elements of the commercial activity exception's third clause. Accordingly, we reverse the district court's holding that the commercial activity exception applies to the *Frank* suit and OSIC's tort and TUFTA claims.

## C. Waiver Exception

Under 28 U.S.C. § 1605(a)(1), a foreign state is not immune from suit when the "foreign state has waived its immunity either explicitly or by implication." This case involves explicit waiver, which requires "an intentional and knowing relinquishment of [a] legal right." *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 234 (5th Cir. 2004) (quoting *Good v. Aramco Servs. Co.*, 971 F. Supp. 254, 258 (S.D. Tex. 1997)).

In responding to Antigua's motion to dismiss, OSIC argued Antigua waived sovereign immunity in two loan agreements it entered into with Stanford. The agreement for the first of the loans, referred to as the "$40 Million Loan," was provided to Antigua to "pay salaries and for other discretionary purposes." The second loan, referred to as the "$31 Million Loan," was provided to Antigua by Stanford to build a hospital. The district court found that provisions of both loan agreements explicitly waived sovereign immunity for OSIC's contract claims based on either loan.

---

and remedies as Stanford to recover for Antigua's failure to pay back the loans. As such, because the financial loss resulting from Antigua's failure to repay the loans was not directly felt by Plaintiffs, the "direct effect" requirement is not met.

Although Antigua contests the merits of the district court's waiver ruling, Antigua does not contest the application of the commercial activity exception to OSIC's breach of contract claims.[10] As such, OSIC's breach of contract claims will proceed under the commercial activity exception regardless of whether we overturn the district court's holding on the waiver exception.

Antigua also contests the scope of the district court's waiver ruling and asks this Court to limit the district court's ruling on the waiver exception to apply only to $71 million ($31 Million Loan + $40 Million Loan) in breach of contract claims. But, the district court's order itself already provides Antigua with the relief it seeks. While OSIC pleaded damages of "approximately $90 million" as a result of five different loans between Stanford and Antigua, the district court's order only addressed the $31 Million Loan and the $40 Million loan. Therefore, the district court has already provided Antigua with the relief it seeks on appeal. As such, we decline to further address the scope of the district court's waiver ruling.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE in part and REMAND for further proceedings consistent with this opinion.

---

[10] In its brief, OSIC also argues that the waiver exception applies to its TUFTA claims. But, as OSIC makes this argument for the first time on appeal, it is waived. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir. 2005).